IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JARED L. WHITT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CASE NO. 8:12-CV-00358 |
| ) | |
| UNION PACIFIC RAILROAD ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

DEFENDANT'S BRIEF IN SUPPORT OF
MOTION IN LIMINE REGARDING EXPERT
TESTIMONY OF DOUGLAS CASA, PH.D.

Prepared and Submitted by:

David J. Schmitt #19123
LAMSON, DUGAN & MURRAY, LLP
10306 Regency Parkway Drive
Omaha, NE 68114
(402) 397-7300

    and

Clifford A. Godiner
Tabitha G. Davisson
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, MO 63101
(314) 552-6433

ATTORNEYS FOR DEFENDANT

# BACKGROUND

## I. Plaintiff Alleges Three Separate Counts Against Union Pacific In This Action

Plaintiff filed this action against Defendant Union Pacific Railroad Company ("Union Pacific") claiming that he suffered two on-the-job injuries: one on June 12, 2012, when he purportedly lifted a bag of anchors and felt a strain in his arm, and another on June 28, 2012, when he suffered an alleged heat-related incident. (Second Amended Complaint, ¶¶ 8-10, 20-22, 29) Based on his injuries, Plaintiff brings two claims under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51, et seq. Specifically, Plaintiff claims that Union Pacific negligently failed to provide him a reasonably safe place to work because, inter alia, it did not provide assistance to Plaintiff for lifting anchors onto his machine (Count I), and because it did not provide training on heatstroke or respond appropriately to an employee with symptoms of heatstroke (Count II). (Second Amended Complaint, ¶¶ 11, 30)

Plaintiff asserts a third claim for relief (Count III) under the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109(c)(1), alleging that a Union Pacific manager interfered with his medical treatment following the alleged June 28 heat-related incident. (Second Amended Complaint, ¶ 45). Specifically, Plaintiff claims that, while being transported to the hospital by a Union Pacific manager, a higher-ranking Union Pacific employee intervened and had Plaintiff returned to the railyard. Plaintiff did proceed to the hospital about five hours later, where he was treated and released. Plaintiff's Second Amended Complaint does not allege any violations of rules or regulations promulgated by the Federal Railroad Administration ("FRA"), of an FRA regulation requiring Union Pacific to adopt an Internal Control Plan ("ICP"), or of a violation of Union Pacific's ICP.

Plaintiff identified Douglas Casa, Ph.D. ("Casa") as an expert witness to testify regarding liability issues in this case. He expresses opinions as to all three Counts. As set forth below, the Court should grant Union Pacific's Motion in Limine and exclude Casa's testimony regarding both Counts I and III of Plaintiff's Second Amended Complaint. For the sake of judicial economy, Union Pacific will not reiterate a detailed background of the case.[1] Rather, Union Pacific submits with this Motion in Limine the Report of Douglas Casa, Ph.D. dated November 30, 2013 (Ex. 1), the deposition of Douglas Casa, Ph.D. taken February 28, 2014 (Ex. 2), and selected portions of the deposition of Plaintiff (Ex. 3). The undisputed admissions by Casa in his sworn deposition demonstrate that Union Pacific's Motion in Limine should be granted as to Count I and Count III.

## II. Plaintiff's Liability Expert Douglas Casa, Ph.D.

Casa's Curriculum Vitae reveals no legal training, and Casa purports no expertise in shoulder injuries. Casa has never been employed by the Occupational Safety and Health Administration ("OSHA"), the FRA, or any railroad. (Casa Dep., 21:13-19) He has never worked in the rail industry in any respect and has not been to a railyard in any professional capacity. (Casa Dep., 21:20-22:9) Casa has never physically seen any of the machinery at issue in the present case, so any understanding he has of how that machinery works or what is required to operate that machinery in optimal or less-than-optimal conditions comes from discussions with Plaintiff's counsel. (Casa Dep., 22:16-19; 164:6-165:9)

Casa's experience as a purported expert is as a professor at the University of Connecticut, teaching in the department of kinesiology, which he characterizes as the study of human

---

[1] On February 24, 2014, Union Pacific filed a Motion in Limine to exclude proposed testimony from Plaintiff's liability expert witness George Gavalla. At that time, Union Pacific submitted a Brief providing a detailed factual background of the case along with numerous depositions supporting its factual citations. Rather than repeat that background, Union Pacific respectfully refers the Court to its earlier filing.

movement. (Casa Dep., 4:1-12). Casa's background is in the field of sports, with some experience with the military. (Casa Dep., 6:10-16) Casa testified that he specializes in the field of heat-related illnesses, including exertional heat stroke. His work in that field has primarily been associated with athletic sports activities. (Casa Dep., 7:17-8:7)

**ARGUMENT**

Casa purports to give opinions relating to Union Pacific's liability with regard to all three claims brought by Plaintiff. His Report lists 7 "Considerations" that he apparently intends to offer to the jury. (Ex. 1 at 1-8) As shown below, all of Casa's opinions with respect to Counts I and III are inadmissible. Further, to the extent that Casa's opinion regarding what would have happened to Plaintiff had he originally continued to the hospital, his testimony is also inadmissible.

**I.      Standard for Admissibility of Expert Testimony**

The standards for the admissibility of expert testimony are found in Fed. R. Evid. 702, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

It is a trial court's responsibility to act as a gatekeeper, ensuring that all expert testimony is both relevant and reliable before admitting it at trial. Daubert v. Merrell Dow Pharms., 509 U.S. 579, 589 (1993). This requirement applies not only to testimony based on scientific knowledge, but also to testimony based on technical or other specialized knowledge. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999).

Under Eighth Circuit precedent, proposed expert testimony is inadmissible unless it meets three prerequisites. Polski v. Quigley Corp., 538 F.3d 836, 839 (8th Cir. 2008). First, evidence based on scientific, technical, or other specialized knowledge must be useful to the jury in deciding the ultimate issue of fact. Id. Second, the proposed expert witness must be qualified to assist the jury. Id. Third, the proposed testimony must be reliable or trustworthy in an evidentiary sense as set forth in the three requirements in Rule 702. Id.

For purposes of the present Motion, six particular rules are especially important:

- First, the expert's opinion must be relevant to the case. Fed. R. Evid. 401-03. Experts cannot testify to matters that do not make the truth or falsity of a relevant proposition more or less likely. Barrett v. Rhodia, Inc., 606 F.3d 975, 980 (8th Cir. 2010) (courts must consider whether an expert's opinion can be applied to facts at issue); Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1056 (8th Cir. 2000) (even where an expert opinion is reliable, if it cannot be applied to the specific facts of the case, the opinion should be excluded).

- Second, the subject matter of the expert's opinion must "not exceed the scope of the witness's expertise . . . ." Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., 254 F.3d 706, 715 (8th Cir. 2001) (reversing district court's admission of testimony). Experts are routinely forbidden to testify about matters outside the areas in which they are qualified. Id.; Barrett, 606 F.3d at 981 (affirming exclusion of expert testimony on topics about which the expert was not qualified because she had no training or experience).

- Third, expert testimony must be based on rigorous and reliable methods. Kumho Tire, 526 U.S. at 148-49. "When determining the reliability of an expert's opinion, the district

court examines the following four non-exclusive factors: (1) "whether it can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) "[the method's] 'general acceptance.'" Presley v. Lakewood Eng'g & Mfg. Co., 553 F.3d 638, 643 (8th Cir. 2009) (citing Daubert, 509 U.S. at 593-94). The court must "separate expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." Id. (quoting Glastetter v. Novartis Pharm. Corp., 252 F.3d 986, 989 (8th Cir. 2001)).

- Fourth, before admitting scientific evidence, the court must determine whether the theory advanced by the expert has been subjected to the scientific method, focusing on the principles and methodology behind the evidence, not the conclusions they generate. Daubert, 509 U.S. at 594-95. Each step of the experts' methodology must be scientifically valid. Savage v. Union Pacific RR. Co., 67 F. Supp. 2d 1021, 1027 (E.D. Ark. 1999). A scientific conclusion is not "reliable" if it is not based on methods and procedures of science, but instead based on subjective belief or unsupported speculation. Id. ("A court may conclude that there is simply too great an analytical gap between the data and the opinion offered.")

- Fifth, "expert testimony on legal matters is not admissible. . . . Matters of law are for the trial judge, and it is the judge's job to instruct the jury on them." Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 2003). "Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards." Barragan v. Tyson Foods, Inc., 2008 WL 1776439, *5 (N.D. Iowa April 17, 2008) (quoting Burkhart v.

Washington Metro. Area Trans. Auth., 112 F.3d 1207, 1213 (D.C. Cir. 1997)). Expert testimony that "tell[s] the jury what result to reach or communicate[s] a 'legal standard – explicit or implicit – to the jury" is inadmissible. In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (footnotes omitted).

- Sixth, opinions that invade an area in which a jury does not need the assistance of an expert witness are inadmissible. Strong v. E. I. DuPont de Nemours Co., Inc., 667 F.2d 682, 686 (8th Cir. 1981) (issue of whether warnings are needed on equipment are not the proper subject of expert testimony because the "jury was capable of drawing its own inferences from the available evidence"); Brassett, 687 F.2d at 158. As the Eighth Circuit held in Ellis v. Miller Oil Purchasing Co., 738 F.2d 269, 270 (8th Cir. 1984), "[w]here the subject matter is within the knowledge or experience of lay people, expert testimony is superfluous." The test for determining the appropriateness of expert testimony is "the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Id. Given this standard, Ellis holds that expert testimony regarding proper driving behavior is inadmissible. Id.

As shown herein, Casa's opinions run afoul of one or more of these rules and should therefore be deemed inadmissible.

## II. Casa's Opinions Regarding Count I and Count III Should Be Excluded

### A. Count I: Casa's Opinions About Plaintiff's Alleged June 12, 2012, Injury Are Inadmissible

Plaintiff alleges in Count I that he injured his left arm on June 12, 2012, while lifting bags of anchors and claims that Union Pacific was negligent with respect to his injury. Casa does not evaluate the underlying negligence allegations in Count I:

> Q. As far as what was occurring that day with these bags of anchors, what was occurring, what wasn't occurring, are you rendering any opinions about that, Doctor?
>
> A. No, I really wasn't focused on that.

(Casa Dep., 128:5-9).

Instead, Casa purports to opine that Plaintiff's June 12, 2012, injury was exacerbated by Plaintiff's later heat-related injury. (Ex. 1, p. 2) During his deposition, Casa admitted that he has made what he calls an "educated guess" that any June 12, 2012, injury was exacerbated by the heat-related incident of June 28, 2012, and plays a role in his current condition. Consistent with this admission, Casa's testimony reveals that his "guess" lacks factual support, is not based on an appropriate scientific method, and is outside of his area of expertise.

> Q. We were talking about the current condition Mr. Whitt experiences with his left arm issues. My question is are you able to say whether with any certainty, reasonable certainty, whether or not the first incident with the lifting, whether or not that had any role one way or another in the condition that Mr. Whitt is currently experiencing?
>
> A. I think it[']s related because I think that first condition, he was dealing with something that was a little weak in his body when he had the heat stroke.
>
> Q. But how do you know that, what do you base that on?
>
> A. I mean, it's not, it's just a professional opinion. I mean, he had an injury and it's likely he wasn't fully recovered and then he has this extreme stress of a heat stroke, and then that previous injury is now something that's bothering him, you know, for the long term. So it kind of makes sense that there was something that

> was weak and now is stressed even more and is now affected by it. <u>I can't give you medical evidence to back that up</u>.
>
> Q. Right. What I'm trying to find out is it really speculation on your part, is it just an educated guess?
>
> A. <u>It is an educated guess</u>.

(Casa Dep., 124:11-125:12) (emphasis added). Later in the deposition, Casa reiterated that his opinion regarding Plaintiff's alleged injury from June 12, 2012, and whether it was exacerbated by the incident of June 28, 2012, is based on speculation and guess:

> Q. Okay. But as far as whether or not his condition, if he, whatever the condition may have been, if it was exacerbated by this heat illness that –
>
> A. I don't know.
>
> Q. <u>You don't know, that really is just a guess</u>?
>
> A. <u>Yes</u>.

(Casa Dep., 127:20-128:1) (emphasis added).

Given these admissions, Casa's opinions regarding Count I most certainly fail the requirements to be admitted under the cases cited above. Casa is unable to testify to a reasonable degree of certainty regarding any injury Plaintiff may have sustained on June 12, 2012, whether it was exacerbated by the heat-related incident of June 28, 2012, and whether it plays any role in Plaintiff's current condition. Casa has not provided scientific analysis or methodology supporting his "opinion," and, as such, readily admitted it was a speculative guess. Accordingly, all testimony by Casa relating to Count I addressing the June 12, 2012 incident should be excluded because it is speculative, unsupported by sufficient facts, and is outside of Casa's limited area of expertise. <u>Onyiah v. St. Cloud State Univ.</u>, 684 F.3d 711, 720 (8th Cir. 2012) (exclusion of expert testimony proper because it was excessively speculative or unsupported by sufficient facts); <u>Johnny v. Bornowski</u>, 2011 WL 5515519, *3 (W.D. Mo. Nov. 10, 2011)

(refusing to allow psychologist to testify regarding physical injuries); Wheeling Pittsburgh Steel Co., 254 F.3d at 715 (expert hydrologist cannot testify regarding safe warehousing practices); Savage v. Union Pacific R.R. Co., 67 F.Supp.2d 1021, 1035 (E.D. Ark. 1999) (causation conclusion excluded when nothing more than an educated guess with no scientific data to support it).

### B. Count III: Casa's Opinions About Plaintiff's FRSA Claim Are Inadmissible

Count III of Plaintiff's Second Amended Complaint alleges that Union Pacific violated 49 U.S.C. § 20109(c)(1). Under that statutory provision, Union Pacific may not "deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of his employment." 49 U.S.C. § 20109(c)(1). Importantly, Plaintiff's Second Amended Complaint makes no allegations regarding an alleged violation of FRA regulations.[2]

In his report, Casa states that Union Pacific violated § 20109, certain FRA regulations, and Union Pacific's own policies and rules. (Ex. 1, Consideration #4, pp. 4-6) In addition, Casa purports to opine that the alleged delay in Plaintiff receiving medical care caused "long-term complications" that "would have been prevented." (Ex. 1, p. 7) As shown below, all of these opinions are inadmissible.

#### 1. Opinions Regarding Violations of Laws, Regulations, Policies, and Rules

In his report, Casa states that he is going to opine that Union Pacific **violated** § 20109 and FRA regulations (specifically, those requiring Union Pacific to adopt an Internal Control Plan regarding the reporting of injuries), although he admits that, in reaching these opinions, he utilized no scientific methodology and simply read the plain statutory and regulatory language and applied them to the facts of this case as he understands them. As discussed above, Casa has

---

[2] The absence of any allegations that FRA regulations are at issue in this case was discussed at length in Union Pacific's Memorandum in Support of its Motion to Exclude Gavalla. See Docket Entry 102, at 14.

never been employed by a railroad, FRA, or OSHA. He further admits he has never worked in the rail industry in any respect. (Casa Dep., 21:4-21:22). In fact, Casa has never been to a railroad, other than possibly if he was travelling on a train as a child and passed through a yard. (Casa Dep., 21:23-22:22).

As explained below, Casa's opinion that Union Pacific violated the FRSA, 49 U.S.C. § 20109(c)(1), or any federal regulations, is inadmissible because Casa himself admits he is not qualified to interpret such regulations or statutes. Casa testified he does not have any experience with the relevant statute or the FRA regulations he cites, and that he reached his conclusions merely by reading the language, which he agreed speaks for itself. In reaching his legal conclusions, Casa provided no scientific methodology, and he admits that a juror can do the same thing he is doing by applying disputed facts to the statutory and regulatory language:

> Q. Let's just talk about specifically your citing to CFR, Code of Federal Regulation internal control plan. First of all, is it fair to say all you're doing is simply repeating what the regulation says in your report?
>
> A. Yes. I just said that, obviously I am not a lawyer, but I was thinking that they did not follow the recommendation of this internal control plan.
>
> Q. But whether or not Union Pacific did or did not follow any recommendation of an internal control plan, all you're doing, isn't it fair to say that all you're doing is you are just looking at the facts and just trying to in your mind apply whatever the facts are to what the language says in the statute?
>
> A. Yes.

(Casa Dep., 198:16-199:5). Casa further testified regarding the FRSA:

> Q. But by way of you're saying a violation of the statutes occurred –
>
> A. I maybe don't understand the statute well enough to know if it was violated or not.
>
> Q. All right. In fact, it's Federal Railroad Safety Act 49 U.S.C. §20109, did you even see that, ever even read that statute before this case?

> A. I don't want to say because in the previous cases I may have seen that.
>
> Q. But you don't remember seeing it sitting here today, I understand it is subject to confirmation by looking, but just sitting here?
>
> A. <u>I wasn't familiar with it when I was reading this like a couple of months ago</u> but I may have seen it previously.
>
> Q. Okay.
>
> A. That might have been shared with me in previous documents.
>
> Q. So staying with the Code of Federal Regulation, all you're doing is you are just simply reading it and based on these facts as I understand them either this was complied with or it wasn't complied with, is that right?
>
> A. Yes.
>
> Q. <u>That's the extent of any scientific methodology that you applied?</u>
>
> A. <u>Yes</u>.
>
> Q. <u>I mean, you agree with me that really that type of analysis of whether or not the CFR was violated or whether or not that Federal Railroad Safety Act was violated, that's no different than what a juror would be able to do, they are going to have the facts, they can read the statute and the juror can make the decision on their own whether or not either one of those were violated or complied with. Agreed?</u>
>
> Mr. Cox: Form and foundation
>
> A. Yes.

(Casa Dep., 200:13- 201:24) (emphasis added). Casa also references Union Pacific's General Code of Operating Rules, concluding that they were not complied with. (Ex. 1, p. 6) Regarding these and other Rules, Casa agrees that his analysis is again simply based on a reading of the language, no different than what a juror could perform.

> Q. Same by way of the, you cite to the GCOR, General Code of Operating Rules, and Union Pacific maintenance of way rules, again is that the extent of your analysis is simply reading what the rule says and then making a judgment call as to whether or not based on these facts that rule was or was not complied with?

A. Yes.

Q. And a juror sitting there can make as equal of an assessment as you can in that respect?

Mr. Cox: Form and foundation.

A. They may not have my background obviously for the medical side of it.

Q. I understand that.

A. <u>But they can form their own opinion based on language as well.</u>

(Casa Dep., 202:4-20) (emphasis added).

As the quoted testimony above demonstrates, Casa's testimony regarding Plaintiff's Count III must be barred for several reasons. First, Casa seeks to opine that a statute was "violated." (Ex. 1, p. 6) Such legal conclusions are not the proper subject of "expert" testimony; <u>Barragan v. Tyson Foods, Inc.</u>, 2008 WL 1776439, *5 (N.D. Iowa April 17, 2008). <u>Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.</u>, 320 F.3d 838, 841 (8th Cir. 2003). The holding in <u>Barragan</u> is especially on point. In that case, a plaintiff claimed that her employer had interfered with her rights under the Family and Medical Leave Act ("FMLA"). To support that claim, plaintiff proffered an expert Human Resources witness who would testify that the defendant did not follow the requirements of the FMLA. In granting defendant's motion in limine to exclude such testimony, the court held that the proposed testimony "consists of nothing more than the statement that the defendants' practice did not comply with the requirements of the FMLA, and these statements are comprised of nothing more than legal conclusions." <u>Barragan</u>, 2008 WL 1776439, *6. As the court stated, a legal expert is unnecessary in court because "[e]ach courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards." <u>Id.</u> at *5. Casa's proposed testimony suffers from this exact same flaw and it should, therefore, be excluded.

Second, because there was no scientific methodology to Casa's analysis, his opinion should be excluded. Presley v. Lakewood Eng'g & Mfg. Co., 553 F.3d 638, 643 (8th Cir. 2009) (citing Daubert, 509 U.S. at 593-94) (the court must "separate expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge.") Here, Casa offers no scientific analysis; he simply read the statutes, regulations, and policies and applied them to his understanding of the facts. Third, Casa did not purport to possess any qualifications allowing him to interpret statutory or regulatory language in a way that would assist the jury. To the contrary, Casa expressly testified and admitted that a juror can conduct the same analysis as he did by simply reading the language and applying the facts to reach a decision whether Union Pacific did or did not comply with the same in this case. Consequently, for this reason too, Casa's testimony should be excluded. Strong v. E. I. DuPont de Nemours Co., Inc., 667 F.2d 682, 686 (8th Cir. 1981) (issue of whether warnings are needed on equipment are not the proper subject of expert testimony because the "jury was capable of drawing its own inferences from the available evidence").

Accordingly, Casa's proposed testimony regarding all issues in Count III and whether Union Pacific violated FRA regulations and the Federal Railroad Safety Act should be excluded under Fed. R. Evid. 702.

### 2. Opinions Regarding Impact of Alleged Delay in Medical Care

In Count III, Plaintiff alleges that a Union Pacific Director, Talmage Dalebout, caused a delay in his medical care. (Second Amended Complaint ¶ 45) Specifically, Plaintiff alleges that Dalebout stopped Plaintiff from going to the hospital after he was discovered lying in the shade toward the end of his shift. Instead of going to the hospital at that time, he was taken to a cooling station, where he was placed in an air conditioned area, given fluids, and had water

poured over him. (Plaintiff's Dep, 97:14-98:18) Plaintiff went to the hospital that night; the total alleged delay in his medical care by a hospital was approximately 5 hours or less. (Casa Dep., 8:6-14)

In Consideration No. 5, Casa opines that there was an "irreversible delay" in proper care. (Ex. 1, at 7) During his deposition, Casa testified regarding the basis of his alleged opinion that the delay in care exacerbated the problems that Plaintiff has experienced as a result of the alleged incident of heat exposure. (Casa Dep., 203:16-21) As shown below, this opinion is inadmissible because it is based on rampant speculation and lacks factual support in the record.

Casa's opinion that Plaintiff's medical condition was adversely impacted by the five-hour delay in his receiving medical care is based on the following analysis. First, if an individual's temperature reaches 105 degrees for 30 minutes, complications from heat stroke are likely. (Casa Dep., 75:12-76:17) Conversely, if an individual's temperature is only 105 degrees and it is lowered within 30 minutes, a heat stroke sufferer will "recover completely." (Casa Dep., 75:5-13) Second, although there is no evidence at all regarding what Plaintiff's temperature was prior to his arrival at the hospital five hours after the incident (at the time he arrived at the hospital, his temperature was within a normal range),[3] Casa concludes that Plaintiff's temperature when he was discovered at about 4 p.m. on June 28, 2012, was "probably somewhere between 105 and 106." (Casa Dep., 61:17-24; 80:6-19; 205:5-12) From this speculation, Casa makes the logical leap that: (a) Plaintiff's temperature was between 105 and 106 degrees for between 30-60 minutes based on testimony regarding Plaintiff's struggles in the hours, days, and weeks

---

[3] Plaintiff's liver enzymes, which are an important criteria for assessing whether someone suffers from heat stroke, were also within the normal range when he visited the hospital the evening of June 28, 2012. (Casa Dep., 81:19-23; 82:25-83:16; 84:20-23) One of the markers of muscle function, rhabdomyolysis, was also not in the extreme levels when Plaintiff was tested at the hospital on June 28, 2012. (Casa Dep., 86:10-21) Although Plaintiff was showing signs of dehydration at the hospital the evening of June 28, 2012, that symptom is consistent with both heat stroke and the less severe heat exhaustion. (Casa Dep., 87:10-24)

following June 28, 2012. (Casa Dep., 203:23-204:4; 76:23-25; 77:11-16) ("So in this particular case I think he had a what you might call a mild heat stroke where he had a temperature thankfully that wasn't 108 or nine or ten . . . . So my guess is from everything . . . he probably was in that 30 to 60 window of being hyperthermic"; and (b) this would not have occurred if Plaintiff had been taken to the hospital immediately upon being found. (Casa Dep., 204:11-17)

Casa's conclusion that Plaintiff's condition was exacerbated or even caused by the alleged delay in medical care is inadmissible for several reasons. First, there is no way to know whether, had Plaintiff continued to the hospital when his condition was first discovered, he would have gotten his temperature down below 105 degrees within Casa's 30-minute threshold. This is true because there is no evidence of how long, if at all, Plaintiff's temperature was over 105 degrees. As discussed above, Plaintiff's temperature was not taken until he went to the hospital that night; at that time, his temperature was within the normal range. Moreover, even if one can assume that Plaintiff's temperature ever reached 105 degrees, there is no way of knowing how long Plaintiff's temperature had been over 105 degrees when he was first discovered lying down near the tracks. Casa admits that he does not know how long Plaintiff was lying down under the tree before his foreman found him. (Casa Dep., 194:3-23) ("Like you could tell me he was down for three minutes, he might have been down for eight minutes, I don't know.") Indeed, in his report, Casa states – without citing any evidence – that Plaintiff "was left to suffer for an extended period of time with no assistance from co-workers." (Ex. 1, p. 5) Thus, Casa cannot say that the 30-minute threshold would not have been met regardless of how quickly Plaintiff had been taken to the hospital after his condition was first discovered.

Second, even if this flaw could be ignored, there is no evidence that Plaintiff's temperature would have been below 105 degrees within 30 minutes had he gone to the hospital

immediately after being found. There is no evidence of when Plaintiff would have arrived at the hospital and how long it would have taken him to be seen by medical professionals once he arrived. It is simply impossible to know or predict with any reasonable certainty what treatment Plaintiff would have received had he originally continued to the hospital, so as to allow a conclusion that his temperature would have remained above 105 degrees for less than 30 minutes. Notably, Casa supplies no scientific evidence of how much slower the treatment that Plaintiff actually received (being placed in a cool area, given fluids, and doused in water) lowers a person's temperature than does the treatment that Casa alleges Plaintiff might have received at the hospital (immersion in cold water) to allow him to infer that immediate transportation to the hospital would have resulted in Plaintiff's temperature not being over 105 degrees for 30 minutes.

In the end, Casa offers only speculation to back up his "opinion" that Plaintiff's medical condition would be better today had he been taken to the hospital when he was first found on June 28, 2012. Thus, this opinion must be excluded. Onyiah v. St. Cloud State Univ., 684 F.3d 711, 720 (8th Cir. 2012) (exclusion of expert testimony proper because it was excessively speculative or unsupported by sufficient facts); Presley v. Lakewood Eng'g & Mfg. Co., 553 F.3d 638, 643 (8th Cir. 2009) (the court must "separate expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge" (quoting Glastetter v. Novartis Pharm. Corp., 252 F.3d 986, 989 (8th Cir. 2001)). In Presley, the Eighth Circuit noted that a district court can weigh whether the proposed expert ruled out other alternative explanations and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case. Id. Similarly, expert opinions should be excluded when

they are not based on sufficient data because absent supporting scientific data, an expert's conclusions are "little more than guesswork." Savage, 67 F. Supp. 2d at 1035.

The same is true of Casa's opinions in the present case. Casa's entire theory that Plaintiff's condition was irreversibly impacted by the five-hour delay in his going to the hospital is based on pure speculation. Casa has no way to know how long, if at all, Plaintiff's temperature was over 105 degrees, how long it had been so high before he was found, or how long it would have remained over 105 degrees had he gone to the hospital. Moreover, Casa did little to rule out alternative explanations for Plaintiff's current medical difficulties and even admitted that it was possible that Plaintiff's upper extremity injury could have been "completely unrelated" to his heat-related incident. (Casa Dep., 209:23-210:3) Consequently, Casa's entire opinion on these subjects should be excluded under Fed. R. Evid. 702.

## CONCLUSION

A determination regarding Casa's proposed testimony as to Count I and Count III is ripe for resolution at this time. Union Pacific filed its Motion in Limine regarding Casa's testimony as to Count I and Count III based on Casa's own sworn testimony and admissions. Because Casa's opinions as to those Counts are based on speculation, lack background and expertise, are unreliable and without basis in any scientific methodology, they should be excluded.

For the foregoing reasons, Union Pacific's Motion in Limine should be granted. The Court should exclude all testimony from Plaintiff's expert witness Douglas Casa, Ph.D. regarding Count I concerning the June 12, 2012 incident, and Count III concerning FRA regulations and the Federal Railroad Safety Act, 49 U.S.C. § 20109.

THOMPSON COBURN LLP

By: /s/ Tabitha G. Davisson
    Clifford A. Godiner
    Tabitha G. Davisson
    One US Bank Plaza
    St. Louis, MO 63101
    (314) 552-6000

    and

    David J. Schmitt, #19123
    LAMSON, DUGAN and MURRAY, LLP
    10306 Regency Parkway Drive
    Omaha, NE 68114
    (402) 397-7300 – Office

    Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2014, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which sent notification of such filing to James L. Cox, Jr. and David J. Schmitt and there are no participants to send the foregoing document to by United States Postal Service.

/s/ Tabitha G. Davisson
Tabitha G. Davisson