UNITED STATES DISTRICT COURT

DISTRICT OF NEBRASKA


JARED L. WHITT

           Plaintiff       CIVIL ACTION NO.

   VS.                 8:12-CV-00358

UNION PACIFIC RAILROAD
COMPANY

         Defendant       FEBRUARY 28, 2014



DEPOSITION OF DOUGLAS CASA, PH.D.



APPEARANCES:

    For the Plaintiff:

        BRENT COON AND ASSOCIATES
           3801 E. Florida Avenue, Suite 905
           Denver, Colorado 80210
        BY:  JAMES L. COX, JR., ESQ.


    For the Defendant:

        LAMSON, DUGAN AND MURRAY, LLP
           10306 Regency Parkway Drive
           Omaha, Nebraska 68114
        BY:  DAVID J. SCHMITT, ESQ.




JULIE BLIER, BA, LCR 0093, NOTARY PUBLIC



PENGAD 800-631-6989

EXHIBIT

2

```
 1                          . . . Deposition of DOUGLAS CASA,

 2          Ph.D., taken on behalf of the Defendant, in the

 3          hereinbefore entitled action, pursuant to the

 4          Federal Rules of Civil Procedure, before Julie

 5          Blier, BA, LCR, and duly qualified Notary Public

 6          in and for the State of Connecticut, at the

 7          Nathan Hale Inn, 855 Bolton Road, Storrs,

 8          Connecticut 06268, commencing at 9:00 a.m., on

 9          February 28, 2014.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    DOUGLAS CASA, PH.D., with an
 2               address of 75 Maple Road, Storrs,
 3               Connecticut 06268, having first been
 4               duly sworn, deposed and testified as
 5               follows:
 6  BY MR. SCHMITT:
 7        Q    All right.  Sir, my name is Dave Schmitt,
 8  I'm a lawyer, I represent Union Pacific Railroad
 9  Company in a lawsuit that has been filed by Jared
10  Whitt.  I understand that you're been designated as an
11  expert witness by Mr. Whitt, is that correct?
12        A    Yes.
13        Q    I'm here to take your deposition today to
14  find out about all opinions that you have in regards
15  to this case as well as all bases and reasons for your
16  opinions.  All right?
17             So if at any point during this deposition
18  you don't understand my question or I'm unclear please
19  ask me to repeat or rephrase it and I'll be happy to
20  do so.  Okay?
21        A    Yes.
22        Q    If at any time you would like to take a
23  break we can certainly do so, you just need to let us
24  know.  All right?
25        A    Yes.
```

1          Q      What is your occupation?

2          A      I'm a professor at the University of

3     Connecticut.

4          Q      What do you do at the University of

5     Connecticut as a professor?

6          A      I'm a professor in the department of

7     kinesiology.

8          Q      What is that?

9          A      It's a study kind of human movement so it

10    might involve things like exercise science and sports

11    medicine and biomechanics and strengthening

12    conditioning, things like that.

13         Q      Are there certain aspects of that field that

14    are particularly relevant to the types of opinions

15    that you're rendering in this case?

16         A      Yes.  Well, my background is in sports

17    medicine and exercise physiology so it's kind of a

18    combination of those two factors.

19              (Defendant's Exhibit 39 marked for

20    Identification.)

21    BY MR. SCHMITT:

22         Q      Okay.  I'm going to hand you what's been

23    marked as Exhibit 39.  Is that a true and accurate of

24    your curriculum vitae?

25         A      I'm just noting that the date is June of

1    2013 so I think I have one that's maybe updated

2    through November 2013 that I can get forwarded to you,

3    it would just be a couple of additional publications.

4        Q    Okay.

5        A    But everything else is accurate to this

6    point.

7        Q    Let's do this then, if you would forward a

8    copy of your updated CV to Jim Cox and I would ask

9    that he forward it to me.

10       A    Yes.

11            MR. COX:  I'll do that.

12   BY MR. SCHMITT:

13       Q    And the only changes that need to be made to

14   Exhibit 39 to make it more accurately reflect your

15   experience, education and training is that there have

16   been a couple of additional publications?

17       A    Yes, I would say there's probably ten

18   publications from that point and there might be some

19   presentations as well.

20       Q    Were there any publications or presentations

21   that were particularly relevant to the issues you're

22   discussing in this case?

23       A    To be honest they probably all are only

24   because they're all related to heat and hydration, my

25   publications, we could actually do a quick PubMed

1    search and see what came up since that date but I'll

2    make sure you get those.

3         Q    All right.  In reviewing your curriculum

4    vitae, and it's fairly extensive, at least this

5    Exhibit 39, I count it looks like it's 82 pages, is

6    that right?

7         A    Yes, that's the June one, correct?

8         Q    Yes.

9         A    Yes.

10        Q    As I review this at least from my

11   observation it appears as though that your specialty,

12   your background is all related to the sports field, is

13   that fair?

14        A    No, I have a lot of experience with military

15   and with general stresses of exercise that would be

16   relevant for laborers as well.

17        Q    What percentage of your practice is related

18   to sports related issues, in other words, I know

19   you're a professor, you teach various courses, we can

20   read the CV, it speaks for itself, there's, I can

21   continually see, for example, the word sports come up

22   for sports players, things like that, what I'm trying

23   to do is get an understanding of what percentage of

24   your background, your practice, the current work that

25   do is really related to sports medicine, in that

1    field?

2        A    Maybe 50 percent.  I would, whenever I have

3    a paper that's published related to heat stroke and

4    exertional heat stroke or hydration topics that's not

5    specific just to sports, I mean, that might be

6    specific to a soldier, a laborer or just people in

7    general.

8        Q    In the military what percentage of your

9    practice is spent with military related issues?

10       A    Well, like I said, a lot of it is

11   overlapping because a good percentage of the work that

12   I do is related to all those things, for instance,

13   like a paper that's published on exertional heat

14   stroke, cold water immersion being the gold standard

15   for treatment, that's relevant to all, anybody who

16   suffers an exertional heat stroke so it's hard to

17   pigeonhole it into one domain.

18           When I'm writing that I'm thinking about a

19   soldier or a farm worker or an athlete having a heat

20   stroke, and when I do a study on hydration and its

21   effect on cognitive performance that can be a lay

22   person or a soldier or an athlete.

23           So it's really hard to pigeonhole a study

24   because a lot of it is just looking at physiological

25   effects of people doing intense exercise in the heat

1    and it's not necessarily an athlete.  So it's people

2    who are physically active and have issues related to

3    their exercise, heat tolerance and, you know, things

4    like that.  That would be very, very hard for me to

5    decide how to bridge that out.

6         Q    I understand from your testimony that the

7    work that do you will have overlap into multiple

8    different areas.  I guess my question is more related

9    to -- let me ask it this way, what I'm trying to find

10   out is what perhaps the primary focus would be of the

11   work do you, for example, I understand that you might

12   have done some work about exertional heat stroke but,

13   and that you are saying that it can have applications

14   to multiple fields.

15        The reason for my question is that again as

16   I read your CV it just seems to be a recurring theme,

17   that the vast majority virtually all of your CV

18   appears to be focused, that the work you were doing

19   was focused on the sports field or perhaps secondarily

20   some in the military field.

21        A    Like I said it's hard to look at it that

22   way.  One way I would consider looking at it is my

23   focus area is exertional heat stroke, issues that

24   affect exercise heat tolerance, and hydration issues.

25   That's probably the best way of putting the work that

1    I do.

2        Q    So there are three points, exertional heat

3    stroke --

4        A    Issues that affect exercise heat tolerance,

5    and hydration.

6        Q    And hydration?

7        A    I mean that is also part of number two but

8    it's enough work there that it could stand alone.

9            To give you an example of the things in

10   number two could be like body cooling studies, heat

11   acclimatization, work to rest radios, sleep issues and

12   things that could affect someone's exercise heat

13   tolerance.

14           When I talk about heat stroke I'm talking

15   about prevention, recognition and treatment of heat

16   stroke especially exertional heat stroke.

17       Q    You use the term heat stroke and then

18   exertional heat stroke, is there a difference?

19       A    Well, there's something called classical

20   heat stroke.

21       Q    What is classical heat stroke?

22       A    That happens to people who are not related

23   to exercise.  A couple of examples would be like when

24   infants are left in cars that are all closed off in

25   oppressive heat, or elderly people during a heatwave

1   that are like in apartment buildings that aren't air

2   conditioned, so they're not exercising but the heat

3   becomes so overwhelming for that person that they

4   can't regulate their body temperature anymore.

5        Q    So if that is classical heat stroke then is

6   the other category --

7        A    Is exertional heat stroke.  So it's related

8   to physical activity, the things we see in farm

9   workers, laborers, soldiers, athletes.

10       Q    Is the treatment required for classical heat

11  stroke than it is for exertional heat stroke?

12       A    The basic premise is to get their

13  temperature down as fast as possible, that's

14  consistent across both.

15            If I had a 85 to 90-year-old person who had

16  co-morbidities I don't know if we would recommend them

17  going into a cold water immersion tub because, you

18  know, that might be too much of a shock for that

19  person so we would maybe cool them by other methods

20  besides the cold water immersion.

21            An otherwise healthy person like a soldier

22  or an athlete or laborer who is like in their 20s we

23  would use cold water immersion because we would get

24  their temp down as fast as humanly possible because

25  the most pressing thing is the hyperthermia, where the

1    person who's 90 years old there are a lot of issues

2    you're dealing with besides them just being hot.

3        Q    When you say co-morbidity factors give me an

4    example of what you're talking about.

5        A    Well, people who are susceptible to that

6    classic heat stroke, those elderly people, it's

7    usually people who have like cardiovascular

8    difficulties already, they might have diabetes, they

9    might have respiratory issues.

10            So they already, it's the people who usually

11   have some conditions already that are usually

12   susceptible to that classic heat stroke.

13       Q    All right.  We'll come back to that and talk

14   about that in greater detail.

15       A    Okay.

16       Q    When I review your CV there's a section

17   under, it's entitled publications, and at least this

18   version, Exhibit 39, I understand it's a little out of

19   the date, but in this section it indicates there are

20   138 different published items, is that right?

21       A    Yes.  I think it's at 150 or 151 right now.

22       Q    Tell me about this, I note that there are

23   various names many times with each of the respective

24   publications, is that accurate?

25       A    Yes.

1       Q     Why is that?

2       A     Those are the people that usually

3    contributed to the research study.

4       Q     Okay.

5       A     So it's usually a couple of professors and

6    usually some grad students that pulled off that

7    research study and it's a massive amount of time and

8    effort that goes into a project like that so it's

9    usually the people who are getting credit for the

10   effort.

11      Q     What's the significance of the ordering of

12   the names?

13      A     It's a good question.  Usually the lead

14   author in our work is usually the lead Ph.D. student

15   who ran the project and did most of the writing.  Then

16   usually their supervisor is either second or last,

17   last is sometimes a place of honor for the person

18   who's kind of the overall director, second is often

19   the supervisor of that Ph.D. student.  Often then

20   they'll be listed alphabetically a lot of times where

21   it's just everybody contributed and it's hard to tease

22   out who contributed the most.

23          On some of the more prestigious kind of

24   position statements or consensus statements my name is

25   first because I was the lead author on, I don't know,

1    five or six or seven documents that have come out in

2    the last years.  One came out last summer so it's not

3    in your hand right now, looking at preventing sudden

4    death in secondary schools.

5         Q    So generally if your name is not first that

6    means that you were not the lead author on that

7    particular publication?

8         A    Yes, I was considered a co-author.

9         Q    Correct.  Were then a lot of these

10   publications actually students, Ph.D. --

11        A    They're my --

12        Q    -- candidates?

13        A    -- students.

14        Q    Okay.

15        A    So I'm supervising them.

16        Q    All right.

17        A    And I'm helping them land jobs down the road

18   so being a lead author is very prestigious for them to

19   try to get a job.

20        Q    And because of your assistance as a

21   professor overseeing their work then that gives you

22   the honor of being able to be identified as one of the

23   contributors to that publication?

24        A    Well, it's usually I'm the one who usually

25   got the grant and usually had the idea for the study,

1    I'm usually the one who spearheaded the whole

2    operation, but that Ph.D. student is often the one who

3    did the kind of nitty gritty of some of that stuff.

4         Q    But don't the Ph.D. students, aren't they

5    usually encouraged to come up with their own topic?

6         A    Well, we usually have global things that we

7    work on and then they'll pick out certain ideas within

8    projects that we're doing.

9         Q    There's a section entitled grants under

10   consideration and that goes on for page after page.

11        A    Well, grants under consideration is blank,

12   there's nothing there, it's probably grants with all

13   those others.

14        Q    I see.

15        A    When I updated the resume at that moment

16   there wasn't one being considered at that moment. so

17   I'm sorry, I should have put NA underneath that

18   section.

19        Q    Thanks for the clarification.  So at least

20   under funded grants why are you including those in

21   your CV?

22        A    Usually people in the academic world put

23   down the grants that they solicited and obtained,

24   that's very typical, it's kind of a key part of our

25   tenure promotion process.

1          Q      What's a grant?

2          A      A grant would be like a research grant that

3    you would get funding to do a study or it might be a

4    service grant like you're providing educational

5    services maybe for the CDC or NIH or something like

6    that.  It's what's providing funding to your operation

7    to, you know, promote the cause and promote the work

8    that you do.

9          Q      There's many of these entries, if not most

10   actually, indicate it starts out with the year and

11   then it says principal investigator, what's a

12   principal investigator?

13         A      That's usually the person who's in charge of

14   that particular study.  So you might have a principal

15   investigator who is in charge or a

16   co-principal-investigator if there's a couple of

17   people in charge, or you might be a co-investigator on

18   a study where you're not in charge but you're involved

19   with the study.

20         Q      So with these grants then as your work are

21   you going to, for example, the industry or the

22   corporation or the government, whatever it might be,

23   asking them to donate money to fund whatever the

24   project is that you would like to work on?

25         A      It could be one of three probably common

1    ways.  One is they come to us and ask us to do a

2    project.  Second, we could go to them with an idea of

3    which we think there might be a mutual interest.

4    Third might be an application process, it's just an

5    open application process and then they award to be

6    what they deem to be the most worthy.

7         Q    Which of those three scenarios typically

8    occurs with your practice?

9         A    In the last three or four years we've been

10   fortunate that we have a lot of people coming to us

11   now because we have established an even greater

12   reputation so it's probably a pretty good balance

13   between those, between those three.

14        Q    Okay.  I note in the CV there's various

15   times there's a reference to NATA, what is that?

16        A    NATA is the National Athletic Training, I'm

17   sorry, National Athletic Trainer's Association, that's

18   the governing body for athletic trainers in our

19   country.

20        Q    Okay.  Continuing through the CV there's

21   various professional presentations, various

22   categories, is the same generally true, that if, of

23   what you indicated earlier, that if your name isn't

24   first that you were a contributor to that particular

25   work, that abstract, whatever it might be, but that

1      the person listed first would have been the primary

2      author or presenter?

3          A    If there are presentations it's usually the

4      lead person that is the one actually standing up and

5      doing the presentation, but the other co-authors are

6      the ones who work together on the research study.

7          Q    So you may have provided information that

8      then the person giving the physical presentation could

9      use, rely on in their presentation?

10         A    Yes, or we work together on the research

11     study and they're just the person -- there's one

12     research study sometimes that could have four

13     presentations and there might be four different lead

14     people.

15         Q    Okay.  I notice just in the last page, hobby

16     section, it says advocate of equal access for women in

17     sport.  Tell me about that.

18         A    Oh, just trying to make sure that women have

19     the same opportunities like whether it be like, for

20     instance, in college they didn't used to have woman's

21     pole vaulting, they didn't used to have women's

22     steeple chase, and up until 1972 the longest women's

23     event in the Olympics was the 800 meters, they didn't

24     even allow women to even run a mile.  I don't know if

25     you know back in the 1920s a bunch of women collapsed

1    following one of the mile races and they banned

2    anything longer than a mile.  I have two daughters so

3    we work very hard with organizations to try promote

4    same opportunities.

5         Q    I note from your CV that you have

6    involvement with the Korey Stringer Institute?

7         A    Yes.

8         Q    And your title is what?

9         A    I'm the chief operating officer.

10        Q    What is the Korey Stringer Institute?

11        A    Okay.  Korey Stringer was a football player

12   for the Minnesota Vikings and he passed away in 2001,

13   August 1st, he had suffered a heat stroke during the

14   second day of their training camp.  And after he

15   passed away his widow had numerous lawsuits that

16   ensued and I helped her as an expert witness through

17   some of those.

18            When she settled with the NFL, her and

19   Commissioner Goodell made a commitment to have a

20   lasting legacy in Korey's name, and when they made

21   that decision to have that they both reached out to me

22   to ask if we would be interested in hosting that

23   institute at the University of Connecticut.

24            And obviously that was a big honor and we

25   were interested in doing that so we've, it's a

1    phenomenal opportunity for me professionally to have

2    this forum in terms of education and research and

3    something to be able to pursue some of the things to

4    enhance safety for soldiers and laborers and athletes.

5         Q     What percentage of your time is spent with

6    the Korey Stringer Institute versus the other work

7    that do you just with the University the Connecticut?

8         A     That's a good question.  The fact of the

9    matter is everything we do at the Korey Stringer

10   Institute I was doing before the Korey Stringer

11   Institute existed because I mean our main focus is

12   research, education, policy changes, or advocating for

13   changes and like mass media outreach so we can get

14   good information out to people, all of those things I

15   was doing because KSI ever existed.

16              So this just gave us a greater vehicle to

17   make it takes place.  I mean in a sense 100 of my work

18   is professor slash Korey Stringer Institute, you

19   can't, they're never really separated because even all

20   the grad students I have and the grad student classes

21   I have we're teaching the stuff that is the work of

22   the Korey Stringer Institute.

23              Some of the titles of my classes are

24   entitled preventing sudden death in sport, exertional

25   heat stroke, legal issues of sudden death, you know,

1    so there are lot of issues that we deal with.

2         Q    Is your position with the Korey Stringer

3    Institute, is that a paid position?

4         A    No.

5         Q    Okay.

6         A    I receive 100 percent of my salary from the

7    state as a professor.  So the great benefit of the

8    Korey Stringer Institute is it allows funding for the

9    grad students and employees who work at KSI to promote

10   the mission of KSI and really promote overall goals of

11   enhancing safety.

12        Q    That's the primary purpose of that Korey

13   Stringer Institute here today?

14        A    Our big theme is preventing sudden death in

15   sport, like trying to have physical activity happen in

16   a safe and productive manner.

17             MR. COX:  Do you think you could move the

18        speaker a little closer?  I'm having a little

19        trouble picking you up.

20             THE WITNESS:  Sure.

21             MR. SCHMITT:  Is this phone even on?

22             THE COURT REPORTER:  No, it was a backup

23        in case Skype didn't work.

24             MR. SCHMITT:  Okay.

25

1    BY MR. SCHMITT:

2         Q    How old are you, sir?

3         A    Forty-five.

4         Q    All right.  Have you spent almost your

5    entire career here in connection with the University

6    of Connecticut in some capacity?

7         A    Since 1993 until now so a little over 20

8    years.  I've been here all of those 20 years except

9    for two years I was a professor down in Georgia after

10   I got my Ph.D. I was a Ph.D. student here from '93 to

11   '97, professor down in Georgia until '99 and then

12   since that date I've been here.

13        Q    Have you ever been employed by the Federal

14   Railroad Administration, the FRA?

15        A    I have not.

16        Q    Have you ever been employed by OSHA?

17        A    I have not.

18        Q    Have you ever been employed by any railroad?

19        A    No.

20        Q    Have you ever worked in the rail industry in

21   any respect?

22        A    No.

23        Q    Have you ever been, for example, to a rail

24   yard?

25        A    I might have been when I was younger but not

1    in relation to like what I know now, so I don't want

2    to, you know, it's a tough answer because I think I

3    might have been when I was kid so I don't want to give

4    an inaccurate answer.  Related to this topic and my

5    expertise, I would say no.

6         Q    But other than perhaps as a kid traveling

7    through a rail yard that's the extent of your physical

8    presence in a rail yard?

9         A    Yes.

10        Q    Have you ever physically seen equipment and

11   machines that are used to install track?

12        A    Yes, on this case and in previous cases

13   people have sent me pictures.

14        Q    So the extent of your exposure --

15        A    I'm sorry, and some video.

16        Q    So the extent of your exposure to the

17   machines would be simply by looking at photos or

18   videos, not physical presence?

19        A    Yes.

20        Q    So you've never sat for an example on an

21   anchor applicator machine?

22        A    I have not.

23        Q    You mentioned that in some prior, this case

24   and some prior cases that people may have sent you

25   photos or videos, my question is how many cases have

1    you been involved in that dealt with some type of

2    railroad related issue?

3         A    Is it okay if I look here?

4         Q    Absolutely.

5         A    It's either the third or the fourth case.

6         Q    For the record what you're looking at is

7    your report?

8         A    Yes.

9         Q    Which is dated November 30, 2013?

10        A    Yes.

11             MR. SCHMITT:  What we'll do is we'll go

12        ahead and mark that as Exhibit 40.

13        (Defendant's Exhibit 40 marked for

14    Identification.)

15        A    Just if you want to make a note number seven

16    and number eight in this report were both train

17    related cases.

18   BY MR. SCHMITT:

19        Q    We're looking on page --

20        A    Nine.

21        Q    -- of Exhibit 40?

22        A    Yes.

23        Q    Okay.

24        A    Number 11 also, that one I worked for the

25    defense on, the other two were plaintiff.

1          Q     So seven, eight and 11?

2          A     Yes.

3          Q     Okay.

4          A     Specific to a train employee.

5          Q     Yes.

6          A     And the current case.  So I was right, it

7     was three previous.

8          Q     Seven involved a train welder with the CSX

9     Railroad?

10          A     Yes.

11          Q     You said that you were retained by the

12     plaintiff?

13          A     Yes.

14          Q     What happened just generally in that case?

15          A     I honestly don't remember them.  He was, I

16     know he was working extensively outside and I think on

17     one day he had some difficulty and then on the next

18     day he suffered a heat stroke.

19          Q     When we use the term heat stroke, stroke is

20     a term of significance, correct?

21          A     Yes.

22          Q     All right.  A heat stroke is something

23     different than, for example, a heat illness which I

24     see you have listed as item number eight?

25          A     Yes.

1          Q     Is heat stroke much more severe than a heat

2     illness?

3          A     Well, a heat illness could include heat

4     stroke but a heat stroke is much more serious.   Heat

5     illness is a family of conditions, potential

6     conditions.

7          Q     All right.   Did you give a deposition with

8     the CSX case?

9          A     It says here official report only so that

10    one never went, that was settled before my deposition

11    was needed.

12         Q     Do you still have that report?

13         A     I do believe that I definitely would.

14         Q     Let's see item eight was a railroad

15    conductor who suffered a heat illness, do you recall

16    what occurred in that case?

17         A     I honestly don't remember great detail on

18    some of these, it's been a few years right now and I

19    honestly didn't brush on them at all.

20              I do remember him being a conductor and I

21    remember there being difficulty for him on his run

22    that day where he actually had to get out and do a lot

23    of manual work that he typically didn't do and it

24    caused him to have some difficulty that day.

25         Q     Do you know as a conductor what he was, you

1    said he was running in and out, running in and out of

2    what?

3        A    He was having to get out of the train a lot

4    of times to deal with stuff that was ahead on the

5    track that he typically wasn't doing but I guess it

6    was a unique day.

7        Q    You gave a deposition in that case?

8        A    Yes.

9        Q    Do you still have that deposition?

10       A    Absolutely.

11       Q    Then last item was number 11 and tell me

12   about that one.

13       A    I honestly have to double check that case.

14   It was definitely a laborer but I don't remember the

15   specifics of the case.

16            I do know it was for the defense and the

17   defense had asked me if they thought it was a heat

18   stroke or not, and that was my level of involvement

19   because I did not think it was a heat stroke in that

20   particular case.

21       Q    So you were only asked to render an issue

22   about diagnosis of the condition?

23       A    Yes, well, they wanted me to consider what

24   were the possible conditions this person might have

25   been suffering from and what was likelihood that it

1     was some of these different ones because I think the

2     plaintiff was making the complaint that he was sure it

3     was heat stroke but we didn't have compelling evidence

4     that it was a heat stroke.

5          Q     It said that you assisted, is this a law

6     firm?

7          A     Yes.

8          Q     Okay.

9          A     I tried to include at least the lawyer's

10    names or the law firm for each of them.

11         Q     Okay.

12         A     So at least you could always Google them and

13    find them.

14         Q     You didn't give a report in that case?

15         A     No, it says opinion provided, so I

16    definitely submitted something.

17         Q     No deposition though?

18         A     Correct.

19         Q     Do you know or are you certain sitting here

20    today that that workers' compensation case involved in

21    a railroad?

22         A     I'm not 100 percent sure.

23         Q     Okay.

24         A     I remember someone being, I can't remember

25    if it was a rail yard or someone was I believe loading

1    and unloading supplies and I'm just not positive where

2    the setting was.

3         Q    Okay.  With item number seven was the report

4    that you prepared something that was then produced to

5    the attorney, the plaintiff's attorney that retained

6    you that then was used in the lawsuit itself?

7         A    I'm assuming that they used it in the

8    process of trying to obtain a settlement, yes.

9         Q    Okay.  The deposition you said in item

10   eight, that's readily available to you?

11        A    Yes.  If it's not to me I'm sure the lawyer

12   could get it to me.

13        Q    Okay.

14        A    I'm assuming in most cases they usually send

15   me the PDF of the deposition after, especially more in

16   the recent years.

17        Q    Okay.  What I would like you to do if you

18   could email a copy, look at your records and email a

19   copy of that deposition to Mr. Cox and then I would

20   ask that he forward that to me.

21        A    Sure.  Item eight deposition.

22             MR. COX:  That's the deposition in which

23        case?

24             THE WITNESS:  Trumain Moorer case,

25        M-o-o-r-e-r.  It was Trumain Moorer versus

1          Norfolk Southern Railroad Company.  It's number

2          eight on my list.

3                    MR. COX:  Okay.

4    BY MR. SCHMITT:

5          Q     If the report that you used in item number

6    seven that we discussed, if that was produced, in

7    other words, by that plaintiff's lawyer to the other

8    side, in other words, used by both parties, if it

9    wasn't just simply held only by the plaintiff I would

10   also like you to forward a copy of that to Jim Cox and

11   ask that that be produced.

12         A     Sure.

13                   MR. COX:  I will do that.

14         A     Number seven. I'm really 99 percent sure

15   they produced that to the other side because I

16   remember discussions after.

17   BY MR. SCHMITT:

18         Q     All right.  Same with item 11.

19         A     This one I'm not positive about.

20         Q     Okay.  Can you tell me what -- strike that.

21               Before we get to that your CV lists,

22   itemizes 19 cases that you've worked on as an expert,

23   item number 20 which is this case and then some other

24   cases that are just beginning.  Does then exhibit --

25         A     You said CV, do you mean my opinion?

1      Q    Yes, thank you for clarifying.  Bad

2   question.  Let me start over.

3           Your report, Exhibit 40, does the Exhibit 40

4   identify all of the cases that you have worked on as a

5   retained expert witness in litigation?

6      A    Up through November 30th.

7      Q    Yes.

8      A    So there are other cases that have, you

9   know, obviously progressed in the last five or six

10  months and that's why I tried to, you know, these are

11  ones that were really like in the beginning and I

12  wasn't even sure if I was going to be moving forward

13  with helping.

14          So there's probably one or two others that

15  it looks more likely I'm going to be helping with them

16  right now.  I don't think -- none of them are train

17  situations.  One is a police officer at an academy.

18  One is a soldier.  Same law firm actually and it's

19  both working for the defense in both of those cases.

20     Q    So currently to the present date you've been

21  involved as a retained expert in litigation matters

22  around 27, 28 times?

23     A    Well, I think it's actually -- six were, a

24  lot of people seek out me, see if I'm interested in

25  helping but I don't always pick up every case that I'm

1    asked to help with so I would move that to 22 or 23

2    right now that I could say for sure.

3        Q    Okay.  Explain to me then, you said that

4    there are some cases where you may be consulted but

5    you don't, I think you used the term pick up, tell me

6    what you mean.

7        A    A lot of it has to do with time reasons.  At

8    the University of Connecticut I'm allowed one

9    consulting day per week during the academic year, so I

10   have those 30 days to work with during the academic

11   years and then I have some more days potentially in

12   the summer.

13            So I have to get consulting approval for any

14   cases I work with.  So I have to make a very accurate

15   guess of what my time investment will be on a case

16   that I decide to work with.  So if I'm not able to do

17   it I might sometimes suggest other people who could

18   assist whoever contacted me.

19            And also I sometimes look into the, after I

20   get more information, a lot of times, a lot, there's

21   probably literally another 40 to 50 cases that I don't

22   list here that people don't end up pursuing litigation

23   because they sought out my opinion and a lawyer will

24   just run things by me like an hour or two on the phone

25   and say is this worth it, so I think they're even

1    considering do they accept this client, you know, is

2    this a case worth picking up.

3         So I will talk them through it, like is this

4    something, a legitimate case or not and, you know,

5    obviously if they don't pursue it, you know, you don't

6    see it on this list here and I don't charge that

7    person for that hour or two of my time that I'm kind

8    of just giving my informal time.

9         Q    With this consulting work then that you do

10   you indicated that you have to get approval, tell me

11   what percentage of your time is spent work as a

12   consultant expert witness.

13        A    It also, just so you know, my consulting

14   approvals don't only include cases, like I also have

15   to get consulting approval if I serve as an adviser to

16   a corporation or if I go give a presentation somewhere

17   and get paid so there's a lot of different things that

18   UConn approves for consulting, anything that's outside

19   my normal job.

20        So of my consulting work I would say about

21   half of it is legal cases and about half is work that

22   I might do, for instance, if I serve on a board of

23   advisers for a company, or a lot of time like a

24   company will ask for my opinion on products or

25   innovation.

1          But so the bottom line, it probably works

2     out to be between 15 and 20 days a year I work on

3     legal cases.  Is that what you were looking for?

4          Q    It is.

5          A    Okay.  They might not be full days but it

6     just gives you an idea.

7          Q    So 15 to 20 out of the 365 day year?

8          A    Yes.

9          Q    Okay.  The fees that you charge for

10    consulting work in legal related matters are $400 per

11    hour?

12         A    Yes.

13         Q    Then if you, for example, come to Nebraska

14    to testify would you be charging also then for your

15    travel expenses obviously?

16         A    Yes.

17         Q    Okay.  Are the fees that you earn as a

18    consultant, are those fees then that would go to you

19    directly rather than to the University of Connecticut?

20         A    Yes, that goes to me personally.

21         Q    Okay.  Of the cases that you've been

22    involved as a legal expert or -- strike that.

23         Of the cases where you've worked as an

24    expert witness retained consultant in a legal related

25    matter, litigation, what percentage is for the

1    plaintiff or employee versus the defendant?

2         A    That's a good question.  I'm frequently

3    asked that question.  I think I've worked for the

4    defense now on five cases.  Do you want me to point

5    those out to you?

6         Q    Sure.

7         A    It would be number two.

8         Q    And you're looking at Exhibit 40?

9         A    Yes.

10        Q    Okay.

11        A    Number 11.  What you might consider labeling

12   21 and 22 because I just told you there's a case for a

13   soldier and a case for a police academy training that

14   took place.  So that is up to four and --

15        Q    In those last two you were retained by the

16   employer?

17        A    Yes.

18        Q    Okay.

19        A    It was, to be honest just so you know, it

20   was actually a company that makes a supplement and

21   they're blaming the supplement on the heat illness.

22   That's one of the parties that's being sued in that

23   case.

24        Q    Okay.

25        A    So not just the only one.

1        Q    All right.

2        A    So that's four right there and there might

3    be one other new case that I'm failing to think of

4    right now.

5        Q    Have you ever been retained by Jim Cox

6    before this case or his law firm, Brent Coon and

7    Associates?

8        A    Never, this is the first time.

9        Q    Do you know how Mr. Cox became aware of the

10    services that you're providing in this case?

11        A    Yes.  I actually brought it because I'm also

12    always asked this question, when I started the

13    relationship.

14             On May 31st, 2013 I received an email from

15    Jim and he had said he had a friend named John Moss

16    who was the lawyer out of Atlanta, and if you look on

17    my opinion which I think you said was Exhibit 40 he's

18    the lawyer that I worked with on case number eight.

19    So that's the connection.

20        Q    Okay.  That the first contact that you had

21    with Mr. Cox was the email of May 21, 2013?

22        A    May 31st.

23        Q    Oh, May 31st?

24        A    Yes.

25        Q    What other communications have you had with

1     Mr. Cox in written form?

2        A   I have a few emails here, most of them are

3     kind of procedural like, let me see, you know, things

4     like this when someone sends me something that I'm

5     supposed to review I get like an official letter.

6        Q   What you just handed me is a letter to you

7     dated February 10, 2014 from Mr. Cox's law firm

8     enclosing the report of James V. Shea, Jr.?  Right?

9        A   Yes.  These are just examples since you're

10    asking but like he was giving me an update of when the

11    deposition might be, when my official opinion might be

12    due.

13        I had asked if I could have a slight

14    extension possibly on when the opinion be due because

15    it was right at the end of the semester and I think he

16    have contacted you about that.

17        Q   He did.

18        A   And then I also had inquired I think when he

19    knew when the trial might be and I told him dates I

20    would be on vacation.

21        Q   Could I just take a look at all of these.

22    You've identified various written communications from

23    Mr. Cox's office.  If you want to just hand me that

24    other one that you mentioned too.

25        A   Sure (handing).

1        Q     And you brought with you here today your

2   entire work file?

3        A     I did.  I also brought my computer because

4   some of it is not printed out and they're just PDFs.

5        Q     What are the PDFs that would be on your

6   computer?

7        A     I did, I tried to be exhaustive here with

8   everything that I have so I don't necessarily have to

9   find any for you.  There are some additional items

10  since November 30th that I did bring with me so I can

11  at least show you but this is exhaustive up to

12  November 30th.

13       Q     Okay.  For our record, so you're looking at

14  your report, Exhibit 40, page one identifies items A

15  through T and those are first of all up through the

16  date of that report the items that you looked at?

17       A     Yes.

18       Q     So when you reference documents on your

19  computer that are in PDF, are the only PDF documents

20  on that computer documents that are identified here in

21  Exhibit 40?

22       A     I am going to double check that in a break

23  but I believe everything I have since then I either

24  printed out or brought with me, but if something was

25  maybe enormously long I may not have printed it out.

1     Q     During a break you can feel free to take a
2   look at that and we'll confirm that.
3             And then you said since your report you
4   received additional items, what additional items have
5   you received?
6     A     So there's a printout of an OSHA Technical
7   Manual.
8     Q     Okay.  For the record this is entitled OSHA
9   Technical Manual (OTM), Section III, Chapter 4, is
10  that right?
11    A     Yes.
12    Q     Okay.  Who provided this to you?
13    A     That was Jim Cox.
14    Q     And the date, at least the print date on it
15  is 2/25 of 2014 which was only, well, less than a week
16  ago?
17    A     Yes.
18    Q     Why do you understand you were provided with
19  this document?
20    A     I had asked for some information regarding
21  if we knew of any OSHA standards just for general
22  recommendations.
23    Q     So this was research that Mr. Cox did for
24  you to find these OSHA standards to --
25    A     I had done some Googling myself, I wanted to

1    see if they meshed up but that was something he shared

2    with me after we had the discussion.

3        Q    What other documents --

4        A    It was the same day I got this one just so

5    you know.

6        Q    So the same day you received the OSHA

7    Technical Manual, you handed me also then a single

8    page entitled Appendix C ACGIH Threshold Limit Values

9    for Hot Environments, correct?

10       A    Yes.

11       Q    That was provided to you again by Mr. Cox?

12       A    Yes.

13       Q    All right.  Any other documents that you

14   have been provided or reviewed in connection with your

15   work in this case that we have not discussed?

16       A    Yes.  There are, I'm guessing it was an

17   email discussion, the two people who came to pick up

18   Jared the day after he had the condition, so one is

19   Brandon Peppers and one is Jared's wife.  I got those

20   yesterday, two days ago I think.

21       Q    So you've handed me a four page document

22   that indicates it's from a Brandon Peppers to Donna

23   Baker?

24       A    That's the first two pages, and then the

25   next two are from Jared's wife.

1          Q     It says from Priscilla Whitt to Donna Baker?

2          A     Yes.

3                MR. SCHMITT:  Okay.  Here's what I would

4          like to do so that we keep track of what we're

5          looking at.

6                    This last item, this question and answer

7          session, these four pages, I'm going to mark as

8          Exhibit 41.

9            (Defendant's Exhibit 41 marked for

10      Identification.)

11               MR. COX:  Are you marking both statements

12         individually?

13               MR. SCHMITT:  They were all stapled

14         together as one document, Jim, as four pages.

15         A     They were two different emails.  Sorry about

16      that.  I did that for my own convenience.

17           (Defendant's Exhibit 42 marked for

18      Identification.)

19               MR. SCHMITT:  Okay.  So we've marked as

20         Exhibit 41 the document from Brandon Peppers to

21         Donna Baker dated February 27, 2014, and as

22         Exhibit 42 is the February 27, 2014 document from

23         Priscilla Whitt to Donna Baker.

24   BY MR. SCHMITT:

25         Q     Then let's just continue with marking these

1    documents that you stated that the OSHA Technical

2    Manual and Appendix C were sent to you at the same

3    time on February 25?

4         A    Yes.

5              MR. SCHMITT:  I will mark the OSHA

6         Technical Manual as Exhibit 43, and the

7         Appendix C ACGIH Threshold Limit Values as

8         Exhibit 44.

9         (Defendant's Exhibits 43 and 44 marked for

10   Identification.)

11   BY MR. SCHMITT:

12        Q    Then finally then there was a compilation of

13   communications with Mr. Cox starting with the May 31,

14   2013 email and then some follow up?

15        A    There's also this one, that is just to tell

16   me when my deposition was going to be.

17        Q    Any other communications, written

18   communications, with Mr. Cox or anyone from his

19   office?

20        A    I don't think so, well, just like I think

21   this was like a contract when I first started.

22        Q    Okay.

23        A    This is where some of the hard copy stuff

24   came but this is still predated so like this should

25   all be on my opinion.

1           I tried to save these different letters.  If
2      it's a nice colorful letterhead like that that means
3      it came in the mail and it wasn't an email.
4           Q    Okay.
5           A    These are three others but they all predated
6      the thing again so I do believe my information is
7      complete.
8                MR. COX:  Doug, keep your voice up.
9                THE WITNESS:  I'm sorry.  Okay.
10          A    This one is postdated and that I believe was
11     the opinions which I'm about to give you but I still
12     have other information to share with you.
13     BY MR. SCHMITT:
14          Q    Okay.
15          A    This is a packet of all the opinions, so my
16     opinion, Fran O'Connor and another railroad expert's
17     opinion.
18          Q    Okay.  Let me just stop you for just a
19     second.  You've handed me plaintiff's rule 26A2
20     disclosures in the Jared Whitt case and you mentioned
21     some opinions from some other individuals?
22          A    Well, the people, I can't remember his name.
23     Gaballa?
24          Q    Yes.
25          A    It was Gaballa, and then those two pages,

1    then that would include O'Connor's opinion, Fran

2    O'Connor, and my opinion is at the end so there's

3    three opinions in here.

4         Q    Anything else that you looked at, reviewed

5    or relied on in connection with this case?

6         A    I got an expert report from Shea Solutions.

7         Q    Dated February 10 of 2014?

8         A    Yes.

9         Q    Okay.

10        A    Then these two items was Jim's office, they

11   had put together like a little overview of some of the

12   microenvironment issues based on different people's

13   thoughts, and then this was kind of like a little flow

14   of the day.

15        Q    Okay.  So this microenvironment heat index

16   document, it's two pages, and this was prepared by

17   Mr. Cox?

18        A    Use this one, this was updated a little

19   more.

20        Q    So there were two versions of this document?

21        A    Yes.

22        Q    One dated February 24, 2014 and one dated

23   February 27, 2014?

24        A    Yes.

25        Q    Both were sent to you prepared by Mr. Cox or

1    someone at his office?

2        A    Yes.

3              MR. SCHMITT:   I'm going to mark both of

4        those documents together as Exhibit 45.

5          (Defendant's Exhibit 45 marked for

6    Identification.)

7    BY MR. SCHMITT:

8        Q    There is a 14 page document entitled Whitt

9    versus Union Pacific Railroad Company that appears as

10   though it's some type of maybe a medical or a

11   chronology, is that right?

12       A    That's the best word.

13       Q    That was again prepared by Mr. Cox and sent

14   to you?

15       A    These are my only copies of these so we're

16   going to need to make photocopies of some of these.

17       Q    That's fine.   It's just because for the

18   record we need to make sure we identify what it is

19   that you've reviewed and you've relied on.

20              MR. SCHMITT:   So this chronology I'm

21       marking as Exhibit 46.

22          (Defendant's Exhibit 46 marked for

23   Identification.)

24       A    I think that's it.   Just let me check my

25   computer.

1            MR. COX:  Dave, so I'm clear, 45 is

2        microenvironment and 46 is the chron?

3            MR. SCHMITT:  Yes.

4        A    I think the only thing we have left are

5    these two, let me pull them up for you -- these two

6    pictures were also sent to me to maybe show you

7    equipment that he would be wearing.

8    BY MR. SCHMITT:

9        Q    Okay.

10           MR. COX:  Voice up, please.

11           THE WITNESS:  I'm sorry.

12       A    I had received two pictures of Jared wearing

13   head gear, that protective gear that he would be

14   wearing while he was working, one with an example of

15   the face shield up and one with the face shield down.

16   BY MR. SCHMITT:

17       Q    When did you receive those two pictures?

18       A    Two days ago.

19           MR. SCHMITT:  What I would ask, Jim,

20       you're familiar with the two photographs,

21       obviously you provided them to Dr. Casa, could

22       you forward those to me, please?

23           MR. COX:  They're coming in in a

24       disclosure.

25           MR. SCHMITT:  Okay.

1        A     But I think we did well.  I think that's

2     what I have.

3               MR. SCHMITT:  There are these email or

4               letter communications we'll just mark these all

5               together as Exhibit 47.

6          (Defendant's Exhibit 47 marked for

7     Identification.)

8               MR. SCHMITT:  The exhibit sticker will be

9               placed on the first communication of May 31,

10              2013.

11              THE WITNESS:  That's what exhibit, Dave?

12              MR. SCHMITT:  47.

13    BY MR. SCHMITT:

14        Q     And then the last one being Exhibit 48 which

15    is the contract, what you referred to as the contract

16    when you were retained as an expert in regards to this

17    case, correct?

18        A     Yes.

19              MR. SCHMITT:  That will be Exhibit 48.

20         (Defendant's Exhibit 48 marked for

21    Identification.)

22    BY MR. SCHMITT:

23        Q     Okay.  I'll put these documents all back in

24    front of you.  Please feel free to refer to any of

25    them throughout your deposition to refresh your memory

1      or otherwise.

2                  My question is first of all in, you authored

3      a report which is Exhibit 40, did Exhibit 40 at the

4      time it was authored, November 30, 2013, contain all

5      of your opinions and all reasons and bases for your

6      opinions?

7          A     To the best of my ability everything I had

8      received up to that point is included on page one.

9          Q     My question though is more specific, did at

10     the time you authored Exhibit 40, did it contain all

11     of your opinions and all of the bases and reasons for

12     your opinions as of that point?

13         A     Up to that point, yes.

14         Q     My question is since that time, you've now

15     received some additional information and documents

16     that we just discussed?

17         A     Yes.

18         Q     Have your opinions or any reasons or bases

19     for your opinions changed from what you've stated in

20     your original report dated November 30 of 2013?

21         A     Nothing has changed.  Some of my thoughts

22     became more solidified with the some of the supportive

23     materials.

24         Q     Can you tell me which of your thoughts

25     became more solidified?

1          A     Is it okay if I grab my opinion here?

2          Q     Yes.

3          A     Probably I mean two primary ones:  One is I

4     feel more certain now that he definitely suffered an

5     exertional heat stroke; and, second, having to do with

6     the lack of efforts to make modifications related to

7     the work to rest rations and environmental conditions.

8          Q     You said the last one was efforts to change?

9          A     To modify the work to rest ratio based on

10    the environmental conditions.

11         Q     So of those two items that have now become

12    more solidified which is the term that you used, let's

13    talk about each in turn.

14               What is it that led your opinion to become

15    more solidified that Mr. Whitt suffered an exertional

16    heat stroke based on the information you reviewed?

17         A     Do you mind if I take a one second bathroom

18    break?

19         Q     Let's take a five minute break.

20                     (Recess)

21               MR. SCHMITT:  Back on the record.

22    BY MR. SCHMITT:

23         Q     Before we broke you were going to tell me

24    that you reviewed some additional documents that made

25    you more certain that Mr. Whitt suffered an exertional

1    heat stroke.  What specific additional information did

2    you receive that helped you become more certain in

3    that regard?

4          A    The one thing I was kind of lacking up to

5    this point was information on, specific information of

6    how Jared was feeling later the next day or the

7    ensuing days, so -- I just can't remember his name

8    right now so I apologize, let me find the document,

9    here it is.

10          So I had gotten information from Priscilla

11   Whitt and Brandon Peppers that gave a bigger glimpse

12   into Jared's condition on the Friday I guess it was

13   and then the ensuing days after they drove him home

14   and maybe the week after.

15          And it kind of felt more in line now with

16   the information from Wiesen who saw him immediately

17   while he was in the cooling tent and then you keep

18   carrying it back further and it makes a lot more sense

19   that he was suffering exertional heat stroke, there's

20   a lot of consistency.

21          Q    So the additional information you're relying

22   on are Exhibits 41 and 42 which were the question and

23   answers that were sent to you by Mr. Cox's office a

24   couple of days ago?

25          A    Yes.  In fact I had previously thought he

1    had a heat stroke and this, like I said, it was

2    solidified with some of my thought process.

3         Q    Okay.  What was it specifically about what

4    Mr. Whitt was experiencing during the week or so after

5    the incident that is contained in Exhibits 41 and 42

6    that supports your opinion or that solidifies it?

7         A    Someone who suffered heat exhaustion is not

8    struggling the next day and ensuring days after.  Heat

9    exhaustion patients recover very quickly.  They don't

10   have what we consider like a longer term sequela.

11        So as stated in these pages here Jared was

12   struggling quite a bit for the days after whether it

13   be dizziness --

14        Q    That was my next question, what were the

15   sequela that he was suffering from that supports your

16   opinion?

17        A    Had gastrointestinal issues where he

18   couldn't really eat much, extreme heat intolerance --

19        Q    Intolerance?

20        A    Intolerance, yes.  Lightheadedness, weakness

21   throughout his whole body, achy, things like that.

22        Q    Those sequela will be only be experienced by

23   someone during the days or week after the incident of

24   someone who suffers a heat stroke?

25        A    Yes.  Someone who suffers heat exhaustion

1    would usually not have these kinds of, one, the

2    length, and, two, the severity, and, three, the array

3    of these kind of responses.

4         Q    So someone that suffers heat exhaustion

5    though can suffer some of those sequela?

6         A    To give you an example, someone who has heat

7    exhaustion very, assuming after they have heat

8    exhaustion that they're rehydrated and given a chance

9    to rest in almost all cases that person can resume

10   activity the next day.

11        Q    So you say almost all so not all --

12        A    Heat exhaustion.

13        Q    Okay.

14        A    I mentioned not all because sometimes if

15   someone, for instance, is not rehydrated at all or is

16   not given a chance to rest they might need a little

17   more time than one day.

18             But they wouldn't still suffer all of these

19   like inability to eat, exercise, heat intolerance, for

20   instance, would never happen in a heat exhaustion

21   case.

22        Q    Okay.  What else would never happen in a

23   heat exhaustion case out of the sequela that Mr. --

24        A    Gastrointestinal issues where I suppose he

25   couldn't have any kind of substantial meals or normal

1    kind of meals.   The dizziness.

2         Q    Would never occur with someone with heat

3    exhaustion post incident?

4         A    Beyond that like first day or so, that's

5    something they might suffer acutely from and maybe for

6    a few hours after.

7         Q    When you say first day or so define or so.

8         A    Well, I mean, usually the remainder of that

9    day the condition takes place and maybe onto the next

10   day.

11        Q    That's the extent that a person that

12   suffered heat exhaustion would experience dizziness?

13        A    Yes.

14        Q    So a person that would suffer dizziness, for

15   example, in your opinion that continued two, three,

16   four days later would be then indicative of a heat

17   stroke?

18        A    Yes.

19        Q    Okay.

20        A    Especially taken collectively with all of

21   the things he was feeling.

22        Q    Any of the other sequela that Mr. Whitt

23   experienced that would only be experienced by someone

24   who suffers a heat stroke?

25        A    Not that I recall right at this second right

1    now.  The things that I think I also maybe had a

2    better chance to look more closely at Wiesen who I

3    mentioned earlier, his testimony, especially in the, I

4    want to say the one to two hour range after the

5    condition presented itself when he was back at that

6    cooling station when he was noted to be out of it,

7    only using single syllable words, and being extremely

8    exhausted, and having numbness and tingling in his

9    arms and legs, and contractures in his arms and then

10   especially so in his left arm.

11        These things don't happen when someone has

12   heat exhaustion.  People who have heat exhaustion can

13   have a completely normal conversation in the couple of

14   hours after a condition presents itself.  A heat

15   exhaustion patient is fine ten or 15 minutes after

16   they first start getting treated.

17        They may be really tired but they're not in

18   any way incapacitated from a central nervous system

19   capacity, the ability to process thoughts and

20   communicate.

21        Q    And the deposition testimony of Mr. Wiesen,

22   he was one of Mr. Whitt's co-workers?

23        A    He was.  Wiesen is someone who came into the

24   cooling station in a time frame while Jared was being

25   taken care of there.

1        Q      The things that you mentioned that

2    Mr. Wiesen testified that Jared was reporting

3    including numbness and tingling in the legs I think is

4    the one of the items, correct?

5        A      Arms and legs.

6        Q      Arms and legs.  Is numbness and tingling in

7    the arms and legs, is that a sign or symptom of

8    someone who sufferers a heat stroke?

9        A      Yes.  Heat stroke is a very unique condition

10   that you can have many different signs and symptoms

11   because when someone is overheated different parts of

12   the body could be affected by the hyperthermia.

13           So for some people it could the liver is

14   affected, some the kidneys, some the muscles, some the

15   nervous system, some the brain, some the heart.

16           So it can be multifaceted and so, you know,

17   in this particular case we'd see like his GI system

18   was affected so you have stomach and intestines.  His

19   central nervous system was affected from the

20   perspective of heat intolerance which is regulated by

21   the hypothalamus.  Could be the dizziness which could

22   have been some vestibular issues there.  His extreme

23   weakness, like you don't know if there might have been

24   some muscular issues, for instance, rhabdo, which is a

25   fancy term, but it's r-h-a-b-d-o, it has a longer back

1    part of it, which we don't have to worry about right

2    now.

3              Those are examples of some of the parts of

4    Jared that might have been influenced by the

5    hyperthermia.

6         Q    Continuing with just then the source of the

7    information to support your opinion that he suffered

8    the exertional heat stroke, have you reviewed any of

9    the deposition testimony of the other various

10   co-workers that were also present including

11   immediately after the scene or after the incident when

12   Mr. Whitt was found sitting on the ground?

13        A    Yes, yes, that's where it all is very

14   consistent.  So the ones I think would be most

15   relevant would be David Birt and Joe Linford.

16             So the Birt and Linford, the Wiesen one that

17   was mentioned earlier, and then the contributions from

18   Priscilla Whitt and Brandon Peppers forms a very

19   consistent story that this was an exertional heat

20   stroke from time of incident to, you know, the week

21   after the incident.

22        Q    Is it significant to you that multiple

23   co-workers, in fact, I think virtually everybody

24   except perhaps Mr. Wiesen making some inferential

25   allusion to it but have all testified that from their

1    personal observations Mr. Whitt was not disoriented or

2    confused.   Was that significant in your own opinions?

3        A     I didn't get that impression from Joe

4    Linford.   Jared communicated to Joe that he was out of

5    it and that he was not doing well and Linford made

6    such an extraordinary effort to lower him down to the

7    ground so that he was protected just in case maybe he

8    fainted.

9            And in Jared's own testimony he says how he,

10   I don't know if he used the word goofy or he was out

11   of it, that there might have been a stretch of time

12   from when they helped to carry him when he was down

13   into the truck, that there might have been ten or 15

14   minutes that he doesn't really recall.

15       Q     Do you consider it significant that other

16   witnesses have testified that specifically from their

17   personal observations of Mr. Whitt that he was not

18   confused, that he was coherent, conversant?

19       A     I didn't get that impression from Birt or

20   Linford that he was his normal self at this point from

21   a cognitive perspective.

22       Q     Are you aware that other witnesses have, and

23   if you're not that's fine, but are you aware whether

24   or not other witnesses have testified that from their

25   personal observations Mr. Whitt was not confused?

1              MR. COX:  Objection to form and

2        foundation.

3        A     There may have been people that said that.

4    I'm not sure if they had enough contact with him to

5    really get a good sense of that.

6    BY MR. SCHMITT:

7        Q     So you don't know what contact they had if

8    you're not familiar --

9        A     Well, the people that I feel had a lot of

10   contact with him being Birt and Linford and Wiesen who

11   actually spent significant time with him had enough

12   worry, I mean, you think of Birt, the second he is

13   working with him he has enough concern that he wants

14   to drive him to hospital.

15       Q     What did Mr. Birt testify to as to why he

16   wanted to take --

17       A     I think his two biggest concerns were that

18   he was suffering a heat illness and that he may have

19   some prodromal, signs and symptoms of potentially

20   having a heart attack or a heart issue because he had

21   reported numbness and tingling in his extremities

22   especially his left arm.

23            So he, Birt is gathering this information

24   together, here is a guy who is laying down in the

25   heat, is getting assisted to a vehicle after, you

1    know, being in the heat and then is in this vehicle

2    and then communicating that he has numbness and

3    tingling.

4              So he, Birt had said that he thought heart

5    might be connected or a result of a heat stroke and he

6    was deathly concerned about the heart issue because

7    that's I think was the big impetus of why he wanted to

8    get him to a hospital but he thought it might have

9    been related to a heat issue.

10       Q    That is your recollection of what Mr. Birt

11   had testified to?

12       A    Yes.

13       Q    Is someone that's experiencing numbness or

14   tingling on just one side of their body, in other

15   words, just the left upper extremity as compared with

16   both extremities, is that significant in determining

17   whether or not a patient suffered a heat stroke or --

18       A    There's definitely a little bit more of a

19   concern of a potential heart attack when someone tells

20   you they have like unilateral numbness and tingling

21   down their left arm, that's kind of a red flag.

22             But Jared supposedly said he had numbness

23   and tingling in his legs and arms, so I don't know the

24   extent that he really focused just on his left arm.

25             And, I mean, he was, it was clear he was

1    dizzy, light headed, you know, weak, great fatigue.

2    And, you know, like I said, Joe was so concerned,

3    first he saw him laying down, asked him to sit up,

4    then he tells him, Jared tells him he's not doing well

5    and Joe lowers him back down to the ground.

6         So those are all pretty big indications that

7    Jared was in a pretty serious situation, and then they

8    assist him to the car and they put him in the truck

9    and then the person who is driving the truck thinks

10   that this is serious enough that I'm heading to the

11   hospital.

12        Q    If someone is suffering a heat stroke would

13   you expect that they are confused?

14        A    Yes, or what we usually say is there's some

15   kind of altered CNS function, CNS stands for central

16   nervous system function.

17        Someone could be completely unconscious,

18   they could have confusion, they could have, you know,

19   just inability to act normally, they might be slow to

20   respond, agitated, aggressive, I mean, those are just

21   some outward signs and symptoms you might see.

22        Q    Let me do this, well, before I continue with

23   that, and so the testimony that you're relying on then

24   is from Birt, Wiesen and Linford as you've just

25   identified?

1        A     And Whitt.

2        Q     And Mr. Whitt himself?

3        A     Yes.

4        Q     Do you consider any of the testimony from

5     any of the other co-workers and individuals who were

6     present at the time of Mr. Whitt regarding their

7     observations of his condition to be important or

8     significant?

9        A     I don't want to discredit any of them, I'm

10    just targeting some right now.  I mean, I think

11    Steely, I think he encouraged Jared to go to the

12    hospital that evening after I think he might have had

13    a phone call with him after he was back at the hotel,

14    so he might have sensed something that was important

15    and serious.

16       Q     But you don't know?

17       A     No, I am just saying he did encourage him to

18    go to the hospital, so he might have been putting all

19    together what he saw that day and if he was still

20    struggling at that moment he was, you know, being

21    supportive of him going to the hospital, that's what

22    Steely testified.

23       Q     Okay.  Anyone else?  Anything else

24    significant?

25       A     Nothing that sticks out at this exact

1      moment, those are some of the strong ones.

2          Q     All right.  I'd like to make a list of,

3      first of all, heat stroke and if we can go through

4      those, what are the signs and symptoms, we have

5      touched on some of them, but let's get a working list

6      that we can then work off of.  What are the signs and

7      symptoms of a heat stroke?

8          A     Well, the two key diagnostic criteria for a

9      heat stroke that separates it conclusively from other

10     conditions is, one, extreme hyperthermia at the time

11     of collapse.

12         Q     What is that, extreme hyperthermia?

13         A     Like the exact temperature, usually like 105

14     or greater, maybe 104 or greater depending on --

15         Q     In the internal body temperature?

16         A     Yes.

17         Q     Okay.

18         A     So we lost the ability to have an accurate

19     assessment here when they decided not bring him to the

20     hospital so we lost one of our key diagnostic

21     criteria, we don't have access to this data, because

22     obviously they didn't do rectal temperature at the

23     cooling station nor did any of his co-workers do it at

24     the time of his collapse.

25               Just as an example, in the military athletic

1    situations a rectal temperature would be obtained

2    within a minute or two at the time of collapse.

3          Second --

4    Q    All that would do is it would just be a

5    diagnostic tool, it's not a treatment tool?

6    A    No, I mean, it allows you immediately to

7    move in that direction that you realize it's a heat

8    stroke because there were other reasons why someone --

9    the second one I'm going to tell is CNS dysfunction.

10   So the temperature helps you because there are other

11   reasons why someone could have CNS dysfunction.

12         So if someone is like unconscious in front

13   of you but they're not hyperthermic you're starting to

14   think now about maybe a head injury or, you know, a

15   hypoglycemia issue so the temperature really helps

16   trigger you right towards the proper treatment method.

17         So CNS dysfunction, I kind of went through

18   that already, that could have a myriad of

19   presentations.  In its most severe form it might be

20   just someone in a coma.

21         I've personally treated 167 heat strokes and

22   more than half of them are conscious and lucid at the

23   time of collapse, but then that could dramatically

24   change in a matter of minutes, that lucidity.  So

25   someone might not be able to communicate with you

1   anymore, they might have an altered consciousness,

2   they might get agitated or aggressive.

3         As he said like, in Jared's testimony like

4   he thought he was like spacey or goofy, or obviously

5   Wiesen's testimony later on which really starts to see

6   the effect of now some time passing with the

7   hyperthermia, that he was just not, clearly not the

8   normal Jared Whitt for that time frame that he was in

9   that cooling station.

10        Q    So the two diagnostic criteria, the extreme

11   hyperthermia, and number two, the CNS dysfunction, and

12   the CNS dysfunction consists of, it could be coma,

13   confusion, what else do you conclude in CNS

14   dysfunction?

15        A    Altered consciousness.

16        Q    Okay.  Define altered consciousness.

17        A    Someone who's not fully aware so they're not

18   maybe giving either proper answers or they say

19   inappropriate things or they may be just in and out of

20   it, they may be kind of a little bit responsive for a

21   little while and then a couple of minutes they're not

22   responsive.

23        Q    What else is included in the CNS

24   dysfunction?

25        A    As I said agitation or aggression, some

1   people punch and scream and bite.  Some people are

2   easily annoyed.

3          The biggest thing with a person who is

4   having heat stroke compared to heat exhaustion is heat

5   exhaustion people get better in the ten, 15, 20

6   minutes after the condition presents itself and

7   someone either, you know, stops exercising, they get

8   them to the shade and they start cooling down, where

9   heat stroke people get worse as time pursues and he

10  clearly was not getting better in any time frame after

11  that.  So that's why it's really, really interesting

12  that at the cooling station that he's just not doing

13  well.

14      Q    That's the primary criteria to distinguish

15  between heat stroke and heat exhaustion is that heat

16  exhaustion people will get better in 15 to 20 minutes

17  following the episode?

18      A    Well, in addition to the items I mentioned,

19  I mean, obviously if you have the body temperature

20  measurement, a heat exhaustion person would typically

21  be 102 to 105 at the time of collapse and a heat

22  stroke person would typically be, you know, the most

23  common starting heat stroke temperatures are like in

24  the 105 to the 110 range.

25      Q    All right.  So heat exhaustion, we're making

1      a list -- well, strike that.

2              Before we get to the heat exhaustion, heat

3      stroke, did you give me then the entire list?

4          A    Those are the key diagnostic criteria.

5      There are a list of signs and symptoms.  The problem

6      with the --

7          Q    All right.  We'll get to those in a minute.

8      I like your approach, let's talk about the diagnostic

9      criteria.  So heat exhaustion, we were starting to

10     develop a list, one of them being, number one, that

11     the internal body temperature is in the range of 102

12     to 105 degrees?

13         A    Yes.

14         Q    Are there additional diagnostic criteria for

15     that list?

16         A    Yes, I mean, by definition heat exhaustion

17     is the inability to continue exercise in the heat.

18         Q    Then what does that mean, the inability to

19     continue exercise in the heat?

20         A    Usually there's, you're connecting it with

21     some kind of cardiovascular insufficiency meaning that

22     the person's heart can't continue to sustain --

23              There's three things the heart is being

24     pressured to do:  One, sustain the muscular activity

25     of doing the exercise; two, getting blood to the skin

1   surface area so that you continue to cool yourself;

2   and, three, to maintain blood pressure.

3           So it's challenged at this point because the

4   muscle is asking for a lot of blood, the skin is

5   asking for a lot of blood to cool itself, but you're

6   also usually dehydrated at this time so there's less

7   of a reservoir of fluid.

8           So the body, you know, can't keep up, you

9   can't continue to exercise in the heat.  So that's why

10  people will usually stop and that's why they usually

11  rapidly recover because you can get fluids back in the

12  person.

13          The muscular activity stopping is one of the

14  big things that allows a heat exhaustion person to

15  recover because now the muscle is not demanding any

16  more blood flow like it was during exercise.

17  Q     And so the recovery issue is important in

18  determining the difference between --

19  A     Yes.

20  Q     -- the diagnosis between heat exhaustion and

21  heat stroke?

22  A     Yes.

23  Q     When we talk about the recovery, Doctor, you

24  said that heat exhaustion will get better in 15 to 20

25  minutes whereas heat stroke, that person will get

1    worse over time?

2         A    Yes.

3         Q    Can you describe for me in what manner that

4    a heat stroke victim will get worse over time?

5         A    Sure.  It's the cognitive side of things can

6    get worse, for instance, a good example is Wiesen, he

7    said, I think he said he was there with him for 60 to

8    90 minutes and he was completely not normal for that

9    60 to 90 minutes.

10        Q    But did, all right, and that was Mr. Wiesen?

11        A    Yes.

12        Q    Did Mr. Whitt get better though following

13   that 60 to 90 minutes cognitively?

14        A    Maybe marginally but he seemed like he was

15   extremely fatigued and still slow to respond even when

16   they got him back to the hotel which prompted, I guess

17   it was Wiesen who drove him back and then prompted

18   them to I think make phone calls and get him to the

19   hospital.

20        Q    Okay.  So cognitively gets worse, what else

21   in the recovery issue?

22        A    Well, it seems like while he was in the

23   cooling station the numbness and tingling were not

24   doing well at all --

25        Q    Were they getting worse?

1       A      -- lightheaded or it was at least sustained.

2    That's one of the big things you have to understand

3    with heat stroke is often things will, maybe one might

4    not get worse but they're not getting better.

5            And there's a few things to understand,

6    people who are rapidly cooled following a heat stroke

7    they recover a lot faster and a lot of these issues

8    are not problems anymore.

9            So as an example like with a lot of heat

10   strokes I've cared for, two, three, four hours after a

11   heat stroke these people often can, will walk on their

12   own and will, can leave really well with their family

13   or with friends.

14           And they are might be exhausted in terms of

15   just like, I don't want to go exercise right now, a

16   lot of fatigue, but they still, they can go home and

17   make themselves dinner and they can watch TV and they

18   can go to sleep and have a normal night's sleep and

19   things like that.

20           When a heat stroke victim is not

21   aggressively cooled that's when you enter this channel

22   of events like he fell into where, you know, eating

23   didn't go well that next day, or ensuing days, sleep

24   didn't go well, his ability to be out in the heat

25   didn't go well.  These are very common things that

1  happen for people who have a heat stroke that was not

2  cared for properly.

3      Q    What were the circumstances that you

4  treated, I wrote down you said 167 heat stroke victims

5  in your career, why were you treating those

6  individuals?

7      A    A lot of different situations.  I have been

8  on the medical team of a lot of different situations

9  where heat strokes take place.  So I've been at road

10  races, I have been in football players, soccer

11  players.

12     Q    So sporting events?

13     A    Those were all sporting events.  I've

14  consulted a lot with military heat strokes but not on

15  site specifically for the care of those.

16     Q    So you yourself personally treating heat

17  stroke victims were in connection as part of a medical

18  team with road races and sporting events in your

19  career?

20     A    Yes.

21     Q    I guess we didn't talk about your

22  educational background but let me just confirm this.

23  First all you are a doctor, it's a doctor of

24  philosophy, Ph.D.?

25     A    Yes.

1        Q     All right.  You are not a medical doctor?

2        A     That is correct.

3        Q     All right.  So you're personally never

4   practiced emergency room medicine, for example?

5        A     I have not.

6        Q     Or practiced any type of medicine obviously

7   in any specialty?

8        A     Well, just to clarify because I'm not sure

9   if the jury will fully understand, their level of

10  understanding regarding athletic training, I'm a

11  licensed athletic trainer in the state of Connecticut.

12       Q     What does that mean?

13       A     So an athletic trainer is a medical

14  professional that prevents, recognizes and treats

15  medical conditions to the physically active people.

16  So athletic trainers work in sports settings and

17  military settings and industrial settings.

18       Q     You said prevent?

19       A     Recognize and treat.

20       Q     Okay.

21       A     Injuries related to the physically active.

22  So that's the medical credential that allows me to

23  work in these situations.

24       Q     And this licensed athletic trainer status,

25  that's a license issued by the state of Connecticut?

1        A    Yes.

2        Q    What are the criteria to receive that

3   license?

4        A    You have to graduate from an accredited

5   athletic training program and you have to pass a

6   national standardized test, you know, board

7   certification, similar to any other medical credential

8   like a nurse or a PA or things like that.

9        Q    Of course becoming a PA is a fairly

10  extensive educational regimen?

11       A    Same as athletic training, there's no

12  difference.

13       Q    Tell me the graduating from the accredited

14  training program, for example, how many credit hours?

15       A    Sure.  There's typically about 20 athletic

16  training classes you need, so some programs will do it

17  within a master's degree or some programs might make

18  it a fourth or fifth year in an undergrad program so

19  it's, it just depends on the school that you choose.

20  Some people will get their bachelor's first and then

21  do athletic training in graduate studies and some

22  people will do it as part of a bachelor's program.

23       Q    So there's 20 classes, how many credits

24  roughly?

25       A    About 60 credits that are specific to

1    athletic training.

2        Q    So, for example, someone that has a

3    bachelor's degree in --

4        A    Economics.

5        Q    Perfect.  Just give me some sense then

6    because I'm not familiar with such licensing, how

7    much, somebody that has a bachelor's degree in

8    economics and they now want to be a licensed athletic

9    trainer, it would be require roughly 60 credits every

10   two --

11       A    To give you an idea, most bachelor's

12   programs across America no matter what the field it

13   takes about 120 to 130 credits to graduate from any

14   college in America.

15            About 60 of those are your general education

16   things to first, usually first two years of college

17   and then usually you're at about 60 credits or so for

18   whatever major you chose.

19            So like, for example, here at the University

20   of Connecticut like that would be similar to the

21   amount of credits you would need to become a nurse or

22   like an occupational therapist or other medical

23   credentials like that.

24            Physician assistants still in our country,

25   you know, you can be a bachelor's degree and get a PA

1     but I know like in 2020 they're moving toward

2     requiring a grad degree.

3              Similar to athletic training I think our

4     year is going to be 2025 --

5                    THE COURT REPORTER:   Could you slow down

6         a little bit.

7                    THE WITNESS:   Sorry.

8         A    I think it's 2025 athletic training will

9     require a grad degree so, and PT just made that move

10    as well, like they have a date out there that requires

11    a grad degree instead of just an undergrad degree.

12             So the medical professions are often now

13    moving towards the entry level degree becoming a

14    graduate degree.

15    BY MR. SCHMITT:

16        Q    Okay.

17        A    Is that helpful?

18        Q    It is.

19        A    Okay.

20        Q    We were then going through the list of then

21    the recovery issues on patients who suffer heat stroke

22    versus heat exhaustion.  You had indicated numbness

23    and tingling, that that will continue for someone with

24    a stroke --

25        A    It could, like I said some heat stroke

1    victims might have not at all and some might have

2    that.

3        Q    Let me ask you on that point, is it

4    significant, let's just assume hypothetically that you

5    have a patient or an individual that's only suffering

6    numbness and tingling in one extremity versus both

7    upper extremities, is that consistent or inconsistent

8    with someone that suffered a heat related illness?

9        A    It's really hard to say.  I mean, Jared had

10   reported that he felt numbness and tingling in his

11   both legs and both arms and then even at the cooling

12   station later he felt it in both arms and then it

13   really continued specifically in his left arm.

14            But heat stroke is such a random, in terms

15   of what the responses you see, there's no consistency

16   to it because when you overheat the body there's

17   something what we call the critical threshold for cell

18   damage, it's probably somewhere around 105.5 degrees

19   Fahrenheit.  When you get over that zone the human

20   body thankfully has about 30 minutes that it can

21   tolerate without any complications.

22            Now, that's a huge benefit from an

23   evolutionary perspective because in the past getting

24   above that temperature was something that we did, for

25   instance, when we were hunting because we could get

1    hot for a short period of time and then there was no

2    damage, no long term consequence which is a powerful

3    tool for us.  We could have, you know, extreme

4    exercise for a short period of time.

5            But when you're over that temp for about 30

6    minutes you tend to start having long term issues.  So

7    just to give you an example, when you have a heat

8    stroke victim if you keep that window that they're

9    over 105 to less than 30 minutes we have evidence in

10   over 2,300 cases of heat stroke that they recover

11   completely, no issues.

12      Q    Out of how many?

13      A    All of them, 2,300 like out of 2,300.  If

14   you can get someone's temp under 105, this is just

15   even outside the landscape of this, this is how we

16   save people's lives, you know, who are football

17   players and soldiers, this is the key to saving lives

18   from heat stroke.

19           And, you know, the people who are employing

20   you, anytime you have recommendations the key thing is

21   getting the temp down as fast as possible if someone

22   has heat stroke because we know that from military and

23   athletic data that no one has died if their temp

24   stays, if it's under 30 minutes.

25           Then in the 30 to 60 minute window there's a

1    chance of death, not likely, but there's a likelihood

2    that there's going to be some kind of long term

3    issues.  So as examples, it might be someone needs

4    kidney dialysis either temporarily or permanently or a

5    kidney transplant, they might have liver issues, they

6    might have muscular issues.

7          But two of the most common issues are heat

8    intolerance meaning they struggle to exercise in the

9    heat; or cognitive issues, that's a very common thing

10   that I get from former military soldiers that they

11   can't function at the level they did before.  So

12   that's the 30 to 60 minutes window.

13         When you're over 105 for greater than 60

14   minutes the likelihood of someone dying is greater and

15   if they do survive it becomes much more likely that

16   there's going to be something that, you know, lingers

17   with them beyond just the acute condition.

18      Q    What would you expect that would linger?

19      A    Heat intolerance and cognitive issues are

20   two of the biggest things, kidney issues are also very

21   common.  But it's a mixed bag, someone might just have

22   heat intolerance but be cognitive completely fine.

23         So in this particular case I think he had a

24   what you might call a mild heat stroke where he had a

25   temperature thankfully that wasn't 108 or nine or ten,

1      I have seen heat stroke at 112.

2            So he might have had something that was in

3      the 105, 106 range and thankfully, you know, you might

4      just be in an air conditioned truck and get to the

5      cooling station, he might not have been above that key

6      temperature for very long.

7            So thankfully Jared didn't die and

8      thankfully it looks like he might not have issues

9      that's he's going to carry forward maybe for his whole

10     life.  So those are really good news items.

11           So my guess is from everything, you know,

12     looking at what you're seeing is he probably was in

13     that 30 to 60 window of being hyperthermic, because of

14     these things that you see that people are telling you,

15     for instance, the cooling station, you know, he's

16     there up to a couple of hours after.

17           The heat stroke victims who cool rapidly,

18     they're not like that two hours later.  These are

19     people who have normal conversations, they tell me

20     their race, they tell me about the practice they were

21     just doing.  And they're tired, but they're just, you

22     know, kind of just tired the way you would feel after

23     an exhaustive bout of exercise but they're still fine,

24     you can look them in the eyes and they seem fine and

25     they can talk to you normally.

1           But these things now, these ensuing things

2      that are happening in the following days and week it

3      tells you that this is clearly not a heat exhaustion

4      but also Jared got a little lucky that, you know, it

5      wasn't an extreme heat stroke.

6           I mean, there was some things that were done

7      well in this situation.  Those would include that once

8      Linford saw him, the second he saw him he realized

9      that something was wrong with his co-worker, that we

10     don't know how long Jared was there, we don't if other

11     co-workers could have helped but Joe noticed

12     something.

13          And then once he got him in the car his

14     colleague, Birt, he thought that this was something

15     above, I don't know how much he was experienced but he

16     said this is something that isn't typical, I'm going

17     to get this guy to the hospital.

18          Even when they got him back to the cooling

19     station, not optimal in any stretch of the

20     imagination, but they have him in air conditioning,

21     they're thinking of hydrating him, they're thinking of

22     potentially, you know, using ice, these are not the

23     best cooling modalities but they all work, they had

24     the best interest of Jared.  So they all hopefully

25     took him from that mild heat stroke into a safety zone

1    where maybe, obviously he didn't die and hopefully he

2    might not have life long consequences of the

3    condition.

4        Q    I wrote down that you indicated that you

5    believe Jared suffered a mild heat stroke?

6        A    That would be my guess, yes, just, it needs

7    to be fair because it's something I would certainly

8    tell jurors, we lost, a lot of our ability to

9    accurately diagnose this was lost when he didn't go to

10   the hospital.

11            So we have to make some assumptions that

12   normally you would never have to make theses

13   assumptions because if Birt had continued to the

14   hospital they would have had a core temperature and

15   they would have had a much better sense of, a medical

16   sense and a medical assessment of cognitive function,

17   that all the people who either transported him or

18   cared for him at the cooling station, there was no

19   people who had medical credentials.

20       Q    So diagnostic evidence that would have been

21   available had he had gone to the hospital would have

22   been, number one, core temperature; number two,

23   cognitive function evaluation by a medical doctor?

24       A    A medical professional.

25       Q    Anything else?

1          A      No.   Like I mentioned to you before a couple

2     of the key diagnostic criteria are hyperthermia and

3     cognitive function, and we really lost our ability to

4     acutely assess those by people who are trained to

5     assess those things.

6          Q      Is an individual's vital signs or lab

7     results, are those important diagnostic criteria to

8     determine whether or not an individual suffered a heat

9     stroke?

10         A      Absolutely, they're very important.   But in

11    this particular case I'm guesstimating a little bit

12    but it was probably four-and-a-half to five-and-a-half

13    hours later that you first start getting those vital

14    signs or lab tests assessed by medical professionals.

15         Q      So meaning when Mr. Whitt went to the

16    hospital later that evening --

17         A      It would be make total sense that his

18    temperature would be back down near normal since all

19    that time had passed.

20         Q      What are the vital signs and lab results

21    that you would look at in determining whether or not a

22    patient suffers a heat stroke?

23         A      That's a good question.   So a lot of people

24    will have blood pressure issues, sustained, meaning

25    like the systolis might be low later on; they might

1    still have a high heart rate meaning the pulse still

2    might be up in 140s, 50s and 60s for people who are

3    still stressed; they might still have a high

4    respiratory rate so a, you know, resting might be ten

5    or 12 and they might still be in high teens; the

6    fourth vital sign would be body temperature, obviously

7    harder to tell a little later on; fifth, some people

8    use Pulsox, probably at that point that wouldn't be

9    very revealing.

10            From the lab tests some of the things that a

11   lot of people will look at are like liver, people

12   would look at liver enzymes as an example, markers of

13   muscle function or that rhabdo that I mentioned to you

14   earlier, those might be also done, people might look

15   at someone's hydration status.  Those start to tell a

16   little bit of a story.  Thankfully in this case as I

17   mentioned to you already we did not see elevated liver

18   enzymes.

19        Q    Okay.  Those were normal at the time Mr.

20   Whitt was seen in the hospital?

21        A    Yes.  I would have to check the time but I'm

22   going to guess somewhere in the ten to 12 range that

23   night.

24        Q    So the fact that they were, in which you

25   thought guesstimating four-and-a-half, five-and-a-half

1    hours post incident?

2         A    So a few things you have to consider here,

3    one is that encouraging that his liver enzymes were

4    not elevated at that point, they can be elevated in

5    that short period of time.  It tells us again what I

6    told you would probably support my theory of the mild

7    heat stroke situation.

8              But to be really honest people's liver

9    enzymes, they spike 12, 18, 24 hours later so they

10   don't always give you the most robust response in

11   those few hours later.

12        Q    But of course it's an important criteria

13   given the fact that obviously the hospital drew it and

14   took a look?

15        A    No question.  And often they will draw it to

16   serve as a comparison because they often will not

17   expect to see an evaluated level right then but then

18   if he's not doing well and they do it again the next

19   morning and see the spike and now they're really

20   thinking this is a serious heat stroke that's starting

21   to take a turn for the worse and we have to think

22   about how we can help the liver regain normal

23   function.  So a lot of times they use that as a

24   baseline measure.

25        Q    Are you aware of any abnormal liver enzyme

1      test results for Mr. Whitt?

2           A     I don't think so.  But from my records I

3      don't remember him getting any other testing beyond

4      that Thursday evening, like, I mean, acutely, like he

5      might have had stuff weeks later.

6                 So all of this points in the same direction

7      that you thankfully have a person who when he

8      collapsed it was probably in the 105 to 106 range.

9           Q     So going through the lab results, liver

10     enzymes which in this case Mr. Whitt's were normal

11     which then could be indicative and support a finding

12     that he did not suffer heat stroke, agreed?

13          A     Yes, I mean, I don't think you could ever

14     rule out a heat stroke based on liver enzymes that are

15     four or five hours -- perhaps I didn't clarify one

16     thing.

17                Some people could have heat stroke and not

18     have elevated liver enzymes.  Liver is one organ that

19     doesn't have to be affected from a heat stroke.  Okay.

20     That is one thing that is often affected.

21                But like I mentioned to you before for some

22     people it might be their muscles and their kidneys and

23     that might be it.

24          Q     So it's a variety of criteria?

25          A     Yes.

1        Q     But do you agree with me though then that at

2   least this one particular criteria, liver enzymes, the

3   fact that those were normal would be indicative or

4   support, just by itself in isolation would support a

5   finding that Mr. Whitt did not suffer a heat stroke?

6        A     Not the readings from four or five hours

7   later.  If you tell me the morning after readings that

8   they were absolutely normal then we would know one of

9   two things, or three things, that it wasn't an extreme

10  heat stroke or his liver wasn't affected by the heat

11  stroke or he didn't suffer heat stroke.

12              But four or five hours after the condition

13  that is not, that would not be the time you would ever

14  expect to see the peak of those measurements.

15              When someone has a legit, like very serious

16  heat stroke, I'm talking about like people who are 108

17  to 110 who not cooled, I mean, these things, I mean,

18  they will spike for two, three days out before you

19  start to see it come down.

20       Q     So someone that suffers a heat stroke will

21  never have liver enzymes being elevated within the

22  four to five hours --

23       A     I don't want to say that, they could.

24       Q     Okay.

25       A     But I think most physicians who do the

1    measure there, like I said it's usually serving as a

2    baseline for the next measure that they're going to be

3    getting.

4         Q    All right.  So it may serve as a baseline,

5    I'm just trying to understand then what's the purpose

6    in doing them that evening, they're normal, is that

7    consistent or inconsistent with someone that suffered

8    --

9         A    Well, there's two reason to do it that

10   evening.  One is if they're already elevated that's

11   telling.

12        Q    If they're elevated it's telling you that

13   they had a heat stroke?

14        A    Yes, it could be a heat stroke.

15        Q    Right.

16        A    And second, it serves as the baseline

17   because if you see somewhat normal readings right then

18   and then it spikes the next morning you know that the

19   liver is now being affected by the number of minutes

20   that it was hyperthermic.  So --

21        Q    This -- what were you going to say?

22        A    I was just going to say we often use the

23   term like a heat stroke sometimes uncovers the weak

24   link organs in our body, where you could have a heat

25   stroke and the kidney is not affected at all but the

 1    muscle is affected or nothing is affected but only the

 2    brain is affected.

 3            So like it's just, we don't know, we don't

 4    have the understanding yet of why these number of

 5    minutes that they're hyperthermic that seems to affect

 6    certain organs.

 7            Now, some people have multi-organ failure

 8    and that's very tightly related to the number of

 9    minutes a person is hyperthermic.

10    Q    The second lab result issue you said was the

11    marker of muscle function which was this --

12    A    Rhabdo.

13    Q    Rhabdo?

14    A    The real full name of that is

15    rhabdomyolysis.

16    Q    Did they do that test for Mr. Whitt?

17    A    I believe they did like often you'll do

18    things like test the myoglobin levels, I am actually

19    not positive if they did those, actually I would have

20    to check, I'm assuming they did and I'm assuming that

21    there was nothing extreme right then.

22            But once again these things often peak in

23    the 12 to 24 hour window after someone has a heat

24    stroke.

25    Q    If that test were performed and if they were

1    found to be normal at least at the time that they were

2    done, would that be consistent or inconsistent with

3    someone that suffered a heat stroke?

4         A    Well, I think we're back to the same thing

5    again.  If they, if it was not elevated it's probably

6    telling us one of three things:  That organ wasn't

7    affected by the heat stroke; or they didn't have the

8    heat stroke; or not enough time has passed yet to show

9    the results from that test.

10        Q    Okay.  The third item of the lab results was

11   an analysis of the urine hydration status?

12        A    Yes.

13        Q    Was Mr. Whitt evaluated in that respect?

14        A    Yes.  They evaluated him and I guess he was

15   still thought to be dehydrated and I believe they gave

16   him about two liters of fluid in that few hour stretch

17   he was there.

18        Q    So was the finding Mr. Whitt had, was that

19   consistent or inconsistent with a heat stroke or

20   something else?

21        A    Dehydration is often present with heat

22   stroke.

23        Q    Is it also present with heat exhaustion?

24        A    Yes.

25        Q    Okay.

1       A     People who are suffering from heat

2    illnesses, the great percentage of the time they're

3    dehydrated.

4       Q     Okay.  So it would be indicative of a heat

5    illness in general, it may also be heat stroke, but it

6    could be some other lesser form of --

7       A     In terms of what happened that day, that he

8    definitely suffered a heat illness and, you know,

9    dehydration can be, you know, related to any of the

10   heat illnesses but it certainly makes sense for

11   someone who, you know, was active all day in the heat.

12      Q     Any other lab results that you are testing

13   that you want to perform to assist in the diagnosis of

14   someone as to whether they suffered a heat stroke that

15   we haven't talked about?

16      A     I mean, people would typically do, like they

17   may do cognitive batteries, like on some kind of

18   cognitive test.

19            I think it would matter the extent of what

20   they're being presented with, they wouldn't usually do

21   it like right at that moment in the four hour mark,

22   that might be something they do like a few days later

23   especially if they're concerned that person is not

24   what they think getting back to normal.

25      Q     Were there any cognitive tests performed on

1    Mr. Whitt that night?

2         A    I don't believe so.

3         Q    Okay.  Anything else that we haven't talked

4    about?

5         A    I don't think so.  I mean, I don't know if

6    you want to follow up now because you did diagnostic

7    criteria, do you want to do signs and symptoms?

8         Q    I do.

9         A    Okay.

10        Q    So what are the signs and symptoms first of

11   all of a --

12        A    This is the really important part in terms

13   of education especially for co-workers and people who

14   maybe are not medically trained.

15             The signs and symptoms of heat exhaustion

16   and heat stroke completely overlap each other.  So as

17   an example nausea and vomiting, headache, dizziness,

18   dehydration, extreme fatigue, malaise, I could go on

19   but that gives you a little bit of a start.  But all

20   of those can be present with heat exhaustion and heat

21   stroke.

22             So the rule of thumb always is if you're not

23   sure which of the two conditions it is always assume

24   the worst until proven otherwise because a heat

25   exhaustion person can never die and never have any

1   long term complications from their condition.  A heat
2   stroke can die or have long term complications.  And a
3   heat exhaustion person would never, never suffer from
4   being aggressively cooled.
5          So the course of action that's optimal for
6   heat stroke would never harm the heat exhaustion
7   person.  So you're always better off assuming the
8   worst.  And I like David Birt's perspective of let's
9   get him to the hospital as fast as possible because
10  that's where the medical professionals are.
11         If you told me there was an MD or an
12  athletic trainer at the cooling station I honestly
13  would never have gone to the hospital, I would have
14  want the medical professionals test him as fast as
15  possible.
16         We have, just to show how important it is to
17  get their temp down to get the medical professionals,
18  the current advice in the military and in athletics
19  that we're trying to get the industrial world to also
20  adapt is the concept of is cool first, transport
21  second if medical professionals are available.
22         Cool first, transport second, that is if
23  medical professionals are available because we don't
24  want to lose the time, it's reiterating the concept
25  that we have a 30 minute window and we want to take

1    advantage of that window.

2         Q    Okay.

3         A    In this case, you know, David said he pulled

4    off the road when his supervisor called him, and I

5    don't know if he pulled off the road for the whole

6    eight minutes of that call, but that gives you an

7    example of like that's valuable time lost.

8              And then they decide to bring him back and

9    then for some period of time he ends up staying in the

10   truck and then goes into this cooling station and all

11   of it is not optimal ways of cooling so our minutes,

12   our clock is ticking and we're losing valuable time

13   and that's why we, you know, always assume the worst,

14   assume it's a heat stroke until proven otherwise.

15             And given the circumstances I think, you

16   know, you would always want these co-workers to think,

17   you know, this may be a heat stroke, let's get him

18   cared for quickly.

19        Q    Do you believe that telephone call was eight

20   minutes long?

21        A    I was told it was eight minutes long so I'm

22   just --

23        Q    Who told you that, Mr. Cox?

24        A    It was in this, I can find it for you, in

25   the chronological stuff.

92

1                    MR. COX:  Keep your voice up.

2                    THE WITNESS:  Sorry.

3         A    Here it is, got it.

4              This says here, phone records, Thomas

5    Dalebout called Dave Birt and the call lasted eight

6    minutes.

7    BY MR. SCHMITT:

8         Q    That's Exhibit?

9         A    I'm sorry, Exhibit 46.

10        Q    Page?

11        A    Page four.

12                   MR. COX:  David, so you'll know, those

13             are from the phone records that you sent me.

14   BY MR. SCHMITT:

15        Q    All right.  So you were indicating that then

16   if there's a medical professional on site don't

17   transport, treat him right there, cool first,

18   transport second?

19        A    Just with the caveat, if you have an

20   appropriate cooling modality like cold water immersion

21   or being able to have like a shower from a cold locker

22   room shower like where you can douse completely the

23   whole body with cold water.

24        Q    That was going to be my next question, what

25   is an appropriate treatment for someone like Mr.

1    Whitt?

2       A    There is the ideal treatment and that would

3    be something like cold water immersion.

4       Q    Cold water immersion, how would that take

5    place?

6       A    Yes, people usually have like in athletic

7    fields and like basic training scenarios in the

8    military they'll have like a Rubbermaid tub, and it's

9    filled with ice and water, like maybe a 150 gallon

10   tub.

11      Q    You've seen that in the military?

12      A    Yes.

13      Q    Okay.

14      A    Some basic training stuff, they'll have six

15   or eight of those set up.

16      Q    Of course, basic training, that's a pretty

17   extreme exertional activity?

18      A    Yes.  Like American football, I mean, the

19   current guidelines of high school, college and pro

20   football is to always have an immersion tub set up

21   during August practices and it's become actually

22   thankfully a standard of care.

23      Q    Okay.

24      A    So it's, the reason it's kind of a good

25   thing is it's not expensive for people to buy a $150

1    tub, and ice and water is usually accessible.

2         So usually cool someone in a 15 to 20 minute

3    range because someone's temp in that modality goes

4    down about a degree Fahrenheit every three minutes.

5    So if you go back to the scenario I said the most

6    common starting temps for heat stroke are 106 to 110,

7    if you just took 108 as an example there, someone

8    would get down from 108 to 104 in about 12 to 15

9    minutes.  So my most common thing is 18 to 20 minutes

10   of cooling a heat stroke victim, I mean, I've cooled

11   some for 30 but --

12        Q    So the cold water immersion, so using like a

13   Rubbermaid tub.  What other ways?

14        A    Other ways would be dousing the whole body

15   with cold water so, for instance, being under a cold

16   shower.

17        Q    Would simply pouring water on the individual

18   be acceptable?

19        A    You could pour water if you had the entire

20   body being covered with cold water and it was

21   perpetual, so like dousing with a hose, for instance,

22   is another modality we recommend in some situations if

23   you have, if the water coming from the hose is

24   reservoir water it might not be good but if it's well

25   water it might be cold like where reservoir water

1    might be warm during the summertime.

2                    THE COURT REPORTER:  Please, please slow

3        down.

4                    THE WITNESS:  I'm sorry.

5        A     Let me go back.

6              So water from a reservoir in the summertime

7        often is hot because it's closer to the surface, I

8        mean, we make sure people practice their techniques

9        they're going to be using.

10              But if it's water that comes from a well, a

11        well kind of supply that would impact water that like

12        comes from a shower, dousing with a hose, that would

13        be cold.  But it has to be perpetual introduction of

14        cold water on the body.

15              Another example is just pouring ice over the

16        entire body like literally because some people might

17        not have water but they might have ice so like

18        covering the entire skin surface with ice.

19              Another example is rotating cold wet towels.

20        This is a good portable way of treating heat stroke

21        where you might have a cooler and it has ten towels in

22        it filled with ice and water and you could strip the

23        person down to like their underwear and introduce

24        freezing, cold, wet towels on the body, and then after

25        you're done putting that tenth one on the body you

1    take off the one you put on first, put that back in

2    the cooler and keep introducing freezing, cold, wet,

3    water.

4            That's probably 60 to 70 percent as

5    effective as cold water immersion, but if you're able

6    to start cooling them right away you still can get

7    them under that key temp of like 105 within that 30

8    minute window.

9            So those are some of the more optimal ways.

10   If you told me you had none of those available, you

11   know, we'd still have to go to other considerations

12   because even like a person driving someone in an

13   ambulance we still want them cooling while they're

14   transporting them and they may not be able to do one

15   of those techniques.

16           Like a good example would be military

17   because it would be similar to a train situation where

18   they are out, you know, working where it might be a

19   couple of miles up the road, up the track.

20           In the military like if someone goes down to

21   basic training they might have a ten minute truck

22   drive back to where the cooling station is but they

23   cool them in that whole ten minute truck drive with

24   the best modality they have available in the truck

25   until they get to the tubs.

1   BY MR. SCHMITT:

2        Q     What's an appropriate way then for an

3   individual suffering an heat illness to be cooled

4   while traveling?

5        A     In transporting so, I mean, there's lot of

6   thing that help so you try to have a lot of these

7   things present, air conditioning would be helpful,

8   shade would be helpful, if you have a lot of water

9   available like, for instance, in coolers or water

10  bottles like, for instance, there's a flat bed truck

11  like in the military you can still douse the person

12  with cold water from water bottles or any kind of

13  containers you have.

14       Q     Is drinking water while that person is being

15  transported, is that a good treatment modality?

16       A     It is, the colder the better of the water,

17  and even if someone has ice bags, I mean, ice bags on

18  30 percent of the body is better than not being on the

19  body at all.

20             So those things, you are doing whatever you

21  possibly can to assist the cooling process, that's the

22  key.

23             It's one thing, no matter how this case

24  unfolds one thing I would encourage Union Pacific to

25  do, and I do this in all their cases, is I would

1    really would encourage them and for their co-workers

2    to just reiterate that point, do anything possible to

3    treat on site, during transport, in the cooling

4    station if you've waiting for the ambulance, or, you

5    know, in the ambulance or anything like that, we would

6    want to get that advice out just publicly at large to

7    just help everyone.

8        Q    Is having a cooling station present on the

9    site of a work location that has air conditioning in

10   it, is that a good practice?

11       A    Having a cooling station is a good practice,

12   I would have a better modality on site to cool a heat

13   stroke victim.  They didn't have the opportunity to

14   really cool him well in that station.

15            I mean, it's better than nothing to be in an

16   air conditioned, shaded environment, for instance,

17   while you're waiting for an ambulance than just being

18   out in the heat.

19            But one example if it wasn't, I don't know

20   how, I'm sure all of these cooling stations are

21   different throughout the country but, for instance, if

22   there was a locker room there you could have a tub set

23   up where you could easily put water in and train it

24   each day.

25            Or the example I gave you of a cooler with

1    rotating ice, wet towels because you could easily put

2    a plastic tarp down and then keep rotating ice, cold,

3    wet towels on the person, and it would not be that

4    messy to clean up afterwards.

5              So those are things that could be utilized

6    on site while you're potentially waiting for transport

7    because I'm making the assumption there's not a

8    medical professional there in a lot of those cooling

9    station so that you would be looking eventually to get

10   this person to a medical facility.

11       Q    As far as then the treatment that you say

12   should be provided by a medical professional on site

13   can that treatment, this immersion, this rapid

14   cooling, can that take place by a non medical

15   professional?

16       A    Yes.  That's good question.  So if, I'm

17   assuming that when these teams get together there's

18   probably some kind of medical designee so someone who

19   is first aid, CPR certified, has gone through basic,

20   it's their health designee for that unit of people

21   that are working.

22              So if that's the case that person should

23   definitely initiate the best possible cooling that

24   they can utilize until the ambulance arrives, and if

25   that facility allows for an immersion tub I would

1    absolutely encourage that.  If it only allows for

2    rotating the cold, wet towels I would encourage that.

3    No matter why I would recommend more than they had

4    currently in this situation that something has a

5    little better cooling rate.

6         Q    Okay.  What was provided here to Mr. Whitt

7    you would agree with me that at least there was, and

8    I'll just use the term first aid, there were certainly

9    first aid procedures that were followed for Mr. Whitt

10   to attempt to cool him, would you agree with that?

11        A    I would agree.  I think they recognized that

12   it was a serious circumstance and they were able to

13   provide shade and air conditioning and maybe some

14   ability to maybe put a cooling collar on or maybe some

15   ice or maybe put some water on parts of his body,

16   people did recognize that it was a serious condition.

17        Q    Were all of those things you just mentioned,

18   the air conditioning, the cooling towels and devices

19   around his neck, in the shade, drinking water, pouring

20   water over him, were those all good practices by Union

21   Pacific?

22        A    They were all very good practices and they

23   were all appropriate but none of them provide the

24   really high cooling rates that would optimize a heat

25   stroke recovery.

1    Q    So in your opinion the distinction of what

2    should have been done is there should have been a more

3    optimal type of cooling, rapid cooling provided to

4    Mr. Whitt, is that fair?

5    A    If he was going to be remaining on site for

6    transport I would want to have more aggressive

7    cooling.

8         If the protocol is going to be to just drive

9    the person as fast as possible after a serious

10   situation takes place I would want to have some level

11   of cooling while they're transporting him and

12   obviously not get halfway and then turn around and

13   start.

14   Q    If Mr. Whitt was going to be treated on site

15   the more aggressive cooling that should have taken

16   place was this immersion, cold water immersion that we

17   were discussing earlier?

18   A    I mean, each situation would have to have

19   its own emergency action plan, and I would have to

20   think heat stroke and cardiac and orthopedic injuries

21   would be your three biggest most serious situations in

22   railroads in terms of needing emergency care.

23        So your emergency action plan would have to

24   be dictated, well, what's the capacity at the cooling

25   station, if you don't have a, you know, a water supply

1    of cold water and there's not a shower there or

2    there's not a hose there the immersion might not be

3    feasible.  You might have to go the route of using a

4    cooler that's filled with ice water and towels and

5    have this tarp thing that I said.

6            So each place has to decide what its own

7    emergency action plan is.  There's multiple

8    appropriate methods to succeed in this venue but no

9    matter what it needed to be more effective.

10           Because they chose this route that they were

11   going to -- the big thing is they made the decision

12   that they were going to, they were going to do the

13   cooling because they didn't choose to, like they

14   didn't even, it's not like they were cooling while

15   they were waiting for the ambulance, they didn't call

16   the ambulance, you know what I'm saying, they chose to

17   be the medical providers and provide the cooling in

18   this circumstance.  That's never anything we would

19   ever want to recommend.

20           If it's something that was this serious, you

21   know, just even just think of the situation, if was

22   serious enough that they were thinking of bringing him

23   to the hospital, serious enough that the supervisor

24   said, yes, let's get you to the cooling station, and

25   then serious enough that a bunch of people are

1     continuing to help him, you know, I would have thought

2     they would have at least called an ambulance while

3     they were caring for him, you know.  At some point

4     they should have gotten a medical professional

5     involved in his care.

6              I mean, really the only time a medical

7     professional got involved in his care was a few hours

8     later, you know, and either his roommate or himself

9     decided that, or, you know, advice from others calling

10    people that it warranted medical, but it was, really,

11    co-workers really needed to help him at that point.

12       Q    Do you agree with me that not every

13    situation where an individual gets overheated that

14    they don't need to go to the hospital in every one of

15    those cases, first of all, do you agree?

16       A    I do agree, yes, it's true, in not all cases

17    of heat illnesses would you transport someone or

18    require a medical person to arrive or treat the

19    person.

20       Q    In fact, if we assume that an individual is

21    simply a little overheated, too hot, been in the sun

22    too long, that the type of treatment provided by Union

23    Pacific on site can be appropriate in certain

24    circumstances, correct?

25       A    It can.

1               MR. COX:  Form and foundation.

2  BY MR. BECKETT:

3       Q     Then the distinction, am I correct then that

4  the distinction that you're trying to make is the

5  severity of the condition that Mr. Whitt was

6  experiencing which is then dictating that a different

7  treatment protocol be followed than was provided to

8  him, is that right?

9       A     Yes.

10      Q     All right.  So now then, and so the

11 distinction, the reason that in your opinion that the

12 first aid provided to Mr. Whitt on site wasn't

13 appropriate, that more should have been done, is based

14 on what specific condition or conditions that

15 Mr. Whitt was experiencing, what makes his case

16 different than another worker that just simply gets

17 too hot where treatment on site like Union Pacific did

18 would have been appropriate?

19      A     Yes, I think what we have to boil this down

20 to is the only likelihood that Jared had was it was

21 either a severe heat exhaustion or a mild heat stroke.

22      Q     So you agree he could have had either one?

23      A     Let me just finish.  I'm saying in terms of

24 his co-workers that were there at the time, what he

25 was going through at that moment, the only two, if you

1  had a medical professional that was there at that

2  moment there were only two possibilities, severe heat

3  exhaustion or a mild heat stroke.  It could have been

4  a more heat stroke at that time but we don't have the

5  temperature, we don't know.

6         But those are the only two possibilities.

7  If you don't have medical professionals there without

8  question the people who are not medically trained have

9  to call for medical help because they are not trained

10  to make the difference between a severe heat

11  exhaustion or a mild heat stroke.

12         They're obligated to get this person help

13  because the medical professional is going to have to

14  make the decision.  We know that the reason, I don't

15  think it was a heat exhaustion at all, and the reason

16  is is because a heat exhaustion person does not suffer

17  later that night, the next day, the weeks after this,

18  there's no way this is a heat exhaustion case.

19      Q    We have discussed all the reasons.

20      A    We already went through this.  He struggled

21  and suffered for days afterwards.

22      Q    So you've told me, just so that we're clear,

23  you've told me all of the bases for that opinion and

24  conclusion, correct?

25      A    Right.

1          Q      Okay.

2          A      But the bottom line is, and this is just

3     whoever we are talking about it, athletics, it could

4     be a coach; soldiers, it could be a drill sergeant;

5     industry, it could be their co-workers.  If it's

6     something serious enough that we're doing all this

7     kind of care and we're not sure what it is we got to

8     get a medical professional involved.  Let them make

9     the decision.

10               I would much rather someone get the medical

11    care and say, you know what, it was a heat exhaustion,

12    make that call at that point, not a co-worker, there

13    was no person there that had the medical credential to

14    make that decision.

15         Q      So though I understand in this case err in

16    favor of the worst scenario?

17         A      I would think the company would want that

18    too because if it's the worst thing you would get the

19    get the right care, if it's not the worst thing you

20    have prevented the bad thing from happening, and you'd

21    much rather than have a bunch of mild stuff and be

22    sure you never have the serious thing.

23               I mean they always tell that with people

24    with heat stroke, assume the worst because you never

25    then have the death, always avoid the death or the

1       long term complication.  You'd much rather have, you

2       know, maybe ten unwarranted ambulance calls in your

3       life and have saved all your heat stroke victims.

4            Q    Is it important for an individual like Mr.

5       Whitt who is suffering some type of heat illness to

6       talk with that patient and talk with that individual

7       and find out how they're doing, how are they feeling,

8       what did they want to do, how do they want to be

9       treated, is it important for co-workers, supervisors,

10      everyone present to be asking those types of

11      questions?

12           A    That's a great, great point.  So when it

13      comes to heat stroke we actually don't ever care what

14      the patient is saying, it's really completely

15      irrelevant what the patient is telling you.

16           Q    Why?

17           A    The reason is is that the cognitive issues

18      affect their ability to think rationally and so when

19      I'm dealing with a heat stroke victim, I'm just going

20      to give you an example or two.

21                I once had a person tell me he didn't want

22      rectal temperature done because he was against that

23      idea.  Well, we did it and it was 108.8 and he was

24      unconscious five minutes later, you know.

25                I've had people who tried to not be immersed

1    because they didn't want to be immersed, people who

2    punch and kick and scream; people who just aren't able

3    to answer quickly or coherently.

4         So when someone is suspected of having heat

5    stroke but the report back from that person is not,

6    would never dictate their care, it's their other

7    things they are presenting to you, for instance, not

8    being able to have complete sentences, not being their

9    normal kind of personality that you would expect them

10   to have, things like dizziness or extreme fatigue,

11   you're taking all this all as a collective whole and

12   making a decision.

13        The key factor here is you don't have a

14   medical professional there so you got to just assume

15   it's the worst until proven otherwise.  If there's a

16   medical professional there they can then make the

17   judgment and let it sit on their shoulders that they

18   could be making a mistake but at least they have that

19   ability to make that differential.

20        The key thing too is temperature is the key

21   starting point to really have a good sense of what's

22   going on.

23        Q    In order to be able to determine whether or

24   not the individual can speak in complete sentences of

25   course you need to talk to that individual?

1      A      There's no question you're attempting to

2 communicate with that person, what I'm saying is that

3 what's coming out of their mouth is not meaningful to

4 you, you're not making your judgment, like if I said a

5 fifth of the people I've treated in my life if I asked

6 them if they want me to cool them right now they would

7 have said absolutely not, but I didn't listen to them,

8 I never took their advice, I never made any of my

9 medical decisions based on the advice they were

10 giving.

11      Q      But you're talking to them because you want

12 to, that's part of your evaluation though to see how

13 they're going to respond?

14      A      There's no question.

15      Q      So someone like a supervisor on site, it's a

16 good practice for that supervisor to be talking with

17 that employee and getting information from that

18 employee, correct?

19      A      That's a very good point.  But the thing is

20 --

21      Q      But is that correct?

22      A      It is, yes.  Part of your assessment would

23 be to have a verbal dialogue with the person.

24           But all I'm stating is the things they say

25 to you, if you're suspecting a severe heat illness,

1    that is a possibility of a severe heat illness, which

2    I think people in this case thought it might have been

3    a severe illness, the other ability to make logical

4    thoughts can be compromised so we don't listen to

5    their advice on terms of their care.

6              We would never, like the supervisor

7    Dalebout, who called, and I think Birt might have

8    asked Jared a couple of times, we would never, that

9    person asking them how he feels is irrelevant at that

10   point.

11             I mean, this person was laying down on the

12   side, not feeling so well that his supervisor had to

13   lay him back down, being carried to a car, he's like I

14   think being reclined in a car being transported

15   having, feeling very uncomfortable.

16             His testimony is, you know, pretty powerful

17   that he was not feeling well at this point.  So what,

18   him telling us like, oh, yeah, I think I should go

19   back to the cooling station, that doesn't mean

20   anything to us, we would never want that to be part of

21   our judgment at that point.

22        Q    I mean the practices though, if we take some

23   of those things that were occurring, if Mr. Linford,

24   if he's talking with Jared, Jared is in the shade and

25   Mr. Linford puts him back down, of course that would

1     demonstrate that Mr. Linford is a caring person trying

2     to do an appropriate things, right?

3          A    Yes.

4          Q    I mean that would be --

5          A    That would be a good move.

6          Q    That would be a good practice, putting him

7     back down?

8          A    Yes.

9          Q    Helping Mr. Whitt, whether Mr. Whitt was

10    able to walk on his own, ambulate on his own, but at

11    least putting people on both sides of him to make sure

12    he doesn't stumble and fall, that's a good practice,

13    right?

14         A    Absolutely.

15         Q    Reclining a seat to make it easier to get in

16    and out of the truck whether or not the person needs

17    it but at least reclining it to facilitate entry into

18    a vehicle, that's a good practice?

19         A    Yes.

20         Q    Air conditioning on high in the truck,

21    that's a good practice?

22         A    Absolutely.

23         Q    Do you agree with me that everything that

24    was done by Union Pacific, let's just pick the point

25    at least to the point that he's in Mr. Birt's truck

1    and he's being transported away everything that was

2    done was up to that point was appropriate, acceptable

3    good practices by Union Pacific?

4          A    I totally agree, I actually even stated

5    before, I don't know what happened before Linford saw

6    him, but from the moment Linford got him, took care of

7    him, recognized immediately it could be serious, got

8    him to Birt's car with help to keep him safe so he

9    might not have like fainted or hurt himself, Birt

10   immediately said, I'm going to get him and driving

11   him, that's exactly what you would want to have

12   happen.

13         Q    Okay.

14         A    I am totally on board with that point.

15              And given the possibility of like how long

16   it would have taken an ambulance to come and pick him

17   up and then bring him back, like that was all optimal,

18   that's what I would have done, maybe might have had

19   some additional cooling en route possibly.

20              But up to the point when he got the call

21   from the supervisor that was really looking out for

22   the best for him.

23              I'm not saying that I don't know if Jared

24   was potentially down before Joe got to him but from

25   the moment Joe recognized there was a problem to the

113

1    point that that call was received by Birt that's what
2    I would have wanted to have done so I had no
3    criticisms of that at all.
4         Q    Okay.
5         A    Maybe the ability to cool him en route like,
6    for instance, if the hospital was 40 minutes away I
7    would have wanted cooling take place during the
8    transport.
9              MR. COX:  Let me interrupt for a second
10        if I might.  Both of you are saying that it was
11        Joe Linford that found Jared laying under the
12        trailer.  I think it was actually Mr. Ornellas
13        that did all that.  Since you're both confused
14        about that I just wanted to clarify that.
15             THE WITNESS:  I may have made that
16        mistake.
17   BY MR. SCHMITT:
18        Q    Okay.  So with that modification your
19   testimony is, you stand by your testimony in all other
20   respects?
21        A    Yes.  Just the person who found him, all
22   that stuff.
23        Q    That's fine.  Do you think it's appropriate
24   for a manager to be concerned, a director, a manager,
25   to be concerned about the condition of their

1    employees?

2         A    Yes.

3         Q    I mean, do you have criticism about Mr.

4    Dalebout expressing concern about Mr. Whitt's

5    condition and calling him to talk to him about it?

6         A    I definitely think it's a good idea for a

7    supervisor to call but the more important person,

8    let's just say the possibility of severe heat

9    exhaustion or a heat stroke, the more important

10   opinion in that call was definitely the person driving

11   him, not the patient himself.

12        Q    Okay.

13        A    You would never want a supervisor from a

14   remote spot talking to a person, for instance, who

15   might be a heat stroke victim and then making the

16   judgment based on that.

17             The only person that would have mattered in

18   that car was talking to David, and David was like, I'm

19   feeling that we should transport him, that's why I'm

20   bringing him to the hospital, I'm already en route,

21   and his supervisor didn't support him.

22        Q    But you're not critical of Mr. Dalebout

23   having concern about the condition of his employee and

24   asking him, hey, how are you doing, and at least

25   discussing the situation with him?

1       A    Absolutely appropriate that he made the call

2    to the vehicle.  I just don't think he should have

3    impeded his care.

4       Q    Okay.  On that point as far as impeding his

5    care, now ultimately you understand that Mr. Whitt

6    expressed, verbally expressed the decision that he

7    wanted to return to the cooling tent, is that right?

8               MR. COX:  Form and foundation.

9       A    You have to understand that my opinion is

10   that he suffered a heat stroke.

11   BY MR. SCHMITT:

12      Q    Right.

13      A    So Jared's thought process of being asked to

14   be transported to the cooling station is completely

15   not relevant.

16      Q    All right.  But you agree with me that the

17   testimony and the evidence that you've reviewed is

18   that it was Mr. Whitt, I understand you're saying his

19   decision doesn't make any difference, but it was

20   Mr. Whitt that expressed --

21      A    Yes.

22      Q    -- the desire, the decision, announced that

23   he wanted to the return to the cooling tent, do you

24   first of all agree with that?

25               MR. COX:  Excuse me.  Form and

1        foundation, it misstates evidence.

2              A    It is true, what you said is true, Jared may

3        have requested to go back to the cooling station.

4                    But that's also very much in line with heat

5        stroke victims that I've seen in my own life, that

6        they ask for a different care for themselves.

7                    So the person who was driving Jared who

8        thought he needed to get to a hospital, that's the

9        person who was kind of his provider at that moment, he

10       was his guardian at that moment, he was the closest

11       thing to a medical provider at that moment.  He was

12       the one who should have made the ultimate decision

13       regarding his care.

14   BY MR. SCHMITT:

15             Q    If we assume that, let's just take a

16       hypothetical that there was no hospital within a 500

17       radius or a health care professional within a 500 mile

18       radius because you're working out in the middle of the

19       desert somewhere.

20             A    Okay.

21             Q    In that situation, if we make that

22       assumption that an option of taking that person to a

23       hospital wasn't available do you agree with me that

24       the first aid, the treatment that was provided by

25       Union Pacific to Mr. Whitt then in this situation was

117

1        appropriate, reasonable treatment?

2        A    Okay.   The case you described, then you

3    definitely would have had a more aggressive cooling

4    modality on site because you would have known there's

5    no way I'm going to get this person cooled to the

6    hospital so you would have had a tub or rotated cold

7    water towels, any appropriate care would have been to

8    have a much more aggressive cooling on site.

9             I don't think David would have embarked on

10   the beginning of that trip if he knew he had a 500

11   mile drive, I think I made the drive thinking that he

12   was, you know, ten, 15 minutes from a hospital.

13            One thing to always keep in the back of your

14   mind too is that David was thinking that this might

15   have been a heart condition issue.

16        Q    I think that was his testimony.

17        A    There's many reasons for wanting to take

18   him.   David was thinking maybe the heart thing might

19   have been related to the heat illness or a cause of

20   the heat illness.

21            But I am not aware if they had an AED on

22   site in the rail yard.   I'm not sure of that.   But the

23   only way you would ever care for a heart person is

24   getting him close to where the AED is, and that's why

25   because even if you forget when Dalebout makes the

1   call, forget the heat thing, just the possibility that

2   this was a heart attack, the only way he would ever

3   survive is getting him to the hospital because the AED

4   is the only thing that's going to save someone's life

5   if they go into cardiac arrest.

6          So from my perspective Birt had the right

7   hunch, the right thought, it fell in line with

8   Ornellas, you know, feeling that it was something that

9   required some care.

10          And if you look at Birt's testimony, one of

11   the most compelling things was, well, first of all you

12   look at his action, his action was let's get him to

13   the hospital until the supervisor stopped that

14   property.

15          But Birt looking back whenever he gave his

16   deposition, when he said he considered a couple of

17   days later he wishes he had continued on to the

18   hospital, I mean, because often people's first

19   intuition is correct and he saw a person in front of

20   him that was not the normal Jared Whitt and he's like,

21   I'm going to get this guy the hospital based on what

22   he's telling and what I'm seeing, and he regretted a

23   couple of days later not following through on his

24   actions.

25          Q    Is the long term condition that Mr. Whitt

1    currently experiences regardless of what the cause was

2    but at least the condition, do you understand he's

3    complaining of some issues with his left upper

4    extremity?

5         A    Yes.

6         Q    Some numbness or weakness or tingling, is

7    that right?

8         A    Yes.

9         Q    My question to you is that --

10        A    This is related to the surgery he recently

11   had, right?

12        Q    Well, it's my understanding he recently had

13   surgery.

14        A    Okay.  I don't know a follow up related to

15   the surgery or anything, details related to that, but

16   I'm assuming you're connecting these two parts.

17        Q    Maybe I should ask it this way, what in your

18   opinion was the long term sequela that Mr. Whitt

19   experienced as a result of this heat related incident?

20        A    That's a good question.  So I don't know if

21   we have a full understanding of that yet, for

22   instance, I don't know if he still has heat

23   intolerance, like typically someone would have a heat

24   tolerance test down for something like that, because

25   that's one of the common things that happens after a

1    heat issue is heat intolerance.  So that hadn't been

2    done.  I don't know if he's gone through a full -- I

3    don't think he has any long term cognitive issues,

4    thankfully.

5           But hopefully this is, I mean, knock on

6    wood, hopefully this is the only lingering issue that

7    he has from that particular episode.

8           Q    The left arm condition?

9           A    Yes.  But like I said I don't want to say

10   that convincingly because I don't know of any evidence

11   of a heat tolerance test being done on him.

12          Q    The only other thing that you suspect that

13   could be out there would be possible heat intolerance

14   but you just don't know because we don't have any test

15   results?

16          A    That's just based on like seeing Jared's

17   testimony and hearing from Jim that Jared seems to be

18   doing better.

19          Q    Okay.  Now, do you understand that Mr. Whitt

20   filed this lawsuit claiming two separate incidents,

21   one was a heat related illness, and another one had to

22   do with a lifting issue?

23          A    Yes, I believe that was two to three weeks

24   earlier in the same June.

25          Q    My question is have you formed any opinions

1    as to the cause of Mr. Whitt's left arm condition that

2    he currently experiences?

3         A    Yes, that's a good question.  I mean,

4    obviously I have to be a bit speculative.  But in

5    terms of my opinion remember earlier I had said

6    sometimes a heat stroke reveals some of your weak

7    links in your body because that hyperthermia can cause

8    different things so that thing that happened in

9    earlier June might have been amplified or brought back

10   into the fold because of the heat stroke.

11        So he had said he had weakness and tingling

12   in his legs and arms and then there was some kind of

13   tense contractures that were happening, I think his

14   wording might even have been beyond what your normal

15   like amount of flexion, for instance, might be.  So

16   that might have exacerbated that previous condition,

17   might have been made it worse.

18        The thing to consider, that was another

19   potential benefit of going right to the hospital

20   because there's, that's not uncommon to see something

21   like this, and at the hospital they could have given

22   him medication, pharmaceutical intervention to

23   actually stop that from happening, so we might have

24   been able to prevent, the condition that he is

25   suffering right now we might not be dealing with this

1      at all right now if he had gone right to the hospital.

2          Q     But we don't know?

3          A     We don't know.   Like I said all of it has to

4      speculative on what I wanted him to get to the

5      hospital and get medical care right away so we have to

6      make our best guesses right now.

7          Q     You said that, as I recall you said

8      something to the effect that this is not an uncommon

9      situation or uncommon condition or maybe it's a common

10     condition?

11         A     In heat stroke victims, I don't want to say

12     common meaning like greater than 50 percent.   I have

13     seen in many cases of heat stroke I've care for people

14     having tense contractures of their musculature that

15     goes on for extended periods of time.

16               So it might be in their legs that they have

17     extreme contraction of like their hamstrings or their

18     quadriceps muscles, it might be their biceps, it could

19     be their wrist flexors, I mean we could be cooling

20     people for heat stroke and they could be sitting there

21     like this like for 15 or 20 minutes in a row.

22               But when you get their temperature down

23     really fast that helps relieve that because obviously

24     the heat stroke is subsiding.   Or if someone is in the

25     hospital they will give like relaxants, muscle

1    relaxants, they'll often put in an IV to calm this

2    person down.

3            And that continued contraction, I mean, this

4    can happen to any human being, if you sit there

5    holding a cell phone next to your ear for a three hour

6    phone call when you get off the phone you can't like

7    move your arm.

8            So imagine that happening forcefully,

9    uncontrollably in a heat stroke victim for an extended

10   period of time, that obviously can be related to some

11   of the issues he's dealing with now.

12      Q    Have you ever seen a heat stroke victim

13   or -- let me strike that and be broader.

14           Have you seen someone who suffered a heat

15   related illness regardless of the severity suffer

16   permanent numbness, weakness in one upper extremity as

17   a result of that?

18      A    That's a good question.  So thankfully for

19   most of the heat strokes I have cared for, I mentioned

20   to you earlier they're all cooled really rapidly and

21   they survive and they don't have long term sequela.

22           But I do know of cases, people in the past

23   in the military that have had situations like that

24   where they have ongoing issues and it might not just

25   be, it could be the arm or the leg, it could also be,

1    I've known of people like in the upper muscles of

2    their neck, whatever went into this kind of tension

3    mode for an extended period of time could have been

4    injured from that.

5              Do you mind if we take a quick break?

6        Q    Fine.

7                   (Recess)

8              (Time noted:  11:37 a.m.)

9              MR. SCHMITT:  Back on the record.

10   BY MR. SCHMITT:

11       Q    We were talking about the current condition

12   Mr. Whitt experiences with his left arm issues.  My

13   question is are you able to say whether with any

14   certainty, reasonable certainty, whether or not the

15   first incident with the lifting, whether or not that

16   had any role one way or another in the condition that

17   Mr. Whitt is currently experiencing?

18       A    I think it's related because I think that

19   first condition, he was dealing with something that

20   was a little weak in his body when he had the heat

21   stroke.

22       Q    But how do you know that, what do you base

23   that on?

24       A    I mean, it's not, it's just a professional

25   opinion.  I mean, he had an injury and it's likely he

1    wasn't fully recovered and then he has this extreme

2    stress of a heat stroke, and then that previous injury

3    is now something that's bothering him, you know, for

4    the long term.

5              So it kind of makes sense that there was

6    something that was weak and now is stressed even more

7    and is now affected by it.  I can't give you medical

8    evidence to back that up.

9        Q    Right.  What I'm trying to find out is it

10   really speculation on your part, is it just an

11   educated guess?

12       A    It is an educated guess.

13       Q    Okay.

14       A    The fact of the matter is there's no

15   evidence in the world to specifically tie this

16   condition that happens two weeks before with a heat

17   stroke because we don't have, there's no ability to

18   pull from any evidence that we have to say that's

19   true.

20       Q    If there was an incident, whenever it

21   certainly wasn't of a magnitude that Mr. Whitt

22   reported to anyone at the time, you understand that?

23       A    Yes.  I remember reading that he didn't

24   report that until a month or two later.

25       Q    Are you aware of any evidence that he was

1    actually having any problems, complaints, anything at

2    all with that left upper extremity during the, let's

3    say, well, for a significant period of time before the

4    heat related illness?

5        A    I mean, I don't remember him saying that

6    there was an issue during the course of the day.

7        Q    Right.

8        A    Yes.

9        Q    So that's really my question is, I mean this

10   issue of this, of the lifting these bags of anchors, a

11   couple of weeks before that he doesn't report, that he

12   doesn't lose any time, that it's my understanding at

13   least from what he said that he may have had a little

14   bit of soreness at least initially, is it fair to say

15   that it's really a guess whether or not that had any

16   role at all in the heat related illness and his

17   current condition?

18       A    Well, I don't think it had a role, well, the

19   first injury definitely didn't have any role in him

20   having a heat injury the second time.

21       Q    All right.

22       A    They would not be related to each other.

23       Q    All right.

24       A    I think the heat illness might, could have

25   exacerbated that that's what had happened earlier.

1        Some of the things do kind of make intuitive

2   sense a little bit in that he had this issue, you

3   know, a couple of weeks earlier and this was a pretty

4   unique day based on his testimony his machine was not

5   functioning properly.

6        Q    Well, we'll talk about that.

7        A    But it is connected only because if he was

8   doing all of this upper body work that he's not used

9   to on this particular day it does make sense that

10  would kind of, you know, if you were going to reinjure

11  it on a particular day this would be the day because

12  he's doing all this unique work that he's not doing

13  over the last couple of weeks so that makes sense from

14  an overuse perspective.

15       Q    I mean, sure, there's certainly just a time

16  sequence that it's interesting perhaps?

17       A    He did a lot of upper body labor that

18  particular day, the day he had the heat illness, based

19  on his testimony.

20       Q    Okay.  But as far as whether or not his

21  condition, if he, whatever the condition may have

22  been, if it was exacerbated by this heat illness that

23  --

24       A    I don't know.

25       Q    You don't know, that really is just a guess?

1        A     Yes.

2        Q     Fair enough.   As far as, Doctor, let's just

3    see if we can just talk really briefly about that

4    first incident.

5              As far as what was occurring that day with

6    these bags of anchors, what was occurring, what wasn't

7    occurring, are you rendering any opinions about that,

8    Doctor?

9        A     No, I really wasn't focused on that.

10       Q     You're giving your specialty, you're here

11   today to talk about the heat related illness incident

12   that Mr. Whitt has filed in this lawsuit?

13       A     Prevention, recognition and treatment of

14   heat stroke I think is the focus of my testimony.

15       Q     So you've authored a report which is

16   Exhibit 40, is that correct?

17       A     Yes.

18       Q     As we have talked about earlier this

19   contains all of your opinions and your bases for your

20   opinions?

21       A     Yes.

22       Q     And of course a lot of what we've already

23   discussed here is applicable, has provided information

24   for the opinions of what, that you've actually

25   expressed here in your report, right?

1        A     Yes.

2        Q     Okay.  So if we go through these what I'd

3    like to do is discuss then all of your opinions and

4    your bases for your opinions.  In the way you break

5    down your report there's, they seem to be in sections

6    called considerations.

7        A     Yes.

8        Q     What are you trying to accomplish by that,

9    what does that mean when you say consideration one,

10   consideration two, et cetera?

11       A     Well, we set the stage in consideration one

12   of the overview of what happened that day.

13             And so then we tried to take a look at if he

14   had a heat stroke, which I believe he did, what are

15   the things that predispose someone to have a heat

16   stroke, so that's in consideration number two, those

17   are some of the most common things that alter

18   someone's exercise heat tolerance so that's why I

19   presented that there.

20             Consideration three are the things that I

21   think may have been present that particular day for

22   this particular case.

23       Q     Okay.

24       A     Then consideration four is specific to what

25   was present that maybe could have been different or

1    changed or optimized to maybe prevent it from

2    happening, recognized sooner or treated better.

3         Q    Okay.

4         A    Then five brings back some of the big ticket

5    items to kind of make a synopsis of some of the things

6    that I mentioned earlier.

7              Six is kind of related to what I brought up

8    earlier is if he is going to return to just the same

9    exact work that he's done previously that I do believe

10   that we should be sure his exercise heat tolerance is

11   adequate.  I mention that here because I don't know if

12   that's completely recovered or adequate, just to make

13   sure he's safe if he goes back then.

14             Then seven is just my summary.

15             And then as you know I give my list of my

16   prior experience as an expert.

17        Q    Okay.  In going through each of those then,

18   item number one or consideration number one, you had

19   indicated that the heat illness has been diagnosed by

20   multiple physicians to be exertional heat stroke, did

21   I read that correctly?

22        A    You did.

23        Q    Have you personally read the medical records

24   that were authored by the providers who actually saw

25   Mr. Whitt at the hospital and in the weeks and months

1    following?

2         A    I would actually want to clarify that

3    statement from my opinion, that the heat illness was

4    referred to as a heat stroke by someone, I don't think

5    that there's evidence that a physician specifically

6    diagnosed a heat stroke.  So my follow up in recent

7    reading makes me clarify that statement.

8         Q    Understood.  Are you aware that Mr. Whitt

9    has retained an expert physician, Dr. O'Connor --

10        A    Yes.

11        Q    -- who has opined on that specific issue?

12        A    Yes.

13        Q    You're aware that plaintiff's retained

14   expert has expressed an opinion that Mr. Whitt did not

15   suffer an exertional heat stroke, do you understand

16   that?

17        A    I do.  I think he may consider changing his

18   mind when he has more information available to him

19   like some of the information that I have now but

20   that's obviously up to his prerogative.

21             But I did want to clarify that one thing,

22   that it was not diagnosed but it was referred to as a

23   heat stroke in different medical records.

24        Q    If Dr. O'Connor doesn't change his opinions

25   then your opinion is different than what

1    Dr. O'Connor's opinion is, correct?

2         A    That's correct.

3         Q    Have you ever spoken with Dr. O'Connor?

4         A    Yes.

5         Q    When you speak with him?

6         A    Not about this case, no.

7         Q    Okay.

8         A    He's a close friend of mine.

9         Q    Okay.

10        A    I know him quite well.

11        Q    Okay.

12        A    I've known him for ten years.  When you said

13   have we spoke before, like thousands of time.

14             Him and I worked medical staff together at

15   the marine corps marathon, we have treated many heat

16   strokes together.  And him and I actually co-wrote the

17   U. S. army, the specific doctrine that dictates heat

18   stroke care in the U. S. army, him and I co-wrote the

19   document.

20             So we have a long history together, so I'm

21   disagreeing with a friend and colleague of mine.

22        Q    A respectful disagreement, right?

23        A    Yes.  But remember I do think Fran

24   specifically stated it was a severe heat exhaustion, I

25   think that was his opinion.

1          And I said to you earlier, remember I said I

2     thought things were more solidified in my belief, that

3     it was a minor mild heat stroke and that has to do

4     with now the connectivity of what happened to Jared

5     after.  In the days and weeks after, so I think Fran

6     has to also consider rendering with this new

7     information.

8          Q    And the new information is what you

9     discussed earlier, it's the questions that, the

10    questions and answers that were provided by

11    Mr. Whitt's lawyer that are marked as Exhibits 41 and

12    42, information that came from Priscilla Whitt and

13    Brandon Peppers?

14         A    Yes.

15         Q    Who is Brandon Peppers, do you know?

16         A    No.  I am assuming it's a friend of the

17    family.

18              THE WITNESS:  Is that a friend of the

19         family, Jim?

20              MR. COX:  Yes.  It's Brandon that went

21         with Priscilla to Chicago to help drive Jared

22         home.

23              THE WITNESS:  Yes.

24              MR. SCHMITT:  Okay.

25    BY MR. SCHMITT:

1      Q      Okay.  So in regards to this specific

2    indication you haven't talked to Dr. O'Connor about

3    this case?

4      A      Not about the details, no.

5      Q      I don't recall, did you provide

6    Dr. O'Connor, Dr. O'Connor's name or recommend him to

7    Jim Cox as someone that should become involved in this

8    case?

9      A      I'm 99 percent sure I have. I've referred

10   Fran in a few different cases.  Anytime someone asks

11   for an MD, Fran is like literally the leading person

12   in the U. S. army related to heat illnesses.  So when

13   someone asks me for a name that's a name I often will

14   give.  So I do believe I did it but I don't actually

15   specifically remember that.

16     Q      The consideration number one continues:  The

17   contracture he experienced with his left limb at the

18   time of the incident on June 28, 2012 likely played a

19   role in his current problem.  Let me stop there.

20            Have you given me all the reasons and the

21   bases for that opinion already here in this

22   deposition?

23     A      Yes.

24     Q      All right.  Then it says:  And likely

25   exacerbated an earlier work incident.  And now we have

1    already discussed that, that in your opinion it would

2    really be an educated guess?

3         A    It's my guess but it's, there's not a, I

4    don't think anyone could give you a medical foundation

5    connecting those two.

6         Q    Continuing it says:  One of the critical

7    contributing factors to his medical complications was

8    a lack of proper health slash safety diligence

9    regarding the prevention, recognition and treatment of

10   his condition.  Tell me what you mean.

11        A    Sure.  I think we kind of covered the

12   treatments, I don't know if we need to get into all

13   that right now.

14        Q    If we have already covered it then that's

15   fine, we don't need to repeat it.

16        A    I'm satisfied with that.

17        Q    Until there's something you want to add,

18   Doctor?

19        A    No, we went through that a lot.  And

20   recognition is similar to some of the stuff I

21   mentioner to you before, the fact that if you weren't

22   sure if it was a heat stock or heat exhaustion I think

23   you should have assumed the worst until proven

24   otherwise, and I would have encouraged getting the

25   temperature at the hospital.

1           Prevention we haven't covered yet.  But it

2    depends on where you want to cover it because it's all

3    the items in consideration four, most of those are

4    prevention items.

5           Q     All right.

6           A     There are some big ticket items that we may

7    want to spend more of our time on.

8           Q     In item number four?

9           A     Prevention in general.

10          Q     We'll talk about those in a moment.  It

11   seems as though consideration number one is almost

12   somewhat of a summary that you're going into detail

13   later?

14          A     It sets the stage.

15          Q     Okay.  Then the last sentence in

16   consideration one:  Additionally many factors in this

17   case show the intense thermoregulatory demands placed

18   on this occupation were not appreciated and the health

19   safety policies in place in June 2012 to protect the

20   employee's health were grossly inadequate.  Tell me

21   what you mean and are those going to be discussed

22   later?

23          A     You have to tell me when you want to talk

24   about under prevention, we already have covered the

25   recognition and treatment side, so that's part of that

1    grossly inadequate, especially the treatment side of

2    things.

3         Q    Okay.

4         A    Disappointed that he didn't continue on to

5    the hospital.  But the prevention side we haven't

6    talked about.

7         Q    Let's then talk about the prevention, we'll

8    talk about it now understanding then that's --

9         A    It will be later.

10        Q    -- later.

11        A    Sure.

12        Q    So tell me what you mean, what in your

13   opinion should have been done in this case regarding

14   prevention?

15        A    Sure.  So there's approximately six key

16   items that affect someone's rise in body temperature.

17   So the two biggest items are the intensity of the

18   activity and the environmental conditions.  So if you

19   look -- I have to just pull it up it.  Just one

20   second.

21             All right.  It's Exhibit 11.  It's from

22   Linford and it's the quality safety meeting process

23   heat stress prevention.  So it's kind is an overview

24   of their heat guidelines from Union Pacific.  I want

25   to make sure if there's a second, it also includes

1    Exhibit 12 a little bit.

2         Q    Exhibit 12 or Exhibit 13?

3         A    No, 11 and 12 mostly for --

4         Q    All right.

5         A    -- what I want to talk about.

6         Q    Okay.  And Exhibit 11 is a document that you

7    understand was authored by Union Pacific, it was a

8    program, some training that was provided?

9         A    I think it came out about 15 months before

10   the incident.

11        Q    Okay.

12        A    So the big take home here when you read this

13   document is that there are no specific guidelines

14   given to the supervisors here on how you would modify

15   work to rest ratios.

16             Work to rest ratios are kind of your key way

17   of protecting your employees or your soldiers or your

18   athletes or whoever you're caring for because the work

19   to rest ratios brings into the two key items we just

20   mentioned.

21             It modifies the intensity which I just said

22   that's the key factor that drives the temperature up.

23   It modifies the intensity based on the environmental

24   conditions.

25             So just as an example, just so you know what

1    I'm talking about here, I brought a few others, just

2    let me see, so the one I already shared with you,

3    Exhibit 44.

4         Q    Yes.

5         A    And this just gives you an example of

6    different wet bulb globe temperatures and how you

7    would modify your work to rest ratio based on the

8    environmental conditions.  So obviously as it gets

9    hotter and you're doing, if it gets hotter you make

10   modifications and as your work load gets heavier you

11   make modifications.

12        Q    And this is from, at least according to what

13   the document says it's from an OSHA technical manual?

14        A    This is just an example.

15        Q    Okay.

16        A    I'm just providing an example because in

17   your, in this document here, so that's one example,

18   I'm going to give you another one, this is one example

19   from the military, so you might want to put an exhibit

20   on this.

21             MR. SCHMITT:  We're going to mark this

22        document you're now referring to as Exhibit 49,

23        and it appears to be out of a document, page

24        number 48, water requirements and soldier

25        hydration.

1                (Defendant's Exhibit 49 for Identification.)

2        A    I can get you the document where that comes

3    from.

4   BY MR. SCHMITT:

5        Q    That's some type of a military document?

6        A    That was written by people in the military

7    as recommendations for soldiers.  I'm giving an

8    example of wet bulb globe temperature, the

9    abbreviation is WBGT, that's the common term that's

10   used.

11              This is just an example again of easy work,

12   moderate work, hard work, and you make modifications

13   as the temperature goes up.

14       Q    And the modifications that you are trying to

15   make or that you are making are in regards to --

16       A    Usually --

17       Q    -- intensity of activity?

18       A    Usually two big things, the amount of time

19   you're exercising, and the intensity.  And so that's

20   why we call it the work to rest ratio.

21       Q    The amount of time exercising and what is

22   the other one?

23       A    And the intensity.  Amount of time and

24   intensity.

25       Q    Okay.

1       A     That's why you make modifications based on

2    the environmental conditions and the work you have

3    planned for that day.

4             So this is another example, this is from

5    American College of Sports Medicine.  This is from

6    their position statement.

7                    MR. SCHMITT:  We'll mark this document as

8         Exhibit 50.

9         (Defendant's Exhibit 50 marked for

10   Identification.)

11      A     So it's similar again, I'm just giving you

12   an example of increasing WBGT and how you make

13   modifications as it gets hotter.

14   BY MR. SCHMITT:

15      Q     You used the term WBGT, what does that stand

16   for?

17      A     That is the wet bulb globe temperature so

18   you saw that in the OSHA thing and that's kind of the

19   gold standard for knowing the environmental conditions

20   and we can talk about that in a second, I'll explain

21   that.

22      Q     Where did you obtain Exhibits 49 and 50?

23      A     That's a good question.  Exhibit 49, I have

24   to get to you, that's from a military kind of

25   doctrine.

1      Q      So you brought this document with you here

2   today?

3      A      Yes.   That's what I wanted to share with

4   you.

5      Q      Okay.

6      A      I will make a note to get it to you.

7   Military doctrine, WBGT, which means I'm also going to

8   need to get you this one here.

9      Q      Exhibit 50?

10     A      That's from I said from ACSM so I will get

11  you a copy of that.

12     Q      These are documents you can just email?

13     A      Yes.

14     Q      Okay.

15     A      Then this last one, as an example, this is

16  Georgia High School football, this is again wet bulb

17  globe temperature, and here you can see they changed

18  the amounts and number, the amounts and length of rest

19  breaks based on the environmental conditions.

20             MR. SCHMITT:  We'll mark this as Exhibit

21      51.

22          (Defendant's Exhibit 51 marked for

23      Identification.)

24  BY MR. SCHMITT:

25     Q      This was from a high school?

1          A      The Georgia High School policies.

2          Q      Okay.

3          A      So I gave you examples from military, from

4     work which is OSHA, I gave you examples from two

5     athletic settings.

6          Q      So you've now presented us with examples of

7     these different --

8          A      So this is what I mean in this document, a

9     supervisor who is not medically trained, because we

10    made the assumption at this work setting and we don't

11    have a medical professional.

12           So we would want to provide guidance on,

13    okay, if it is just environmental condition outside

14    what is the modification we need to make because the

15    trained employee is not, he's not a heat physiologist,

16    he's not an MD, he's not trained specifically on how

17    to make modifications.

18           So like these OSHA guidelines are actually

19    done pretty well just to give an example of some of

20    the things that should be considered adopting.  So

21    this is by far the biggest thing in terms of

22    prevention that was not in place.

23         Q      All right.  So let me talk in a little bit

24    greater detail, so the wet bulb globe temperature or

25    WBGT?

1       A    Yes.

2       Q    What is that?

3       A    Good question.  Okay.  So wet bulb globe

4   temperature is three different temperatures combined

5   into one, so it's a calculation.

6            So one is the ambient temperature, that's

7   just the temperature you hear when you're listening to

8   the radio, and that's ten percent of the calculation.

9            Then there's the wet bulb temperature, that

10  factors in the humidity that's in the air, that's

11  70 percent of the calculation.

12           Then there's the black globe temperature,

13  that's the effect of the radiant heat from the sun,

14  and that's 20 percent.

15           So then you have your three temperatures and

16  then you can obviously do the percentage of that, you

17  get an actual wet bulb globe temperature, and that's

18  this number here, the calculation.

19      Q    Okay.

20      A    Let me tell you why there's a big advantage

21  to this, okay, so as you can see in some of these, for

22  instance, I mentioned already Exhibit 12, and it's

23  also part of Exhibit 11, it's not as pretty because

24  it's not in color, but these are examples of heat

25  index, not wet bulb globe temperature.  The reason why

1    WBGT is better is because if you note at the bottom of

2    the heat index recommendations it says --

3              THE WITNESS:  I don't know if you have to

4       type all this but it's in the text.

5       A    -- the heat index guides were devised for

6    shady, light wind conditions and exposure to full

7    sunshine can increase heat index values by up to 15

8    degrees Fahrenheit.

9              The benefit of WBGT is you don't have to

10   make that estimate, that globe temperature is giving

11   you that reading so you don't ever have to speculate

12   is it sunny, is it hot, is it cloudy so that's taking

13   that into account.

14             So that's why everyone, that's why most of

15   the governing bodies of industry and military and

16   sports have gone to the WBGT recommendation because it

17   just provides a huge advantage so you don't have to

18   worry about kind of guesstimating and adding that into

19   the equation.  So I did out some sample calculations

20   so I can go over with you from that day.

21      Q    Okay.

22      A    I thought this would be interesting.

23      Q    Here's what we'll do, these are handwritten

24   calculations that you prepared?

25      A    Just remind me that I have to get

1    photocopies.

2         Q    We'll get photocopies of all of these.

3              MR. SCHMITT:  We will put an Exhibit 52

4         sticker on here.

5              (Defendant's Exhibit 52 marked for

6    Identification.)

7    BY MR. SCHMITT:

8         Q    Tell me what this is, Doctor.

9         A    Sure.  So I did a few different examples.

10   So the first one is 3:51 p.m. so this is close to

11   when, you know, he was having difficulties and it's

12   during the hotter time of the day and I realize that's

13   not how it was the whole day.  It was approximately

14   100 degrees Fahrenheit.

15        Q    Where did you get that information?

16        A    Actually from the most local weather station

17   I think said it was like 99 degrees at that time.

18        Q    Okay.

19        A    That's just to give you an idea because it's

20   only 10 percent of the equation, 99 would be like

21   one-tenth difference, just giving it as an estimate

22   for you.

23        Q    So on that point on determining the actual

24   temperature then your source, you're consulting the

25   National Weather Service?

1      A    Yes.

2      Q    And do you agree with me that the National

3  Weather Service is a more accurate reflection of the

4  actual conditions out there than say an employee

5  estimating or guessing in their mind what the

6  temperature might be or what the sun might be or what

7  the wind might be?  Do you agree with me?

8      A    That's A loaded question.  The, I would much

9  rather have them done this on site, it's a whole

10 separate discussion we can get into.

11     Q    Right.

12     A    You really always should get temperature

13 assessment on site because you have a microenvironment

14 and you have different issues to consider and I will

15 just tell you like in military bases and in sports we

16 always tell them to get the environmental conditions

17 on the field or site you're going to be having to do

18 your work in.

19          You don't want to rely on something that's

20 six miles or ten miles away because, for instance, you

21 know, even Union Pacific says in some of their

22 materials that the temperature near the rail might be

23 warmer than it is just in general because it heats up

24 near the tracks.

25     Q    Okay.

1        A    In fact, one document said it might even be

2    30 degrees higher on a full sun day.

3             So just to give you an example, so it was

4    about 45 percent relative humidity when it was the

5    hottest time of the day.  So when --

6        Q    What's your source for the 45 percent

7    relative humidity?

8        A    That's the same place I'm getting this.

9        Q    All right.

10       A    For now the only document of temperatures I

11   have is the thing from O'Hare.  I don't have anything

12   else.

13       Q    So just that we're clear though you agree

14   with me that the actual weather conditions that day,

15   that a more accurate source of information and more

16   reliable is the weather source is the weather services

17   rather than employees who are estimating or guessing

18   as to what their recollection is a year later?

19       A    Right. There's no question that the local

20   weather service is better than someone's subjective

21   recollection.

22       Q    Okay.

23       A    I totally agree with that.

24       Q    Okay.

25       A    But the employees which is the second item

1    for prevention, they should have gotten temperature

2    assessment on site, that should be a standard

3    operation.

4         Q    All right.  And the point being there

5    because there's been I think some testimony where

6    witnesses were asked, I'm just going to use a term

7    leading questions, that, well, could it have been 120

8    or could it have been 20 degrees warmer or 30 degrees

9    warmer, do you agree with me that when you read that

10   testimony from these witnesses of course they're

11   responding in a fashion but they're just using their

12   best educated guess?

13        A    I didn't form any opinion based on their

14   opinion of the temperature.

15        Q    Okay.

16        A    It means nothing really to me right now.

17        Q    So the source of information we need to look

18   at in this case and rely is the information that's

19   available which is from the National Weather Service?

20        A    That's correct, but it follows the fact that

21   I believe they failed by not getting on site

22   temperatures.

23        Q    Okay.

24        A    That's an important consideration.

25        Q    We'll talk about that in a minute.

1      A      So if you know the humidity and the

2  temperature outside then you can calculate this wet

3  bulb temperature, so that's 82.

4           The black globe, this has to be a little bit

5  of a guess, and I'm only using, remember I just read

6  to you the heat index, that it said about 15 degrees

7  Fahrenheit higher at the bottom of that sheet?

8      Q      Correct.  When exposed to full sunshine and

9  it says can increase up to 15 degrees.

10     A      Totally agree.  That's why I put sunny here

11 because I have partly sunny also.

12     Q      All right.

13     A      This is just an example.  So this is kind of

14 worst case scenario, this particular one.  So the

15 calculation comes out to be 90.4 in this circumstance.

16     Q      What you've done is a weighted average of

17 each of these?

18     A      Ten percent, 70 percent, 20 percent.

19     Q      So ten percent ambient?

20     A      Yes.

21     Q      Dry bulb?

22     A      Yes.

23     Q      Seventy percent wet bulb, and 20 percent,

24 the radiant, which is black globe.

25           How do they do that, black globe?

1        A     Good question.  So that's a thermometer that

2    sits inside of a black vessel, so if it's really sunny

3    out it gets extremely hot inside that black vessel,

4    when it's cloudy, when it's cloudy outside, full cloud

5    coverage, your black globe temperature is the exact

6    same as your dry bulb temperature.

7             And then I've had days doing data collection

8    in Georgia where I've had the black globe be 35 to 40

9    degrees warmer than the regular temperature, brutal

10   hot sunshine near blacktop.  So it can be done.

11            So this is 90.4 for the wet bulb globe

12   temperature, my first example, and you can go back

13   through these examples.  In all of the examples this

14   puts you in an extremely stressful situation, 90.4 is

15   like cancel, make modifications, have many more rest

16   breaks, so this is an important, that's a high

17   temperature.

18       Q    What does that 90.4 correlate to here in the

19   documents that you have?

20       A    This gives you an example here.  So wet bulb

21   globe temperature, 90 would be, for instance, here, if

22   you were doing heavy work, this is what you would do

23   if you were doing --

24            MR. COX:  Keep your voice up.

25            THE COURT REPORTER:  And please slow

1          down.

2                    THE WITNESS:  Sorry.

3          A    If you were doing heavy work this is the

4     work to rest ratio you would have because you're over

5     86.

6     BY MR. SCHMITT:

7          Q    Let me just stop you there so when we read

8     later and for Mr. Cox's benefit so he can follow,

9     Exhibit 44 which is the Exhibit C from an OSHA

10    technical manual, what you've done is you've looked at

11    these columns by work load, light, moderate, heavy,

12    making the assumption if the individual is doing heavy

13    work?

14         A    No, it's just an example.

15         Q    Oh.

16         A    If you look at Jared's case, if the machine

17    was working properly that day he probably has light

18    work, and in his particular situation on his day if it

19    was malfunctioning for many hours it was probably

20    moderate work.

21              But either way I'm giving you an example,

22    it's over 90 and we're into some of the more extreme

23    things because we're at the bottom of this thing, we

24    have more rest and less work.

25              Here you can see even if it's light work or

1    if it's moderate work it's saying to have 75 percent

2    rest and 25 percent work each hour.  So it gives you

3    an idea, we're in an extreme stress situation.

4           So that's one example.  Let me just do a few

5    so we can kind of pull this all together.

6           Track, this is, you know from some of the

7    documents it says that it can be hotter near the

8    track, okay, so whether it be the rail causing the

9    heat, maybe the engines from the motors, from the

10   equipment, from all the metal from the equipment,

11   whatever it may be.

12          So some, there was a document, and I'll pull

13   it out if you need me to pull it out, this is I think

14   one of the examples, there are a couple of examples,

15   it says like the temperature should be, of the rail

16   should be 30 degrees Fahrenheit hotter.

17     Q     What you're looking is the engineering track

18   maintenance field handbook?

19     A     I think you may have given that a number

20   already somewhere.

21     Q     Exhibit 37?

22     A     There you go.

23     Q     But what it says is that the rail

24   temperature, in other words, the temperature of the

25   steel rail will be approximately a 30 degree increase

1    on a sunny day?

2        A    Yes.

3        Q    But you agree with me that someone that is

4    standing let's say 20 feet away from that rail, of

5    course they're not experiencing a 30 degree increase

6    in temperature, are they?

7        A    Totally agree.

8        Q    Even somebody, Doctor, somebody that's

9    sitting on a machine that's up in the air and

10   isolated, insulated from the area of the rail which is

11   on the ground itself, you agree with me that an

12   operator in sitting inside of a machine that's feet

13   above the surface is not going to be exposed to a 30

14   degree increase in temperature, ambient temperature?

15       A    It may not.  That's the thing, the person

16   operating the machine has other environmental stresses

17   because most of those machines are all metal and that

18   metal is going to be extremely hot and they also will

19   have engines and that engine is producing heat.

20            So we don't know exactly what the

21   temperature is while he is sitting on this machine or

22   while he is potentially using a sledgehammer to put,

23   you know, to do the application of the things

24   manually.

25            But the point is is that in that small

1    environment there near the rail it's warmer than the

2    environmental conditions, we don't know the extent of

3    how much warmer.  It's warmer.

4         Q    Warmer than the ambient air?

5         A    Correct, it's warmer than the ambient.  We

6    don't know the extent.  If he's ten feet in the air

7    it's probably not as much, if he's two feet above the

8    ground it's probably hotter.

9         Q    And if you have breezes, wind that's

10   available that's going to provide a more rapid rate of

11   cooling, reduction in ambient --

12        A    It doesn't reduce temperature.

13        Q    The exposure?

14        A    Yes, it could help the person though with

15   cooling.

16        Q    Okay.

17        A    So that's just an example, I'm only doing

18   the examples to just lay the foundation.

19        Q    Yes.

20        A    So what I did to be fair, I only went up 15

21   degrees because it gives an example of 30 degrees so I

22   didn't go to the extreme, I only went up 15 degrees.

23   And I did the same humidity again because it's still

24   the same outside and now the calculated wet bulb would

25   be 94 --

1          MR. COX:  How much?

2          THE WITNESS:  94, and we'll get the sheet

3     to you, Jim.

4     A     And then the black globe here, I just did

5     the same thing again approximately but I went with 125

6     here, that's ten degrees above this one.  Here I went

7     15 degrees, it's definitely going to be warmer on a

8     full sunny day. I gave you examples where it's not

9     full sun so it doesn't go up as much.

10          But the point is is this is just an

11     extremely high number, 102.3, it's off the charts,

12     this doesn't even exist on these recommendations.  So

13     this is an example of it warm if you factor in some of

14     the track heat.

15          Here I have two examples in partly sunny so

16     partly sunny brings down the extent that the black

17     globe temperature is above because remember in your

18     little chart it said it goes up 15 degrees in full sun

19     so I did half of that in partly sunny.

20     BY MR. SCHMITT:

21     Q     Okay.

22     A     Make sense?

23     Q     When we talk about this Exhibit 12 where it

24     says in exposure to full sun what that means is that

25     the employee is exposed, is standing outside and is

1     exposed to full sunlight, full sunshine?

2          A     Yes.

3          Q     In other words, if that employee does not

4     have any type of protection from, for example, shade

5     from a tree, right?

6          A     Yes.

7          Q     Or shade from a canopy that might be on the

8     equipment that they're sitting on, right?

9          A     No question.

10         Q     Or even a hard hat, for example, that will

11    provide some shade?

12         A     To a point, actually probably stores more

13    heat than it helps you prevent the sun but that's

14    another issue.

15         Q     All right.

16         A     But there's no question shade can be

17    provided by the vehicle, shade can be provided by the

18    trees, and the cloud cover might provide shade.

19         Q     Even the shade, for example, if an

20    individual is sitting in a seat that won't have a back

21    rest --

22         A     Yes.

23         Q     -- that portion of the body is being shaded?

24         A     There's no question.  I'm giving you

25    examples here.  Based on his testimony it sounds like

1     he was having to do more manual labor than he normally

2     does and he was out in full sun for portions of the

3     day.

4          Q    How much was he actually out in full sun?

5          A    I don't know if anybody has that estimate

6     but at multiple times through the day it seemed like

7     he had to get off of his machine, do manual labor, get

8     back on, get back off, so we might have to ask like

9     Jared the exact time that was spent on each of those

10    tasks.

11         Q    All right.  Is that significant, is that

12    important to you to know how much he actually was off

13    that machine and whether or not it was perhaps just

14    simply an infrequent occurrence because there are

15    other individual laborers who are following up behind

16    his machine to the extent there's a problem, they're

17    the ones actually applying?

18              MR. COX:  Wait a minute.  Form and

19         foundation.

20         A    He, Jared's testimony gives an indication

21    that he had to frequently do that last process that

22    the machine was not properly doing.  So I don't know

23    the exact amount.

24              The point is is that I said, I even gave

25    credit before, if he never left his vehicle it's light

1    work for the day.  He was doing some labor like this

2    so I would consider it a moderate effort day.

3  BY MR. SCHMITT:

4        Q    At the most?

5        A    At the most, yes.  But even these kind of

6    environmental conditions that we're in these still

7    require attention for light or moderate work.

8             But based on the afternoon that he describes

9    and like I did this with everybody, I assumed every

10   single person was telling the truth when they were

11   doing their deposition, every person.

12            So when Jared's testimony is that afternoon

13   that he was laboring more one than he typically does.

14   And just one thing to bring up like in the Shea

15   report, he mentioned that why did only Jared have a

16   heat illness that day.

17       Q    Why was it only Jared?

18       A    Yes, why was it only Jared.

19            But it makes a lot of sense, if Jared

20   doesn't normally, for two weeks he doesn't have, he's

21   not having to do all this labor, and on this

22   particular day the machine is not working properly and

23   he's doing a lot more labor than he normally does so

24   it might have went from the mild to the moderate day.

25            Plus based if you look on the previous like

1    four or five or six days this was the hottest day like

2    in the last week so you have extreme stress and you

3    have this unique work load that he hadn't had

4    previously.

5            So if we assume everything that we take at

6    face value that makes sense to me.  So I did partly

7    sunny, we're still in some big conditions right here

8    in terms of WBGT, you can see this, 89 or 101.

9            What I did here also as I looked at the

10   morning temps because I know Shea made some notes that

11   he was thinking I was making the difference that it

12   was brutally hot all day which I wasn't, it's the

13   afternoon obviously is the hottest time of the day.

14           But it was still pretty hot, it's 93 degrees

15   at 11 o'clock in the morning for the dry bulb which

16   is, you know, a hot day, 47 percent humidity,

17   speculating here full sun, I mean you could obviously

18   do the same thing for partly sunny, all indications

19   were that it was either partly sunny or sunny based on

20   people's feedback. So just giving you examples here.

21       Q    All right.  So this WBGT that we've been

22   discussing, you said that the military and sports

23   industry, sporting athletes are beginning to adopt

24   this?

25           A    And the OSHA guidelines are based on that.

1      Q      Okay.

2      A      So industry, military, and athletics.

3      Q      Well, OSHA does not mandate that the

4  industry use the WBGT.

5      A      No, I'm not saying that, I'm just giving you

6  an example of their recommendations based on this.

7      Q      Well, there's a reference from OSHA in

8  Exhibit number 44, if an entity or individual wants to

9  use the WBGT, but you're not saying that OSHA is

10 requiring --

11     A      I actually don't honestly know what OSHA

12 requires.

13     Q      All right.

14     A      I'm giving you an example of something they

15 produced and this is the gold standard, I'm going to

16 give you even an example of a couple of weeks ago.

17 FIFA, which is capital F-I-F-A, that's the governing

18 body for soccer worldwide for the Brazil World Cup

19 that's coming up, if the WBGT goes over a certain

20 level they have to insert an extra halftime into each

21 half.

22     Q      Okay.

23     A      I'm just saying this is the momentum of

24 medicine and science right now, it's just a better

25 tool than heat index because you don't have the

1    arbitrary factor of do I add in ten, do I add in five,

2    because when you get the environmental, you know, if

3    the training crew is working in an area that is

4    heavily shaded, if the guy who is in charge of that is

5    getting those conditions right then they might be able

6    to handle much more work because full shade might take

7    out all the effects of the sun.

8           But then when they move in, they might have

9    a three hour time of full sun, they might have to back

10   off in that time frame.  It is just so arbitrary.

11        Q    Certainly the type of exertional activity

12   that an athlete like a soccer player, we've all seen

13   what a soccer player does by watching an event, a lot

14   of running, maximum exertion, do you agree with me

15   that the type of exertional activity an athlete

16   undertakes is significantly more than what an average

17   worker, laborer will perform?

18        A    Definitely.  It just depends on what the

19   laborer is doing because there are laborers that can

20   do much higher intensity than a football player or

21   soccer player.

22           But if you're talking about specifically

23   Jared I agree with you that his typical work day I

24   would put in light load.  But the one really unique

25   thing about his situation is he had a unique stress,

1    that he did a lot more labor that afternoon than he

2    was accustomed to, and if you combine that with warmer

3    conditions than he was used to it wouldn't take a

4    rocket scientist to predict that's the guy who's going

5    to have a heat problem that day because you have a

6    very unique stress for that particularly individual

7    that day.

8        Q    And certainly individuals in the military

9    and in basic training and boot camp, all of the

10   activities that a military soldier will undertake

11   certainly they have more exertional activity than an

12   average laborer would, agreed?

13       A    It's funny you said average laborer because

14   I just happen to know a lot of laborers that have

15   brutally hard work.

16       Q    We'll talk about that in a minute but on a

17   general basis would you agree with me just the general

18   manual labor employee --

19       A    It depends, because you could have a

20   construction worker, you could have a firefighter that

21   could have were higher labor than some other --

22       Q    Sure, a firefighter going up and down the

23   ladder carrying heavy equipment?

24       A    Just out in the mountains fighting forest

25   fires.

1        Q     Sure.  As far as type of work that Mr. Whitt

2     is actually performing, operating a machine, do you

3     have an understanding of what he's actually doing

4     other than what he's simply saying in his deposition

5     that he's doing, I mean -- let me stop there.

6            Do you have any understanding of what he's

7     actually doing other than what his version is as he

8     has expressed in his deposition?

9        A     Jim explained to me at length in one phone

10    conversation because I asked like what is the exact

11    process of the person who does this job and that gave

12    me a better understanding and also obviously reading

13    through Jared's description.

14       Q     So what did Mr. Cox tell you?

15       A     Well, he kind of just went through all the

16    components of what someone has to do when he uses that

17    machine but the big part for me is what would be

18    different when the machine was dysfunctional, the fact

19    that he had to get off and, you know, three or four

20    strokes each time to get each one in to be

21    satisfactory to move on to the next one.  So getting

22    out of your seat, doing that labor and getting back

23    in, and you're doing it as you're going up the line.

24            I'm not claiming it's like a soccer player

25    playing in a 100 degree temperature.  But I'm just

1    saying it took it from what was very likely a

2    typically light work load for him and definitely

3    ramped it up to possibly be a moderate workday for

4    him, and then you combine it with maybe being, you

5    know, eight to ten degrees warmer than it had been on

6    previous days.  And then you have, I don't know what

7    it might have been for him, maybe a ten hour shift

8    that he worked that day, you know, from 6:30 or seven

9    in the morning up to four o'clock.

10        Q    You're not testifying that this WBGT is a

11   standard that is required in the rail industry, are

12   you?

13        A    No.  It's something I would suggest that

14   they just consider doing on site.

15        Q    All right.  If, for example, it's determined

16   by WBGT analysis or just otherwise by looking at the

17   weather forecast and seeing what's occurring that in

18   the event of a hotter day there should be

19   accommodations or changes made to recognize that

20   environment, is that really what you're saying?

21        A    That's true.  Because they do have an

22   ability to make accommodations.  If they get into what

23   they consider their high heat procedures then that

24   would be when the heat index is in the red zone, so if

25   look again at Exhibit 12 --

1          Q      All right.

2          A      -- it's a little hard to distinguish between

3    the orange and red there but if it gets into the red

4    zone then they follow these precautions that are on

5    page 11 of Exhibit 11.

6                 As an example they say take a five minute

7    break every hour, that's just one example, and I know

8    it might have been a little hard on my opinion, that

9    is an example of what I meant by grossly inadequate.

10   A five minute break within an hour under high heat

11   conditions doesn't fall in line with any of the

12   recommendations I brought here today from OSHA or the

13   military or sports.

14         Q      You're talking about then compared to

15   Exhibit 12 extreme danger, the red section?

16         A      Yes.

17         Q      What your opinion is is that if that's all

18   that was done, only take a rest break for at least

19   five minutes every hour?

20         A      I'm speaking strictly of the rest to work

21   ratio since we were kind of hovering on that topic.

22         Q      Okay.

23         A      That is completely insufficient under

24   extreme weather conditions.  I mean, you would

25   probably, in those kind of extreme conditions you

1    would want ten minutes per 30 minutes, that's the most

2    extreme, that's the highest part of our chart.

3         Q    Is that true, that you would want ten

4    minutes of rest?

5         A    At least ten every 30.

6         Q    Okay.  At least ten minutes of rest per 30

7    minutes of work in the event according to NOAA's

8    National Weather Service heat index chart there is an

9    extreme danger, right?

10        A    I'm assuming you're doing like light to

11   moderate work since we're talking about Jared's

12   situation.  That would be different if you're doing

13   heavy work.

14        Q    Okay.

15        A    So we're nowhere near what actually, I mean,

16   this recommendation is just inadequate, five minutes

17   per hour in extreme danger situations.

18        Q    What is your source, we probably marked it

19   but if you can identify for me what is your source for

20   your opinion that the rest break should have been ten

21   minutes every 30 minutes?

22        A    Well, part of it is my own knowledge, I

23   mean, as an expert, plus Exhibits 44, 49.

24                   MR. COX:  Tell me what 44 is.

25                   MR. SCHMITT:  That's Appendix C from

1          OSHA.

2          A      Exhibit 49 which is the one I mentioned from

3     the military before.  Exhibit 50 which is from the

4     ACSM.  And Exhibit 51 which is from the Georgia High

5     School one.  Those are just examples, we can get many

6     more.

7  BY MR. SCHMITT:

8          Q      Okay.  If Union Pacific had in fact had a

9     procedure where employees were taking a ten minute

10    rest break for every 30 minutes of work and if

11    Mr. Whitt had done that what would have been the

12    outcome?

13         A      There's lot of benefits to having longer

14    break periods.  One, it gives you a chance for your

15    body temperature to come down while you're not

16    working; second, it gives you a chance to have more

17    time to hydrate which could optimize someone's

18    hydration status during the course of the day.

19               So those are -- the biggest reason is you're

20    keeping the person's temperature down because now

21    you're resting for 20 minutes out of that hour.

22         Q      In your opinion would it have made any

23    difference in regards to Mr. Whitt?

24         A      It absolutely could have prevented a heat

25    stroke from taking place.

1      Q    When you say could have meaning that it's
2  possible it could have and possible it may not have
3  made any difference?
4      A    I believe it's likely the heat stroke would
5  have been prevented.
6      Q    Okay.  Is it important -- well, before I get
7  to that, are there any other, I guess we were on the
8  topic of --
9      A    Was kind of work to rest ratio, the high
10  heat procedures because I thought it was inadequate,
11  the work to rest ratios --
12              THE COURT REPORTER:  I really can't even
13          understand you.
14              THE WITNESS:  Sorry.  It's my fault.
15      A    We were on the topic of work to rest ratios,
16  so that's why I got to the high heat procedures which
17  is part of Exhibit 11 because I felt that those were
18  inadequate.
19              And if you look at the charts here you have
20  like what was that particular day in the afternoon so
21  if you went to down from 99 degrees and you said 45
22  percent humidity, we're definitely in orange but we
23  could easily be in red if you factor in the sun, the
24  black globe part of it or if you factor in the heat of
25  the rail.

1          So either of the things that cause people to

2     kick this up a notch you would easily be in the red

3     zone of this.  And I think that they thought they were

4     like they had an extreme danger day from some of the

5     testimony that I was getting from some of the

6     supervisors.

7  BY MR. SCHMITT:

8          Q    Well, then if we base it on the evidence

9     that we know of, a 99 degree day at 45 percent

10    temperature --

11         A    Right.

12         Q    -- or humidity, excuse me.

13         A    But you have to go 99 plus 15 because It's

14    telling you to add in 15 on sunny days.

15         Q    For a person that's in full sunshine?

16         A    But the full sun also affects of everything

17    around you, that's why that calculation is there, it

18    makes your vehicle hotter, it makes the rail hotter,

19    it makes the ground hotter.

20         A lot of the heat you're getting is actually

21    being reflected from the ground so even though the top

22    is covering you you're getting the effect of the sun

23    from its reflection from the ground.

24         Q    But to be fair this is a document published

25    by the government, OSHA, right?

1      A    Yes.

2      Q    And what it's saying is that exposure to

3  full sunshine, so someone that is not exposed to full

4  sunshine is not going to be, you do not need to

5  increase this heat index value by 15 degrees

6  Fahrenheit, correct?

7      A    That's why I tried to give you examples

8  before to give you the benefit of the doubt.

9      Q    That's fine.

10     A    Let's just say half it of so

11  seven-and-a-half.

12     Q    And of course this document says up to 15

13  degrees, I mean, it doesn't say --

14     A    And I just gave an example, it could go up

15  30 or 40.

16     Q    Well, it could be one degree?

17     A    There's no question.

18     Q    Okay.

19     A    If it was a sunny day out it is affecting

20  the entire thermal load.

21     Q    And certainly you believe OSHA would have

22  been aware and taken that into consideration when it's

23  authored in this document, right?

24     A    I already mentioned that heat index is an

25  inferior method, that's why you use WBGT because you

1     then don't ever have to predict this.

2          Q     Well, certainly Exhibit 12 is a document

3     that's, heat index is a document that was published by

4     OSHA?

5          A     I know.  That's why I'm explaining to you

6     that they have also OSHA recommendations for WBGT.

7          Q     All right.

8          A     I'm just saying if I were made the boss

9     tomorrow I would say we're not going to use heat index

10    anymore.

11         Q     Okay.

12         A     We're going to use WBGT.

13         Q     What percentage of the industry in general

14    uses WBGT?

15         A     I don't think there's a study that's been

16    published that I could tell you that.

17         Q     Would you agree with me that it's probably

18    in the significant minority?

19         A     I know the military uses it.

20         Q     Sure.

21         A     And sports is moving towards it a lot and

22    like all those firefighter situations, they use it.

23         Q     Any other industry that you know of that's

24    using it, other than what you've just mentioned,

25    military, sports and firefighters?

1      A     What is OSHA suggesting they use this for in

2   this circumstance?

3      Q     I'm asking.

4      A     I don't know.

5      Q     Okay.

6      A     I'm here as the expert to tell you what's

7   the best thing to take care of the employees.

8      Q     Okay.

9      A     But even if you, even if you said it wasn't

10  sunny out you're still in the orange zone here and we

11  haven't factored in the heat of the rails and the

12  possibility of it being sunny outside, even if you

13  were in the orange five minutes per hour is not

14  enough.

15     Q     Let's talk about that.  If you're in the

16  orange of the OSHA's heat index which is titled using

17  the heat index, a guide for employers, so an employer

18  being guided by OSHA, if you have using the criteria

19  that OSHA is showing, temperature, humidity that is in

20  the danger, what should be done in that situation?

21     A     You would probably have, the other one is 20

22  minutes break in an hour, you would probably have ten

23  minutes break in an hour if it's light or moderate.

24     Q     Okay.

25                 MR. COX:  What was that answer?

1               THE WITNESS:  You would have at least ten

2          minutes if it was light or moderate work.

3    BY MR. SCHMITT:

4          Q    Per hour?

5          A    Per hour.  So I would probably say like ten

6    to 15 minutes, and the other one would probably be 20

7    to 25 minutes if you were in the red.

8          Q    But we're talking about the category of

9    danger?

10         A    Right, like I said if it was orange I would

11   probably say it would be ten to 15 minutes you would

12   not be exercising each hour.

13         Q    So ten to 15 minutes of rest, what's the

14   source and the basis for that opinion, that it would

15   be ten to 15 minutes?

16         A    All the same ones I just said before because

17   they all go into this range as well.

18         Q    But the sources that we're talking about are

19   sources from military, from sporting events, and then

20   --

21         A    OSHA.

22         Q    Well --

23         A    We can get a lot of other industry

24   guidelines for WBGT.

25         Q    I'm just asking for your opinion, what the

1    source is of it?

2         A    That would be the same numbers that I gave

3    you for the high heat danger.  For the extreme danger

4    it would be the same as danger.

5         Q    What would be the same for danger as it is

6    for extreme danger, oh, the sources?

7         A    Yes.

8         Q    Okay.  That we've already discussed?

9         A    Same exhibit numbers.

10        Q    All right.  Any other bases or opinions,

11   Doctor, in regards to this heat to rest ratio that we

12   haven't talked about?

13        A    I don't know.  That was one of the big

14   factors that I wanted to discuss.

15        Q    Okay.  As far as what was being done that

16   day and you said that by way of heat to rest ratio,

17   and you've expressed your opinion, is it also a good

18   practice for employers to, for example, reduce work

19   load, accommodate work load when it's going to be

20   hotter that day or being up higher?

21        A    That's the whole point of this is to have

22   less time that you're exercising in the day when it's

23   hotter outside.

24        Q    All right.

25        A    That's why I just said their guidelines of

1    five minutes per hour in the extreme danger is

2    extremely dangerous recommendation to have people only

3    have five minutes off each hour.

4         Q    Well, but the directive actually was that it

5    was a mandatory five minute break every hour, you

6    understand that?

7         A    That what's really inadequate, five minutes

8    isn't enough time.

9         Q    Was Union Pacific's directive that every

10   employee also take rest breaks whenever that employee

11   wanted to, was that a good practice?

12        A    Yes.

13        Q    Was it a good practice of Union Pacific to

14   direct all of its employees including Mr. Whitt to

15   drink plenty of water?

16        A    Yes.

17        Q    Was it a good practice for Union Pacific to

18   have provided Mr. Whitt and its employees with all the

19   water that they wanted to drink?

20        A    Yes.

21        Q    Was it a good practice of Union Pacific to

22   instruct Mr. Whitt to go into the cooling station and

23   cool down whenever he felt that he wanted to?

24        A    Yes.

25             MR. COX:   Foundation.

1   BY MR. SCHMITT:

2        Q    Was it a good practice of Union Pacific to

3   direct Mr. Whitt to go into any of the air conditioned

4   trucks that were being positioned throughout the work

5   area whenever he wanted to?

6        A    Yes.

7              MR. COX:   Foundation.

8        A    I was focused on that one item.  The bosses

9   should make specific modifications based on the

10  environmental conditions to protect the workers, the

11  work to rest ratio.

12  BY MR. SCHMITT:

13       Q    So all these other practices were good

14  practices but in your opinion the other thing that

15  should have been done is there should have been

16  regardless of telling an employee take a rest break

17  whenever you want and for however long you want, Union

18  Pacific should have mandated that it be at least ten

19  minutes, ten to 15 minutes per hour?

20       A    Absolutely.  The supervisors have to take

21  control because the workers might not feel comfortable

22  taking a break, a directive is different, if they are

23  told they have to stop and have certain rest breaks

24  that's definitely a much better way of protecting

25  them.

1      Q     Well, but now you're interjecting a

2  subjective guess, really, what workers thought or may

3  thing or don't think?

4      A     That's based on my experience, everyone is

5  going, for instance, everyone can interpret how

6  they're feeling differently.  For instance, a lot of

7  people who have heat stroke do not have warning signs

8  beforehand.  Okay.

9            One of the things that Shea had brought up

10  in his thing, that he should have early warning signs,

11  Jared's fault for not stopping, on page nine.  That's

12  clearly somebody who just doesn't understand heat

13  stroke because a lot of people have heat stroke, the

14  first time they realize it's a problem is when their

15  face is on the ground and they're unconscious.  They

16  have no warning signs beforehand.

17            So you can't just rely on your workers

18  feeling like I need a break, I don't need a break, you

19  have to have a directive to protect them with the

20  breaks so that you can prevent that from happening in

21  the first place.

22      Q     But isn't an individual, the individual

23  employee is the person most knowledgeable about his or

24  her own body?

25      A     There's no question but you have to

1  understand in heat stroke not everyone has an early

2  warning sign.

3      Q    Okay.

4      A    By having the rest break you protect that

5  from happening because you are getting their

6  temperature down automatically over the set period of

7  time.

8      Q    Well, is heat stroke, is there a progression

9  of heat related illnesses, in other words, does it

10  progress from I'm a little hot versus as we go up the

11  scale?

12     A    That's a great question.  That's one of the

13  great misnomers, it's like someone is going to have a

14  more mild heat situation before they have a heat

15  stroke and that's completely not true.

16          You could have an exertional heat stroke and

17  be unconscious and never have had a heat cramp or heat

18  syncope or heat exhaustion beforehand.

19          When I was 16 I suffered a heat stroke

20  myself running in a race and besides for just, I was

21  running the best race in my life and besides for being

22  really thirty because it was the last lap of a 25 lap

23  race and feeling warm but it was really hot outside

24  and you always feel warm when it's really hot outside

25  I collapsed unconscious on the track.

1          So I didn't have any indication before that
2      I was, that something was wrong with me, and that
3      happens in a lot of heat stroke cases.
4          Q    What percentage of heat stroke cases will an
5      individual experience no signs on symptoms before they
6      suffer the heat stroke?
7          A    That's a great question.  It's something
8      from the science perspective, we would love to really
9      understand that better.  A couple of studies that have
10     looked at that said about 50 percent of people don't
11     have any prodromal signs and symptoms before heat
12     stroke.
13         Q    Prodromal?
14         A    Prodromal is just something you feel
15     beforehand.
16         Q    And 50 percent of individuals suffering heat
17     stroke have no signs or symptoms before?
18         A    Nothing that made them indicate it was a
19     heat stroke, nothing different than a normal exercise
20     session in the heat.  Do you know what I mean?
21         Q    Sure.  We've all worked outside or exercised
22     --
23         A    Nothing that triggers that person to think
24     that this is different or it's a heat stroke.
25              I have to really follow up that statement.

1            The problem is with that is I don't

2      completely believe that number, it might be lower than

3      50, the reason is is that people who have a heat

4      stroke and die, we don't get a chance to ask them if

5      they have prodromal sign or symptom so we lose that

6      data plan, does that make sense, you know, because

7      obviously they lose that opportunity.

8            So the most extreme cases, the ones that are

9      most likely to die, they might have had the prodromal

10     symptoms but we'll never know.

11           But the take home message is that

12     supervisors who can consult with the experts in

13     industry and in medicine need to give the directive to

14     their employees about what is an appropriate work to

15     rest ratio in a work environment and then have the

16     appropriate work guideline in place like one of these

17     and then you also say to them, you know what, if

18     you're not feeling well you can still take breaks in

19     addition to these, it's up to you.

20           But we're going to definitely protect you

21     for these number of minutes during these hot

22     conditions because we know sometimes that heat stroke

23     might present and the person might not be able to

24     prevent it.

25           Q    But even in your situation with the heat

1     stroke you felt hot before you suffered it?

2          A     There's no question.   But in every race I've

3     run in the heat in my life before or since I also felt

4     really hot, running hot weather races.

5                So there wasn't something like I was, you

6     know, I had a severe headache or severe dizziness or

7     something was, you know, I did feel oppressively hot

8     but I have felt oppressively hot in my running life

9     running in the summertime.

10               But the point is even will the employee

11    always be able to interpret the seriousness of signs

12    and symptoms, you know what I mean, we can't assume

13    that they're all going to have that high level of

14    knowledge like, oh, this is something I need to be

15    worried about.

16               That's just a good work to rest ratio.  As I

17    mentioned before, remember the intensity and

18    environmental conditions are the two key factors that

19    drive temperature up.

20               So with good work to rest ratios we take

21    both of those into account on the same policy because,

22    one, we're making modifications of the amount of work

23    they're going do based on the environmental

24    conditions.  So it's very, very protective.

25               I mentioned there's other factors that drive

1    temperature up, and one is hydration, and I believe

2    they did a great job of keeping him hydrated; another

3    is equipment or uniform, and I believe that was not an

4    issue in this particular case really; one is heat

5    acclimatization.

6        Q    You have no issues, no concerns or

7    criticisms about that?

8        A    He had been exercising in, you know, pretty

9    moderate heat in the weeks leading up to that so he

10   was probably in a pretty good situation, the thing

11   that was unique is he may have had a new stress that

12   day because he was doing more labor than usual so he

13   might not have been acclimatized for that, but overall

14   I feel like he was ready to exercise in the heat.

15       Q    You felt that Union Pacific's conduct in

16   this case in regards to Mr. Whitt specifically in

17   regards to heat acclimatization was appropriate?

18       A    Yes.

19       Q    Okay.

20       A    So that's why I didn't criticize.  They have

21   a heat acclimatization policy in the high heat

22   guidelines.

23       Q    Okay.

24       A    You didn't hear me say anything about

25   hydration, I felt it was fine.

1        Q      Oaky.

2        A      So I think I hit five there, right, because

3   equipment, heat acclimatization, hydration, intensity,

4   and environmental conditions.   Those are five so far.

5        Q      Okay.

6        A      The other one is just something we call

7   individual factors that can affect someone's heat

8   tolerance and, for example, that could be like

9   medications they're on, it could be if they're sick

10   that particular day, it could be previous history of

11   heat illnesses, so I don't think that was an issue in

12   this particular case at all.

13        Q      Okay.

14        A      I don't think he brought anything to the

15   table that changed his susceptibility that day for

16   heat illnesses.

17        Q      All right.   Is it better for an individual

18   to adapt to the heat, for example, to eat fruits and

19   vegetables rather than let's say double cheeseburgers?

20        A      First of all, no one has ever done a study

21   to prove that one way or the other.

22             The double cheeseburger would never be a

23   hinderance to someone exercising in the heat if

24   they're hydrating properly.   You can still drink

25   plenty of water and still have your double

1    cheeseburgers.

2         Q    Okay.

3         A    And that would not change your risk.  If you

4    tell me he's having double cheeseburgers and not

5    having any fluids then that's the risk, but just

6    because you're having double cheeseburgers that

7    doesn't change your risk profile for heat stroke.  You

8    could have double cheeseburgers and then have a water

9    bottle next to you all day and be totally fine.

10        Q    Was it a good practice that Union Pacific

11   was following that day in providing fruits and

12   vegetables, making those available for the employees

13   there working?

14        A    Yes.

15        Q    Was it also a good practice of Union Pacific

16   that it advised Mr. Whitt and all of the employees to

17   be watching out for each other and observe each other

18   and what they're doing?

19        A    Yes.  I definitely like the idea of the

20   buddy system, I'm not sure if it was like tightly in

21   place for Jared's case in this particular situation.

22   I don't know if anyone could identify who his buddy

23   was on that particular day.

24        Q    Well, but there were managers --

25        A    I'm not saying there weren't people who

1    crossed paths with him during the course of the day

2    and kept checking up on him.

3        Q    But was it a good practice?

4        A    We're not making any claim here that, I

5    guess I get the sense that Union Pacific cares about

6    its employees.  I'm just saying, you asked me what I

7    would do to enhance the situation.

8            There's three key focus items:  One is I

9    definitely would have work to rest ratios based on

10   environmental conditions, that's just kind of a gold

11   standard; second is I would have a plan in place to

12   aggressively treat heat stroke whether it be you're

13   transporting the person or you're cooling them on

14   site.

15       Q    Okay.

16       A    Like we say before if you're 100 miles from

17   a hospital you're cooling on site, if you're one mile

18   from the hospital you're taking him to the hospital,

19   so you have to have a plan that makes sense.

20       Q    That's item number two because now you're

21   giving me --

22       A    Global.

23       Q    -- these are overall your global opinions:

24   Number one, the work to rest ratios which we have

25   discussed; number two, adequately treating heat stroke

1     as you've just discussed?

2          A     And third without question the item that a

3     supervisor should never overrule a colleague who's

4     caring for somebody who's on site who recognizes that

5     something is serious.

6               So I'm not pointing blame as a global thing

7     for Union Pacific, like I like their focus on

8     hydration, I like their focus on that people thought

9     that this might be a day that there might be a risk,

10    they were thinking of it, so there were things that

11    were in place but there are things that I think put

12    Jared in particular risk on those three particular

13    items.

14         Q     Let's talk about the third one.  The first

15    two are certainly within your expertise?

16         A     Yes, we have covered that, right.

17         Q     But this third one now that you've

18    interjected, and I guess this is maybe the remaining

19    area of the report talking about supervisors should

20    never overrule a colleague?

21         A     That just related to a heat stroke.

22         Q     Okay.

23         A     Because the heat stroke case like because if

24    they're not on site the person who is there has to be

25    the one who you believe, not the victim, do you know

1    what I'm saying.

2          So you have to rely on the person who's

3    cognizant and conscious and taking care of this other

4    person, you have to rely on that person's intuition

5    and their opinions.

6          Like if you were driving me in a car to the

7    hospital because you said, Doug, you don't look good,

8    and you were taking care of me and you said, I'm

9    taking you to the hospital, if your boss called you

10   and said, put Doug on the phone, like after we had

11   this conversation you would know I'm not putting Doug

12   on the phone, like I am going to decide that I need to

13   go to the hospital.

14         I learned from a heat stroke expert today

15   that their opinion when they're in a crisis situation

16   we're not going to heed them, we're going to go on my

17   intuition.  So that's something that just globally you

18   would not want to rely on a heat stroke victim's

19   opinion in that situation.

20      Q    But you're assuming there that it is in fact

21   a heat stroke victim?

22      A    I agree.

23      Q    But let's assume it's somebody that's just

24   overheated?

25         A    Just in this particular case David felt that

1    there may have been a heat illness present and there

2    may have been a heart issue.  In those two

3    circumstances his ability to sense this was much

4    better than somebody in a remote location.

5         There are times where a supervisor should

6    overrule somebody, like if someone says, I'm driving

7    to the hospital and the supervisor says, the hospital

8    is 100 miles and you have an AED one mile behind you

9    and the person might be having a heart attack,

10    supervisor tells him to turn around and go where the

11    AED is.  That's makes sense.

12         But in a heat stroke situation like this you

13    would want to rely on the person who's there, just

14    like the example I just gave you.  If you were

15    transporting me I would want you to make the decision

16    for my care, not me make the decision as me the person

17    who may be suffering from a heat stroke.

18         Q    Well, and I understand your earlier

19    testimony saying that you should not have relied on

20    Jared Whitt's request to go back to the cooling

21    station, correct?

22         A    Yes.

23         Q    All right.  Do you have any other opinions

24    or bases for opinions on this issue?

25         A    No, I've hit my big global items.

1          Q    All right.   Continuing with your report then

2     where we left off as I'm looking we have talked about

3     consideration three, right?

4          A    Yes.

5          Q    Is there anything else about consideration

6     three that we haven't discussed?

7          A    No.

8          Q    Consideration four, do you have any, up to

9     the point where you're citing Federal Railroad

10    Administrative regulations, we'll talk about that

11    separate, but let's talk about specifically heat

12    issues and --

13         A    One and two we definitely covered already.

14         Q    Okay.

15         A    Three was just me commenting on that, there

16    was something about dry, hot skin in one of the Union

17    Pacific materials and that we don't ever tell people

18    that for heat stroke anymore.

19         Q    Well, some publications including from OSHA

20    still make that reference, agreed?

21         A    I don't disagree.   I'm just trying to tell

22    you that everybody should have it out of their

23    materials.

24         Q    That would be your recommendation?

25         A    In medicine everyone is suggesting taking it

1     out, not just Doug.

2          Q     Even though OSHA doesn't take it out, so

3     OSHA is doing something different than what you're

4     recommending, agreed?

5          A     That is true.  We need to get OSHA to

6     change.

7          Q     Go ahead and continue.

8          A     I think we covered the rest of that stuff

9     with the treatment there.

10               I already mentioned to you that I believe

11     that the heat index should have been, you know, done

12     through the day on site.

13          Q     Okay.

14          A     Number two there on that page five talks

15     about I didn't think the five minute break was

16     sufficient, we talked about that earlier.

17               Down below it talks about the buddy system,

18     I wasn't positive that was in place for Jared that

19     day.

20          Q     But if in fact co-workers were there and did

21     check up on Jared during the day and if we assume that

22     that occurred then you agree with me, you wouldn't

23     have any criticisms about Union Pacific's buddy system

24     and the fact that it --

25               MR. COX:  Form and foundation.

1   BY MR. SCHMITT:

2       Q    -- that it implemented the buddy system that

3   it did that day, agreed?

4       A    I think it comes down to, I think the letter

5   of the law kind of for a buddy system is you have

6   somebody assigned to you.

7            I think what you're speaking of which I do

8   think took place was that he had supervision, like

9   people were looking out for him.

10           But I don't think there was like a -- when

11  people talk about having a buddy system in industry or

12  like in the military it's like I'm looking out for

13  Mike and Mike is looking at out for Jack, do you know

14  what I mean.

15      Q    Do you agree with me though in that scenario

16  it's usually somebody that is working right next to

17  you?

18      A    No, agreed.  So he might not have had

19  someone that has the job that he would be right next

20  to him.

21      Q    So when you have people that are spread out

22  somewhat on different machines, other people working

23  through the area, safety captains, circulating through

24  the area and certainly stopping then by each

25  individual employee, that's a good practice?

1        A     As long as it happens frequently.

2        Q     Okay.  Define frequently.

3                 MR. COX:  Form and foundation.

4        A     If someone is going to be, have a chance to

5    interact with someone like every ten to 15 minutes,

6    you know, just checking up on them.

7    BY MR. SCHMITT:

8        Q     You're saying every ten to 15 minutes

9    somebody should stop by and check --

10       A     No, just have the ability to know, let's

11   just say something does goes wrong, is it going to be

12   an hour before someone passes by again, do you have

13   them like in a visual line of sight?

14       Q     So a visual line of sight would be

15   acceptable?

16       A     You don't want to go like an hour without

17   having contact with someone.

18       Q     So as long as you're at least in the visual

19   line of sight?

20       A     Yes, see what Jared is doing, the machine is

21   still going, he's still working.

22       Q     That would satisfy your opinion on what

23   should be --

24       A     I would want to occasionally have

25   interaction verbally with the person, you know, you

1    stop by every 30 to 60 minutes, do you have enough
2    water, do you feel okay, you know.
3         Q    If we assume that that occurred, that there
4    was personal contact throughout the day as well as
5    visual observations that could be made at any time
6    then in your opinion Union Pacific provided an
7    appropriate buddy system, if that occurred?
8         A    I think there might have been you could say
9    appropriate supervision throughout the day, I just
10   don't know how long he was laying down for before he
11   started to get tired, I don't think there's anything
12   in the testimony so we know that.
13        Q    About how long he was lying down before
14   someone came to him?
15        A    Before he got transported away, like how
16   many minutes was he actually laying down for.
17        Q    Do you have any evidence that you're
18   critical of Union --
19        A    No, I'm just saying I don't know.
20        Q    Okay.
21        A    Like you could tell me he was down for three
22   minutes, he might have been down for eight minutes, I
23   don't know.
24        Q    So there's nothing that you're aware of that
25   you're critical of in that respect?

1        A    No.

2        Q    Okay.  Any other opinions, have we talked

3   about all your opinions, bases for your opinions up to

4   this point before we start reading federal

5   regulations?

6        A    I think so, yes.

7        Q    Okay.  Now, let's talk about those.  First

8   of all, you cited Federal Railroad Administration

9   internal control plan; you've also cited a federal

10  statute, the Federal Railroad Safety Act, right?

11       A    Yes.

12       Q    First of all, have you been employed by the

13  FRA?

14       A    No.

15       Q    I think I may have asked you that earlier.

16       A    No.

17       Q    You're not a lawyer?

18       A    No.

19       Q    And I'm not trying to be, I don't know,

20  what's the term, but as I'm reading your report I

21  understand the fact that you're rendering some

22  opinions about some heat issues --

23       A    I think the take home message here is just

24  anything that is related to how medical care should be

25  not interfered with.  So you know already know my

1    opinion was that his medical care should not have been

2    interfered with by the supervisor when David was

3    taking care of him.

4         Q    When you say it was interfered with by the

5    supervisor tell me what you mean.

6         A    David wanted to take him to the hospital.

7         Q    Because David Birt thought he was having a

8    heart attack?

9         A    And he also thought he was having heat

10   issues from that day.

11        Q    Well, that the heart attack was related to

12   the whatever heat issues?

13        A    Yes, I think David mentioned that there

14   might have been a heat illness, there might be a heart

15   issue.

16        Q    All right.

17        A    David's goals were, David wanted to take him

18   to the hospital, and after the supervisor called that

19   was reversed.

20        Q    In your opinion that just shouldn't have

21   occurred, I mean, regardless of whatever the

22   supervisor is that's there, whatever decision or

23   thought that that supervisor had, that's what should

24   be done without anybody above questioning it or doing

25   anything by way of getting information or discussion,

1    conversation?

2         A    I have no problem with the supervisor

3    calling but if David says I'm worried about a heart

4    attack or a heart issue and I'm worried about a

5    potential heat illness or a serious heat illness no

6    one should ever offer an opinion from a remote site

7    that would potentially -- it's not like saying take

8    him to this hospital or call an ambulance right from

9    that spot or we have a doctor back at the cooling

10   situation, he's not offering an alternative medical

11   care, he reversed him from any medical care, he

12   eliminated medical care because there was no medical

13   person back at the cooling station.

14        Q    Well, but the way it was reversed here, do

15   you agree with me the reason that they didn't continue

16   on to the hospital, at least according to the

17   testimony from everybody that was there is that Jared

18   made the statement, made the decision, made the

19   statement that he didn't want to go to the hospital,

20   that he wanted to go to the cooling tent?

21              MR. COX:   Form and foundation.

22   BY MR. SCHMITT:

23        Q    Agreed?

24        A    I agree that Jared may have said that.  But

25   we already talked about that, heat stroke victims

1    can't get into that, and David had the belief in his

2    heart that he should take this guy to the hospital, he

3    was doing that, and David even admits a couple of days

4    that I should have taken him to the hospital, like he

5    knows in his gut that that was the right thing to do.

6           I'm just saying a person calling from a

7    remote site, I can't even imagine, if I ever called

8    someone up driving to a hospital and I said I think

9    the guy I'm taking to the hospital right now might be

10   having a heart attack, I would never tell the person

11   driving the person to the hospital to stop driving

12   him.

13       Q    Right.  All right.  You've told me about all

14   of your reasons and bases for that opinion?

15       A    Yes.

16       Q    Let's just talk about specifically your

17   citing to CFR, Code of Federal Regulation internal

18   control plan.  First of all, is it fair to say all

19   you're doing is simply repeating what the regulation

20   says in your report?

21       A    Yes.  I just said that, obviously I'm not a

22   lawyer but I was thinking that they did not follow the

23   recommendation of this internal control plan.

24       Q    But whether or not Union Pacific did or did

25   not follow any recommendation of an internal control

1    plan all you're doing, isn't it fair to say that all

2    you're doing is you're just looking at the facts and

3    just trying to in your mind apply whatever the facts

4    are to what the language says in the statute?

5        A    Yes.

6        Q    You're not applying any type of scientific

7    methodology to that analysis, are you?

8        A    Well, I made mention already that anything

9    that increased the amount of time that Jared was

10   hyperthermic could affect his outcome.

11       Q    I understand that.  Let me just be quite

12   honest and frank.

13       A    Yes.

14       Q    Trying to render opinions about whether or

15   not Union Pacific violated federal statutes or federal

16   regulations, I'm trying to find out what is your

17   expertise and basis to render those types of opinions.

18            I understand and you've made yourself very

19   clear that certain things should have been done or

20   shouldn't have been done based on your opinion as to

21   industry standards and practices.

22       A    Right.

23       Q    It's a whole different issue to now say that

24   Union Pacific violated a federal law, I mean, this CFR

25   regulation, this Federal Railroad Safety Act, that's

1   going a little bit further.  Do you understand the

2   distinction that I'm making here?

3                   MR. COX:  Form and foundation.

4       A   Obviously it's a big difference for you I

5   can tell.  I'm not, I just took the exact words and

6   considered this particular case in relation to that

7   language.

8   BY MR. SCHMITT:

9       Q   That's the extent of your analysis, correct?

10      A   This particular case, I mean, I think I was

11  very consistent through the documents that, you know,

12  I was critical of how the medical care was provided.

13      Q   But by way of you're saying a violation of

14  the statutes occurred --

15      A   I maybe don't understand the statute well

16  enough to know if it was violated or not.

17      Q   All right.  In fact it's Federal Railroad

18  Safety Act 49 USC Section 20109, did you even see

19  that, ever even read that statute before this case?

20      A   I don't want to say because in the previous

21  cases I may have seen that.

22      Q   But you don't remember seeing it sitting

23  here today, I understand it's subject to confirmation

24  by looking, but just sitting here?

25      A   I wasn't familiar with it when I was reading

1    this like a couple of months ago but I may have seen

2    it previously.

3         Q    Okay.

4         A    That might have been shared with me in

5    previous documents.

6         Q    So staying with the Code of Federal

7    Regulation all you're doing is you're just simply

8    reading it and based on these facts as I understand

9    them either this was complied with or it wasn't

10   complied with, is that right?

11        A    Yes.

12        Q    That's the extent of any scientific

13   methodology that you applied?

14        A    Yes.

15        Q    I mean, you agree with me that really that

16   type of analysis of whether or not that CFR was

17   violated or whether or not that Federal Railroad

18   Safety Act was violated, that's no different than what

19   a juror would be able to do, they're going to have the

20   facts, they can read the statute and the juror can

21   make the decision on their own whether or not either

22   one of those were violated or complied with.  Agreed?

23             MR. COX:  Form and foundation.

24        A    Yes.

25

1    BY MR. SCHMITT:

2         Q    But --

3         A    I think we hit all the key items.

4         Q    Fair enough.  Same by way of the, you cite

5    to the GCOR, General Code of Operating Rules, and

6    Union Pacific maintenance of way rules, again is that

7    the extent of your analysis is simply just reading

8    what the rule says and then making a judgment call as

9    to whether or not based on these facts that rule was

10   or was not complied with?

11        A    Yes.

12        Q    And a juror sitting there can make as equal

13   of an assessment as you can in that respect?

14                  MR. COX:  Form and foundation.

15        A    They may not have my background obviously

16   for the medical side of it.

17   BY MR. SCHMITT:

18        Q    I understand that.

19        A    But they can form their own opinion based on

20   language as well.

21        Q    Right.  Doctor, is there anything else in

22   your report, we have got some additional

23   considerations --

24        A    No, that's just reiterated, we covered them

25   all already.

1        Q    All right.  Do you have any opinions or

2   bases for your opinions that you intend to renter in

3   this case that we have not already talked about here

4   today?

5        A    Not unless brand new information became

6   available to me.  Based on everything I have up to

7   this point we have done a very exhaustive job of

8   covering it.

9             MR. SCHMITT:  Okay.  That's all I have.

10        Thank you very much.

11             THE WITNESS:  All right.

12                  CROSS EXAMINATION

13   BY MR. COX:

14        Q    Dr. Casa, can you hear me all right?

15        A    Yes.

16        Q    Did the delay in getting Jared Whitt to the

17   hospital cause or contribute to a greater injury as a

18   result of the exposure to the heat?

19             MR. SCHMITT:  Form, foundation.

20        A    I do believe that the delay in his care

21   affected the outcome.

22   BY MR. COX:

23        Q    How?

24        A    Because the amount of time that he was

25   overheated or hyperthermic influenced the severity of

1    the exertional heat stroke that he suffered and

2    affected the things that he struggled with in the

3    days, weeks that followed and even potentially up to

4    his current condition.

5         Q     That's the question we don't have an answer

6    to yet, is whether or not his heat tolerance has been

7    affected?

8         A     That is correct.  As noted earlier that's

9    something I think that people should consider

10   pursuing.

11        Q     Did the delay in getting Jared Whitt to the

12   hospital cause or contribute to his delay in his

13   recovery from the heat stroke?

14              MR. SCHMITT:  Form, foundation.

15        A     Yes, because I think they're related to each

16   other, the recovery is directly related to the

17   severity of the condition that happens acutely.

18   BY MR. COX:

19        Q     Is it true that one who suffers a heat

20   stroke has an increased susceptibility to subsequent

21   heat injury?

22        A     That's a really good question.  If a person

23   is not treated properly, yes, the evidence indicates

24   they might be at a greater risk for having heat

25   illnesses in the future.

1      Q      Just let me look at my notes.  Hang on a

2    second.

3      A      Okay.

4             (Pause.)

5      Q      Do I understand your opinion to be within a

6    reasonable probability that at the time of Mr. Whitt's

7    mild heat stroke his temperature was in the 105 to 106

8    degree range?

9                    MR. SCHMITT:  Form, foundation.

10     A      I would say it was at least 105, I don't

11   want to say for sure but most likely it was probably

12   somewhere between 105 and 106.

13   BY MR. COX:

14     Q      It's your opinion that he was in that 30 to

15   60 minute window -- what is your opinion about the 30

16   to 60 minute window for one that is in the 105 --

17                    THE COURT REPORTER:  I can't hear him.

18     A      He said what's your opinion on if someone is

19   in the 30 to 60 minute window.

20                    THE WITNESS:  Is that what you said, Jim?

21                    MR. COX:  Yes.

22   BY MR. COX:

23     Q      Where was Mr. Whitt in that window at that

24   temperature?

25                    MR. SCHMITT:  Form, foundation.

1        A      Given how he was feeling later that day and

2    in the days and the week after I believe that he was

3    in the 30 to 60 minute window because we don't see

4    that kind of response if someone is cooled in the zero

5    to 30 minute window, those people tend to do much

6    better in the days after the condition presents

7    itself.

8  BY MR. COX:

9        Q      Explain again if you would that 30 to 60

10   minute window, window for what?

11       A      That's the amount of time that the person is

12   above like the threshold for cell damage that some

13   people speculate is around 105 or so.

14       Q      Could you clarify for us your opinion based

15   on your education, training and experience as to

16   whether or not the heat stroke and all of the signs

17   and symptoms that Mr. Whitt described and demonstrated

18   to witnesses caused or contributed to the underlying

19   injury and its sequelae today of continuing numbness

20   and tingling, pain and weakness in his left arm?

21              MR. SCHMITT:  Form, foundation.

22       A      I definitely think that they could have been

23   related because of the contractures and the numbness

24   and tingling that he experienced during the heat

25   stroke could be related to what he's currently

1    experiencing.

2    BY MR. COX:

3        Q    That opinion is based on your education,

4    training and experience more than likely than not?

5        A    Yes.

6                MR. SCHMITT:  Same objections.

7    BY MR. COX:

8        Q    Do you have an opinion as to whether or not

9    the delay in the treatment, the delay of getting him

10   to the hospital caused or contributed to an

11   exacerbation of that underlying injury and the

12   symptoms that continue in his left arm?

13               MR. SCHMITT:  Same objections.

14       A    Yes, I do believe it could have exacerbated

15   it because if he had gone immediately into the

16   hospital the physicians at the hospital might have

17   given him pharmaceutical intervention to stop the

18   contractures or at least decreased the severity of it.

19   BY MR. COX:

20       Q    In terms of what Union Pacific Railroad

21   could have been done to prevent this heat injury to

22   Mr. Whitt did I understand you to recommend that they

23   monitor if possible the heat conditions at the job

24   site rather than relying on National Weather Service

25   or other information?

1          A     Yes.

2                 MR. SCHMITT:   Form.

3          A     The two biggest things that I would

4     recommend that Union Pacific do is:   One, to have a

5     policy for work to rest ratios based on the

6     environmental conditions; and second would be

7     monitoring the environmental conditions on site and

8     doing so in a manner that would give you WBGT.

9          Q     Are you acquainted with what an anemometer

10    is?

11         A     Yes.

12         Q     What is an anemometer?

13         A     An anemometer is a device that can give you

14    the temperature and humidity.

15                MR. COX:   Okay.   That's all the questions

16         I have, Dr. Casa.   Thank you, sir.

17                MR. SCHMITT:   Just follow up with a few

18         and we'll be done.

19                        REDIRECT EXAMINATION

20    BY MR. SCHMITT:

21         Q     This anemometer, that's something that you

22    could use in connection with this WBGT analysis?

23         A     The WBGT would eliminate the need for the

24    anemometer, the WBGT eliminates the need for an

25    anemometer or any kind of device that gives you the

1   other ones because the WBGT device gives you the three

2   temperatures you need.

3         Q     Right.  And again this WBGT is something

4   that you would recommend but you agree that that is

5   not something that's universally used in the industry?

6         A     Yes.

7         Q     As far as this fact that -- strike that.

8               Do you agree, Doctor, that it is possible

9   that if Mr. Whitt had been taken to the hospital

10   immediately from the job site that his ultimate

11   condition and his current condition, that that may

12   have been exactly the same as what it was given the

13   fact that he went back to the cooling station?

14         A     I don't think it would have been the same.

15         Q     All right.  Do you agree with me that it

16   could be possible, I understand you don't believe it's

17   likely, but do you agree that it's possible that it

18   could have been?

19               MR. COX:  Form and foundation.  Calls for

20         speculation.

21         A     It's possible but unlikely.

22   BY MR. SCHMITT:

23         Q     All right.  Do you also agree with me that

24   the condition that Mr. Whitt is currently complaining

25   of with his left upper extremity, that it may be

1    completely unrelated to his heat related incident?

2              MR. COX:  Form and foundation.

3        A    It's possible but unlikely.

4   BY MR. SCHMITT:

5        Q    All right.  You understand that some of the

6   treating doctors have identified and diagnosed his

7   condition as being carpal tunnel and tennis elbow, do

8   you understand that?

9        A    Yes.

10       Q    And of course carpal tunnel and tennis elbow

11  aren't caused by a heat stroke, are they?

12             MR. COX:  Forms and foundation.

13       A    No.

14  BY MR. SCHMITT:

15       Q    All right.  Doctor, I'm assuming this to be

16  the case but just let me make sure I'm clear, that

17  throughout the deposition anytime that I asked you

18  questions you always understood my questions and if I

19  asked a bad question you asked me to rephrase it or

20  get that straightened out before you actually answered

21  it?

22       A    Completely understood the questions.  They

23  were very well conducted.

24       Q    Okay.

25       A    The only thing is that the Ornellas I want

1    to substitute for Linford during the earlier part, so

2    the person who I believed first saw Jared and laid him

3    down and got him up and helped get him to the vehicle,

4    that was Ornellas.

5              MR. SCHMITT:  Very good.  That's all I

6         have.

7              MR. COX:  Thank you, Doctor.

8              I'll take an etran and please attach all

9         of the exhibits to my copy.

10              And Doug, when you send me those new

11         exhibits send those to me so I can get those to

12         David.

13              THE WITNESS:  Absolutely.

14              MR. COX:  You have the right to read and

15         sign the deposition or waive reading and signing.

16              THE WITNESS:  I want to read and sign.

17              THE COURT REPORTER:  Do you want me to

18         send it to you or to the deponent?

19              MR. COX:  You can send it to directly to

20         Dr. Casa.

21              THE COURT REPORTER:  Okay.

22              THE WITNESS:  I'll make these exhibits

23         here.

24              (Deposition concluded at 1:14 p.m.)

25

```
1    STATE OF CONNECTICUT

2    COUNTY OF TOLLAND

3

4              I, Julie Blier, a Notary Public in and

5         for the State of Connecticut, do hereby certify

6         that the above proceedings were reported by me

7         stenographically and this transcript represents a

8         true and accurate transcription of said

9         proceedings.

10             I further certify that I am not related

11        to the parties hereto or their counsel, and that

12        I am not in any way interested in the event of

13        said cause.

14             Dated at Hebron, Connecticut, this 13th

15        day of March, 2014.

16

17

18                           _____

19                           Julie Blier, BA, LCR
                                 Notary Public
20                           CT License No. 0093

21   My Commission Expires:
     March 31, 2019
22

23

24

25
```

1

2                     I N D E X

3    WITNESS          DIRECT    CROSS     REDIRECT    RECROSS

4    DOUGLAS CASA      3        203        208          –

5

6

7                 DEFENDANT'S EXHIBITS

8                  FOR IDENTIFICATION

9

10    EXHIBIT                                    PAGE

11     39     CV of Dr. Douglas Casa             4

12     40     Opinion paper of Dr. Casa          23

13     41     Brandon Peppers to Donna Baker     40

14     42     Priscilla Whitt to Donna Baker     40

15     43     OSHA Technical Manual (OTM),       41

16            Section III, Chapter 4, 2/25/14,

17            nine pages

18     44     Appendix C, ACGIH Threshold Limit  41

19            Values

20     45     Microenvironment Heat Index,       42

21            four pages

22     46     Chronology, 14 pages               44

23     47     Packet of emails, first page with  46

24            sticker dated May 31, 2013

25

1    (Exhibits continued on next page)

2    EXHIBIT                                      PAGE

3    48       Contract between Casa and Brent      46

4             Coon and Associates

5    49       Water requirements and soldier       140

6             hydration, one page

7    50       Example of increase in WBGT from ACSM 141

8    51       High school example                  142

9    52       Handwritten calculations             146

10            (Original exhibits filed with original

11       transcript and copies made for each attorney)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    C E R T I F I C A T E   O F   D E P O N E N T

2

3                    I, DOUGLAS CASA, Ph.D., have

4        read the foregoing transcript of the testimony

5        given and it is true and accurate to the best of

6        my knowledge as originally transcribed and/or

7        noted on the attached Errata Sheet.

8                         _____

9                         DOUGLAS CASA, Ph.D.

10       Subscribed to and sworn to before me on

11       this _____ day of _____ ,

12       2014.

13

14                       _____

15                            Notary Public

16   My Commission expires:

17   _____

18

19

20

21

22

23

24   No. 8:12-CV-00358, JARED L. WHITT vs UNION PACIFIC
     RAILROAD, DEPOSITION OF DOUGLAS CASA, Ph.D., February
25   28, 2014, (jb).