IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JARED L. WHITT,                    )
                                   )
            Plaintiff,             )
                                   )
        vs.                        )        CASE NO.:  8:12-CV-00358
                                   )
UNION PACIFIC R.R. CO.,            )
                                   )
            Defendant.             )


### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE REGARDING PROPOSED EXPERT TESTIMONY OF GEORGE GAVALLA

James L. Cox, Jr., Nebraska Bar #20223
Attorney for Plaintiff
BRENT COON & ASSOCIATES, PC
3801 E. Florida Ave., Suite 905
Denver, CO  80210-2500
Telephone: (303) 756-3243
Fax: (303) 756-3595
jim.cox@bcoonlaw.com

## INDEX OF EXHIBITS

Exhibit 1        Safety Analysis Report of George Gavalla, dated November 27, 2013 (Exhibit 1 to Mr. Gavalla's deposition)

Exhibit 2        Deposition of George Gavalla (excerpts)

Exhibit 3        FRA Guide for Preparing Accident/Incident Reports: Chapter 1 – Pages 1, 3; Chapter 2 – Pages 2, 11, 12; Chapter 6 – Page 30

Exhibit 4        Deposition of Plaintiff, Jared L. Whitt (excerpts)

Exhibit 5        *Santiago v. Metro-North Commuter*, ARB Case No. 10-147 (July 25, 2012)

Exhibit 6        FRA Office of Safety Analysis, Number of Reported Employee Cases Per 200,000 Hours Worked for Union Pacific RR Co. [UP] January – December 2012

Exhibit 7        Deposition of  Todd Menchaca

Exhibit 8        The Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads: Hearing Before the Committee on Transportation and Infrastructure House of Representatives, One Hundred Tenth Congress, First Session, October 25, 2007 (Excerpts)

Exhibit 9        Elmhurst Memorial Emergency Department Record, Page 4

Exhibit 10       Plaintiff's Union Pacific Railroad Company Report of Personal Injury dated June 29, 2012 (Ex. 2 to Plaintiff's deposition)

Exhibit 11       Deposition of David Birt (excerpts)

Exhibit 12       Deposition of Talmage Dalebout (excerpts)

Exhibit 13       Administrative Review Board Decision and Order Granting Claim,  *Petersen v. Union Pacific Railroad Company*, Case No.: 2011-FRS-00017 (DOC August 7, 2013)

Exhibit 14       Memo to All Operating Management Employees, January 27, 2009; Subject: Employee Personal Injury Responses (the "Duffy Memo") (Defendant's Responses to Plaintiff's Third Request for Production of Documents, Request No. 7.)

Exhibit 15       Report of Douglas Casa, Ph.D. (Exhibit 40 to Dr. Casa's deposition)

Exhibit 16       Deposition of Douglas Casa, Ph.D. (excerpts)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA
AT OMAHA, NEBRASKA

| | | |
|---|---|---|
| JARED L. WHITT, | ) | Case No.: 8:12-CV-00358 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S BRIEF IN** |
| vs. | ) | **OPPOSITION TO DEFENDANT'S** |
| | ) | **MOTION IN LIMINE REGARDING** |
| UNION PACIFIC RAILROAD COMPANY, a | ) | **PROPOSED EXPERT TESTIMONY** |
| Delaware corporation, | ) | **OF GEORGE GAVALLA** |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

Plaintiff has brought two claims for relief in the present action under the provisions of the Federal Employers' Liability Act, 45 U.S.C. § 51, *et seq.* ("FELA"). Plaintiff claims that on June 12, 2012, he sustained an injury to his left arm, and that on June 28, 2012, he sustained heat related injuries, which included an exacerbation of the prior injury to his left arm, which together resulted in a condition diagnosed as neurogenic thoracic outlet syndrome. In Plaintiff's Third Claim for Relief, Plaintiff has claimed Defendant violated the Federal Rail Safety Act, 49 U.S.C. § 20109(c) ("FRSA"). Plaintiff claims Defendant violated the FRSA by interfering and delaying his medical treatment that was requested by Plaintiff because of the heat-related injury he suffered on June 28, 2012.

## GEORGE GAVALLA

Plaintiff has identified George Gavalla ("Gavalla") as an expert witness in this matter. Mr. Gavalla's report addressed both Plaintiff's and Defendant's conduct in these matters in light of applicable Federal and Union Pacific Railroad ("UPRR") regulations, rules and procedures. After review of the relevant information, Gavalla issued a report dated November 27, 2013 addressing Plaintiff's claims for relief and setting forth multiple opinions, enumerated 1 through

1

20.   Plaintiff does not intend to offer Gavalla's opinions Nos. 1-11.  Plaintiff will address these issues and this evidence with witnesses other than Mr. Gavalla.  Defendant's motion is therefore moot as to these opinions.

However, Gavalla's remaining opinions, enumerated as 12 through 20 in his report, are admissible under the Federal Rules of Evidence.  These opinions are well within Gavalla's unique area of expertise, do not invade the province of the Court by instructing the jury on the applicable law, and are highly relevant to Plaintiff's claims under the FRSA.  In fact, other Courts that have addressed the admissibility of these opinions from this exact witness have determined that these opinions are relevant and admissible under the provisions of F.R.E. 702 in a FRSA action.  Therefore, Defendant's motion in limine is properly denied as to opinion nos. 12 through 20, and Gavalla should be allowed to testify as to these opinions in any trial of this matter.

<u>**RELEVANT FACTUAL BACKGROUND**</u>

On November 27, 2013, Gavalla issued his "Safety Analysis Report" in this matter, detailing his relevant background, training and work experience, the materials he reviewed, the process by which he performed his investigation into the subject incidents, and the conclusions he reached as a result of his investigation and review. (Gavalla "Safety Analysis Report," **Ex. 1**)

Gavalla has an extensive background and history in the railroad industry, and in particular regarding issues of railroad safety, including Federal railroad safety regulations and railroad accident investigation.  Gavalla's history with the railroad began in 1976 as an employee of Consolidated Rail Corporation ("Conrail").  He was employed with Conrail from 1976 to 1984 as a signalman, engaged in the construction, inspection, maintenance and repair of the railroad train control systems and highway-rail grade crossing systems. (Gavalla Dep., **Ex. 2**,

11:22-12:19.) As part of those duties, he would accompany track gangs as they worked through his territory, and estimated that he spent anywhere from three and one-half to five months total work specifically with track gangs; gangs such as the one on which Plaintiff was working at the time of his injuries. (*Id.*, 12:19-13:17.)

From 1976 to 1984, while working for Conrail as a signalman, Gavalla was a member of the Brotherhood of Railroad Signalmen ("BRS"), and served as the local chairman of his local union during this time. (*Id.*, 13:18-20; 16:13-16.) From 1984 to 1990, Gavalla served as an Assistant General Chairman for the BRS. As Assistant General Chairman, Gavalla represented railroad signalman on the railroad properties. His duties, among other things, involved the monitoring of safety and handling safety complaints on behalf of BRS members, including reporting of conditions on the railroad properties that were not in compliance with federal railroad safety standards. (*Id.*, 17:9-24.)

In 1990, Gavalla took a position with the national office of the BRS as Director of Research. In conjunction with this position, he also served as Director of Publications for a period of time. (*Id.*, 16:24-17:6.) As Director of Research, Gavalla was not only responsible for staying abreast with the most recent developments in railroad technology, but served as the liaison between the Federal Railroad Administration ("FRA") and the national office of the BRS. In this capacity as liaison, Gavalla had numerous responsibilities, including but not limited to matters such as testifying before the FRA during hearings on safety matters, the handling of BRS safety complaints which involved progression of the complaint through to the FRA and working in conjunction with the FRA to achieve a resolution of the complaint, and the submission of position papers and comments on behalf of the BRS in FRA rule-making proceedings. (*Id.*, 18:8-19:3.) In addition, he served as chairman of a rail labor task force that studied safety issues

regarding on-track rail workers, and made recommendations to the FRA for the developments of Federal Regulations in this regard. He was subsequently appointed to the FRA committee responsible for drafting such regulations which were ultimately promulgated by the FRA. (*Id.*, 19:4-21.) Additionally, he was part of a labor-management task force that recommended regulations on highway-rail grade crossing safety standards. (*Id.*, 20:2-4.)

In 1995, Gavalla accepted a position with the FRA, a government agency within the Department of Transportation ("DOT"). (*Id.*, 21:2-10.) Gavalla began his career with the FRA as a Railroad Safety Project Coordinator, and served in this capacity for two years. In this capacity, Gavalla was responsible for leading large scale safety assessments of the large railroad systems. This entailed Gavalla, and his team of safety inspectors and experts, investigating virtually all aspects of a railroad's operation from a safety point of view; essentially performing an "audit" of the railroad's "safety culture in addition to its practices and procedures and operations. (*Id.*, 21:9-22:22.) While part of the rationale for such audits was to be proactive in assessing safety culture and concerns, Gavalla and his team were very often performing these audits reactively, in response to accidents that had already occurred or accident and injury data that had already been submitted to the FRA, in order to investigate potential issues that were brought to his attention. (*Id.*, 23:14-24:6.) While these investigations often centered around specific accidents that occurred, or a group of very similar accidents, the investigation entailed not only an analysis of why the particular incident(s) occurred, but an analysis of the broader implications and an assessment of what could be implemented to prevent a reoccurrence of such incidents. (*Id.*, 26:3-27:6.)

In 1997, Gavalla became the head of the FRA Office of Safety; the Associate Administrator for Safety. He held this position until 2004. (*Id.*, 28:4-16.) In this capacity, one of

Gavalla's responsibilities was to review both the factual data and conclusions from the reports on employee fatalities that were submitted by the various FRA regions, and provide executive direction as to whether more data was necessary and whether the data properly supported the conclusions. (*Id.*, 27:13-29:25.) The FRA has a methodology developed for the investigations performed by the FRA, set forth in the FRA Accident/Incident Reporting Guide. (See **Ex. 3**.) While Gavalla was Associate Administrator for Safety, his office updated these investigative procedures and methods which set forth a variety of considerations for the investigating officer to examine and review depending upon the type of accident that was being investigated. These considerations ranged from matters as basic as weather conditions, to railroad rules and procedures, to employee training, to FRA regulations. (*Id.*, 36:15-39:7.)

In addition to this responsibility, Gavalla was responsible for the FRA's safety enforcement program and safety inspection program. He was responsible for FRA rule-making proceedings which required collaboration with the Office of Chief Counsel, and served as FRA's liaison to Congress, state legislative bodies and state railroad safety agencies. In addition, he served as the FRA's liaison to the White House and to the Office of Homeland Security, and worked in conjunction with the National Transportation Safety Board to implement its recommendations. (*Id.*, 44:6-45:9.) When Mr. Gavalla was head of the FRA's Office of Safety, the FRA's Office of Safety published the "FRA Guide for Preparing Accident/Incident Reports" effective May 1, 2003 (DOT/FRA/RRS-22), attached as Ex. 3.

After voluntarily leaving his position with the FRA in 2004, Gavalla established a railroad safety consulting firm (Triad Railroad Consulting) that is involved in railroad safety assessments, training, and helping railroads develop rules and procedures in this regard. (*Id.*, 49:6-50:3.) As part of his work with this firm, he has been employed by railroads to complete

inspections and reports on behalf of the railroad for OSHA. In addition, both as part of his separate work as a litigation consultant and in a separate capacity so that he could address and advise rail labor organizations regarding the application of the FRSA, he has met and discussed with OSHA personnel the procedures for investigating FRSA complaints, and the application of the FRSA protections in the context of OSHA's expectations for railroads for proper implementation and compliance with the FRSA. (*Id.*, 53:10-55:14.)

## THE INJURIES ON JUNE 28, 2012

On June 28, 2012 Plaintiff was working on a very hot day as an anchor machine operator in Defendant's Proviso Yard near Chicago, Illinois. (Plaintiff Dep., **Ex. 4**, 66:6-67:8.) The temperature was forecast to be over 100° (Linford Dep., 14:20.) At approximately 4:00 p.m., Plaintiff started to experience "severe" symptoms due to the heat. He felt extremely hot and tired and a little disoriented; his lips were numb and tingling and felt like they were swelling; his hands and feet were numb and tingling; and as time went on, it progressed and starting coming up his arms and legs. (*Id.*, 74:25-75:11.) Plaintiff made it to the side of the track and sat in the shade, trying to drink water and pour it on his wrists. (*Id.*, 75:12-15.) At this point, Plaintiff's vision was blurry and he felt like he was "in la-la land," "everything was goofy." (*Id.*, 75:16-18.) He recalls Eddie Ornellas coming over to ask him if he was okay, and if he wanted to go sit in the truck to cool down. Plaintiff said he could not, that he could not move. The next thing he recalls is being put in Dave Birt's truck. (*Id.*, 75:18-25.)

Upon being placed in Dave Birt's truck, Mr. Birt drove off and then asked Plaintiff what had happened. Plaintiff said he did not know, but described his symptoms, including pain, numbness and tingling down his left arm. At that time, Plaintiff thought he was having a heart attack, and was asking Mr. Birt to get him to the hospital as quickly as possible. (*Id.*, 87:5-20.)

Shortly after this exchange, Mr. Birt's phone rang. Mr. Birt answered his phone and Plaintiff heard Mr. Birt say "I'm taking this man to the hospital," followed by Mr. Birt saying "well, what do you want me to do?" Mr. Birt then said, "I'm no doctor, but when a man's arms are numb and tingling, I'd say he needs to go see one." The next thing he heard Mr. Birt say was, "I'm pulling over," and he pulled his truck over into a parking lot. (*Id.*, 87:24-88:10; 91:10-92:3.) Plaintiff testified that it was difficult to estimate time due to his disorientation but estimated he had been driving in the truck somewhere between 5-15 minutes when Mr. Birt's phone rang. (*Id.*, 91:1-9.)

After Mr. Birt pulled over, he asked Plaintiff if he could talk on the phone. Plaintiff said he probably could but he could not hold the phone himself so Mr. Birt had to hold the phone up to Plaintiff's ear. At that point, the person on the phone identified himself to Plaintiff as Talmage Dalebout. (*Id.*, 88:11-16.) Mr. Dalebout asked Plaintiff what happened, and Plaintiff recounted his symptoms, indicating his arms were numb and tingling. (*Id.*, 92:13-22.) Mr. Dalebout then told Plaintiff that he "probably got too hot." Mr. Dalebout then told Plaintiff, "why don't we just bring you back here to the job site and get you cooled down . . . If you get cooled down, you'll probably be okay." (*Id.*, 88:18-24.) Plaintiff's only response was "I just need fixed. I want fixed." (*Id.*, 88:23-24.) At that point, Mr. Birt drove Plaintiff back to the job site. (*Id.*, 88:25-89:1.)

Plaintiff never agreed to go back to the yard to be "fixed." He had specifically told Mr. Birt to get him to the hospital as quickly as possible but never told Mr. Dalebout whether he wanted to go to the hospital or to the yard because he was "out of it." (*Id.*, 92:23-94:2.) He could not move his arms, and was just laying there in the seat of the truck. "I was pretty spacey." (*Id.*)

After he got off the phone with Mr. Dalebout, Mr. Birt was very upset. While driving back to the yard, Mr. Birt commented to Plaintiff, "(W)hat's it going to take for this company to get rid of their safety record?" He further stated to Plaintiff, "(W)hat's it going to take, for someone to die out here on the track before they get rid of this safety record?" (*Id.*, 94:6-95:2.)

Once he was back at the job site, Plaintiff remained in Mr. Birt's truck for a period of time, while he was brought some Gatorade and water bottles, which he drank. (*Id.*, 89:1-13; 96:6-97:13.) He was then assisted by Joe Linford and another person out of the truck and taken into a trailer where they poured water on him and wrapped something around his neck to cool it. (*Id.*, 89:1-13; 97:14-98:2.) Mr. Linford was rubbing Plaintiff's left arm, and saying that Plaintiff's arm was "freezing," that he did not have circulation in it. The muscles in both of Plaintiff's arms had contracted, causing his arms to be flexed and drawn up to his chest. (*Id.*, 89:13-90:11.) Plaintiff's right arm eventually released while he was at the trailer but his left arm never released until Plaintiff was taken to the hospital that evening by his roommate. (*Id.*, 90:12-16.)

Plaintiff does not know how long he remained in the trailer but estimated it to be until approximately 6:30 p.m., after the gang had already gone home. When he left the trailer, his left arm was nonfunctional, still drawn up to this chest, and his body was just feeling "beat." (*Id.*, 98:22-99:16.) Plaintiff's roommate then drove him back to their hotel in Plaintiff's vehicle. (*Id.*, 99:21-100:13.)[1]

---

[1] [1] Defendant faults Mr. Gavalla for stating that Mr. Whitt suffered a heat stroke. At Page 22 of its Brief, Defendant states: "In fact, there has been no finding that Plaintiff actually suffered from heat stroke…." This misstates the evidence known to Defendant. Dr. O'Connor has opined that Plaintiff suffered a significant heat exhaustion (Defendant's Ex. 10 at Page 3). Douglas Casa, Ph.D., Plaintiff's heat injury expert, in his report (Ex. 15) confirms his opinion that Plaintiff suffered an exertional heat stroke. He confirmed that opinion in his deposition at 47:18-48:7 (Ex.16):
Q Have your opinions or any reasons or bases for your opinions changed from what you've stated in your original report dated November 30 of 2013?
A Nothing has changed. Some of my thoughts became more solidified with the some of the supportive materials.

## ARGUMENT

Mr. Gavalla has listed twenty (20) conclusions he reached as a result of his examination and investigation of the June 12, 2012 and June 28, 2102 incidents. (Ex. 1, at 19-22.) The first eleven of Mr. Gavalla's conclusions address Plaintiff's First (June 12, 2012 injury to left arm) and Second (heat-related injury June 28, 2012, leading to neurogenic thoracic outlet syndrome) Claims for Relief. As stated above, Plaintiff hereby withdraws these opinions and will not attempt to elicit these opinions from Mr. Gavalla in trial of this matter. However, the opinions enumerated as 12 through 20 relate to Plaintiff's Third Claim for Relief, brought pursuant to the FRSA. These opinions are relevant and admissible, are in compliance with the applicable rules regarding admission of expert testimony, and Defendant motion's should therefore be denied as to these opinions.

### A. Admissibility of Expert Testimony Pursuant to F.R.E. 702.

The Federal Rules of Evidence embody a liberal approach to the admission of relevant evidence. *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 587-89 (1993). In examining the legislative intent in adopting the Federal Rules, the Supreme Court has specifically held that the Rules "basic standard of relevance" is a liberal standard, intended to liberalize the introduction of evidence. *Id.*, at 587. The Supreme Court has further determined that this "liberal thrust" regarding the admissibility of evidence is similarly applicable to the rules regarding opinion testimony (F.R.E. 701-704). *Id.*, at 588.

The admissibility of expert testimony is governed by the provisions of F.R.E. 702.

---

Q Can you tell me which of your thoughts became more solidified?
A Is it okay if I grab my opinion here?
Q Yes.
A Probably I mean two primary ones: One is I feel more certain now that he definitely suffered an exertional heat stroke; and, second, having to do with the lack of efforts to make modifications related to the work to rest ratios and environmental conditions.

Pursuant to Rule 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Pursuant to the liberal thrust of the Federal Rules, the Supreme Court has specifically recognized that the Rules relating to opinion testimony, and specifically Rule 702, embody the "general approach of relaxing the traditional barriers to 'opinion' testimony." *Daubert*, 508 U.S. at 588, *quoting Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988). The Eighth Circuit has also specifically recognized this liberalized standard, holding that Rule 702 is meant to liberalize the rules governing the admission of expert testimony. *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 686 (8th Cir. 2001); *Weisgram v. Marley Co.*, 169 F.3d 514, 523 (8th Cir. 1999), *aff'd*, 528 U.S. 440 (2000). Rules 702 is clearly "one of admissibility rather than exclusion." *Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir.1991).

The Eighth Circuit recognizes a three part test for determining the admissibility of an expert's testimony under Rule 701. *Lauzon*, 270 F.3d at 686; *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008). First, evidence based upon scientific, technical or other specialized knowledge must be useful to the jury in deciding an ultimate issue of fact. This is an application of F.R.E. 401, evidence must be relevant. Second, the expert witness must be qualified to assist the finder of fact. Finally, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that it may properly provide the assistance the jury requires if it accepts the testimony as true. *Lauzon*, at 686; *Polski*, at 839.

"'As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.'" *Hose v. Chicago Northwestern Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995) *quoting Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir. 1988). Only when the expert's opinion is "'so fundamentally unsupported that it can offer no assistance to the jury'" must the opinion be excluded. *Hose*, 70 F.3d at 974 *quoting Loudermill*, 863 F.2d at 570. "Doubts regarding the usefulness of an expert's testimony are resolved in favor of admissibility." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006).

The Supreme Court has expressly recognized that the factors set forth in *Daubert* are not mandatory and "may or may not be pertinent" depending upon the nature of the issue, the expert's particular area of expertise and the subject of the testimony. *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). The Court has discretion in applying these standards. Otherwise, the trial court would be deprived of the "discretionary authority needed . . . to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted." *Id.*, at 152.

Generally, experts cannot express opinions that are nothing more than legal conclusions. However, several circuits that have examined this issue have held that when an area of law is uncertain or unresolved, the testimony of an expert may be relevant and helpful to show whether or not a defendant acted "willfully." *United States v. Vreeken*, 803 F.2d 1085, 1091 (10th Cir. 1986). *See also United States v. Garber*, 607 F.2d 92, 98-99 (5th Cir. 1979); *United States v. Clardy*, 612 F.2d 1139, 1153 (9th Cir. 1980).

The Advisory Committee Notes for Rule 702 are instructive when determining the breadth of an expert's proposed testimony. The Notes specifically state that it can be important

in some cases for an expert to educate the fact-finder about general principles, without ever attempting to apply these principles to the facts of the case. F.R.E. 702, Notes of Advisory Committee on Rules (2000 Amendment). Therefore, in drafting Rule 702, the Committee expressly recognized that it can be important for an expert to lay a foundation for the fact-finder to assist it in understanding the expert's testimony and the facts at issue.

### B. The Federal Rail Safety Act ("FRSA") and the Remedy of Punitive Damages.

The purpose of the FRSA is to promote safety in every aspect of railroad operations. 49 U.S.C. § 20101; *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 156 (3rd Cir. 2013). In 2007, Congress expanded the anti-discrimination provision of the FRSA, explicitly stating that a railroad "may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part" to the employee engaging in one of the enumerated protected activities. 49 U.S.C. § 20109(a).

The FRSA sets forth an extensive list of "protected activities." For the purpose of this matter, the relevant provision states:

> A railroad carrier or person covered under this section may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment. <u>If transportation to a hospital is requested by an employee who is injured during the course of employment, the railroad shall promptly arrange to have the injured employee transported to the nearest hospital where the employee can receive safe and appropriate medical care.</u>

49 U.S.C. § 20109(c)(1). (Emphasis added.)

In interpreting the burden of proof in such cases, the Third Circuit held that a plaintiff need not provide evidence of motive in a claim under the FRSA:

> "We note that the fact that an employee need not ascribe a motive to the employer greatly reduces an employee's burden in making a prima facie case. However, we believe that this reduced burden is appropriate in FRSA cases. We note, for example, that the legislative history shows that Congress was concerned that some railroad supervisors intimidated employees from reporting injuries to the FRA, in

part, because their compensation depended on low numbers of FRA reportable injuries within their supervisory area. (Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads: Hearings Before the H. Comm. on Transportation and Infrastructure, 110th Cong. (Oct. 22, 2007))."

*Araujo*, 708 F.3d at 161, n.7 (3rd Cir. 2013). In addressing the burden-shifting scheme under

AIR-21, which the Department of Labor has adopted in FRSA claims, the Third Circuit cited to

*Stone & Webster Eng'g Corp. v. Herman,* 115 F.3d 1568, 1572 (11th Cir.1997), in noting that

this is a "tough standard" for employers to meet, and "not by accident." *Araujo*, at 159.

> "The 2007 FRSA amendments must be similarly construed, due to the history surrounding their enactment. We note, for example, that the House Committee on Transportation and Infrastructure held a hearing to 'examine allegations ... suggesting that railroad safety management programs sometimes either subtly or overtly intimidate employees from reporting on-the-job-injuries.' (Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads: Hearings Before the H. Comm. on Transportation and Infrastructure, 110th Cong. (Oct. 22, 2007))."

*Id*.

The Court went on to note:

> As the Majority Staff of the Committee on Transportation and Infrastructure noted to members of the Committee:
> The accuracy of rail safety databases has been heavily criticized in a number of government reports over the years. The primary issue identified in many previous government investigations is that the rail industry has a long history of underreporting incidents and accidents in compliance with Federal regulations. The underreporting of railroad employee injuries has long been a particular problem, and railroad labor organizations have frequently complained that harassment of employees who reported injuries is a common railroad management practice. *Id.*
>
> . . .
>
> Reports have documented a long history of under-reporting of accidents, under-reporting incidents, of noncompliance with Federal regulations; and under-reporting of rail injuries is significant because employees frequently report that harassment of those who do report incidents, being hurt on the job, is a common practice in the rail sector. *Id.*, at n. 6.

The FRSA further sets forth the remedies available to an employee seeking redress under the Act. In addition to reinstatement with unimpaired seniority rights, the aggrieved employee may receive back pay for any time lost due to the railroad's violation, compensatory damages which may include both special damages and damages for pain and suffering, as well as costs, expert witness fees and reasonable attorney fees. 49 U.S.C. § 20109(e)(2). Additionally, and importantly for consideration of the present matter, the employee may also be awarded punitive damages in amount not to exceed $250,000.00. 49 U.S.C. § 20109(e)(3).

The U.S. Supreme Court has determined that the standards for awarding punitive damages pursuant to the violation of a plaintiff's federally protected rights are no different than those in a common-law action. In *Smith v. Wade*, 461 U.S. 30 (1983), the Supreme Court examined the standard for punitive damages under 42 U.S.C. § 1983. The defendant argued that an award of punitive damages was only proper if there was proof of malicious intent. In rejecting this argument, the Supreme Court stated, "As a general rule, we discern no reason why a person whose federally guaranteed rights have been violated should be granted a more restrictive remedy than a person asserting an ordinary tort cause of action." *Id.*, at 49-50. The Court held that reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, are sufficient to consider an award for punitive damages. *Id.*, at 51.

The Eighth Circuit Model Jury Instructions for Civil Cases set forth model instructions for use in the Eighth Circuit. Chapter 10 of said instructions, titled "Employment – Retaliation (Anti-Discrimination Statutes)," states that the instructions in Chapter 10 are "designed for use in cases where the plaintiff alleges that he or she was discharged or otherwise retaliated against because he or she opposed an unlawful employment practice, or 'participated in any manner' in a proceeding under one of the discrimination statutes." Model Civ. Jury Inst. 8th Cir., 10.00.

While Chapter 10 does not specifically include the text of an instruction on punitive damages, it references the instructions set forth for other types of cases (e.g. – Title VII, 42 U.S.C. § 1981). While there are minor differences in these instructions, each is identical in terms of instruction to the jury as to what may be properly considered when determining the amount of punitive damages:

> If you decide to award punitive damages, you should consider the following in deciding the amount of punitive damages to award:
>
> 1.     How reprehensible the defendant's conduct was. In this regard, you may consider [whether the harm suffered by the plaintiff was physical or economic or both; whether there was violence, deceit, intentional malice, reckless disregard for human health or safety; whether the defendant's conduct that harmed the plaintiff also posed a risk of harm to others; whether there was any repetition of the wrongful conduct and past conduct of the sort that harmed the plaintiff].

Therefore, in considering the question of punitive damages, a jury "should consider" whether there was conduct on the part of Defendant that evidenced a reckless disregard for human safety, whether Defendant's conduct also poses a risk of harm to others, and whether Defendant has engaged in any such conduct before or after this incident. The opinions of Mr. Gavalla are highly relevant to these issues, and are properly admitted into evidence in this case.

**C.  Mr. Gavalla's Opinions Regarding Plaintiff's FRSA Claim (Third Claim for Relief) are Relevant and Admissible.**

As previously stated, Plaintiff's Third Claim for Relief alleges Defendant violated the FRSA, which states that Defendant must not "deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of his employment." 49 U.S.C. § 20109(c). In its Brief, Defendant gratuitously states, "If Plaintiff proves that Union Pacific did so, Union Pacific can escape liability by proving by clear and convincing evidence that Plaintiff's medical condition was unchanged by the delay, denial or interference." (Defendant's

Brief in Support, Doc. 102, at p. 12.) As authority for this proposition, Defendant has misquoted the directions given by an administrative review board, in remanding the case to the ALJ for further proceedings. A brief review of the ARB decision is therefore warranted.

In *Santiago v. Metro-North Commuter*, ARB Case No. 10-147 (July 25, 2012) (Decision attached as **Exhibit 5**), the defendant railroad re-classified the plaintiff's injury from an on-duty injury to an off-duty injury, and subsequently withheld approval of further treatment as requested by the plaintiff's medical providers, instructing them to now submit all requests for payment to the plaintiff's health insurance carrier. Plaintiff filed a claim with OSHA, and OSHA determined the railroad's actions in reclassifying the injury were retaliatory and in violation of Section 20109(a)(4) of the FRSA. Upon review, the ALJ found the railroad did not violate the FRSA and dismissed the complaint. The Administrative Review Board ("ARB") then issued the cited decision, and remanded to the ALJ for further proceedings.

Pursuant to 49 U.S.C. § 20109(d)(2), an action brought for a violation of the FRSA is to be governed by the rules and procedures set forth in 49 U.S.C. § 42121(b) ("AIR-21"), the statute analogous to the FRSA governing employees of airlines. Pursuant to the burden shifting provisions of AIR-21, the plaintiff must make a prima facie case showing that the protected activity was a factor, in whole or in part, in the railroad's retaliatory action. If this showing is made, the railroad can defeat the claim if it proves by clear and convincing evidence that it would have taken the same action in the absence of the protected activity.

In the relevant portion of the decision, the ARB expressly stated that this issue was not before them, but went on to recognize that it was impossible to literally apply this burden shifting test to a FRSA violation involving Section 20109(c). *Santiago*, at 18. In an attempt to reconcile this impossibility and provide guidance to the ALJ in that case, the ARB stated in dicta

that a "reasonable interpretation" of congressional intent would be to require the railroad to prove by clear and convincing evidence that "the result would have been the same with or without the railroad carrier's interference(.)" *Id.* In other words, if the delay in medical treatment would have occurred even in the absence of the railroad's interference, the claim is properly dismissed. The decision never stated that the requirement was to prove the "Plaintiff's medical condition was unchanged by the delay," as is asserted by Defendant.

While the statements of the ARB in dicta regarding its interpretation of statutory language are not binding upon any Court, this approach was rational given the facts of that case. The delay in treatment was a result of the physician re-classifying the plaintiff's injury, and if that re-classification would have occurred in the absence of the railroad's interference (*i.e.* – if the result would have been the same), the claim would be properly dismissed. The application of that test to cases such as the present matter must, of necessity, always result in the same conclusion: it is impossible for the delay in treatment to have occurred in the absence of the Defendant's interference. This is not a case, like *Santiago*, where the actions of a third party caused the delay and the issue is whether the railroad improperly influenced the third party. It is the direct action of the Defendant itself that caused the delay. Therefore, accepting the *Santiago* rationale as proper, as Defendant suggests, it is impossible for Defendant to meet its burden as it is impossible for the delay to have occurred in the absence of Defendant's interference. As the ARB stated, other than taking the employee to the hospital, "the whistleblower statute contemplates that the railroad carrier will stay completely out of the way of medical treatment(.)" *Santiago*, at 16. (Emphasis added.)

1. **Mr. Gavalla's opinions address numerous issues that are properly to be considered by the jury in determining whether punitive damages are to be awarded.**

As previously stated, Gavalla's Conclusion Nos. 6 and 7 will be addressed by Plaintiff through other witnesses. Mr. Gavalla will not be asked to render any opinions as stated in the aforementioned conclusions. Therefore, no response by Plaintiff is necessary regarding Conclusion Nos. 6 and 7.

In assessing punitive damages, the relevant inquiry involves an assessment of whether or not Defendant engaged in a reckless, callous or intentional disregard for Plaintiff's rights. *Smith v. Wade*, 461 U.S. at 51. In assessing such damages, the inquiry is focused in part on how reprehensible the conduct of the Defendant was, and includes an examination of whether the conduct of Defendant can pose a risk of harm to others, as well as whether there was any prior conduct of the same type.

> a. **The FRA has long recognized that harassment and intimidation is commonplace throughout the rail industry in terms of injury reporting, and that this harassment and intimidation negatively impacts the integrity of rail safety data.**

The FRA is the federal agency charged with promoting safety on the nation's railroads. The Federal Railroad Administration (FRA) tracks each railroad's injury statistics based on "number of reported employee cases per 200,000 hours worked." *See* **Exhibit 6**. In Exhibit 6, "cases" includes all cases of injuries on the Union Pacific Railroad in the year 2012. This chart demonstrates that the Union Pacific Railroad's safety record in 2012 was 1.14 cases per 200,000 hours worked.

The Safety Analysis by the FRA places an incentive on the Union Pacific Railroad, and their supervisors, to have occur on the job as few injuries as possible. There is, therefore, an incentive on railroad supervisors to report as few injuries occurring on the job as possible. A supervisor's performance evaluation is influenced or affected by a supervisor's safety record, which includes the happening of injuries on his watch.

Mr. Manchaca took Mr. Dalebout's position as Manager of Track Programs shortly after

Mr. Whitt's injury on July 28, 2012. He testified:

> Q. What is your knowledge or understanding, sir, of whether or not a reportable—an FRA reportable injury that occurs on Rail North is in any fashion reflected in the manager's evaluation performance review, or any other fashion?
>
> A. We have several initiatives. Core safety is one of them. Production is one. Costs are others. So I don't know where it falls in from the upper management, you know, how they view it, but they all carry a weight, but I don't know what it is.
>
> Q. In your performance review, there is weight given to meeting budget, managing costs, safety, core safety, those issues? That is all a part of how you are evaluated as a manager?
>
> A. Yes, sir.
>
> Q. And part of that performance review is safety, and factored into the safety evaluation is are you or is your gang meeting the safety goal in terms of man-hours worked without injury? Am I understanding that right, or phrasing that right?
>
> A. I know they measure it in that way. I'm not sure how the evaluate it at our level.
>
> Q. I some fashion, though, it is considered in a manager's evaluation?
>
> A. Yes.
>
> Q. And that occurs with what frequency?
>
> A. Annually.

(Menchaca Dep., **Exhibit 7**, 6:4-25, 10:2-11:5)

In addition to its affect on a manager's performance review or evaluation, an additional

incentive to avoid reporting of injuries by attempting to influence an employee's medical

treatment for an injury on the job has also been documented historically. In an Oversight and

Investigations Hearing on the Impact of Railroad Injury, Accident, and Discipline Policies on the

Safety of American's Railroads before the Committee on Transportation and Infrastructure,

House of Representatives, One Hundred Tenth Congress, October 25, 2007, **Exhibit 8,**

Chairman Oberstar stated:

> "Reports have documented a long history of under-reporting of accidents, under-reporting incidents, of noncompliance with Federal regulations; and under-reporting of rail injuries is significant because employees frequently report that harassment of those who do report incidents, being hurt on the job, is a common practice in the rail sector."

> "One of the reasons for this pressure is … under-reporting or withholding of reporting makes accident statistics look better than they really are, but it denies the public, it denies regulators, and it denies the Congress a full understanding of the nature and extent of safety problems in the rail industry, and that is vital to improving safety."

Chairman Oberstar went on to state:

> "We have reviewed the most recent FRA comprehensive accident incident reporting and recording audits. Those audits, conducted at major railroads. FRA found 352 violations of Federal law for under-reporting in the largest category: failure to report employee injuries. That is only the number of under-reported injury events that FRA was able to identify. Maybe just the tip of the iceberg.

> "The associate administrator of FRA for safety said she believed that supervisory pressure on employees to not report injuries is a significant issue."

In the written statement of Joseph H. Boardman, Administrator, FRA, before the

Committee on Transportation and Infrastructure, U.S. House of Representatives, October 25,

2007, Administrator Boardman stated:

> "Railroads, supervisors and employees are under pressure to show good results – the absence of injuries – and that is a reality that everyone in the industry lives with daily.

> "The underlying motivators driving harassment and intimidation are varied and powerful, and deeply ingrained in railroad culture."

Administrator Boardman went on to say:

> "Based upon its review of FRA's railroad industry and accident reporting data, GAO had concluded that the audited railroads were violating FRA's accident reporting regulations by under-reporting and inaccurately reporting injuries and accidents. As a result of these findings, GAO made several recommendations, including that FRA require railroads to establish injury and accident reporting internal control procedures."

Administrator Boardman continued:

> "FRA's final rule (effective January 1, 1997) amended the railroad accident reporting regulations in several ways in order to enhance the quality of the injury and accident data relied upon by FRA in carrying out its rail safety programs. Among other things, FRA adopted an Internal Control Plan (ICP) requirement mandating that each railroad develop, adopt, and comply with an ICP in order to 'ensure that complete, reliable, and accurate data is obtained, maintained, and disclosed by the railroads.'

> "In the final rule, FRA stated that 'many railroad employees fail to disclose their injuries to the railroad or fail to accept reportable treatment from a physician because they wish to avoid potential harassment from management or possible discipline that is sometimes associated with the reporting of such injuries.' Accordingly, the regulation requires that each ICP include a policy statement that not only declares the railroad's commitment to complete and accurate reporting, but also 'to the principle, in absolute terms, that harassment or intimidation of any person that is calculated to discourage or prevent such person from receiving proper medical treatment or from reporting such accident, incident, injury or illness will not be permitted or tolerated and will result in some stated disciplinary action against any employee, supervisor, manager, or officer of the railroad committing such harassment or intimidation.'"

In Administrator Boardman's conclusion, he stated:

> "Harassment and intimidation calculated to avoid reporting of employee on-duty injuries create barriers to proper medical care and potentially threaten the integrity of FRA safety data."

The testimony of Robert M. Grimalia, Senior Assistant Vice President, Safety, Environment, and Security, Union Pacific Railroad, before this same Committee is also informative. Mr. Grimalia was the Chief Safety Officer at Union Pacific Railroad. Mr. Grimalia stated:

> "Our goal is zero accidents. To enable us to get to our goal, we have systematic processes and explicit policies for managing safety programs and reporting. Unfortunately, accidents do sometimes occur. Our Internal Control Plan (ICP) and our safety policies specify how our managers are to handle personal injuries and the associated reporting."

He continued:

"Any manager who tries to make himself or herself look better by suppressing accident reports is going to have NO career at Union Pacific."

"Some may point to violations and disciplinary actions as an admission that some managers do not adhere to our policy, and they would be right. However, our processes do find them. We believe our actions in these cases show that we are serious about compliance, and that these cases of deviation are the exception, not the rule."

In response to a question from Chairman Oberstar, Mr. Grimalia has stated:

"There are pressure on managers in every business and in government to perform their jobs well. A very small minority unfortunately think that manipulating numbers is a way to show job performance. UPRR's role is to train managers otherwise and take appropriate action when they err and chose the wrong course."

In written response to questions from the committee: "Do supervisors have any portion of their bonuses based on injury statistics in their management area? (If yes) What is the maximum amount that he/she could earn based on injury statistics alone?" In written response, Mr. Grimalia answered:

"Supervisors are evaluated on several key performance metrics, including safety. At the frontline supervisor level, we focus primarily on prevention activities such as audits and inspections, training and procedure compliance. We use injury statistics more extensively for the highest-level managers. There is no bonus schedule for injury statistics."

The FRA has very forthrightly and very explicitly stated that the harassment and intimidation of railroad employees that discourages them from seeking medical treatment or reporting injuries is a recognized problem; that this harassment and intimidation negatively impacts the safety of the industry and the FRA's ability to recognize and solve safety related issues; and, that the railroad's internal policies and procedures foster this environment by effectively rewarding Mangers for low injury statistics.

      **b. The FRA explicitly issued regulations to combat the harassment and intimidation and Defendant has, on paper, adopted these regulations and implemented these policies.**

The FRA recognized that railroads were not providing accurate reporting data which negatively impacted its ability to address safety, and therefore implemented regulations aimed at forcing railroad to provide accurate reports. 49 C.F.R. Part 225, Railroad Accidents/Incidents: Reports, Classification, and Investigations, §225.1 "Purpose," states:

> "The purpose of this part is to provide the Federal Railroad Administration with accurate information concerning the hazards and risks that exist on the Nation's railroads. FRA needs this information to effectively carry out its regulatory responsibilities under 49 U.S.C. chapters 201-213. FRA also uses this information for determining comparative trends of railroad safety and to develop hazard elimination and risk reduction programs that focus on preventing railroad injuries and accidents."

The FRA set forth requirements mandating that railroad adopt internal policies directly addressing the issue of harassment and intimidation in injury reporting. 49 C.F.R. §225.33, "Internal Control Plans," outlines the FRA's requirements for each railroad's Internal Control Plan, and requires:

> "A policy statement declaring the railroad's commitment to complete and accurate reporting of all accidents, incidents, injuries, and occupational illnesses arising from the operation of the railroad, to full compliance with the letter and spirit of FRA's accident reporting regulations, and to the principle, in absolute terms, that harassment or intimidation of any person that is calculated to discourage or prevent such person from receiving proper medical treatment or from reporting such accident, incident, injury or illness will not be permitted or tolerated and will result in some stated disciplinary action against any employee, supervisor, manager, or officer of the railroad committing such harassment or intimidation."

In Exhibit 3, the FRA Guide for Preparing Accident/Incident Reports, prepared by the Office of Safety of the U.S. Department of Transportation, Federal Railroad Administration, effective May 1, 2003, Chapter 1, "Purpose" (Chapter 1 – Page 1), the document states:

> "The purpose of the regulations in Part 225 is to provide FRA with accurate information concerning the hazards and risks that exist on the Nation's railroads. FRA needs this information to effectively carry out its regulatory and enforcement responsibilities under the Federal railroad safety statutes. FRA also uses this information for determining comparative trends of railroad safety and to

develop hazard elimination and risk reduction programs that focus on preventing railroad injuries and accidents."

The Guide includes the following statements as to the need for accurate injury reporting data and the effect of such data as it relates to rail safety: Later, at Pages 3 and 4:

"Recordkeeping is a critical part of railroad's safety and health efforts for several reasons:

> Keeping track of accidents, injuries, and illnesses can help prevent them in the future.
>
> Using accident, injury, and illness data helps identify problem areas. The more that is known, the better to identify and correct hazardous workplace conditions.
>
> Accurate record keeping will allow a railroad to better administer safety and health programs.
>
> As employee awareness about accidents, injuries, illnesses, and hazards in the workplace improves, workers are more likely to follow safe work practices and report workplace hazards. Railroad and FRA compliance officers can rely on the data to help them properly identify and focus on accidents, injuries and illnesses in a particular area."

*Id.*, at p. 3.

The Guide goes on to define "Injury" as, "Harm to a person resulting from a single event, activity, occurrence or exposure of short duration." *Id.*, at Chap 2, p. 2. The Guide further defines "First aid treatment" as, "treatment limited to simple procedures used to treat minor conditions, such as abrasions, cuts, bruises, and splinters. First aid treatment is typically confined to a single treatment and does not require special skills or procedures" (Chapter 2 – Page 11). *Id.* <u>An injury that requires only first aid treatment is not reportable.</u>

"Medical treatment" is defined as, "any medical care or treatment beyond 'first aid' regardless of who provides such treatment. Medical treatment does not include diagnostic procedures, such as X-rays and drawing blood samples." *Id.* (Chapter 2 - Page 12. The guide

specifically provides that, "Intravenous administration of fluids to treat work-related heat-related conditions is medical treatment." *Id.*, at Chap. 6, p. 30. <u>An injury that requires medical treatment is reportable.</u> When Plaintiff was finally taken to the emergency room at about 8:30 p.m. on the day of his injury, he was given two bags of saline intravenously. **Exhibit 9**, Elmhurst Memorial Emergency Department Record, p. 4; **Exhibit 10**, Plaintiff's Personal Injury report, dated June 29, 2012. <u>Therefore, Plaintiff going to the hospital to receive "intravenous administration of fluids to treat work-related heat-related conditions," as opposed to Plaintiff just being "cooled down" on the job site, would convert Plaintiff's injury into a reportable injury and require reporting of said injury to the FRA.</u>

It is important to note that at the time the Office of Safety of the FRA issued its Guide for Preparing Accident/Incident Reports, May 1, 2003 (Ex. 3), George Gavalla was the head of the Office of Safety for the FRA.

As Mr. Gavalla notes in his report, Defendant subsequently issued its own Policy Statement as required by the regulation. The Policy Statement says, in part, that, "UP will not tolerate harassment or intimidation of any person that is calculated to discourage or prevent such person from receiving proper medical treatment . . ." Ex. 1, p. 17. Dennis Duffy, Defendant's Chief Operating Officer, subsequently issued a memorandum to all Operating Department Management Employees addressing the Policy Statement and the issue of harassment and intimidation (Ex. 14) . The memorandum stated, in part, that FRA regulations and the FRA's interpretation of those regulations specify how Defendant's Managers <u>must</u> handle on-duty injuries and medical treatment and that Mr. Duffy was providing "basic procedural guidelines" for complying with those regulations:

> "(1) When an employee is injured, the first priority is to ensure that the employee receives the necessary medical attention, without delay. If transportation to a

hospital is requested the manager shall arrange transportation to the nearest hospital where the employee can received safe and appropriate medical care."

. . .

"(3) When an employee is taken for medical care, do not try to direct or influence the employee or the medical professionals as to the type of treatment the employee should receive."

Mr. Duffy continued:

"The FRA has expanded their interpretation of what constitutes harassment and intimidation and/or interfering with medical treatment. Specifically, the FRA considers virtually ANY discussion of medical treatment options or the elements of personal injury reportability with an employee or treating physician, to be interference with medical treatment."

The FRA has enacted very specific and direct regulations aimed at eliminating the harassment and intimidation of railroad employees who attempt to report or seek medical treatment for on-duty injuries. George Gavalla is uniquely qualified to address what these regulations and policies are, what they require, and why they are in place.

        **c.  The FRA regulations, their requirements, and the reasons for which they were enacted are directly relevant to Plaintiff's claim under the FRSA, and specifically the claim for punitive damages.**

Given the potential remedy under the FRSA of punitive damages, which Plaintiff has validly pled in his FRSA claim, the conclusions of Mr. Gavalla that are at issue are clearly relevant and admissible. In assessing punitive damages, the reprehensibility of a defendant's conduct is a key component, which includes whether there was reckless disregard for human health or safety, whether the defendant's conduct poses a risk of harm to other, and whether there has been any repetition of the wrongful conduct, including a pattern of such conduct in the past.

The only Court of which Plaintiff is aware that has examined this exact issue has ruled that the conclusions of Mr. Gavalla are relevant and admissible. In *Barati v. Metro-North R.R. Commuter R.R. Co.*, 939 F. Supp. 2d 143 (D. Conn. 2013), the plaintiff was injured and was then

disciplined and terminated after reporting his injury. He brought a claim under the FELA for his injury, combined with a claim under the FRSA for the discipline he received, alleging the discipline was retaliatory in violation of the FRSA. The jury returned a verdict for the plaintiff on both the FELA and FRSA claims, and awarded the plaintiff punitive damages on the FRSA claim. Exactly as in the present matter, the railroad filed a motion in limine to totally preclude Mr. Gavalla from testifying. The Court granted the motion in part, but allowed Mr. Gavalla to testify regarding his experience and knowledge as head of the FRA Office of Safety, which included testimony regarding the rules and safety regulations the railroads were required to implement and the ICP of the defendant and its requirements. *Id.*., at 147-48. He was allowed to testify in a general nature about

> "the importance of railroads accurately reporting injuries and employees' 'lost days from work' from injuries, and testified that the 'FRA uses the lost days data as a measure of severity when making determinations of where to send their inspectors, ... [y]ou need to have accurate data on the severity of the accident and injury."

*Id.*, at 148. He continued by stating, "[o]bviously, the whole point and purpose of the internal control plan is to ensure that a railroad has an effective ... safety management program in place so that you could identify incidents that were not reported properly and then correct them." *Id.* Further, the Court allowed testimony regarding the categories of conduct that the FRA considers to be in violation of its regulations and a railroad's ICP, as well as the specific language and requirements of Metro-North's ICP.

The last of Mr. Gavalla's testimony referenced by the Court, but not indicated by the Court to be the only other opinions offered, was in response to a question by plaintiff's counsel regarding why it would matter whether or not a railroad would fail to report an injury or underreport the severity of an injury. In response, Mr. Gavalla stated:

Well, again, it goes to the—you'd have to look at the implications for why was that discrepancy allowed to occur. You'd have to ask the question, well, did the railroad—was the railroad deficient in their management of the safety process? Did it fail to actually find that data out and get it to the right people responsible in reporting it? So, did the people who were responsible for escalating that information—or giving that information to the reporting officer, did they not know what they were supposed to do, or did the system they have in place not catch them. And if the answer is, well, those things were okay, then you'd have to ask the question, well, was there something—was there a problem with the railroad's safety culture, the integrity of it, its intentions to report. So, you'd have to look at why wasn't that accident or injury reported properly.

After the verdict for the plaintiff, the railroad filed a post-trial motion which included the claim that the opinions of Mr. Gavalla, the same opinions being offered in the present matter, were unfairly prejudicial and warranted a new trial. In denying the railroad's motion, the Court held that Mr. Gavalla's testimony was not unfairly prejudicial given that his testimony was phrased in general terms and Metro-North's employees provided the testimony which established the specifics of the conduct in violation of the ICP and regulations.

The present matter involves a virtually identical scenario. Mr. Gavalla proposes to testify generally as to the safety rules and safety regulations railroads were required to implement, Defendant's ICP and its requirements, the importance of accurate reporting by railroads and why the FRA needs such accurate data, the purpose of an ICP, categories of conduct that violate FRA regulations and Defendant's ICP, the reasons that accurate data may not be reported and why the reporting of accurate data matters. These are the same opinions authorized by the Court in *Barati*. The opinions that are well-founded, offered by a witness who is in a unique position to understand these issues, and clearly relevant to the matters at issue.

Again, just as in *Barati*, the relevant evidence of violation of the FRA regulations and the Defendant's ICP and policies will be established through the testimony of other witnesses. The evidence is undisputed that Defendant had in place an ICP which, as is required by the FRSA,

strictly forbids any interference with an employee's attempt to get medical treatment for an on-the-job. It is undisputed that Defendant's Chief Operating Officer issued instructions to Management personnel clearly defining what conduct was prohibited by the ICP and FRA regulations. This specifically included instructions stating that "any discussion of medical treatment options" is considered to be interference with medical treatment.

The evidence will show that Plaintiff was explicitly requesting transportation to a hospital for treatment for his heat related injuries. David Birt was the Work Equipmen Supervisor on site at the time of Plaintiff's injury, and he had determined that Plaintiff needed to go to the hospital because of his condition. Birt Dep., **Exhibit 11**, at 5:22-23; 15:17-17:5; 18:10-14. On the way to the hospital, Mr. Birt receives a phone call from Talmage Dalebout. Mr. Dalebout was the Manager of Track Programs for the rail gangs on the Northern and Western Region for the Union Pacific Railroad at the time of Plaintiff's injury. As was aptly stated by Mr. Gavalla, he was Plaintiff's boss's boss's boss. Recall that at the time of Mr. Dalebout's call, Plaintiff was experiencing numbness going up his arms and legs, blurry vision, disorientation, and his arms were contracting such that he could not even hold the phone up to his own ear.

In spite of Plaintiff's condition, Plaintiff's request to go to the hospital, and the determination that Plaintiff needed to go to the hospital by Mr. Birt, Defendant's Supervisor that was on site and actually in a position to evaluate see Plaintiff and evaluate Plaintiff's condition, Mr. Dalebout poses the "option" to Plaintiff of whether or not he would like to return to the cooling station to try to cool down there instead of going to the hospital. Dalebout Dep., **Exhibit 12**, 44:22-45:2.[2] When he posed this "option" to Plaintiff, Mr. Dalebout was aware that

---

[2] When Plaintiff's injury was reported to Talmage Dalebout, he was in his hotel room by O'Hare Airport, 10-15 miles away. When Mr. Dalebout made the telephone call to Dave Birt, he was still in his hotel room. He did not go back to the job site after leaving the job site earlier that morning. He did not make any personal observations of Jared Whitt. (Dalebout Dep., 39:8-24.)

returning to the cooling station, as opposed to going to the hospital, would prevent the injury from being an FRA reportable injury:

> Q. But at the time he returned to the cooling tent, the time Dave Birt returned him to the cooling tent, the injury to Jared Whitt was not yet FRA reportable?

> A. Correct.

Dalebout Dep., 65:3-7.

Mr. Gavalla's testimony is relevant in order to assess this conduct of Defendant in light of Plaintiff's claim under the FRSA, and in particular the claim for punitive damages. Mr. Dalebout was aware of the reporting requirements and that Plaintiff going to the cooling station instead of the hospital meant the injury would not be reportable to the FRA. Further, Mr. Dalebout was aware that any discussion of medical treatment options with an employee is considered to be interference with medical treatment and violation of FRA regulations and Defendant's ICP, and therefore the FRSA. This conduct then must be considered in the context of the FRA's acknowledgement that harassment and intimidation of employees has long been an issue in the rail industry, and the FRA's need for accurate reporting in order to accurately assess and respond to safety concerns. It also must be assessed in light of Defendant's policy of rewarding Manager's for low injury reporting, a practice which obviously encourages such harassment and intimidation and interference with medical treatment. This fact has been testified to in hearings before the Administrative Law Judges in other FRSA cases involving Defendant. *See* ALJ's Decision and Order, Petersen, Docket No. 2011-FRS-00017 (Dep't of Labor August 7, 2013), **Exhibit 13**. Finally, it must be considered that in direct contradiction to its ICP, Defendant actually promoted Mr. Dalebout on July 15, 2012, and no discipline of any kind was

assessed against him.  (Dalebout Dep., Ex. 12, 8:8-9:6.)  In light of these considerations, the conclusions of Mr. Gavalla at issue are properly admitted.

Finally, it should be noted that Defendant's argument that Plaintiff has not pled any violation of a FRA regulation or Defendant's ICP is without merit.  The regulations and ICP set forth the exact requirements of the FRSA, often using very similar, if not identical, language.  A violation of the pertinent requirements of the FRA regulations or Defendant's ICP is a violation of the FRSA.  Plaintiff has also included in his Second Amended Complaint at ¶ 5:

> "Plaintiff brings this action against Defendant under the provisions of 45 U.S.C. § 51-60, *et seq.* ('The Federal Employers' Liability Act'), regulations promulgated under the authority of those sections, other federal safety laws …."

Defendant's argument is without merit.

## CONCLUSION

For the reasons set forth above, the conclusions of Mr. Gavalla that are at issue are properly admitted.  As was concluded by the Court in *Barati*, the only Court of which Plaintiff is aware that has addressed this issue, Mr. Gavalla's opinions set the context for examining Defendant's conduct in a FRSA claim, and are therefore relevant and admissible.  Defendant's Motion should therefore be denied as to Mr. Gavalla's Conclusions, Nos. 12-20.

Signed at Denver, Colorado this 31st day of March, 2014.

s/James L. Cox, Jr.
James L. Cox, Jr., Nebraska Bar #20223
Attorney for Plaintiff
BRENT COON & ASSOCIATES, PC
3801 E. Florida Ave., Suite 905
Denver, CO  80210-2500
Telephone: (303) 756-3243
Fax: (303) 756-3595
jim.cox@bcoonlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 31st day of March, 2014, I electronically filed the foregoing **PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE REGARDING PROPOSED EXPERT TESTIMONY OF GEORGE GAVALLA** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

David J. Schmitt, Esq.
LAMSON, DUGAN & MURRAY, LLP
10306 Regency Pkwy. Dr.
Omaha, NE  68114
dschmitt@lmdlaw.com

Clifford A. Godiner, Esq.
Tabitha G. Davisson, Esq.
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, MO  63101
cgodiner@thompsoncoburn.com
tdavisson@thompsoncoburn.com


s/James L. Cox, Jr.
James L. Cox, Jr.