**U.S. Department of Labor**

Administrative Review Board
200 Constitution Avenue, N.W.
Washington, D.C. 20210



In the Matter of:

ANTHONY SANTIAGO,

      COMPLAINANT,

    v.

METRO-NORTH COMMUTER
RAILROAD COMPANY, INC.,

RESPONDENT.

ARB CASE NO.   10-147

ALJ CASE NO.   2009-FRS-011

DATE:   **JUL 2 5 2012**

BEFORE:   THE ADMINISTRATIVE REVIEW BOARD

Appearances:

*For the Complainant*:
    Charles Goetsch, Esq.; *Cahill, Goetsch & Perry PC;* New Haven, Connecticut

*For the Respondent*:
    Charles A. Deluca, Esq., Beck S. Fineman, Esq., and William N. Wright, Esq.; *Ryan, Ryan, Deluca, LLP;* Stamford, Connecticut

Before: Paul M. Igasaki, *Chief Administrative Appeals Judge*; Luis A. Corchado, *Administrative Appeals Judge*; and Joanne Royce, *Administrative Appeals Judge*

### DECISION AND ORDER OF REMAND

    This case arises under the employee protection provisions of the Federal Rail Safety Act of 1982 (FRSA).[1] Anthony Santiago claimed that his employer, Metro-North

---

[1]    49 U.S.C.A. § 20109 (Thomson/West 2012), as amended by Section 1521 of the Implementing Recommendations of the 9/11 Commission Act of 2007 (9/11 Act), Pub. L. No. 110-53, and as implemented by federal regulations at 29 C.F.R. Part 1982 and 29 C.F.R. Part 18, Subpart A.

EXHIBIT 5

Commuter Railroad Company, Inc., (Metro-North) violated the FRSA when it reclassified his back injury as non-occupational and ceased paying for medical treatment. A Department of Labor (DOL) Administrative Law Judge (ALJ) dismissed his complaint after a hearing. Santiago appealed to the Administrative Review Board (ARB). We reverse, in part, and remand this case for further proceedings.

## BACKGROUND

We summarize the ALJ's findings of fact, many of which are undisputed.[2]  Prior to joining Metro-North, Santiago had surgery for a herniated disc in 2003. Metro-North cleared him for full duty as an electrician in October 2005. On July 25, 2008, he reinjured his back at work when a chair collapsed as he sat down. Metro-North's foreman took Santiago to an emergency department where a doctor examined him, took x-rays, diagnosed a lumbar strain/sprain, prescribed pain medication, gave him two days off work, and advised him to see his orthopedic physician.[3]

Metro-North requires employees injured at work to report to its Occupational Health Services (OHS), which determines whether an employee's injury is job-related and evaluates the necessity and effectiveness of medical treatment.[4]  Metro-North's Human Resource Vice-President, Greg Bradley, directly supervises OHS. According to Bradley, OHS is a Metro-North Department and an "assessment center," not a medical provider.

Metro-North contracted with a vendor, Take Care Health (TCH), to operate OHS, a contract that Metro-North could terminate "at any time" and that permitted Metro-North to dictate which TCH employees could work at OHS.[5]  The evidence "overwhelm[ingly] established that Metro-North had significant control over the operations of OHS, could terminate the contract unilaterally for any reason, and had control over the hiring and termination of personnel working at OHS under the contract."[6]  When Santiago was injured, OHS had no written standards for classifying injuries as "occupational" or "non-occupational." Santiago reported to OHS as required, and John Ella, an OHS physician's assistant, found that his back strain was occupational.[7]

---

[2]      Decision and Order (D. & O.) at 2-10. In addition to the D. & O., we cite to exhibits relied upon by the ALJ.

[3]      Complainant's Exhibit (CX) 2-5.

[4]      Respondent's Exhibit (RX) 8-9.

[5]      D. & O. at 7.

[6]      *Id.* at 16, n.21.

[7]      CX 10-12.

After two days, Santiago returned to work but continued to have significant pain. In late August, he consulted Dr. Barry Krosser, a private orthopedic surgeon who referred him to Dr. Thomas Drag for chiropractic treatment. Physician's assistant Ella approved six weeks of thrice-weekly chiropractic visits, but Santiago continued to report pain and numbness radiating down his leg.[8] Subsequently, Ella approved another two weeks of treatment and a magnetic resonance imaging (MRI) test, which was done on October 16, 2008. The MRI report indicated discogenic disease and a disc herniation at L4-L5 as well as bulging and spondylosis at L5-S1.[9] The MRI report also revealed prior back surgery and scarring.

In an October 27, 2008 letter to Dr. Drag, Ella stated that he had reviewed the MRI report and the emergency room x-rays and considered Santiago's work injury resolved. Ella testified that he possessed at the time, but did not review, a copy of the operative report from the 2003 surgery indicating that there was good decompression of the L5-S1 nerve root. Ella then changed the injury designation from occupational to non-occupational, denied Dr. Drag's request for further chiropractic treatments, and instructed him to submit all charges for treatment after October 10 to Santiago's company-sponsored private health insurance.[10]

In response, Dr. Drag sent a letter of Medical Necessity to Ella on November 10 containing a detailed diagnosis of Santiago's condition, symptoms and treatment. Dr. Drag requested that Metro-North continue to pay for treatment as related to his work injury. He addressed Santiago's pre-existing degenerative disc condition but pointed out that Santiago was asymptomatic until the occupational injury on July 25, 2008. Dr. Drag stated that conservative treatment had not improved Santiago's condition and recommended three manipulation-under-anesthesia (MUA) procedures as an alternative to a second lumbar surgery. He noted that Santiago's condition fell within "the standard acceptable forms of conditions" that respond favorably to MUA as established by the National Academy of MUA Physicians.[11] Nevertheless, Dr. Hildebrand, OHS's medical director, told Dr. Drag that she had reviewed the medical records and considered Santiago's "low back pain" to be resolved. She approved the change in classification of the injury from occupational to non-occupational.[12]

After Metro-North's OHS stopped paying for his care, Santiago continued to see Dr. Drag and in March 2009 underwent a three-day MUA procedure, for which his

---

[8]    CX 10, 18.

[9]    CX 12, 20, 33.

[10]   CX 34, 37.

[11]   CX 38.

[12]   RX 39.

private insurance declined to pay. Santiago stated that his out-of-pocket costs for this treatment and the co-pays and deductibles amounted to $16,520.00.[13]

Santiago filed a complaint with DOL's Occupational Safety and Health Administration (OSHA) on December 29, 2008, alleging that Metro-North's change in classification of his injury from occupational to non-occupational was retaliatory, resulted in additional medical expenses for him, and violated the FRSA's provision that an employer not deny, delay, or interfere with an injured employee's medical treatment.[14] After an investigation, OSHA determined that Santiago engaged in protected activity under 49 U.S.C. § 20109(a)(4) and that Metro-North had violated the FRSA. OSHA ordered compensatory damages and $75,000.00 in punitive damages.[15] Metro-North timely filed its objections and requested a hearing, which a DOL ALJ held in New Haven, Connecticut on November 17-19, 2009. The ALJ concluded that Metro-North had not violated the FRSA and dismissed Santiago's complaint. He appealed to the Administrative Review Board (ARB).[16] We reverse and remand.

## JURISDICTION AND STANDARD OF REVIEW

The Secretary has delegated authority and assigned responsibility to the ARB to act for the Secretary of Labor in review of an appeal of an ALJ's decision pursuant to the FRSA.[17] We review the ALJ's factual findings to determine whether they are supported by substantial evidence.[18] The ARB generally reviews the ALJ's conclusions of law under the de novo standard.[19]

---

[13] CX 43.

[14] 40 U.S.C.A. § 20109(c)(1).

[15] The FRSA provides for payment of punitive damages up to $250,000.00. See 49 U.S.C.A. § 20109(e)(3), 29 C.F.R. § 1982.105(a)(1).

[16] Attorneys representing OSHA participated in the three-day hearing and post-trial briefing but did not submit pleadings on appeal to the ARB.

[17] Secretary's Order No. 1-2010 (Delegation of Authority and Assignment of Responsibility to the Administrative Review Board), 75 Fed. Reg. 3924, § 5(c)(15) (Jan. 15, 2010).

[18] 29 C.F.R. § 1982.110 (2011).

DISCUSSION

## 1. Legal Standards

FRSA Section 20109(a)(4) prohibits a railroad carrier from retaliating against an employee who engages in protected activity, such as reporting a work-related injury or illness:

> (a) IN GENERAL.—A railroad carrier engaged in interstate or foreign commerce, a contractor or a subcontractor of such a railroad carrier, or an officer or employee of such a railroad carrier, may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done— . . . .
>
> (4) to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury or work-related illness of an employee.[20]

Section 20109(c) provides:

> (C) PROMPT MEDICAL ATTENTION.—
>
> (1) PROHIBITION.—A railroad carrier or person covered under this section may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment. If transportation to a hospital is requested by an employee who is injured during the course of employment, the railroad shall promptly arrange to have the injured employee transported to the nearest hospital where the employee can receive safe and appropriate medical care.
>
> (2) DISCIPLINE.—A railroad carrier or person covered under this section may not discipline, or threaten discipline to, an employee for requesting medical or first aid treatment, or for following orders or a treatment plan of a treating physician, except that a railroad carrier's refusal to permit an employee to return to work following medical treatment shall not be considered a violation of this section if the refusal is pursuant to Federal Railroad Administration

---

20    49 U.S.C.A. § 20109(a)(4).

6

> medical standards for fitness of duty or, if there are no
> pertinent Federal Railroad Administration standards, a
> carrier's medical standards for fitness for duty.   For
> purposes of this paragraph, the term "discipline" means to
> bring charges against a person in a disciplinary proceeding,
> suspend, terminate, place on probation, or make note of
> reprimand on an employee's record.[21]

FRSA section 20109, entitled "Employee protections," incorporates the
procedures enacted by the Wendell H. Ford Aviation Investment and Reform Act for the
21st Century (AIR 21), which contains whistleblower protections for employees in the
aviation industry.[22]  To prevail, an FRSA complainant must establish by a preponderance
of the evidence that:  (1) he engaged in a protected activity, as statutorily defined; (2) he
suffered an unfavorable personnel action; and (3) the protected activity was a
contributing factor in the unfavorable personnel action.[23]  If a complainant meets his
burden of proof, the employer may avoid liability only if it proves by clear and
convincing evidence that it would have taken the same unfavorable personnel action in
the absence of a complainant's protected behavior.[24]

### 2. ALJ Decision

#### A.  *Issues before the ALJ*

The ALJ listed six issues that the parties raised – whether:  (1) the Railway Labor
Act (RLA) precludes Santiago's complaint;  (2) the alleged adverse action,
reclassification of Santiago's injury as non-occupational, occurred prior to the effective
date of section 20109(c);  (3) Metro-North violated section 20109(a)(4) and (c)(1) by
interfering with Santiago's medical treatment;  (4) Metro-North violated section
20109(a)(4) by requiring injured employees to report to its medical unit;  (5) Metro-North
violated section 20109(a)(4) by applying its injury frequency index to deny Santiago's

---

[21]    49 U.S.C.A. § 20109(c).

[22]    49 U.S.C.A. § 42121(b), see 49 U.S.C.A. § 20109(d)(2)(A).

[23]    49 U.S.C.A. § 42121(b)(2)(B)(iii); *Luder v. Continental Airlines, Inc.,* ARB No. 10-
026, ALJ No. 2008-AIR-009, slip op. at 6-7 (ARB Jan. 31, 2012); *see Brune v. Horizon Air
Industr., Inc.,* ARB No. 04-037, ALJ No. 2002-AIR-008, slip op. at 13 (ARB Jan. 31, 2006)
(defining preponderance of the evidence as superior evidentiary weight).  The parties agreed
that Santiago engaged in protected activity when he reported his back injury and that Metro
was aware of his injury. D. & O. at 18.

[24]    49 U.S.C.A. §§ 20109(d)(2)(A)(i), 42121(b)(2)(B)(iii)(iv).   *Menefee v. Tandem
Transp. Corp.,* ARB No. 09-046, ALJ No. 2008-STA-055, slip op. at 6 (ARB Apr. 30, 2010),
citing *Brune,* ARB No. 04-037, slip op. at 13.

subsequent promotion and transfer; and (6) punitive damages were warranted if Metro-North violated the FRSA.[25]

On appeal, neither Santiago nor Metro-North contested the ALJ's conclusions that the RLA did not preclude his claim, that the alleged adverse action occurred after the effective date of section 20109(c)(1), and that Metro-North did not violate section 20109(a)(4) by requiring employees to report to OHS or by applying its injury frequency index to employee transfers and promotions. Given that no party has challenged these findings, we accept them as final.[26] Further, the parties agreed that Santiago engaged in protected activity when he reported his work injury to his supervisor on July 25, 2008. Still at issue are whether Metro-North's reclassification of Santiago's injury from occupational to non-occupational constituted an adverse action and, if so, whether his protected activity was a contributing factor in the action.

### B. *The ALJ's statutory construction of section 20109(c)(1)*

The ALJ recognized that resolution of the merits of this claim required interpretation of section 20109(c)(1), which makes it unlawful for a railroad to "deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment."[27] She explained that the first step in interpreting a statute is to determine whether the language has a plain and unambiguous meaning. Noting that the provision is titled, "Prompt medical attention," the ALJ identified two possible interpretations of the relevant language contained in the first sentence; either the prohibition against interference refers only to the period immediately after a workplace injury occurs or it extends for the duration of such treatment. Given this ambiguity, the ALJ proceeded to construe section (c)(1) by examining section 20109(c)(2) entitled "Discipline," the legislative history of the provision, and its potential effects on other statutes such as the FELA. She concluded that section 20109(c)(1)'s prohibition applied only to the temporal period surrounding the injury and that therefore Metro-North did not violate the FRSA because it approved and paid for the treatment Dr. Drag prescribed for eight weeks.[28]

---

[25]   D. & O. at 11.

[26]   29 C.F.R. § 1982.110.

[27]   D. & O. at 19. The ALJ did not decide whether the reclassification was adverse action under section 20109(a)(4). She also determined that because Metro-North approved and paid for the treatment Dr. Drag prescribed for eight weeks after the injury occurred, Metro-North did not violate section 20109(c)(1). *Id.* at 24.

[28]   *Id.* at 21, 24. The ALJ also concluded that OSHA was not entitled to *Skidmore* deference because its interpretation was overly broad, inconsistent with the FRSA's legislative history, and eviscerated the workers' compensation scheme under the Federal Employers' Liability Act (FELA). See *Skidmore v. Swift & Co.,* 323 U.S. 134, 139-140 (1944) (the reasonableness of the agency's interpretation of a statute depends on the quality of the agency's reasoning, the degree of the agency's care, its formality, relative expertness

### 3. Parties' Contentions on Appeal

In his petition for review, Santiago argued that the ALJ erred in concluding that section 20109(c)(1) applied only to the "temporal period surrounding the injury."[29] Santiago contended that the title of a statute – "Prompt medical attention" – is not substantive or controlling, that the plain meaning of the words in a statutory provision is controlling, and that the ALJ's narrow interpretation of subsection (c)(1) defeats the purpose of the FRSA to encourage accurate reporting of work injuries and ensure medical treatment of injured employees. Santiago also argued that the ALJ's interpretation violates the canons of statutory construction because there is no ambiguity in the prohibition that employers not deny, delay, or interfere with an employee's medical or first aid treatment.[30]

Metro-North, on the other hand, argued that Santiago's position takes the relevant provision out of context without regard to the remaining statutory language. Reasoning that interpretation of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the context of the statute as a whole, Metro-North argued that the relevant provision was ambiguous. Metro-North relied heavily on the title of the provision, "Prompt medical treatment," to conclude that the prohibition contained in subsection 20109(c)(1) is temporally limited to medical or first aid care directly following a workplace injury. Metro-North found further support for this position by comparing subsection 20109(c)(1) to subsection 20109(c)(2). Metro-North explained that subsection 20109(c)(2) explicitly extends to longer term medical treatment because it contains reference to "a treatment plan of a treating physician." Metro-North reasoned that this phrase was deliberately left out of subsection 20109(c)(1), thereby demonstrating a legislative intent to limit that prohibition to treatment immediately following an injury.[31]

### 4. Analysis

We appreciate the ALJ's thoughtful and comprehensive analysis and discussion of the difficult issues presented in this case, but we respectfully disagree with her conclusion that section 20109(c)(1)'s prohibition against denial, delay, or interference with an

---

and consistency, and the persuasiveness of the agency's position). *See also In Re: United Gov't Security Officers of Am.*, ARB No. 02-012 slip op. at 6-7 (ARB Sept. 29, 2003). OSHA did not participate on appeal to the ARB.

[29]    Petition for Review at 2.

[30]    Complainant's Brief at 5-16.

[31]    Respondent's Brief at 5-6, *citing Robinson v. Shell Oil Co.,* 519 U.S. 337, 341 (1997).

injured employee's medical treatment applies only to the temporal period surrounding his or her work injury.[32] We also disagree with her understanding of the phrase "deny, delay, or interfere."

## A. *The parallel structure of section 20109(a), (b), and (c)*

Section 20109(c) follows the same pattern as sections 20109(a) and (b), identifying protected activity as well as the prohibited discrimination. For example, in section section 20109(a), Congress identifies a list of "general" protected activities. The prohibited discrimination is "discharg[ing], demot[ing], suspend[ing], reprimand[ing], or in any other way discriminat[ing] against an employee if such discrimination is due, in whole or in part, to the employee's" good faith protected activity. Similarly, in section 20109(b), Congress identifies a category of protected activity related to "Hazardous safety or security conditions," followed by the prohibited discrimination.[33] When Congress added section 20109(c) in 2008, it followed the same pattern set in sections (a) and (b) but not as neatly. Implicitly, it identifies protected activity as requesting or receiving medical treatment or complying with treatment plans for work injuries. We say implicitly because you must infer the protected activity from the prohibited conduct in subsections 20109(c)(1) and (2). Those subsections identify the prohibited discrimination as "delay[ing], deny[ing], or interfer[ing]," or imposing or threatening to impose discipline as defined by the statute.

It is also essential to note that the same procedural burdens of proof set forth in 49, U.S.C.A. § 42121(b) govern sections 20109(a), (b), and (c). Pursuant to subsection 42121(b)(2)(B)(iii), the Secretary may find a violation of FRSA's whistleblower statute if protected activity was a contributing factor in the unfavorable actions defined in FRSA. If an employee establishes such causal connection, the covered railroad or person can only avoid liability by proving with clear and convincing evidence that it would have taken the same action "in the absence of the protected activity." As we discuss below, application of the AIR 21 burdens of proof necessarily must be tailored to work under 20109(c). But the first dispute in this appeal centers on whether 20109(c)(1) protects all requests for medical treatment for a work injury or only the requests for initial or first aid treatment shortly after a work injury.

___

[32]     In denying Metro-North's motion for summary decision, the ALJ stated that the reference in section 20109(c)(2) to "following the orders or treatment plan of a treating physician" evidenced Congress' intent that the provision extended protection beyond the immediate emergency care provided at the time of a work injury. The ALJ determined that the provisions read together protected employees from employer interference with medical care or the treatment plan of a treating physician during the course of treatment and recovery from a work injury. She concluded that applying such protection only to the care provided in the immediate aftermath of a work injury, as Metro-North had suggested, would be inconsistent with the language and intent of the statute. Order Denying Respondent's Motion for Summary Decision at 4-5 (Nov. 9, 2009).

[33]     The prohibited discrimination identified in section 20109(a) is virtually identical to that identified in section 20109(b).

## B. *Plain language controls*

A fundamental rule of statutory construction is that "a legislature says in a statute what it means and means in a statute what it says."[34] The Supreme Court has repeatedly emphasized that a statute should be enforced according to its plain language "since this approach respects the words of Congress."[35] The first sentence of subsection 20109(c)(1) states as follows: "A railroad carrier or person covered under this section may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment." These words plainly convey congressional intent to prevent a railroad carrier or other person from negatively affecting in any manner the medical treatment or first aid treatment for an employee's work injury.[36] Whenever an employee needs medical treatment or attention, the railroad carrier should not step in the way to prevent or delay such treatment. Nothing in the first sentence mandates a time frame, either immediately or long term. Nor is there any temporal limitation on "medical or first aid treatment."

Indeed, as the ALJ acknowledged: "Medical treatment is generally defined as the management and care of a patient to combat disease or injury.[37] It is understood to include more than first aid treatment and may be provided in the immediate aftermath of a work injury and over a period of time following an injury depending on the severity of the injury."[38] The words in a statute are presumed to be used in their ordinary and usual sense.[39] The ordinary meaning of "medical treatment" refers to the management and care of a patient over a period of time beyond initial injury and is dictated by the severity of the injury or disease.[40]

---

[34] *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253-54 (1992)(citations omitted).

[35] *Lamie v. United States Trustee,* 540 U.S. 526, 536 (2004).

[36] The rest of subsection 20109(c)(1) is just as clear. If an injured employee requests transportation to a hospital, the employer must promptly arrange transportation to the nearest hospital. Similarly, subsection 20109(c)(2), titled "Discipline" prohibits an employer from disciplining or threatening to discipline an employee who requests medical or first aid treatment or follows the orders or treatment plan of a treating physician. The term "discipline" is narrowly defined and does not include an employer's reclassification of an injury. 49 U.S.C.A. § 20109(c)(2).

[37] DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (28th ed. 1994) at 999, 1736.

[38] D. & O. at 20-21.

[39] *Caminetti v. United States,* 242 U.S. 470, 485 (1917).

[40] The ALJ found ambiguity in the phrase "medical or first aid treatment." We do not think the words are ambiguous. They are separated by the disjunctive "or" and thus cover both immediate treatment such as first aid and longer-term medical treatment in the absence of a limitation in the statute. As we explain, we see no limitation.

The ALJ relied on a reading of subsection 20109(c)(2) to support her limited construction of subsection 20109(c)(1). Subsection (c)(2) provides in relevant part that a railroad "may not discipline or threaten discipline to an employee for requesting medical or first aid treatment, or for following orders of a treatment plan of a treating physician." Citing principles of statutory construction, the ALJ reasoned that the inclusion of "following orders of a treatment plan of a treating physician" in (c)(2), but its omission from (c)(1), demonstrates that Congress intentionally limited (c)(1) to first aid treatment directly following an injury. Again, we do not read the statute the same way as the ALJ.

Subsection (c)(2) prohibits a railroad carrier or person from disciplining the employee's actions, specifically, the employee's requests for treatment and the employee's compliance with treatment plans. "Treatment plan" is commonly used to include not only medical visits and medical treatment, but also physical therapy and daily medication, among other things. A treatment plan may require the employee to engage in daily exercises during the work day. The fact that (c)(1) protects the employee's actions and extends beyond medical visits does not limit the medical treatment protected in (c)(1). Moreover, we agree with Santiago that it would make little sense for Congress to prohibit railroads from disciplining employees for following the orders of a treating physician, yet at the same time allow railroads to interfere with medical visits from which treatment plans are created.

Metro-North argued that subsection 20109(c)(1) must be construed in light of the section's title, "Prompt medical attention," to limit the prohibition contained in (c)(1) to interference with medical treatment immediately after an injury occurs. First, we do not read the title, "Prompt medical attention," the same way as the ALJ. As we indicated, subsection 20109(c)(1) focuses on ensuring that the railroad carrier does not delay or deny any of the employee's medical treatment related to a work injury, permitting the medical treatment to occur "punctually" and "without delay."[41] The title "Prompt medical attention" addressing delays in medical treatment is consistent with our understanding of (c)(1).

Second, limiting "Prompt medical attention" to the care received immediately after a work injury would make the title inconsistent with subsection (c)(2).[42] As we discuss below, (c)(2) applies to the employee's requests for medical treatment as well as his or her ongoing compliance with "treatment plans." We think understanding "prompt" to mean "punctual" and "without delay" makes the title consistent with both (c)(1) and (2). Third, it is fundamental that titles of sections are not controlling. As the Supreme Court said in *Demore v. Kim*: "'a title alone is not controlling' . . . because the title of a

---

[41]     WEBSTER'S NEW WORLD DICTIONARY, THIRD COLLEGE EDITION (1988), defines prompt as "quick to act or to do what is required; ready, punctual, etc." and "done without delay."

[42]     *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (plain meaning is determined by "the language itself, the specific context in which the language is used, and the broader context of the statute as a whole."

statute has no power to give what the text of the statute takes away. Where as here the statutory text is clear, 'the title of a statute . . . cannot limit the plain meaning of the text.'"[43]

We hold that subsection 20109(c)(1) bars a railroad from denying, delaying, or interfering with an employee's medical treatment throughout the period of treatment and recovery from a work injury. Because the language is clear, reference to other statutes or legislative history to determine its meaning is unnecessary. Nevertheless, the legislative history of the statute supports our broad interpretation of section 20109(c)(2).

## C. *Legislative history of section 20109*

The legislative history to section 20109 (passed in 2008) bolsters our conclusion that it was meant to apply beyond immediate medical care. A series of hearings in the 110th Congress signaled increasing public and Congressional concern with rail safety, including chronic under-reporting of rail injuries, widespread harassment of employees reporting work-related injuries, and interference with medical treatment of injured employees.[44] In particular, as the ALJ noted, testimony before Congress identified numerous management policies that deterred employees from reporting on-the-job injuries including subjecting employees who report injuries to increased monitoring and scrutiny from supervisors, which could lead to discipline and termination, supervisors accompanying employees on their medical appointments and attempting to influence employee medical care, sending employees to company physicians instead of physicians of their own choosing, and light-duty work programs, which have the injured employee report to work, but perform no work, to avoid having to report the injury as a lost work day to the Federal Railroad Administration.[45]

The ALJ cited this misconduct to demonstrate that her limited interpretation of (c)(1) conformed to the congressional goal of promoting accurate injury reporting. However, much of the misconduct cited occurred in the course of an injured employee's medical treatment not just first aid treatment directly after an injury. The full scope of such harassment could be fully remedied *only* by prohibiting interference with medical

---

[43] *Demore v. Kim*, 538 U.S. 510, 535 (2003)(citations omitted).

[44] *See, e.g.*, Reauthorization of the Federal Rail Safety Program: Hearing Before the H. Comm. on Transportation and Infrastructure, 110th Cong. (Jan., 30, 2007); Fatigue in the Rail Industry: Hearing Before the H. Comm. on Transportation and Infrastructure, 110th Cong. (Feb. 13, 2007); Rail Safety Legislation: Hearing Before the H. Comm. on Transportation and Infrastructure, 110th Cong. (May 8, 2007): Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads: Hearing Before the H. Comm. on Transportation and Infrastructure, 110th Cong. (Oct. 22, 2007).

[45] D. & O. at 22: *see generally* "Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads," Hearing Before the House Committee on Transportation and Infrastructure, 110th Cong. (2007)(H. Hrg. 110-84)(Oct. 22, 2007).

treatment beyond just immediate prompt treatment or first aid. Further, limiting the prohibition would be contrary to the Supreme Court's injunction that "safety legislation is to be liberally construed to effectuate the congressional purpose."[46]

The sequence of passage of the relevant FRSA whistleblower provisions further supports a broad construction of subsection 20109(c)(1). Prior to the 2007 and 2008 FRSA amendments, rail employees' whistleblower retaliation complaints were subject to mandatory dispute resolution under the Railway Labor Act.[47]

Recognizing that these anti-retaliation measures were insufficient, Congress significantly expanded them in Section 1521 of the Implementing Recommendations of the 9/11 Commission Act of 2007 signed into law on August 3, 2007. In relevant part, these amendments to 49 U.S.C.A. § 20109 (1) extended FRSA liability to contractors, subcontractors, and officers and employees of the rail carrier; (2) defined protected activity to include explicit protection for employees who "notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury or work-related illness of an employee;" and (3) transferred the enforcement authority of whistleblower provisions to the Secretary of Labor. These 2007 amendments contained subsection 20109(a)(4), the anti-retaliation provision at issue in this case.[48]

Meanwhile, on May 1, 2007, Representative Oberstar, then Chairman of the House Committee on Transportation and Infrastructure, introduced the Federal Railroad Safety Improvement Act of 2007 (H.R. 2095), which contained additional whistleblower provisions, as well as a separate stand-alone section (Section 606) entitled "Prompt medical attention." Section 606 created an affirmative duty on the part of railroads to refrain from interfering with the medical treatment of injured employees. Section 606 was reported by the House Transportation and Infrastructure Committee[49] and passed on October 17, 2007. However, the Senate rewrote the provision to expressly protect requests for medical attention and employee efforts to comply with treatment plans and placed it within the railroad anti-retaliation provisions at 49 U.S.C. § 20109(a), in effect turning the substantive prohibition into a protected act in a whistleblower claim.[50] The

---

[46]   *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 13 (1980).

[47]   75 Fed. Reg. 53523.

[48]   49 U.S.C.A. §§ 20109(a), (a)(4), (d).

[49]   House Report (Transportation and Infrastructure Committee) No. 110-336 (September 19, 2007).

[50]   The Senate's version of the prompt medical attention provision was reported on March 3, 2008 in Senate Report 110-270 and provided as follows:

### SEC. 419. PROMPT MEDICAL ATTENTION.

(a) IN GENERAL.—Section 20109 is amended—

14

Senate apparently preferred to address the problems associated with medical treatment of injured employees in the context of anti-retaliation law.[51]   The House, in turn, rejected the Senate language, largely restored the original House language from the stand-alone prohibition, but concurred in its placement, as in the Senate version, squarely within the whistleblower provisions at 49 U.S.C. § 20109.  This version became law.

We view this history as a progressive expansion of anti-retaliation measures in an effort to address continuing concerns about railroad safety and injury reporting.  The 2007 FRSA amendments contained increased protections for railroad whistleblowers.  These provisions were amended again in 2008, by inclusion of the "prompt medical attention" language, suggesting that Congress viewed the provision as integral to the strengthened whistleblower provisions passed a year earlier.   Together, these amendments convey congressional intent to comprehensively address and prohibit harassment, in all its guises, of injured rail employees.  Congress did not create section 20109(c) in a vacuum, and references to "prompt" in the section do not remove the prohibition against subsequent employer denial, delay, or interference with an injured employee's medical treatment as prescribed by a treating physician over the longer term.

The ALJ's narrow interpretation of "medical treatment" requires a remand.  The ALJ limited the term "medical treatment" to the care immediately following the work injury; therefore, she obviously did not need to address nor did she fully address whether Metro-North interfered with Santiago's request for an MUA three months after the injury

> (1) by redesignating subsections (c) through (i) as subsections (d) through (j), respectively; and
> (2) by inserting after subsection (b) the following:
> "(c) PROMPT MEDICAL ATTENTION.—
> "(1) PROHIBITION.—A railroad carrier or person covered under this section may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment. If transportation to a hospital is requested by an employee who is injured during the course of employment, the railroad shall promptly arrange to have the injured employee transported to the nearest hospital where the employee can receive safe and appropriate medical care.
> "(2) DISCIPLINE.—A railroad carrier or person covered under this section may not discipline, or threaten discipline to, an employee for requesting medical or first aid treatment, or for following orders or a treatment plan of a treating physician, except that a railroad carrier's refusal to permit an employee to return to work following medical treatment shall not be considered a violation of this section if the refusal is pursuant to Federal Railroad Administration medical standards for fitness of duty . . . ."

[51]   Senate Report No. 110-270 (Mar.3, 2008).

occurred. Given the factual issues connected to this analysis in this case, we believe that she should have the opportunity to address this issue and make the necessary factual findings.

In a footnote, the ALJ summarily suggested that she did not believe Metro-North denied, delayed, or interfered with Santiago's MUA request, regardless of how "medical treatment" is defined in subsection 20109(c)(1).[52]   Yet, in the same footnote, the ALJ expressed that the reclassification was "troubling" because it contradicted objective diagnostic tests, the medical records, and the treating physician's recommendation, as well as violating OHS policies. Consequently, we do not think the ALJ intended the footnote to serve as a full analysis; nor is it clear what the ALJ would ultimately conclude as part of the merits analysis. Furthermore, the footnote suggests that the ALJ too narrowly interpreted the words "deny, delay, or interfere." Therefore, we now address those words in the statute and whether a reclassification can constitute a denial, delay, or interference within the meaning of the FRSA whistleblower statute.

### D. Defining and applying the words "deny, delay, or interfere"

Santiago argues that Metro-North's reclassification of his injury to non-occupational unlawfully denied, delayed, or interfered with his medical treatment and, therefore, Metro-North violated the FRSA whistleblower statute. Metro-North argues that the reclassification, as a matter of law and fact, was not a delay, denial, or interference, essentially arguing that the reclassification merely reflected that Santiago's injury was no longer covered by Metro-North's insurance. As we noted above, the ALJ suggested that the reclassification did not deny, delay, or interfere with medical care because (1) it was not clear that the MUA Santiago sought was reasonable and necessary and (2) he ultimately received the MUA. We disagree with the ALJ's interpretation and application of the words "deny, delay, or interfere."

The words "deny, delay, or interfere" should be applied as they are commonly understood.[53]   These are prohibitive words simply meaning to impede, slow down, or prevent medical treatment from moving forward or occurring.[54]   An act that causes medical treatment to be rescheduled necessarily means that the treatment was delayed. Any obstacle placed in the way of treatment necessarily results in interference. Denial means to refuse or reject a request for medical care. This subsection of the statute simply focuses on whether the railroad carrier interfered with medical treatment and thereby engaged in adverse action. As we discuss later in our opinion, issues pertaining to the reasonableness or necessity of the treating physician's treatment plan may be a factor in

---

[52]   D. & O. at 24, n. 36.

[53]   See Carcieri v. Salazar, 555 U.S. 379, 388 (2009) (statutory construction "begins with the ordinary meaning" of the words and "aligns with the natural reading" of the words.

[54]   "Deny" means to refuse to grant, "delay" means to put off or postpone, and "interfere" means to interpose in a way that hinders or impedes. WEBSTER'S NINTH NEW COLLEGE DICTIONARY, pp 336; 340; 631 (1985).

the railroad's attempt to establish an affirmative defense under section 20109(c), but not a factor in the employee's attempt to prove that the railroad interfered with medical treatment.

We agree with Metro-North that section 20109(c) does not create any additional rights beyond those that already exist under other laws, such as FELA. The only affirmative duty created in section 20109(c) is for the railroad carrier to take the employee to the nearest hospital after a work injury if such a request is made. Section 20109(c) does not require the railroad carrier to affirmatively provide medical insurance, but, if it does, it must not interfere with the insurer's decisions. Likewise, section 20109(c) does not require Metro-North to create an occupational health services department, but, if it does, it must not interfere with that department's decision-making. Again, the employee must prove that the railroad carrier interfered. In the end, other than taking the employee to a hospital, the whistleblower statute expects the railroad carrier to stay out of the way of the medical providers. This mandate to stay out of the way impacts the manner in which a whistleblower violation is determined.

As we discussed earlier, section 20109(c) is governed by the AIR 21 burdens of proof where the employee must prove that protected activity contributed to the act that caused the denial, delay, or interference with medical treatment. The whistleblower statute contemplates that the railroad carrier will stay completely out of the way of medical treatment, and if it does exactly that, it will not be liable for whistleblower retaliation if the independent medical treatment providers conclude that no more care is needed for the work injury. However, the instant that the railroad carrier directly or indirectly inserts itself into that process and causes a denial, delay, or interference with the medical treatment, the protected activity necessarily becomes a presumptive reason. In other words, a request for medical treatment is necessarily connected to the railroad carrier's act of denying, delaying, or interfering with such request rather than staying out of the medical treatment. This is consistent with the fact that, in trying to follow the parallel structure in sections 20109(a) and (b), Congress did not need to include the language prohibiting discrimination "due, in whole or in part," to the protected activity in section 20109(c). Causation is assumed by virtue of the fact that the railroad carrier inserted itself into the medical treatment.

In sum, to prove that a railroad carrier violated subsection 20109(c)(1), an employee needs to prove that (1) the carrier inserted itself into the medical treatment and (2) such act caused a denial, delay, or interference with medical treatment. Both of these issues are factual questions that must be decided by the ALJ in light of our decision and analysis. The ALJ found that the evidence "overwhelm[ly] established that Metro-North had significant control over the operations of OHS." The ALJ also found that the MUA procedure took place in March 2009, four months after Santiago's treating physician originally recommended it in his November 10, 2008 letter of medical necessity.[55] However, it remains for the ALJ to determine whether any action by Metro-North caused this four-month interval and thereby "delayed" or "interfered" with Santiago's medical

---

[55]    D. &. O. at 6.

care. The ALJ should make additional findings of fact as necessary to ultimately decide (1) whether Metro-North sufficiently inserted itself into Santiago's medical treatment and (2) whether such involvement caused a delay, denial, or interference with his medical treatment.

### E. *Broad construction of section 20109 is consistent with FELA*

In support of the ALJ's opinion, Metro-North also argued that permitting subsection 20109(c)(1) to apply beyond the immediate period of injury would eviscerate the FELA, which provides a federal remedy for railroad workers injured through their employers' negligence.[56] Metro-North contends that prohibiting it from determining that an employee's work injury has resolved precludes railroads from disputing causation under the FELA and exposes them to unlimited liability for the employee's injury.[57]

We think otherwise. An injured employee seeking reimbursement of his medical expenses under the FELA must prove negligence, that is, that the negligent action or non-action of an employer or a fellow employee was the cause, in whole or in part, of his work injury.[58] But FELA's requirement that an injured employee prove negligence does not foreclose the same employee from proving under section 20109(c) that Metro-North violated a whistleblower protection provision. Certainly, there can be overlapping remedies common to both legal theories, but the FELA itself provides that nothing shall limit the duty or liability of railroad employers or impair the rights of their employees under any other act of Congress.[59] Thus, an employee who files a whistleblower complaint under the FRSA can also file a negligence claim under the FELA. Indeed, Santiago did just that.[60] A railroad's defense against an employee's FELA claims is a separate issue from those addressed in FRSA whistleblower claims and does not constitute "interference" as intended by the FRSA whistleblower statute.

Furthermore, as we explained above, there is no affirmative duty under the whistleblower statute to provide medical care: there is only a duty to transport the employee to a hospital and not interfere with medical care or treatment. However, in agreeing to pay for medical treatment for work injuries, Metro-North cannot insert itself

---

[56] As the ALJ stated, railroad employees are not covered by traditional workers' compensation laws. Instead, under FELA employees may sue for monetary damages for pain and suffering decided by juries based on negligence principles – that is, if the injury is the result "in whole or in part from the negligence" of the railroad – rather than a pre-determined benefits schedule under workers' compensation. D. & O. at 23.

[57] Respondent's Brief at 21-24.

[58] 45 U.S.C.A. § 51 et seq.

[59] 45 U.S.C.A. § 58.

[60] D. & O. at 23 n.35.

into the process and influence the level of care provided. Focusing on whether Metro-North has the right to reclassify an injury as non-occupational for purposes of paying for care misses the bigger and real question. The real question is whether physician's assistant Ella's decision to deny Dr. Drag's request to perform an MUA was truly an independent decision or whether Metro-North exerted sufficient influence over OHS and Ella to cause Ella to reject the treating physician's request. Again, this is an issue the ALJ must decide first.

### F. *Metro-North's affirmative defense*

Because we remand this case for further consideration on Santiago's claim, the issue of the clear and convincing evidence standard is not before us. However, it should be noted that the language in section 20109(c) does not fit exactly with the AIR 21 burdens of proof. AIR 21 requires an employer to prove that it would have taken the same action in the absence of the protected activity. The protected activity in section 20109(c) cases will always be the sole reason that a delay, denial, or interference is possible. Consequently, it is impossible to literally apply AIR 21 burdens and decide whether Metro-North's interference with the request for care would have happened in the "absence of the request."

Given this impossibility and Congress' intent to rely on AIR 21, we think a reasonable interpretation of congressional intent is to require that the carrier prove by clear and convincing evidence that the result would have been the same with or without the railroad carrier's interference (if the employee first proves that the railroad carrier or other covered person interfered). This does not require that the ALJ weigh medical evidence and actually decide the issue of medical causation or reasonableness one way or the other. Instead, as in other discrimination cases, the ALJ must look at all the direct and circumstantial evidence, as a whole, to determine whether the Respondent clearly and convincingly proved that the outcome would have been the same without Metro-North's alleged interference. In this case, for example, Metro-North might argue that any reasonable doctor would have made the same decision that Ella made, absent Metro-North's alleged interference, because it was so clear that Santiago's work injury had resolved or because the proposed MUA treatment was so unreasonable. In contrast, Santiago might show that the Respondent's evidence falls short of clear and convincing due to circumstantial evidence like temporal proximity, the threat of government fines, debatable medical reasoning, policy violations, inconsistent treatment of employees, shifting explanations, and other evidence of pretext. In the end, the ALJ must decide whether Santiago proved interference and, if so, whether Metro-North established its affirmative defense.

### CONCLUSION

It is undisputed that Santiago engaged in activity protected under section 20109(a)(4) when he reported his work injury to his supervisor.[61] It is also undisputed

---

[61]   D. & O. at 18.

that Santiago requested medical treatment for that injury, which qualifies as protected activity under section 20109(c). Santiago contends that he sustained an adverse action when Metro-North medical personnel changed his injury status from occupational to non-occupational, which in turn delayed treatment and ended Metro-North's payment of the cost of further treatment. Because the ALJ erred by limiting construction of section 20109(c) to the time period directly following an injury, she held that Santiago suffered no adverse action when, weeks after his injury, Metro-North changed his injury classification. The ALJ consequently never reached the causation element of a section 20109(a)(4) claim. Because the ALJ too narrowly construed section 20109(c)(1), we remand this case for a determination of whether Santiago suffered an adverse action and, if so, whether Metro-North may avoid liability under the FRSA by clear and convincing evidence that the result would have been the same with or without the railroad carrier's interference.

**SO ORDERED.**

**JOANNE ROYCE**
**Administrative Appeals Judge**

**PAUL M. IGASAKI**
**Chief Administrative Appeals Judge**

**LUIS A. CORCHADO**
**Administrative Appeals Judge**

## ADMINISTRATIVE REVIEW BOARD
## CERTIFICATE OF SERVICE

CASE NAME : *Anthony Santiago v. Metro-North Commuter Railroad Company, Incorporated*

ARB CASE NO.: 10-147

ALJ CASE NO. : 2009-FRS-011

DOCUMENT : ORDER

A copy of the above-referenced document was sent to the following persons on

**JUL 2 5 2012**

Esterlig

### CERTIFIED MAIL:

Anthony Santiago
P.O. Box 1351
Hopewell Jct, NY 12533

Charles Goetsch, Esq.
Scott E. Perry, Esq.
Cahill, Goetsch, & Perry PC
43 Trumbull Street
New Haven, CT 06510

Carol Sue Barnett, Esq.
Deputy General Counsel
Metro-North Commuter Railroad Co.
347 Madison Avenue
New York, NY 10017-3739

Charles A. DeLusa, Esq.
Beck S. Fineman, Esq.
Ryan, Ryan, Deluca LLP
707 Summer Street
Stamford, CT 06901

2

**REGULAR MAIL**

Michael Mabee
USDOL – OSHA Region II
Supervisory Investigator
Whistleblower Statutes
201 Varick Street, Room 670
New York, NY 10014

Margaret A. Temple, Esq.
U.S. Department of Labor
Office of Regional Solicitor
201 Varick Street, Room 983
New York, NY 10014

Teri M. Wigger
USDOL, OSHA
Albany Area Office
401 New Karner Road, Suite 300
Albany, NY 12205-3809

Regional Administrator
Region 2
U.S. Department of Labor/OSHA
Room 670
201 Varick Street
New York, NY 10014

Director of Enforcement Programs
U.S .Department of Labor/OSHA
Room N-3119, FPB
200 Constitution Avenue, N.W.
Washington, DC 20210

Associate Solicitor
U.S. Department of Labor/OHSA
Division of OSHA
Room S-4004, FPB
200 Constitution Avenue, N.W.
Washington, DC 20210

Rachel Goldberg
U.S. Department of Labor
Office of the Solicitor
Room N-2716
200 Constitution Avenue, N.W.
Washington, DC 20210

3

Hon. Colleen A. Geraghty
Administrative Law Judge
Office of the Administrative Law Judges
O'Neill Federal Building – Room 411
10 Causeway Street
Boston, MA 02222

Hon. Stephen L. Purcell
Chief Administrative Law Judge
Office of Administrative Law Judges
800 K Street, N.W., Suite 400
Washington, DC 20001-8001