IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JARED L. WHITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO.:  8:12-CV-00358 |
| | ) | |
| UNION PACIFIC R.R. CO., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT**

1

## INDEX OF EXHIBITS

Exhibit 1          Deposition of Plaintiff, Jared L. Whitt (excerpts)

Exhibit 2          Deposition of David Birt (excerpts)

Exhibit 3          Deposition of Ray Wiesen (excerpts)

Exhibit 4          Deposition of Talmage Dalebout

Exhibit 5          FRA Accident/Incident Reporting Guide

Exhibit 6          Deposition of Todd Menchaca (excerpts)

Exhibit 7          Elmhurst Memorial Emergency Department Record

Exhibit 8          Plaintiff's Personal Injury report, dated June 29, 2012 (Exhibit 2 to Plaintiff's deposition)

Exhibit 9          Safety Analysis Report of George Gavalla, dated November 27, 2013 (Exhibit 1 to Mr. Gavalla's deposition)

Exhibit 10         Deposition of George Gavalla (excerpts)

Exhibit 11         Memo to All Operating Management Employees, January 27, 2009; Subject: Employer Personal Injury Responses (the "Duffy Memo")(Defendant's Responses to Plaintiff's Third Request for Production of Documents, Request No. 7)

Exhibit 12         FRA, 49 C.F.R. § 225.33, Internal Control Plans, marked and identified in the deposition of Talmage Dalebout [Exhibit 4, 69:18-71:23].

Exhibit 13         Defendant's Responses to Plaintiff's Interrogatories to Defendant Relevant to Claim for Punitive Damages Under 20109(c), Interrogatory No. 3, and Answer.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JARED L. WHITT, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.:  8-12-CV-00358 |
| | ) | |
| vs. | ) | **PLAINTIFF'S BRIEF IN SUPPORT OF** |
| | ) | **MOTION FOR PARTIAL SUMMARY** |
| UNION PACIFIC R.R. CO., | ) | **JUDGMENT** |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

Plaintiff has brought two claims for relief in the present action under the provisions of the Federal Employers' Liability Act, 45 U.S.C. § 51, *et seq.* ("FELA").  Plaintiff claims that on June 12, 2012, he sustained an on-the-job injury to his left arm, and that on June 28, 2012, he sustained heat-related injuries, which included an exacerbation of the earlier injury to his left arm.  In Plaintiff's Third Claim for Relief, Plaintiff claims Defendant violated the Federal Rail Safety Act, 49 U.S.C. § 20109(c) ("FRSA").  Plaintiff claims that on June 28, 2012, Defendant violated the FRSA by interfering with and delaying his medical treatment that was necessary because of his on-the-job heat-related injury.

Plaintiff brings this motion for partial summary judgment regarding his Third Claim for Relief.  There is no genuine dispute that on June 28, 2012, Defendant, through its manager Talmage Dalebout, interfered with Plaintiff's attempt to obtain medical treatment on June 28, 2012 for the heat-related injury from which he was suffering, and therefore was in violation of the FRSA, 49 U.S.C. § 20109(c).  As a result, summary judgment that Defendant violated FRSA 49 U.S.C. §20109(c) is properly entered in favor of Plaintiff.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      On June 28, 2012 Plaintiff was working on a very hot day as an anchor machine operator in Defendant's Proviso Yard near Chicago, Illinois. (Plaintiff Dep., Exhibit 1, 66:6-67:8.)  At approximately 4:00 p.m., Plaintiff started to experience "severe" symptoms due to the heat.  He felt extremely hot and tired and a little disoriented; his lips were numb and tingling and felt like they were swelling; his hands and feet were numb and tingling; and as time went on, it progressed and starting coming up his arms and legs. (*Id.*, 74:25-75:11.)

2.      Plaintiff made his way to the side of the track and sat in the shade, trying to drink water and pour it on his wrists. (*Id.*, 75:12-15.)  At this point, Plaintiff's vision was blurry and he felt like he was "in la-la land," "everything was goofy." (*Id.*, 75:16-18.)  He recalls Eddie Ornellas coming over to ask him if he was okay, and if he wanted to go sit in the truck to cool down.  Plaintiff said he could not, that he could not move.  The next thing he recalls is being put in Mr. Dave Birt's truck. (*Id.*, 75:18-25.)

3.      Upon being placed in Mr. Birt's truck, Mr. Birt drove off and then asked Plaintiff what had happened.  Plaintiff said he did not know, but described his symptoms.  At that time, Plaintiff thought he was having a heart attack along with symptoms of heat injury, and was asking Mr. Birt to get him to the hospital as quickly as possible. (*Id.*, 87:5-20.)

4.      Mr. Birt was taking Plaintiff to the hospital because of Mr. Birt's concerns that Plaintiff was having a heart attack from heat stroke (Birt Dep., Exhibit 2, 27:23-28:18), illness as a result of the heat (*Id.,* 28:22-24).

5.      Shortly after this exchange, Mr. Birt's phone rang.  Mr. Birt answered his phone and Plaintiff heard Mr. Birt say "I'm taking this man to the hospital," followed by Mr. Birt saying "well, what do you want me to do?"  Mr. Birt then said, "I'm no doctor, but when a man's

arms are numb and tingling, I'd say he needs to go see one." The next thing he heard Mr. Birt say was, "I'm pulling over," and he pulled his truck over into a parking lot. (Plaintiff Dep., 87:24-88:10; 91:10-92:3.)

6.      Mr. Birt testified that he was halfway to the hospital when Mr. Dalebout called him on his phone (Birt Dep. 17:6-24).

7.      Plaintiff testified that it was difficult to estimate time due to his disorientation but estimated he had been driving in the truck somewhere between 5-15 minutes when Mr. Birt's phone rang. (Plaintiff Dep., 91:1-9.)

8.      After Mr. Birt pulled over, he asked Plaintiff if he [Plaintiff] could talk on the phone. Plaintiff said he probably could but he could not hold the phone himself. Mr. Birt therefore had to hold the phone up to Plaintiff's ear. At that point, the person on the phone identified himself to Plaintiff as Talmage Dalebout. (*Id.*, 88:11-16.) Mr. Dalebout asked Plaintiff what happened, and Plaintiff recounted his symptoms, indicating his arms were numb and tingling. (*Id.*, 92:13-22.) Mr. Dalebout told Plaintiff that he "probably got too hot." Mr. Dalebout then told Plaintiff, "why don't we just bring you back here to the job site and get you cooled down . . . If you get cooled down, you'll probably be okay." (*Id.*, 88:18-24.) Plaintiff's only response was "I just need fixed. I want fixed." (*Id.*, 88:23-24.) At that point, Mr. Birt drove Plaintiff back to the job site. (*Id.*, 88:25-89:1.)

9.      Plaintiff never agreed to go back to the yard to be "fixed." He had specifically told Mr. Birt to get him to the hospital as quickly as possible but never told Mr. Dalebout whether he wanted to go to the hospital or to the yard because he was "out of it." (*Id.*, 92:23-94:2.) He could not move his arms, and was just lying there in the seat of the truck. "I was pretty spacey." (*Id.*)

10.     Once he was back at the job site, Plaintiff remained in Mr. Birt's truck for a period of time, while he was brought some Gatorade and water bottles, which he drank. (*Id.*, 89:1-13; 96:6-97:13.)  He was then assisted by Joe Linford and another person out of the truck and taken into a trailer where they poured water on him and wrapped something around his neck to cool it. (*Id.*, 89:1-13; 97:14-98:2.)  Mr. Linford was rubbing Plaintiff's left arm, and saying that Plaintiff's arm was "freezing," that he did not have circulation in it.  The muscles in both of Plaintiff's arms had contracted, causing his arms to be flexed and drawn up to his chest, which was why Plaintiff could not hold the phone by himself in Mr. Birt's truck. (*Id.*, 89:13-90:11.)  Plaintiff's right arm eventually released while he was at the trailer but his left arm never fully released until Plaintiff was taken to the hospital that evening by his roommate. (*Id.*, 90:12-16.)

11.     Plaintiff does not know how long he remained in the trailer but estimated it to be until approximately 6:30 p.m., after the gang had already gone home.  When he left the trailer, his left arm was nonfunctional, still drawn up to this chest, and his body was just feeling "beat." (*Id.*, 98:22-99:16.)  Plaintiff's roommate then drove him back to their hotel in Plaintiff's vehicle. (*Id.*, 99:21-100:13.)

12.     After a short period of time at the hotel, Plaintiff's roommate, Ray Wiesen, continued to be concerned about Plaintiff.  He called his son, who is a doctor, and described his condition to him.  His son recommended Plaintiff be taken to the hospital (Wiesen Dep., Exhibit 3, 9:15-12:4).

13.     Mr. Wiesen drove Plaintiff to the hospital (*Id.*, 11:12-12:4).  They arrived at about 8:30 p.m.  Plaintiff was treated in the ER.  Plaintiff was given an electrocardiogram; CBC: CT scan of his brain; and a liter of saline, twice.  His diagnosis on discharge, at about 1:11 a.m. on June 29, 2012, was heat-related illness, and he was given patient instructions for heat exhaustion

(Exhibit 7).

14.     David Birt was the Work Equipment Supervisor on site at the time of Plaintiff's injury.  He had determined that Plaintiff needed to go to the hospital because of his condition. Birt Dep., Exhibit 2, at 5:22-23; 15:17-17:5; 18:10-14.  On the way to the hospital, Mr. Birt received a phone call from Talmage Dalebout.  Ex. 1, 87:24-88:10; 91:10-92:3.  Mr. Dalebout was the Manager of Track Programs for the rail gangs on the Northern and Western Region for the Union Pacific Railroad at the time of Plaintiff's injury; he was Plaintiff's boss's boss's boss. Dalebout Dep., Exhibit 4, at 11:16-22.  At the time of Mr. Dalebout's call, Plaintiff was experiencing numbness going up his arms and legs, blurry vision, disorientation, and his arms were contracting and he could not move them such that he could not even hold the phone up to his own ear.  Mr. Dalebout placed the call from his hotel room near O'Hare Airport.  He was not at the job site, and had not been since that morning.  He made not observations of Jared Whitt himself.  Dalebout Dep., Exhibit 4, at 38:18-39:24.

15.     In spite of Plaintiff's condition, Plaintiff's request to go to the hospital, and the determination that Plaintiff needed to go to the hospital by Mr. Birt, Defendant's Supervisor who was on site and actually in a position to evaluate Plaintiff and evaluate Plaintiff's condition, Mr. Dalebout, posed the "option" to Plaintiff of whether or not he would like to return to the cooling station to try to cool down there instead of going to the hospital. Dalebout Dep., Exhibit 4, 44:22-45:2.  When he posed this "option" to Plaintiff, Mr. Dalebout was aware that returning to the cooling station, as opposed to going to the hospital, would prevent the injury from being an FRA reportable injury:

> Q.     But at the time he returned to the cooling tent, the time Dave Birt returned him to the cooling tent, the injury to Jared Whitt was not yet FRA reportable?

7

A.     Correct.

Dalebout Dep., 65:3-7.

16.     In Exhibit 5, the Federal Railroad Administration ("FRA") Guide for Preparing

Accident/Incident Reports, prepared by the Office of Safety of the U.S. Department of

Transportation, Federal Railroad Administration, effective May 1, 2003, Chapter 1, "Purpose,"

the document states:

> "The purpose of the regulations in Part 225 is to provide FRA with accurate
> information concerning the hazards and risks that exist on the Nation's railroads.
> FRA needs this information to effectively carry out its regulatory and
> enforcement responsibilities under the Federal railroad safety statutes.  FRA also
> uses this information for determining comparative trends of railroad safety and to
> develop hazard elimination and risk reduction programs that focus on preventing
> railroad injuries and accidents."

17.     The FRA is the federal agency charged with promoting safety on the nation's

railroads.  It tracks each railroad's injury statistics for the year.  This safety analysis by the FRA

places an incentive on the Union Pacific Railroad, and their supervisors, to have occur on the job

as few injuries as possible.  There is, therefore, an incentive on railroad supervisors to report as

few injuries occurring on the job as possible.  A supervisor's performance evaluation is

influenced or affected by a supervisor's safety record, which includes the happening of injuries

on his watch.

> Q.     What is your knowledge or understanding, sir, of whether or not a
> reportable—an FRA reportable injury that occurs on Rail North is in any
> fashion reflected in the manager's evaluation performance review, or any
> other fashion?
>
> A.     We have several initiatives.  Core safety is one of them.   Production is
> one.  Costs are others.  So I don't know where it falls in from the upper
> management, you know, how they view it, but they all carry a weight, but
> I don't know what it is.
>
> Q.     In your performance review, there is weight given to meeting budget,
> managing costs, safety, core safety, those issues?  That is all a part of how
> you are evaluated as a manager?

A.      Yes, sir.

Q.      And part of that performance review is safety, and factored into the safety evaluation is are you or is your gang meeting the safety goal in terms of man-hours worked without injury?   Am I understanding that right, or phrasing that right?

A.      I know they measure it in that way.  I'm not sure how they evaluate it at our level.

Q.      In some fashion, though, it is considered in a manager's evaluation?

A.      Yes.

Q.      And that occurs with what frequency?

A.      Annually.

(Menchaca Dep., Exhibit 6, 10:2-11:5)

Mr. Menchaca is Manager of Track Programs for Rail North West, for the Union Pacific

Railroad.

18.      The FRA Guide for Preparing Accident/Incident Reports defines "Injury" as, "Harm to a person resulting from a single event, activity, occurrence or exposure of short duration." Ex. 5, at Chap 2, p. 2.  The Guide further defines "First aid treatment" as, "treatment limited to simple procedures used to treat minor conditions, such as abrasions, cuts, bruises, and splinters. First aid treatment is typically confined to a single treatment and does not require special skills or procedures." *Id.*  An injury that requires only first aid treatment is not reportable.

19.      "Medical treatment" is defined as, "any medical care or treatment beyond 'first aid' regardless of who provides such treatment. Medical treatment does not include diagnostic procedures, such as X-rays and drawing blood samples." *Id.*, at p. 12.  The guide specifically provides that, "Intravenous administration of fluids to treat work-related heat-related conditions is medical treatment." *Id.*, at Chap. 6, p. 30.  An injury that requires medical treatment is reportable.  When Plaintiff was finally taken to the emergency room at about 8:30 p.m. on the

9

day of his injury, he was given two bags of saline intravenously. Exhibit 7, Elmhurst Memorial

Emergency Department Record, p. 4; Exhibit 8, Plaintiff's Personal Injury report, dated June 29,

2012.  <u>Therefore, Plaintiff going to the hospital to receive "intravenous administration of fluids</u>

<u>to treat work-related heat-related conditions," as opposed to Plaintiff just being "cooled down"</u>

<u>on the job site, would convert Plaintiff's injury into a reportable injury and require reporting of</u>

<u>said injury to the FRA.</u>

20.      Defendant has issued its own Internal Control Plan (ICP) as is required 49 C.F.R.

§225.33, Exhibit 12[1].  The Policy Statement says, in part, that, "UP will not tolerate harassment

or intimidation of any person that is calculated to discourage or prevent such person from

receiving proper medical treatment . . ." Exhibit 11, "Union Pacific Railroad Company Accident,

Incident, Injury, Illness Reporting," "Policy Statement."

21.      Dennis Duffy, Defendant's Chief Operating Officer, pursuant to Defendant's ICP,

issued a memorandum to all Operating Department Management Employees addressing the

Policy Statement and the issue of harassment and intimidation.  The memorandum stated, in part,

that FRA regulations and the FRA's interpretation of those regulations specify how Defendant's

Managers <u>must</u> handle on-duty injuries and medical treatment and that Mr. Duffy was providing

"basic procedural guidelines" for complying with those regulations:

"(1) When an employee is injured, the first priority is to ensure that the employee

---

[1] (a) Each railroad shall adopt and comply with a written Internal Control Plan that shall be maintained at the office where the railroad's reporting officer conducts his or her official business.  Each railroad shall amend its Internal Control Plan, as necessary, to reflect any significant changes to the railroad's internal reporting procedures. The Internal Control Plan shall be designed to maintain absolute accuracy and shall include, at a minimum, each of the following components:
(1) A policy statement declaring the railroad's commitment to complete and accurate reporting of all accidents, incidents, injuries, and occupational illnesses arising from the operation of the railroad, to full compliance with the letter and spirit of FRA's accident reporting regulations, and to the principle, in absolute terms, that harassment or intimidation of any person that is calculated to discourage or prevent such person from receiving proper medical treatment or from reporting such accident, incident, injury or illness will not be permitted or tolerated and will result in some stated disciplinary action against any employee, supervisor, manager, or officer of the railroad committing such harassment or intimidation.

receives the necessary medical attention, without delay.  If transportation to a hospital is requested the manager shall arrange transportation to the nearest hospital where the employee can receives safe and appropriate medical care."

. . .

"(3) When an employee is taken for medical care, do not try to direct or influence the employee or the medical professionals as to the type of treatment the employee should receive."

Exhibit 11.

22.     Mr. Duffy's statement of the Union Pacific policy continued by stating:

"The FRA has expanded their interpretation of what constitutes harassment and intimidation and/or interfering with medical treatment. Specifically, the FRA considers virtually ANY discussion of medical treatment options or the elements of personal injury reportability with an employee or treating physician, to be interference with medical treatment."

*Id.*

23.     Talmage Dalebout was reprimanded or disciplined as a result of his conduct as it relates to Plaintiff, Jared Whitt, on June 28, 2012 (Exhibit 13)[2].

## ARGUMENT

### I.     Summary Judgment Standards

A motion for summary judgment shall be granted by the court when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).*  A material fact is one that might affect the outcome of a suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists when there is sufficient evidence favoring the party opposing the motion for a jury to return a verdict for that party. *Id.*  In considering a motion for summary judgment, the evidence is to be viewed in a light most favorable to the non-moving party, giving that party

---

[2] Plaintiff has sent Defendant interrogatories inquiring further into the reprimand or discipline assessed against Talmage Dalebout.  Upon receipt of answers to these interrogatories, Plaintiff may move to supplement.

the benefit of all favorable inferences which may be reasonably drawn from that evidence. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

If the moving party meets the initial burden of establishing the nonexistence of a genuine issue of material fact, then the burden shits to the nonmoving party to produce evidence of the existence of a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  The nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment," *Anderson*, 477 U.S. at 257, and "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial," Id. at 256 (citing Federal Rule of Civil Procedure 56(e)).  The inquiry is to determine whether there is a need for trial on the issue. *Anderson*, 477 U.S. at 250.

## II.     The Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20109.

The purpose of the FRSA is to promote safety in every aspect of railroad operations. 49 U.S.C. § 20101; *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 156 (3rd Cir. 2013).  In 2007, Congress expanded the anti-discrimination provision of the FRSA, explicitly stating that a railroad "may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part" to the employee engaging in one of the enumerated protected activities. 49 U.S.C. § 20109(a).

The FRSA sets forth an extensive list of "protected activities."  For the purpose of this matter, the relevant provision states:

> A railroad carrier or person covered under this section may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment.  If transportation to a hospital is requested by an employee who is injured during the course of employment, the railroad shall promptly arrange to have the injured employee transported to the nearest hospital where the employee can receive safe and appropriate medical care.

49 U.S.C. § 20109(c)(1).

In interpreting the burden of proof in such cases, the Third Circuit held that a plaintiff need not provide evidence of motive in a claim under the FRSA:

> "We note that the fact that an employee need not ascribe a motive to the employer greatly reduces an employee's burden in making a prima facie case. However, we believe that this reduced burden is appropriate in FRSA cases. We note, for example, that the legislative history shows that Congress was concerned that some railroad supervisors intimidated employees from reporting injuries to the FRA, in part, because their compensation depended on low numbers of FRA reportable injuries within their supervisory area. (Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads: Hearings Before the H. Comm. on Transportation and Infrastructure, 110th Cong. (Oct. 22, 2007))."

*Araujo*, 708 F.3d at 161, n.7 (3rd Cir. 2013).   In addressing the burden-shifting scheme under AIR-21, which the Department of Labor has adopted in FRSA claims, the Third Circuit cited to *Stone & Webster Eng'g Corp. v. Herman,* 115 F.3d 1568, 1572 (11th Cir. 1997), in noting that this is a "tough standard" for employers to meet, and "not by accident." *Araujo*, at 159.

> "The 2007 FRSA amendments must be similarly construed, due to the history surrounding their enactment. We note, for example, that the House Committee on Transportation and Infrastructure held a hearing to 'examine allegations ... suggesting that railroad safety management programs sometimes either subtly or overtly intimidate employees from reporting on-the-job-injuries.' (Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads: Hearings Before the H. Comm. on Transportation and Infrastructure, 110th Cong. (Oct. 22, 2007))."

*Id*.

The Court went on to note:

> As the Majority Staff of the Committee on Transportation and Infrastructure noted to members of the Committee:
>
> The accuracy of rail safety databases has been heavily criticized in a number of government reports over the years. The primary issue identified in many previous government investigations is that the rail industry has a long history of underreporting incidents and accidents in compliance with Federal regulations. The underreporting of railroad employee injuries has long been a particular problem, and railroad labor organizations have frequently complained that harassment of employees who reported injuries is a common railroad management practice. *Id.*

13

. . .

> Reports have documented a long history of under-reporting of accidents, under-reporting incidents, of noncompliance with Federal regulations; and under-reporting of rail injuries is significant because employees frequently report that harassment of those who do report incidents, being hurt on the job, is a common practice in the rail sector. *Id.*, at n. 6.

Pursuant to 49 U.S.C. § 20109(d)(2), an action brought for a violation of the FRSA is to be governed by the rules and procedures set forth in 49 U.S.C. § 42121(b) ("AIR-21"), the statute analogous to the FRSA governing employees of airlines. Pursuant to the burden shifting provisions of AIR-21, the plaintiff must make a prima facie case showing that the protected activity was a factor, in whole or in part, in the railroad's retaliatory action. If this showing is made, the railroad can defeat the claim if it proves by clear and convincing evidence that it would have taken the same action in the absence of the protected activity. *Araujo*, 708 F.3d at 158-59. Araujo was disciplined for NJT's decision to discipline him for reporting an injury. The claim here is that Mr. Dalebout interfered with Plaintiff's medical treatment and Mr. Birt's efforts to get Plaintiff to medical treatment, for symptoms from a heat-related injury, and Mr. Birt's concerns that Plaintiff was having a heart attack. Plaintiff's claim is not for "retaliatory action" against him, such as would be the case if Plaintiff were disciplined or discharged for reporting an injury; reporting an unsafe condition; or reporting an injury. Here, Plaintiff's claim is for interference with medical treatment under 20109(c), not that Defendant in some fashion retaliated against Plaintiff. Because Plaintiff's claim is not a claim for retaliatory action, Plaintiff claims that the burden-shifting provisions of AR-21 do not apply. To permit Defendant to argue that it would have taken the same action in the absence of protected activity, presumably returning Plaintiff to the cooling station rather than permit him to proceed to the hospital, would undermine the purpose of 20109(c). It would create, contrary to the purpose of 20109(c), the

14

impression in Defendant's managers' minds that if they interfere with or deny Plaintiff medical treatment, maybe his condition will resolve and he will not need medication attention, and therefore his injury will not be reportable to the FRA. This is clearly contrary to the purpose of Congress in passing 20109(c). Were Defendant to be permitted to make this argument, it would circumvent, or contradict, the purpose of 20109(c).

### III.   Reasonable Minds Can Only Conclude Defendant Interfered with Plaintiff's Medical Treatment and Summary Judgment is Therefore Appropriate.

The undisputed evidence in the case shows that Defendant clearly interfered with Plaintiff's medical treatment in violation of 49 U.S.C. § 20109(c)(1). Plaintiff testified that he requested to go to the hospital and Mr. Birt was driving Plaintiff to the hospital. Mr. Birt, a management employee of Defendant, had himself determined that Plaintiff needed to go to the hospital and was taking him so that he could receive treatment. On the way to the hospital, Mr. Birt received a phone call from Talmage Dalebout. Mr. Dalebout was the Manager of Track Programs for the rail gangs on the Northern and Western Region for the Union Pacific Railroad at the time of Plaintiff's injury; a management official senior to Mr. Birt. Mr. Dalebout never observed Plaintiff's condition. Mr. Dalebout called Mr. Birt from his hotel room at O'Hare Airport.

As a result of this phone call, Plaintiff was brought back to the work site where Defendant attempted to cool him. In spite of Plaintiff's request to go to the hospital, and Mr. Birt's determination that Plaintiff needed to go to the hospital, Mr. Dalebout denied, delayed and/or interfered with Plaintiff's medical treatment and Plaintiff was prevented from going to the hospital.

While Plaintiff is not aware of Court decisions related to this specific issue, a Department of Labor Administrative Review Board ("ARB") has examined the provisions of 49 U.S.C. §

20109(c)(1) and the language of that section stating that a railroad "may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment." In *Santiago v. Metro-North Commuter*, ARB Case No. 10-147 (July 25, 2012) (Decision attached as Exhibit 11), Mr. Santiago had sustained an on-the-job injury and had begun receiving medical treatment for the injury. The defendant railroad had contracted with a medical management service company ("TCH") to operate the railroad's occupational health services department. Injured employees were required to report to TCH, which evaluated the employee's injury to determine whether it was work related, and then evaluated the effectiveness and necessity of the treatment to determine whether it would approve the treatment for payment. The evidence "overwhelmingly" showed that the railroad exercised significant control over TCH, to the extent that it could unilaterally terminate the contract at any time, and even had control over the hiring and firing of personnel working for TCH. *Id*. at p. 2.

Approximately three months after the injury, during which time Santiago's injury had been designated as on-duty injury and for which TCH was approving payment, the physician's assistant for TCH managing Santiago's case wrote a letter stating he had reviewed Santiago's radiographic records and considered the on-duty injury to be resolved. He therefore changed the designation of the injury to off-duty. As a result, Santiago's treating physician sent a letter detailing the injury and proposed treatment and requesting approval. In response, the medical director for the railroad's occupational health services department told the treating physician that she had reviewed the records, considered Santiago's injury to be resolved, and approved the change in designation of the injury to non-work related. Santiago was forced to continue treatment by requesting payment for services through his health care insurance, and eventually had $16,000.00 in out of pocket expenses for the treatment.

Santiago subsequently brought a claim pursuant to the FRSA, alleging that the railroad had interfered with his medical treatment.  The OSHA investigator found in his favor and awarded both compensatory and punitive damages.  Upon review, the Administrative Law Judge concluded the railroad had not violated the FRSA and dismissed the complaint.  In reversing the decision of the Administrative Law Judge, the ARB extensively examined the provisions of 49 U.S.C. § 20109(c)(1) and the language relevant to this case.  In interpreting the language of that section stating that a railroad "may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment," the ARB held that:

> The words 'deny, delay or interfere' should be applied as they are commonly understood.  These are prohibitive words simply meaning to impede, slow down, or prevent medical treatment from moving forward or occurring.  <u>An act that causes medical treatment to be rescheduled necessarily means that the treatment was delayed.  Any obstacle placed in the way of treatment necessarily results in interference.  Denial means to refuse or reject a request for medical care.</u>

*Santiago,* at p. 15. (Emphasis added.)  The ARB continued by stating that, "The whistleblower statute contemplates that the railroad carrier will stay completely out of the way of medical treatment(.)" *Id*. at p. 16.

The only possible reasonable conclusion in this matter is that Defendant denied, delayed and/or interfered with Plaintiff's medical treatment.  Plaintiff wanted to go to the hospital and requested to go to the hospital.  Defendant's Supervisor that was on site, Dave Birt, determined that Plaintiff needed to go to the hospital and was in fact taking Plaintiff to the hospital.  Defendant's Chief Operating Officer, Mr. Dennis Duffy, issued instructions to management personnel regarding how to comply with the FRSA and Defendant's Policy Statement that was mandated by Federal regulation.  These instructions stated how Managers <u>must</u> handle on-duty injuries and medical treatment.  The instructions specifically stated that the first priority when an employee is injured is to "ensure that the employee receives the necessary medical attention,

17

without delay." The instructions continue by stating that when an employee is taken for medical care, Managers shall "not try to direct or influence the employee" as to the type of treatment to be received.

There is no dispute that Plaintiff suffered and was suffering from a work-related heat-related injury at the time. Plaintiff testified he requested that he be taken to the hospital. There is no dispute that Defendant's Supervisor had determined Plaintiff needed to go to the hospital. There is no dispute that Plaintiff was actually being transported to the hospital for treatment. In spite of these facts, in spite of Defendant's instructions to all management employees that employees must receive the necessary medical attention without delay, and in spite of the instructions that Managers shall not try to direct or influence the employee as to the type of treatment, Mr. Dalebout called Mr. Birt, asked to speak with Plaintiff (who could not even hold a phone to his own ear due to his condition), and denied, delayed and interfered with Plaintiff's medical treatment by posing to him the option to return to the worksite and not go to the hospital. Even after a couple hours, when Plaintiff's arm was still contracted, Defendant still did not take Plaintiff to the hospital and instead had Plaintiff's roommate drive him back to the motel. There cannot be any disputed that Defendant violated the provisions of 49 U.S.C. § 20109(c)(1), and summary judgment as to Plaintiff's Third Claim for Relief is appropriate.

## CONCLUSION

For the reasons set forth above, summary judgment as to Plaintiff's Third Claim for Relief is properly granted. Reasonable minds could not dispute that Defendant violated the provisions of the FRSA, 49 U.S.C. § 20109(c)(1), by denying, delaying and/or interfering with Plaintiff medical treatment. Therefore, as a matter of law summary judgment as to Plaintiff's Claim that Defendant violated 49 U.S.C. § 20109(c)(1) is appropriate.

Signed at Denver, Colorado this 10th day of July, 2014.

> s/James L. Cox, Jr.
> James L. Cox, Jr., Nebraska Bar #20223
> Attorney for Plaintiff
> BRENT COON & ASSOCIATES, PC
> 3801 E. Florida Ave., Suite 905
> Denver, CO  80210-2500
> Telephone: (303) 756-3243
> Fax: (303) 756-3595
> jim.cox@bcoonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of July, 2014, I electronically filed the foregoing **PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

David J. Schmitt, Esq.
LAMSON, DUGAN & MURRAY, LLP
10306 Regency Pkwy. Dr.
Omaha, NE  68114
dschmitt@lmdlaw.com

Clifford A. Godiner, Esq.
Tabitha G. Davisson, Esq.
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, MO  63101
cgodiner@thompsoncoburn.com
tdavisson@thompsoncoburn.com

> s/James L. Cox, Jr.
> James L. Cox, Jr.

19