UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JARED L. WHITT, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 8:12-CV-00358 |
| | ) | |
| v. | ) | **BRIEF IN OPPOSITION TO** |
| | ) | **PLAINTIFF'S MOTION FOR** |
| UNION PACIFIC RAILROAD CO., | ) | **PARTIAL SUMMARY JUDGMENT** |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

There are critical disputed material facts at the heart of Plaintiff's third claim for relief that must be resolved by a factfinder.[1]  Although Plaintiff argues otherwise, he does so based on a version of "undisputed" material facts that relies almost entirely on his own allegations, even where other witnesses have provided sworn testimony to the contrary.  For instance, Plaintiff claims that he requested that his superiors take him to the hospital and that he never stated otherwise; he presents this story to the Court as if those facts were undisputed.  [Dkt. 140, at 17]  However, even a cursory examination of the deposition testimony of Union Pacific's witnesses reveals that these critical facts are hotly disputed.  Supervisor David Birt testified that he, not Plaintiff, made the decision to take Plaintiff to the hospital *despite* Plaintiff's assertion that he did not need to go to the hospital.  (Birt Dep., Ex. A, 16:17-17:7).  Birt also testified that Plaintiff, after telling Birt that he did not need to go to the hospital, also refused three or four additional invitations from Birt to continue to the hospital while Plaintiff was in Birt's truck.  (Birt Dep.

---

[1] Union Pacific has filed a Motion for Summary Judgment based on 49 U.S.C. § 20109(f)'s language providing that "[a]n employee may not seek protection under both this section and another provision of law for the same allegedly unlawful act of the railroad carrier."  Union Pacific submits that Plaintiff's claim should be resolved based on the undisputed facts relating to this issue, namely that Plaintiff's second and third claims are both based on the same allegedly unlawful act.  Plaintiff's Motion for Summary Judgment, on the other hand, goes to the merits of his third claim for relief, and there are critical disputed facts that make resolution of this claim on a motion for summary judgment inappropriate as described herein.

1

30:13-19).  Manager Talmage Dalebout testified that he told Plaintiff that he would be taken to the hospital if he wished, but that Plaintiff told him that he wanted to try going to the cooling station instead of going to the hospital.  (Dalebout Dep., Ex. B, 44:23-45:6).  Supervisor Joseph Linford also testified that Plaintiff refused more than one offer to be taken to the hospital. (Linford Dep., Ex. C, 48:23-49:10; 55:3-10).

Whether Plaintiff ever actually requested to go to the hospital and whether Plaintiff voluntarily decided not to do so are just two examples of the numerous disputed issues of material facts in this case.  Because these material issues exist, Plaintiff's Motion for Partial Summary Judgment should be denied.

## I.    RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    On June 28, 2012 Plaintiff was working on a very hot day as an anchor machine operator in Defendant's Proviso Yard near Chicago, Illinois.  (Plaintiff Dep., Exhibit 1, 66:6-67:8).  At approximately 4:00 p.m., Plaintiff started to experience "severe" symptoms due to the heat.  He felt extremely hot and tired and a little disoriented; his lips were numb and tingling and felt like they were swelling; his hands and feet were numb and tingling; and as time went on, it progressed and starting coming up his arms and legs.  (Id., 74:25-75:11).

**RESPONSE**:  Admitted in part and denied in part.  Union Pacific admits that on June 28, 2012, Plaintiff was working as an anchor machine operator in the Proviso Yard near Chicago, Illinois, and that the temperature was expected to be very hot that day.  Union Pacific admits that Plaintiff claims he became hot, a little disoriented, felt that his lips were numb and tingling and swelling, and felt that his hands and feet were numb and tingling.  Plaintiff's citation does not support a causal nexus between his allegedly severe symptoms and the heat, and Union Pacific therefore denies that allegation.  Further, a physician treating Plaintiff concluded that he did not

suffer a heat stroke and noted that when Plaintiff was seen at the hospital, his temperature was within normal limits.  (Report of Dr. O'Connor, Ex. D, at 3).

2.       Plaintiff made his way to the side of the track and sat in the shade, trying to drink water and pour it on his wrists.  (Id., 75:12-15).  At this point, Plaintiff's vision was blurry and he felt like he was "in la-la land," "everything was goofy." (Id., 75:16-18.).  He recalls Eddie Ornellas coming over to ask him if he was okay, and if he wanted to go sit in the truck to cool down.  Plaintiff said he could not, that he could not move.  The next thing he recalls is being put in Mr. Dave Birt's truck.  (Id., 75:18-25).

**RESPONSE**:  Admitted in part and denied in part.  Union Pacific admits that Plaintiff was in the shade, drank and poured water on his wrists, and claims that he was "in la-la land" and that "everything was goofy."  However, Dr. O'Connor notes that Plaintiff has a fairly detailed memory for the accounts on June 28 (Report of Dr. O'Connor, at 3).  Union Pacific denies that Plaintiff told Foreman Ornellas that he could not move.  Ornellas testified to his conversation with Plaintiff as follows:  he asked Plaintiff if he was okay, Plaintiff said he was not feeling good, and Ornellas then told Plaintiff that he would be put in the truck and get some help.  (Ornellas Dep., Ex. E, 13:14-25; 14:11-19).  Two men then helped Plaintiff into Birt's truck.  (Ornellas Dep. 14:11-19).

3.       Upon being placed in Mr. Birt's truck, Mr. Birt drove off and then asked Plaintiff what had happened.  Plaintiff said he did not know, but described his symptoms.  At that time, Plaintiff thought he was having a heart attack along with symptoms of heat injury, and was asking Mr. Birt to get him to the hospital as quickly as possible.  (Id., 87:5-20).

**RESPONSE**:  Admitted in part and denied in part.  Union Pacific admits that Plaintiff was placed in Birt's truck and that Birt began driving.  But critically, Union Pacific denies that

Plaintiff asked Birt to get him to the hospital or stated that he thought he was having a heart attack.  Birt testified that it was his decision to take Plaintiff to the hospital and that Plaintiff never made a decision to go to the hospital.  (Birt Dep. 18:10-14; 22:2-3; Declaration of David Birt ("Birt Dec."), Ex. F, ¶ 4).  In fact, Birt testified that Plaintiff told him that he did not need to go to the hospital prior to Birt deciding to head toward the hospital and that Plaintiff told Birt that "everything [is] good" in response to Birt asking Plaintiff how he was feeling.  (Birt Dep. 16:17-17:7).  Birt also testified that in addition to telling Birt that he did not need to go to the hospital prior to Birt deciding to head toward the hospital, Plaintiff told Birt three or four additional times that he did not want to go to the hospital.  (Birt Dep. 30:13-19; Birt Dec. ¶ 5).  Plaintiff never asked at any time to go to the hospital and never indicated to Birt that he believed he was having a heart attack.  (Birt Dec. ¶ 6)

4.      Mr. Birt was taking Plaintiff to the hospital because of Mr. Birt's concerns that Plaintiff was having a heart attack from heat stroke (Birt Dep., 27:23-28:18), illness as a result of the heat (Id., 28:22-24).

**RESPONSE**:  Denied.  Birt did not testify that he was concerned that Plaintiff was having a heart attack from heat stroke, although Birt did testify that he believed tingling in an arm could be a sign of a heart attack.  (Birt Dep. 22:4-9).  Birt testified that he thought it might be a heat-related injury and that it was possible to have a heart attack from heat stroke, but that he was not a doctor and did not know what medically was happening to Plaintiff.  (Birt Dep. 27:23-28:10).

5.      Shortly after this exchange, Mr. Birt's phone rang.  Mr. Birt answered his phone and Plaintiff heard Mr. Birt say "I'm taking this man to the hospital," followed by Mr. Birt saying "well, what do you want me to do?"  Mr. Birt then said, "I'm no doctor, but when a man's

arms are numb and tingling, I'd say he needs to go see one."  The next thing he heard Mr. Birt say was, "I'm pulling over," and he pulled his truck over into a parking lot.  (Plaintiff Dep., 87:24-88:10; 91:10-92:3).

**RESPONSE**:  Admitted in part and denied in part.  Union Pacific admits that Birt's phone rang and that Birt answered the phone.  Union Pacific denies Plaintiff's version of the conversation that took place between Birt and Dalebout.  Dalebout testified about that conversation as follows:  he asked Birt what was going on, Birt reported that Plaintiff was overheated and that he was going to take him to the hospital, and Dalebout asked to speak to Plaintiff to ask him how he was doing.  (Dalebout Dep. 39:5-13).  Dalebout stated that Birt did not tell him that he was concerned that Plaintiff was having a heart attack.  (Dalebout Dep. 39:1-4).  Finally, Birt pulled over to answer the phone before answering it, not after his conversation with Dalebout.  (Birt Dep. 17:20-24).

6.     Mr. Birt testified that he was halfway to the hospital when Mr. Dalebout called him on his phone (Birt Dep. 17:6-24).

**RESPONSE**:  Admitted.

7.     Plaintiff testified that it was difficult to estimate time due to his disorientation but estimated he had been driving in the truck somewhere between 5-15 minutes when Mr. Birt's phone rang.  (Plaintiff Dep., 91:1-9).

**RESPONSE**:  Union Pacific admits that Plaintiff so testified, but states that Birt and Dalebout found Plaintiff to be lucid.  (Birt Dep. 35:4-12; Dalebout Dep. 51:12-22).

8.     After Mr. Birt pulled over, he asked Plaintiff if he [Plaintiff] could talk on the phone.  Plaintiff said he probably could but he could not hold the phone himself.  Mr. Birt therefore had to hold the phone up to Plaintiff's ear.  At that point, the person on the phone

identified himself to Plaintiff as Talmage Dalebout.  (Id., 88:11-16).  Mr. Dalebout asked

Plaintiff what happened, and Plaintiff recounted his symptoms, indicating his arms were numb

and tingling.  (Id., 92:13-22).  Mr. Dalebout told Plaintiff that he "probably got too hot." Mr.

Dalebout then told Plaintiff, "why don't we just bring you back here to the job site and get you

cooled down . . .  If you get cooled down, you'll probably be okay." (Id., 88:18-24).  Plaintiff's

only response was "I just need fixed. I want fixed." (Id., 88:23-24).  At that point, Mr. Birt drove

Plaintiff back to the job site. (Id., 88:25-89:1).

> **RESPONSE**:  Admitted in part and denied in part.  Union Pacific admits only that
> Plaintiff and Dalebout talked on the phone and that Birt held the phone for Plaintiff.  Union
> Pacific disputes Plaintiff's version of his conversation with Dalebout.  Dalebout testified to that
> conversation as follows:  Dalebout asked Plaintiff how he was feeling, and Plaintiff told him that
> he was not feeling good and that his hands and arms were kind of heavy or tingly.  (Dalebout
> Dep. 43:6-44:12).  Dalebout asked him if he wanted to go to the hospital or the cooling station
> and Plaintiff told Dalebout that he was starting to feel better and he would try going to the
> cooling station.  (Dalebout Dep. 44:19-45:6).  Dalebout specifically stated that he told Plaintiff
> that "we will take you to the hospital if you want to go to the hospital" (Id., 44:23-24), and that
> Plaintiff made the choice to return to the cooling tent.  (Id., 45:3-6).

9.     Plaintiff never agreed to go back to the yard to be "fixed."  He had specifically

told Mr. Birt to get him to the hospital as quickly as possible but never told Mr. Dalebout

whether he wanted to go to the hospital or to the yard because he was "out of it."  (Id., 92:23-

94:2).  He could not move his arms, and was just lying there in the seat of the truck.  "I was

pretty spacey." (Id.)

**RESPONSE**:  Denied.  Plaintiff never told Birt to take him to the hospital.  (Birt Dec. ¶ 6)  As discussed above, Dalebout asked Plaintiff if he wanted to go to the hospital or the cooling station and Plaintiff told Dalebout that he was starting to feel better and that he wanted to try going to the cooling station.  (Dalebout Dep. 44:19-45:6).  Dalebout told Plaintiff that he would be taken to the hospital if he wanted to do so.  (Id., 44:23-24).  Birt further testified that, after the call between Plaintiff and Dalebout, Birt asked Plaintiff three or four times if he wished to continue to the hospital, but that Plaintiff declined, saying that "I just need to get to the cooling station and cool down."  (Birt Dep. 30:8-19).  Birt testified that he took Plaintiff to the cooling station because he was following Plaintiff's request.  (Birt Dep. 33:1-9; Birt Dec. ¶ 5).  Birt indicated that he was willing to take Plaintiff to the hospital but Plaintiff did not want to go.  (Birt Dec. ¶ 5)  Finally, Birt and Dalebout testified that Plaintiff was coherent.  (Birt Dep. 35:4-12).

10.     Once he was back at the job site, Plaintiff remained in Mr. Birt's truck for a period of time, while he was brought some Gatorade and water bottles, which he drank.  (Id., 89:1-13; 96:6-97:13).  He was then assisted by Joe Linford and another person out of the truck and taken into a trailer where they poured water on him and wrapped something around his neck to cool it.  (Id., 89:1-13; 97:14-98:2).  Mr. Linford was rubbing Plaintiff's left arm, and saying that Plaintiff's arm was "freezing," that he did not have circulation in it.  The muscles in both of Plaintiff's arms had contracted, causing his arms to be flexed and drawn up to his chest, which was why Plaintiff could not hold the phone by himself in Mr. Birt's truck.  (Id., 89:13-90:11).  Plaintiff's right arm eventually released while he was at the trailer but his left arm never fully released until Plaintiff was taken to the hospital that evening by his roommate.  (Id., 90:12-16).

**RESPONSE**:  Admitted in part and denied in part.  Union Pacific admits that Plaintiff continued to cool down in Birt's truck upon arrival at the cooling station before Linford helped him into the cooling station and that Plaintiff's roommate took him to the hospital late in the evening on June 28, 2012.  Union Pacific also admits that Plaintiff had water poured on him and he was wrapped in materials to help him cool down in the cooling station.  However, Union Pacific denies the remainder of the allegations relating to Plaintiff's medical condition.  Linford testified that he spoke to Plaintiff upon arrival at the cooling station and did not observe any seizure or contraction of Plaintiff's arms.  (Linford Dep. 48:24-49:21; 51:21-23).  Linford did not rub Plaintiff's left arm or find it to be freezing.  (Declaration of Joseph Linford ("Linford Dec."), Ex. G, ¶ 4).

11.    Plaintiff does not know how long he remained in the trailer but estimated it to be until approximately 6:30 p.m., after the gang had already gone home.  When he left the trailer, his left arm was nonfunctional, still drawn up to this chest, and his body was just feeling "beat."  (Id., 98:22-99:16).  Plaintiff's roommate then drove him back to their hotel in Plaintiff's vehicle.  (Id., 99:21-100:13).

**RESPONSE**:  Denied.  Linford testified that the gang was coming in for the day and that Plaintiff's roommate was around to drive Plaintiff home.  (Linford Dep. 55:3-15).  Linford asked Plaintiff how he was doing.  (Linford Dep. 55:3-10).  Linford told Plaintiff they could take him to the hospital, let him continue to cool off in the cooling station, or release him for the day.  (Id.)  Plaintiff said he felt better and was improving and asked to be released for the day.  (Id.)  Linford did not observe any seizure or contraction of Plaintiff's arms.  (Linford Dep. 51:21-23).

12.    After a short period of time at the hotel, Plaintiff's roommate, Ray Wiesen, continued to be concerned about Plaintiff.  He called his son, who is a doctor, and described his

condition to him.  His son recommended Plaintiff be taken to the hospital (Wiesen Dep., Exhibit 3, 9:15-12:4).

**RESPONSE**:  Admitted, but Union Pacific notes that Birt and Linford offered to take Plaintiff to the hospital on June 28, 2012, but Plaintiff refused the offers.  (Linford Dep. 55:3-10; Birt Dep. 30:13-19).  Only after several other people recommended that Plaintiff go to the hospital did Plaintiff's roommate take him.  Plaintiff's roommate suggested that he go to the hospital on the way back to the hotel.  (Whitt Dep., Ex. H, 100:14-101:7).  Plaintiff's roommate's son recommended that he go to the hospital.  (Id.)  Plaintiff's wife and father recommended that he go to the hospital.  (Whitt Dep. 102:2-7).  Safety Coordinator Robert Steely told him to go to the hospital as well if he felt bad.  (Steely Dep., Ex. I,  28:14-29:4).

13.     Mr. Wiesen drove Plaintiff to the hospital (Id., 11:12-12:4).  They arrived at about 8:30 p.m.  Plaintiff was treated in the ER.  Plaintiff was given an electrocardiogram; CBC: CT scan of his brain; and a liter of saline, twice.  His diagnosis on discharge, at about 1:11 a.m. on June 29, 2012, was heat-related illness, and he was given patient instructions for heat exhaustion (Exhibit 7).

**RESPONSE**:  Admitted.

14.     David Birt was the Work Equipment Supervisor on site at the time of Plaintiff's injury.  He had determined that Plaintiff needed to go to the hospital because of his condition.  (Birt Dep., Exhibit 2, at 5:22-23; 15:17-17:5; 18:10-14).  On the way to the hospital, Mr. Birt received a phone call from Talmage Dalebout.  Ex. 1, 87:24-88:10; 91:10-92:3.  Mr. Dalebout was the Manager of Track Programs for the rail gangs on the Northern and Western Region for the Union Pacific Railroad at the time of Plaintiff's injury; he was Plaintiff's boss's boss's boss.  Dalebout Dep., Exhibit 4, at 11:16-22.  At the time of Mr. Dalebout's call, Plaintiff was

experiencing numbness going up his arms and legs, blurry vision, disorientation, and his arms

were contracting and he could not move them such that he could not even hold the phone up to

his own ear.  Mr. Dalebout placed the call from his hotel room near O'Hare Airport.  He was not

at the job site, and had not been since that morning.  He made not observations of Jared Whitt

himself.  Dalebout Dep., Exhibit 4, at 38:18-39:24.

**RESPONSE**:  Admitted in part and denied in part.  Union Pacific admits that Birt was

the Work Equipment Supervisor on site at the time of Plaintiff's injury and that Dalebout was the

Manager of Track Programs for the Northern and Western Region.  Union Pacific admits that

Birt received a call from Dalebout while driving to the hospital, but the testimony establishes that

Dalebout believed that Birt and Plaintiff were still in the rail yard at the time the call was made.

(Dalebout Dep. 45:7-22).  Union Pacific admits that Dalebout was not on the job site and that he

made the call from a hotel room.  Union Pacific states that the testimony cited does not support

the statement that Dalebout was "Plaintiff's boss's boss's boss" and, therefore, the fact is not

appropriately before the Court.  Further, Birt did not make any conclusions about Plaintiff's

condition, but testified that he wanted to take Plaintiff to the hospital because he believed

tingling in an arm could be a sign of a heart attack.  (Birt Dep. 22:4-9).  Birt testified that he

thought it might be a heat-related injury and that it was possible to have a heart attack from heat

stroke, but that he was not a doctor and did not know medically what was happening to Plaintiff.

(Birt Dep. 27:23-28:10).  Union Pacific further disputes Plaintiff's characterization of his

medical condition at the time of Dalebout's call.  Birt noted that Plaintiff was fully coherent, did

not have unnatural speech, did not lose consciousness, and did not have seizures or convulsions.

(Birt Dep. 35:2-18).  Birt indicated that Plaintiff said he was feeling a bit dizzy or woozy but that

he was getting better once in the air conditioning.  (Id.)

15.     In spite of Plaintiff's condition, Plaintiff's request to go to the hospital, and the

determination that Plaintiff needed to go to the hospital by Mr. Birt, Defendant's Supervisor who

was on site and actually in a position to evaluate Plaintiff and evaluate Plaintiff's condition, Mr.

Dalebout, posed the "option" to Plaintiff of whether or not he would like to return to the cooling

station to try to cool down there instead of going to the hospital.  Dalebout Dep., Exhibit 4,

44:22-45:2.  When he posed this "option" to Plaintiff, Mr. Dalebout was aware that returning to

the cooling station, as opposed to going to the hospital, would prevent the injury from being an

FRA reportable injury:

> Q.     But at the time he returned to the cooling tent, the time Dave Birt
> returned him to the cooling tent, the injury to Jared Whitt was not yet FRA
> reportable?
>
> A.     Correct.

Dalebout Dep., 65:3-7.

**RESPONSE**:  Admitted in part and denied in part.  Union Pacific admits that Dalebout

gave Plaintiff the option of going to the hospital or going to the cooling station.  Plaintiff chose

to go to the cooling station.  (Dalebout Dep. 44:19-45:6).  Union Pacific denies that Plaintiff's

use of quotation marks around the word options is appropriate.  Dalebout specifically told

Plaintiff that he would be taken to the hospital if he so desired.  (Dalebout Dep. 44:23-24).

Union Pacific further denies Plaintiff's characterization of Plaintiff's "condition" and that

Plaintiff made a further "request to go to the hospital."  As previously discussed with citations to

the record, there is a dispute as to Plaintiff's condition and whether Plaintiff ever expressed any

desire to go to the hospital.  (Birt Dec. ¶ 6).  Further, Union Pacific disputes that Plaintiff's

citation to the record establishes that Dalebout knew at the time of Plaintiff's injury that

returning to the cooling station would result in Plaintiff's injury being non-reportable to the

FRA.  (Dalebout Dep. 65:3-7).  Instead, the testimony only establishes that the injury was not

FRA reportable when Plaintiff elected to return to the cooling station on June 28, 2012.

Dalebout testified that FRA reportable injuries are not immediately determined because whether

an injury is reported to the FRA is something that is determined throughout the course of the

illness.  (Dalebout Dep. 64:13-65:2).  The testimony does not establish Dalebout's knowledge at

the time of the injury, whether the injury ultimately was FRA reportable, or whether those

reporting requirements were complied with.

16.     In Exhibit 5, the Federal Railroad Administration ("FRA") Guide for Preparing

Accident/Incident Reports, prepared by the Office of Safety of the U.S. Department of

Transportation, Federal Railroad Administration, effective May 1, 2003, Chapter 1, "Purpose,"

the document states:

> "The purpose of the regulations in Part 225 is to provide FRA with accurate
> information concerning the hazards and risks that exist on the Nation's railroads.
> FRA needs this information to effectively carry out its regulatory and
> enforcement responsibilities under the Federal railroad safety statutes.  FRA also
> uses this information for determining comparative trends of railroad safety and to
> develop hazard elimination and risk reduction programs that focus on preventing
> railroad injuries and accidents."

**RESPONSE**:  Union Pacific states that the allegations contained in this paragraph are

irrelevant to the present Motion.  Union Pacific is not being sued for violating any of the

regulations referred to in the quoted paragraph.

17.     The FRA is the federal agency charged with promoting safety on the nation's

railroads.  It tracks each railroad's injury statistics for the year.  This safety analysis by the

FRA places an incentive on the Union Pacific Railroad, and their supervisors, to have occur on

the job as few injuries as possible.  There is, therefore, an incentive on railroad supervisors to

report as few injuries occurring on the job as possible.  A supervisor's performance evaluation

is influenced or affected by a supervisor's safety record, which includes the happening of

injuries on his watch.

> Q.     What is your knowledge or understanding, sir, of whether or not a
> reportable – an FRA reportable injury that occurs on Rail North is in any
> fashion reflected in the manager's evaluation performance review, or any
> other fashion?
>
> A.     We have several initiatives.  Core safety is one of them.  Production is
> one.  Costs are others.  So I don't know where it falls in from the upper
> management, you know, how they view it, but they all carry a weight, but
> I don't know what it is.
>
> Q.     In your performance review, there is weight given to meeting budget,
> managing costs, safety, core safety, those issues?  That is all a part of how
> you are evaluated as a manager?
>
> A.     Yes, sir.
>
> Q.     And part of that performance review is safety, and factored into the safety
> evaluation is are you or is your gang meeting the safety goal in terms of
> man-hours worked without injury?  Am I understanding that right, or
> phrasing that right?
>
> A.     I know they measure it in that way.  I'm not sure how they evaluate it at
> our level.
>
> Q.     In some fashion, though, it is considered in a manager's evaluation?
>
> A.     Yes.
>
> Q.     And that occurs with what frequency?
>
> A.     Annually.

(Menchaca Dep., Exhibit 6, 10:2-11:5).

Mr. Menchaca is Manager of Track Programs for Rail North West, for the Union Pacific

Railroad.

**RESPONSE**:  Plaintiff's paragraph preceding the quotation from the Menchaca

deposition does not comply with Local Rule 56.1(a)(2) as it lacks pinpoint references to

affidavits, pleadings, discovery responses, or deposition testimony.  Therefore, it cannot be considered in support of Plaintiff's Motion and is grounds to deny the Motion.  Union Pacific admits that Menchaca (its Manager of Track Programs for Rail North West), testified that core safety, costs, and budgets are part of his performance review, although the testimony establishes that those items are considered only "at some level."  Dalebout indicated that an injury that occurs on a gang under his supervision does not affect his performance review.  (Dalebout Dep. 22:8-19).  Union Pacific further states that the allegations contained in this paragraph are irrelevant to the present Motion.

18.     The FRA Guide for Preparing Accident/Incident Reports defines "Injury" as, "Harm to a person resulting from a single event, activity, occurrence or exposure of short duration." Ex. 5, at Chap 2, p. 2.  The Guide further defines "First aid treatment" as, "treatment limited to simple procedures used to treat minor conditions, such as abrasions, cuts, bruises, and splinters.  First aid treatment is typically confined to a single treatment and does not require special skills or procedures." Id.  An injury that requires only first aid treatment is not reportable.

**RESPONSE**: Union Pacific states that the allegations contained in this paragraph are irrelevant to the present Motion.

19.     "Medical treatment" is defined as, "any medical care or treatment beyond 'first aid' regardless of who provides such treatment.  Medical treatment does not include diagnostic procedures, such as X-rays and drawing blood samples." Id., at p. 12.  The guide specifically provides that, "Intravenous administration of fluids to treat work-related heat-related conditions is medical treatment." Id., at Chap. 6, p. 30.  An injury that requires medical treatment is reportable.  When Plaintiff was finally taken to the emergency room at about 8:30 p.m. on the day of his injury, he was given two bags of saline intravenously. Exhibit 7, Elmhurst Memorial

Emergency Department Record, p. 4; Exhibit 8, Plaintiff's Personal Injury report, dated June 29, 2012. Therefore, Plaintiff going to the hospital to receive "intravenous administration of fluids to treat work-related heat-related conditions," as opposed to Plaintiff just being "cooled down" on the job site, would convert Plaintiff's injury into a reportable injury and require reporting of said injury to the FRA.

**RESPONSE**:  Admitted in part.  Plaintiff's statements following the citation to exhibits does not comply with Local Rule 56.1(a)(2) as it lacks pinpoint references to affidavits, pleadings, discovery responses, or deposition testimony and, therefore, cannot be considered in support of Plaintiff's Motion and is grounds to deny the Motion.  Union Pacific further states that the allegations contained in this paragraph are irrelevant to the present Motion.

20.     Defendant has issued its own Internal Control Plan (ICP) as is required 49 C.F.R. § 225.33, Exhibit 12[2].  The Policy Statement says, in part, that, "UP will not tolerate harassment or intimidation of any person that is calculated to discourage or prevent such person from receiving proper medical treatment . . ." Exhibit 11, "Union Pacific Railroad Company Accident, Incident, Injury, Illness Reporting," "Policy Statement."

**RESPONSE**:  Union Pacific states that the allegations contained in this paragraph are irrelevant to the present Motion.

21.     Dennis Duffy, Defendant's Chief Operating Officer, pursuant to Defendant's ICP, issued a memorandum to all Operating Department Management Employees addressing the Policy Statement and the issue of harassment and intimidation.  The memorandum stated, in part, that FRA regulations and the FRA's interpretation of those regulations specify how Defendant's Managers must handle on-duty injuries and medical treatment and that Mr. Duffy was providing "basic procedural guidelines" for complying with those regulations:

"(1) When an employee is injured, the first priority is to ensure that the employee receives the necessary medical attention, without delay.  If transportation to a hospital is requested the manager shall arrange transportation to the nearest hospital where the employee can receives safe and appropriate medical care."

. . .

"(3) When an employee is taken for medical care, do not try to direct or influence the employee or the medical professionals as to the type of treatment the employee should receive."

Exhibit 11.

**RESPONSE**:  Union Pacific states that the first two sentences of this paragraph are not supported by the evidence cited by Plaintiff.  Union Pacific further states that the allegations contained in this paragraph are irrelevant to the present Motion.

22.    Mr. Duffy's statement of the Union Pacific policy continued by stating:

"The FRA has expanded their interpretation of what constitutes harassment and intimidation and/or interfering with medical treatment.  Specifically, the FRA considers virtually ANY discussion of medical treatment options or the elements of personal injury reportability with an employee or treating physician, to be interference with medical treatment."

Id.

**RESPONSE**:  Union Pacific states that the allegations contained in this paragraph are irrelevant to the present Motion.  What the FRA considers to be or not to be "harassment and intimidation" is not relevant to this case, which alleges a violation of 49 U.S.C. § 20109(c)(1), a statute under the jurisdiction of the Department of Labor, not the Department of Transportation.

23.    Talmage Dalebout was reprimanded or disciplined as a result of his conduct as it relates to Plaintiff, Jared Whitt, on June 28, 2012 (Exhibit 13)[3].

**RESPONSE**:  Union Pacific states that the allegations contained in this paragraph are irrelevant to the present Motion.  Moreover, Union Pacific disputes that Dalebout's discipline is

admissible.  See Fed. R. Evid. 407.  Finally, there is no evidence that Union Pacific admitted that

Dalebout violated any legal requirement by disciplining him.

## II.        UNION PACIFIC'S STATEMENT OF MATERIAL FACTS IN DISPUTE

1.        The parties dispute whether Plaintiff was coherent on the afternoon of June 28,

2012, in his statements to Union Pacific managers.  Plaintiff claims that he was "in la-la land,"

"goofy," and "squirrelly."  (Whitt Dep. 75:16-18).  Birt, Dalebout, and Linford observed that

Plaintiff appeared to be coherent during their interactions with him.  (Birt Dep. 35:2-18;

Dalebout Dep. 51:12-22; Linford Dep. 51:15-20).

2.        The parties dispute whether Plaintiff made a demand or request to be taken to the

hospital on the afternoon of June 28, 2012.  Plaintiff claims that he told Birt to get him to the

hospital quickly.  (Whitt Dep. 87:23-88:2).  Birt testified that Plaintiff told Birt that he did not

need to go to the hospital prior to Birt deciding to head toward the hospital and that Plaintiff told

Birt that "everything [is] good" in response to Birt asking Plaintiff about how he was feeling.

(Birt Dep. 16:17-17:7).  Birt also testified that in addition to telling Birt that he did not need to

go to the hospital prior to Birt deciding to head toward the hospital, Plaintiff told Birt three or

four additional times that he did not want to go to the hospital.  (Birt Dep. 30:13-19).  Plaintiff

never asked Birt at any time to go to the hospital, and everything that Plaintiff said to Birt

indicated that he did not want to go.  (Birt Dec. ¶ 6).

3.        The parties dispute whether Dalebout knew that Birt and Plaintiff had left the

railyard on June 28, 2012.  Dalebout testified that he believed that Birt and Plaintiff were still in

the yard and that the cooling station would get Plaintiff cooled off more quickly than going to the

hospital.  (Dalebout Dep. 45:7-22; 63:14-64:7).

4.      The parties dispute what occurred during the telephone conversation between Plaintiff and Dalebout and what preference Plaintiff expressed about his care.  Plaintiff indicates that he had said only that he wanted "fixed" and did not say one way or the other whether he wanted to go to the cooling station.  (Whitt Dep. 88:17-24; 92:23-93:16).  In contrast, Dalebout states that he told Plaintiff that he would be taken to the hospital if he wished, but that Plaintiff said he was feeling better and wished to go to the cooling station.  (Dalebout Dep. 44:19-45:6).

5.      The parties dispute whether Plaintiff expressed a desire to return to the cooling station following his telephone conversation with Dalebout.  According to Birt, Plaintiff told him three or four times after his conversation with Dalebout that he did not want to go to the hospital.  (Birt Dep. 30:13-19).  Birt told Plaintiff that he had no qualms about taking him to the hospital if he wanted to go, but Plaintiff said that he was "doing better" and "Why don't we just go on back" [to the cooling station].  (Birt Dep. 18:18-19:2).

6.      In the cooling station, Linford had Plaintiff stay in the air conditioned trailer during the hour or hour and a half left before the rest of the gang finished their work.  (Linford Dep. 48:23-49:21).  Prior to Plaintiff going to the trailer, Linford offered to take him to the hospital and told Plaintiff that if he started feeling worse, to let him know right away.  (Id.)  Linford stated that he observed other employees talking to Plaintiff, that he stopped in to check on Plaintiff periodically, and that Plaintiff was coherent and not acting unusually.  (Id.)

7.      Multiple Union Pacific managers offered to take Plaintiff to the hospital and, each time, Plaintiff said he did not want to go.  (Birt Dep. 18:18-19:2; Dalebout Dep. 44:19-45:6; Linford Dep. 48:23-49:9; 55:3-10).

8.      Dalebout's performance evaluation was not impacted by whether Plaintiff's injury was reportable to the FRA or not.  (Dalebout Dep. 22:8-19).

## III.    SUMMARY JUDGMENT STANDARD

A court shall grant a motion for summary judgment only if the moving party shows that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are, by definition, facts that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute over a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The moving party must show that "there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party meets this initial burden, the non-moving party may defeat a motion for summary judgment by setting forth affirmative evidence and specific facts that demonstrate a genuine dispute on an issue. Anderson, 477 U.S. at 250.

In ruling on a motion for summary judgment, the Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." Kampouris v. Saint Louis Symphony Soc., 210 F.3d 845, 847 (8th Cir. 2000). The Court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." Id. The Court must view the facts and all reasonable inferences in the light most favorable to the nonmoving party. Chambers v. Pennycook, 641 F.3d 898, 904 (8th Cir. 2011).

As shown below, under the relevant standards, Plaintiff's Motion for Partial Summary Judgment must be denied. Numerous disputed issues of material facts exist precluding summary judgment.

IV.     **ARGUMENT**

Plaintiff's entire Motion is based on a distortion of the true record in this case. Throughout Plaintiff's Brief, he cites his own testimony even where it is directly contradicted by the testimony of other witnesses.  Of course, this Court cannot, at the summary judgment stage of this litigation, resolve these credibility disputes.  Given the standards under Fed. R. Civ. P. 56, Plaintiff's Motion completely fails.

A.      **Statutory Analysis**

In his third claim for relief, Plaintiff claims that Dalebout's actions violated 49 U.S.C. § 20109(c)(1).  That statutory provision states that a railroad carrier may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of his employment.  The statute further states that if an employee requests to go to the hospital, the railroad shall promptly arrange for transportation thereto.

Under 49 U.S.C. § 20109(d)(2)(A)(i), claims brought under § 20109(a), (b), and (c) are subject to the burdens of proof set forth in 49 U.S.C. § 42121.  Under 49 U.S.C. § 42121(b)(2)(B)(i), a plaintiff must make out a prima facie case by proving that he engaged in some kind of protected conduct and that his doing so was a contributing factor in an adverse action taken against him by the railroad.  If such proof is made, a defendant may establish an affirmative defense by showing, by clear and convincing evidence, that it would have made the same decision even in the absence of protected conduct.  49 U.S.C. § 42121(b)(2)(B)(ii).

The shifting burdens created by § 42121 fit easily into claims brought under 49 U.S.C. § 20109(a) and (b) which prohibit railroads from retaliating against employees for engaging in certain protected activities, such as reporting an unsafe condition.  Under the framework set forth in § 42121, if an employee engages in such conduct and is subsequently disciplined, the

employee must show that his protected conduct was a contributing factor in that discipline.  If successful, the railroad can avoid liability by proving that it would have imposed the same discipline anyway.

But, as Plaintiff concedes, the claim at bar is not one alleging retaliation for engaging in protected conduct, but is instead a claim for denial, delay, or interference with requested medical treatment.  Thus, the shifting burdens from § 42121 do not fit neatly into the statutory framework.  Still, in 49 U.S.C. § 20109(d)(2)(A)(i), Congress specifically stated that those shifting burdens apply to claims brought under § 20109(c)(1).  To resolve this dilemma, the Labor Department's Administrative Review Board has described the relative burdens of proof as follows:  "if the employee first proves that the railroad carrier or other covered person interfered" with medical treatment, the railroad can establish an affirmative defense by proving by clear and convincing evidence that "the result would have been the same with or without the railroad's carrier's interference."  <u>Santiago v. Metro-North Commuter</u>, 2012 WL 3164360, *12 (July 25, 2012).

Today, Union Pacific is filing the instant Brief as well as a Motion for relief under Fed. R. Civ. P. 56(d).  The Rule 56(d) Motion explains that Plaintiff first informed Union Pacific that he had reached maximum medical improvement on July 30, 2014, and that Union Pacific has therefore not been able to conduct the medical examination under Fed. R. Civ. P. 35 that it needs to establish its affirmative defense.  However, it is completely unnecessary for this Court to reach the affirmative defense issue in order to deny the instant Motion.  There are critical disputed issues of material facts regarding whether Plaintiff ever requested that he be taken to the hospital and whether the decision to return to the cooling station was in fact made by Plaintiff, and not by Union Pacific, thereby making it impossible for Plaintiff to make his required

21

showing of a denial, delay, or interference with medical treatment by Union Pacific. Therefore, as shown below, the Court can deny Plaintiff's Motion for Partial Summary Judgment at this time, which would render Union Pacific's Rule 56(d) Motion moot.

**B.** **There Are Disputed Issues of Material Facts As To Whether Plaintiff Ever Requested to Go to the Hospital**

The most significant underpinning of Plaintiff's Motion, repeated throughout his Brief, is that he engaged in conduct protected by § 20109(c)(1) by requesting to go to the hospital. To support that proposition, Plaintiff cites his own testimony. (Dkt. 140, at 4, 15). However, Rule 56 requires that the Court consider the entire summary judgment record and that, where any factual disputes exist, it must assume that Union Pacific's evidence would be believed by a trier of fact. Kampouris, 210 F.3d at 847. Here, application of that standard makes it impossible for Plaintiff to carry his summary judgment burden.

Numerous witnesses have disputed Plaintiff's claim that he requested to go to the hospital. Supervisor Birt has specifically testified that Plaintiff never requested to go to the hospital and that everything Plaintiff said to him about going to the hospital indicated that he did not want to go. (Birt Dec. ¶ 6). Instead, Birt has stated that he, not Plaintiff, made the decision to begin to take Plaintiff to the hospital. (Birt Dep. 18:10-14; 22:2-3). Birt indicated that he was prepared to continue to the hospital if Plaintiff wished to go, but Plaintiff asked not to continue. (Birt Dec. ¶ 5). Birt's testimony further establishes that Plaintiff, on several occasions while in Birt's truck, stated that he did **not** need to go to the hospital. (Birt Dep. 30:13-19). Plaintiff told Birt that "everything is good" when Birt asked how he was feeling. (Birt Dep. 16:7-17:7).

Similarly, Dalebout's testimony is that he told Plaintiff that he would be taken to the hospital if he wished to go. (Dalebout Dep. 44:23-24). Plaintiff, however, declined to continue to the hospital. Instead, he told Dalebout that he was feeling better and wished to go to the

cooling station.  (Dalebout Dep. 44:19-45:6).  Even after this telephone call, Birt offered to take Plaintiff to the hospital three or four times.  In each case, Plaintiff declined.  (Birt Dep. 30:13-19).

Under these circumstances, a clear disputed issue of material fact exists as to whether Plaintiff ever requested to go to the hospital.  As a result, there is a disputed issue of material fact as to whether Plaintiff engaged in any conduct protected by § 20109(c)(1).  That dispute must be resolved at trial, and summary judgment is therefore improper.

**C.    Plaintiff Cannot Show That Union Pacific Denied, Delayed, or Interfered with His Medical Care Because There is a Disputed Issue of Fact As to Whether Plaintiff Voluntarily Decided Not to Continue to the Hospital**

The focus of this case is the telephone call between Plaintiff and Dalebout.  At the time, Birt's testimony establishes that Birt had unilaterally decided to take Plaintiff to the hospital without request from Plaintiff.  (Birt Dep. 18:10-14; 22:2-3; Birt Dec. ¶ 4).  Dalebout's testimony about that call – which must be accepted as true for purposes of the present Motion – is clear.  Dalebout believed that Birt and Plaintiff were still in the rail yard at the time of the call.  (Dalebout Dep. 45:7-22).  He asked Plaintiff how he was feeling.  Plaintiff described his symptoms.  Dalebout then offered Plaintiff a choice between continuing to the hospital or returning to the cooling station.  (Dalebout Dep. 43:6-45:6).  Dalebout testified that he gave Plaintiff this second choice because he believed that Plaintiff would get cooled down more quickly at the cooling station.  (Dalebout Dep. 45:7-22).  But, as Dalebout specifically testified, he told Plaintiff that "we will take you to the hospital if you want to go to the hospital." (Dalebout Dep. 44:23-24).

Plaintiff's response was clear:  he told Dalebout that he was feeling better and wanted to go to the cooling station.  (Dalebout Dep. 45:3-6).  After telling Dalebout of his voluntary

decision, Dalebout's conversation with Plaintiff ended.  At that point, Birt asked Plaintiff if he wished to continue to the hospital.  In fact, Birt asked Plaintiff three or four additional times whether he wished to continue to the hospital.  (Birt Dep. 30:13-19).  Plaintiff replied that he was feeling better and wished to go to the cooling station.  (Id.)  Birt then returned Plaintiff to the cooling station – not because of any decision made by Dalebout, but only because that was Plaintiff's decision.  (Birt Dep. 33:1-9; Birt Dec. ¶ 5).

Given these facts, it is impossible to find that Union Pacific denied, delayed, or interfered with Plaintiff's medical treatment.  Plaintiff was repeatedly told that he could go to the hospital. He stated that was feeling better and wished to return to the cooling station.  Birt, Dalebout, and Linford all testified that Plaintiff was coherent during their interactions with each of them.  (Birt Dep. 35:2-18; Dalebout Dep. 51:12-22; Linford Dep. 51:15-20).  Taking the evidence in the summary judgment record as a whole, and crediting the testimony of Birt, Dalebout, and Linford where it contradicts Plaintiff's testimony, as the Court must, summary judgment is completely impossible.

Santiago v. Metro-North, cited by Plaintiff, is most certainly not to the contrary.  In Santiago, the employee claimed to have sustained a work-related back injury in July 2008.  2012 WL 3164360, *1.  In October 2008, after the railroad paid for a number of chiropractor visits and an MRI, a contractor controlled by the railroad changed the classification of Santiago's injury from work-related to non-work-related, which meant that the railroad would not pay for continued medical treatment.  Id. at *2.  On November 10, 2008, Santiago's doctor requested that this decision be reconsidered and that the railroad pay for three manipulation-under-anesthesia (MUA) procedures.  Id.  The railroad refused, id., and the MUA procedures were delayed for four months, until March 2009.  Id. at *11.  An administrative law judge dismissed Santiago's

claim, holding that § 20109(c)(1) only applied to the time right around the injury, not to the events in question which occurred several weeks later.  Id. at *4.

On appeal, the Administrative Review Board (ARB) reversed in part and remanded the case to the administrative law judge.  The ARB held that § 20109(c)(1) applied not just to the time of the injury, but to the entire course of an employee's medical treatment.  Id. at *7.  That ruling is, of course, irrelevant to the present case.

In its decision, the ARB went on to explain its understanding of the phrase "deny, delay, or interfere" as used in § 20109(c)(1).  The ARB held that these words should be read as commonly understood.  Thus, § 20109(c)(1) prohibits actions "to impede, slow down, or prevent medical treatment from moving forward or occurring."  Id. at *10.  The ARB explained that "[a]n act that causes medical treatment to be rescheduled" is a delay in medical treatment, an obstacle placed in the way of treatment constitutes interference with medical treatment, and a refusal to provide medical care constitutes a denial of medical treatment.  Id.

Union Pacific engaged in no such act.  Dalebout and Birt specifically and repeatedly told Plaintiff that he would be taken to the hospital if he wished to go.  (Birt Dep. 30:13-19; Dalebout Dep. 44:23-45:6).  It was Plaintiff's decision not to continue to the hospital; he said that he was feeling better and wished to return to the cooling station.  (Id.)  Even after Plaintiff's call with Dalebout, Birt gave him three or four more chances to go to the hospital.  (Birt Dep. 30:13-19).  Under these facts, Union Pacific did not cause Plaintiff's medical treatment to be rescheduled – the decision not to go to the hospital was Plaintiff's.  Nor did Union Pacific place an obstacle in Plaintiff's path – Dalebout and Birt both told him he could continue to the hospital if he wished to do so.  Nor was any request for medical treatment denied; not only did Plaintiff not ever request to go to the hospital, Birt and Dalebout repeatedly told him that he could go.

The instant case is thus completely different than <u>Santiago</u>.  In <u>Santiago</u>, the railroad refused to pay for continued medical treatment, including the MUA procedures recommended by Santiago's doctor.  2012 WL 3164360, *2.  As a result, Santiago did not obtain those treatments for four months.  <u>Id.</u> at *11.  Thus, in contrast to the present case, Santiago's medical treatment was directly impacted by the railroad's decision.  Here, Plaintiff's medical treatment was impacted by his own decision.[2]

In requesting summary judgment, Plaintiff invents a summary judgment record that does not exist.  His Motion ignores all of the testimony that contradicts his own, including the direct testimony by Birt and Dalebout that Plaintiff was told he could go to the hospital and voluntarily chose not to do so.  Summary judgment is simply impossible under the record in this case.

Plaintiff also attempts to support his Motion by reference to irrelevant facts.  For instance, Plaintiff argues that, because the FRA allegedly tracks the number of reportable injuries at Union Pacific and other railroads, Dalebout had some kind of incentive not to have Plaintiff go to the hospital.  Again, Plaintiff asks this Court to ignore the summary judgment standard.  All reasonable inferences from the evidence must be construed ***against*** summary judgment, not in favor of it.  <u>Chambers v. Pennycook</u>, 641 F.3d 898, 904 (8th Cir. 2011).  The fact that Plaintiff believes that Dalebout had a motive to violate the law is not evidence that the law was violated.  To conclude that Dalebout acted improperly would be to give the moving party, rather than the non-moving party, the benefit of all reasonable inferences from the evidence.

---

[2] The fact that Plaintiff was given a choice by Dalebout to continue to the hospital or go to the cooling station cannot possibly constitute a statutory violation.  When a manager finds out that an employee is sick or injured, the normal question will be whether the employee needs to go to the hospital, get some other kind of medical care, or is all right without any treatment.  Under Plaintiff's apparent reading of § 20109(c)(1), a manager who asks an employee which of these he or she wishes violates the law, even if the employee freely makes the decision as to what kind, if any, medical treatment he wishes to have.  Such a construction of § 20109(c)(1) is not consistent with common sense or the facts of <u>Santiago</u>, where a potential § 20109(c)(1) violation was found because the railroad took an affirmative step to postpone medical attention.

Similarly, Plaintiff's claim that Dalebout's performance review could be negatively impacted by Plaintiff's injury is factually and legally wrong.  Plaintiff makes this claim based on the testimony of another Union Pacific manager who stated only that he knew that "at some level," reportable injuries were one of the factors in performance reviews.  Again, as an argument about motive, Plaintiff ignores the summary judgment standard, asking this Court to draw inference in favor of the moving party, instead of the non-moving party.  Moreover, Dalebout has specifically testified that his performance review would not have been affected by whether this injury was reportable.  (Dalebout Dep. 22:8-19).  Again, Plaintiff's arguments simply ignore the summary judgment standards.

Next, Plaintiff cites Union Pacific policies that state that it will not tolerate harassment or intimidation of persons who report injuries, that managers should not try to direct or influence employees' medical decisions, and that the Federal Railroad Administration considers virtually any discussion of medical treatment options or the elements of personal injury reportability to be improper.  (Plaintiff's Facts ¶¶ 20-22).[3]  This argument fails for two reasons.  First, as discussed above, there is evidence in the summary judgment record that Plaintiff did not ever ask to go to the hospital, and that it was Plaintiff who repeatedly and voluntarily stated that he wanted to return to the cooling station.  Second, Plaintiff's third claim for relief is not about whether Union Pacific violated its own policies.  The relevant question is whether Dalebout violated § 20109(c)(1).  Given that there is evidence in the summary judgment record that Plaintiff voluntarily made the decision not to go to the hospital, such a finding is impossible.

---

[3] Notably, Plaintiff cites nothing from the FRA that agrees with this statement.

27

**CONCLUSION**

For the reasons set forth above, Plaintiff's Motion for Partial Summary Judgment should be denied.  Genuine issues of material facts remain that must be resolved by a jury.

Respectfully submitted,

THOMPSON COBURN LLP


By:＿＿＿*/s/ Tabitha G. Davisson*＿＿＿＿＿＿＿＿
＿＿＿Clifford A. Godiner
＿＿＿Tabitha G. Davisson
＿＿＿One US Bank Plaza
＿＿＿St. Louis, MO 63101
＿＿＿(314) 552-6433
＿＿＿FAX:  (314) 552-7433
＿＿＿cgodiner@thompsoncoburn.com
＿＿＿tdavisson@thompsoncoburn.com

and

LAMSON, DUGAN & MURRAY, LLP

By:   David J. Schmitt #19123
＿＿＿10306 Regency Parkway Drive
＿＿＿Omaha, NE 68114
＿＿＿(402) 397-7300
＿＿＿FAX:  (402) 397-8450


Attorneys for Defendant
Union Pacific Railroad Company


**CERTIFICATE OF SERVICE**

I hereby certify that on August 19, 2014, I electronically filed the foregoing with the Court using the CM/ECF system, which will send notification of such filing, via electronic mail, to all attorneys of record for the Plaintiff.

*/s/ Tabitha G. Davisson*＿＿＿＿＿＿＿＿